IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

|  |  |
|---|---|
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, <br><br>     Plaintiff, <br><br> v. <br><br> BEACH MART, INC. and L&L WINGS, INC., <br><br>     Defendants. | **CIVIL ACTION NO.: 2:14-cv-00008-FL** |

Expert Report of
R. Bryan Tilden, CPCU, CLU, ARM, ALCM, ChFC, CIC, SCLA
TILDEN AND ASSOCIATES
Pittsboro, North Carolina
February 1, 2021

EXHIBIT

B

1

# PREFACE

I, R. Bryan Tilden, offer the following report containing a statement of my opinions and the basis and reasons, the data or other information considered in forming the opinions, my qualifications, and the compensation I am to be paid.

I have been retained by Womble Bond Dickinson LLP to review certain materials and to, in summary, provide my expert opinions relating to an insurance claim and the adjustment of a loss, all as explained in this report.

I have over 46 years of experience in the insurance and risk management industry as an author, agent, broker, consultant, underwriter, drafter of policy forms and endorsements, teacher, historian, claim examiner and consultant for both the insured and insurers. As a broker representing the insured, I have placed accounts in the international insurance market, including coordinated placements with Lloyd's brokers, Lloyd's syndicates, United States, Canadian, British, and European insurance companies. I have worked with Lloyd's brokers, Lloyd's syndicates, United States, Canadian, British, Bermudian, and European companies in the drafting, underwriting, and placement of insurance policies for marine and non-marine, and the adjustment of property and liability losses. I teach the construction, drafting, underwriting, adjusting, and analysis of insurance policies throughout the United States, Canada, the Caribbean, Bermuda, and the European Union. I have testified in the United States and London regarding the above subject matters. I am familiar with the international insurance and domestic marketplace's custom and practices, including the London, European, Caribbean, Canadian, Bermudian, and United States markets. I have extensive experience with the commercial general liability insurance policy at issue.

I am not an attorney, and nothing in this report should be construed as a legal opinion in any way. My opinions reflect custom and practice in the insurance industry that come to bear on this matter. At the same time, it is impossible to review the handling of matters without reference to industry rules, regulations, policy terms and conditions, the claimed loss, and the transactions at issue. If any of the terminology or concepts used in this report has any overlap or congruence with legal terms, please be aware that the terms are not being used as legal terms; rather, they are used as terms of art within the insurance industry which are commonly used and understood in the industry.

My curriculum vitae are attached hereto as Exhibit A. I prepared this report after reviewing the documents listed below. My billing rate for consulting expert and expert witness work is $300 an hour.[1] These are my opinions to a reasonable degree of professional certainty. ***Because discovery is ongoing, I reserve the right to amend or supplement this report. Supplementation is likely because of the excessive amount of documents which have been withheld in this litigation, which prevented me from completing a full analysis of this matter. Specifically, it is impossible for me to give my full opinions at this point in the litigation because Penn National has refused to provide many of the claims handling documents which are central to the opinions set forth in this report. Once the full claims file and the relevant claims handling documents are produced and available to me, and once I can review deposition testimony relevant to these withheld documents, I expect to supplement this report to complete the analysis required in this matter.***

---

[1] No portion of my compensation is dependent upon the result of this litigation.

3

# DOCUMENTS CONSIDERED

1. Beach Mart's Complaint against L&L in underlying matter (Sept. 9, 2011);

2. L&L's Answer and Counterclaims against Beach Mart in underlying matter (November 22, 2011);

3. Beach Mart's notice of counterclaims to Penn National (June 8, 2012);

4. Penn National's post tender correspondence and correspondence appointing David Brown to defend matter (Jul 18, 2012 - Jan. 15, 2013);

5. Penn National's Complaint for Declaratory Judgment against Beach Mart (Feb. 4, 2014);

6. Beach Mart's demand for reimbursement of fees incurred (Dec. 01, 2014) and subsequent correspondence;

7. Beach Mart's Answer and Counterclaims in coverage declaratory judgment (Oct. 02, 2017);

8. Penn National Business Owners Liability Insurance Policies (Jan. 1, 2008 to Jan. 1, 2012):

   - BP9 0645388 00
   - BP9 0645388 01
   - BP9 0645388 02
   - BP9 0645388 03;

9. Written Discovery Responses of Penn National and Beach Mart;

4

10. Redacted Claims Notes for Penn National's Claim File and Coverage File through 2/2018;

11. Penn National's Redacted Claim File through 2/2018; and

12. Deposition Transcripts of Greg Gross, Gary Gibson, and Steve Oliver.

While I have reviewed these documents, I could not form complete opinions because a number of documents necessary for my opinion have been redacted, or appear on a privilege log but have not been produced by Penn National, or the documents and records necessary for my opinion have been withheld by Penn National. Additionally, a number of questions were asked at depositions, but the Penn National deponent was told not to answer the question by his lawyer or was unable to answer the question because the relevant documents of Penn National's file had been redacted or withheld. Once this information is obtained, I will necessarily be required to amend or supplement this report to reflect this withheld and/or redacted information and material.

## SUMMARY OF OPINIONS

Based on my review of the documents identified above and my years in the insurance industry, it is my opinion that:

1. Penn National failed to adequately investigate the claim before determining whether coverage applied;

2. Penn National failed to conduct an investigation that followed the custom and practice of the insurance industry in considering all the facts to make an informed decision;

3. The manner that Penn National handled the claim failed to give consideration to the policyholder's interests, and failed to look for coverage in the claim;

5

4. Penn National failed to properly or reasonably consider or respond to the insured's concerns over the selection of defense counsel and whether such action by Penn National was in the best interests of the insured;

5. Penn National's delay in initially responding, delay in paying post-tender defense costs, and refusal to accept its coverage obligation promptly in this matter was inappropriate, contrary to industry custom and practice, and Penn National had more than enough information at a very early juncture in this case to make these decisions;

6. Penn National's refusal to accept its obligations promptly in this matter can only be attributed to its misrepresenting facts and insurance policy provisions – had Penn National been fairly treating its policyholder, it would have accepted its insurance obligations promptly, began defending the claim, and would have reimbursed Beach Mart for its post tender defense costs;

7. Penn National misrepresented terms and conditions of the Policy;

8. Penn National did not clearly explain the basis of its opinion that coverage did not apply;

9. Penn National did not clearly explain the basis and justification for its selection defense counsel, forcing Beach Mart to retain personal counsel to assure a successful defense of the underlying litigation;

10. Penn National did not clearly explain the basis of its refusal to reimburse Beach Mart for its post tender defense costs; and

11. Penn National did not properly consider additional information which was provided by Beach Mart.

6

# BACKGROUND

Beach Mart first sued L&L Wings, Inc. ("L&L") in 2011 the "Underlying Litigation." The Underlying Litigation was a case regarding L&L's attempt to terminate a 2005 trademark agreement between it and Beach Mart. I have no opinion regarding the trademark law at issue in the Underlying Litigation.

Some time after Beach Mart filed its lawsuit, in November 2011, L&L counterclaimed for trademark infringement and unfair competition, unfair and deceptive trade practices and breach of contract. These counterclaims came from L&L's allegation that Beach Mart copied and imitated L&L's branding and advertising styles or concepts. L&L claimed that substantial consumer confusion came from that trademark and its use. Dkt. 40-10.

Analyzing those counterclaims which L&L asserted, the counterclaims included alleged infringement of the WINGS trademark, but also alleged copying of L&L's "distinctive" building facades and store layouts (which L&L claimed was protected "trade dress"), misappropriation of L&L's advertising slogans, misappropriation of L&L's promotional greetings, and misappropriation of other materials. *Id*., at ¶¶ 23-24; Dkt. 40-12, ¶¶ 21-22, 61- 62. L&L asserted that it had been damaged through Beach Mart's unfair competition and unlawful trade practices. Additionally, L&L alleged claim breach of contract and breach of implied duties of fair dealing.

By June 8, 2012, Beach Mart tendered the Underlying Action to Penn National and demanded that Penn National assume its defense obligation and agree to indemnify it, per the Policy between the two of them. But after defense of the counterclaims was tendered to it, Penn National substantially delayed in responding to Beach Mart. Instead of complying with North Carolina law and the industry standards and customs, it delayed in providing a defense, and sent a

7

series of "reservations of rights" letters which neither definitively denied coverage nor agreed to provide a defense. But discovery has shown that Gary Gibson, a claims supervisor at Penn National, had already suggested denying the claim within the first month after the claim was tendered.

More than seven months after Beach Mart tendered its demand for defense, after the completion of the initial discovery period and summary judgment briefing, and after trial in the Underlying Litigation had been scheduled and then subsequently delayed, Penn National finally notified Beach Mart that it would provide a defense, and a law firm appointed by Penn National first contacted Beach Mart to begin efforts to provide a defense to L&L's counterclaims. Beach Mart expressed its concerns over the qualifications and experience of the panel counsel selected by Penn National to defend the counterclaims. Beach Mart further questioned whether, given the nature of the complex intellectual property claims asserted by L&L in the underlying litigation, given the overarching seriousness of such claims in light of Beach Mart's continuation of business and the amount of damages sought by L&L (in excess of $20mm), and given the progress at that juncture by Beach Mart's personal counsel, the panel counsel selected by Penn National would bring sufficient expertise to bear in assuring a favorable defense of the counterclaims.

From January 2013 to February 2014, Penn National's panel counsel worked to assist in the provision of a defense to Beach Mart, as counter-claim defense counsel. But, more than a year after Penn National first began to provide a defense to Beach Mart, Penn National changed its position. Shortly before the Underlying Action's mediated settlement conference, Penn National filed this lawsuit seeking to avoid its coverage obligations. D.E. 1.

Beach Mart was never provided an explanation as to why Penn National changed its position, was not given any prior notice of this declaratory judgment lawsuit, and was never told why Penn National chose to file this lawsuit *immediately* before the mediated settlement conference in the Underlying Action. At the time, Penn National had not updated its January 2013 correspondence that a defense would be provided under the policies.

It is my opinion that Penn National's conduct toward its policyholder did not comply with reasonable and commercially-acceptable standards for acting in the best interests of its insured, and that this general business practice of Penn National has continued on throughout this coverage action. Initially, Penn National waited too long to first reach its decision to provide a defense of the claim, and then after 7 months' delay did decide to defend Beach Mart. Beach Mart is entitled to all of its post-tender defense costs incurred during that time period when it was defending itself out of pocket. When a claim is filed against a policyholder and the policyholder gives notice to its insurer, the steps the policyholder takes to prevent a default judgment are steps which protect the insurer. Beach Mart could have defaulted on the counterclaim (exposing Penn National to policy-limits liability), but it spent its own money to defend this claim. It is entitled under the Policy for reimbursement of those funds. Penn National had ample opportunity to appoint counsel, negotiate rates, defend the claim, and otherwise fulfill its obligations under the Policy. By refusing to do that for many months, it must now reimburse the policyholder for those costs. For a period of at least 5 years, Penn National never questioned or challenged the amount of fees for which Beach Mart sought reimbursement, nor did Penn National ever provide any explanation or justification for Penn National's refusal to pay such fees after Beach Mart's reimbursement demand, while at this same time providing an ongoing defense of the Underlying Litigation.

Penn National's failure to comply with reasonable and commercially-acceptable standards for acting in the best interests of its policyholder continued after it filed this coverage lawsuit. Beach Mart first made a demand for reimbursement of its post-tender defense costs on or about December 1, 2014. Insurers are generally obligated, and it is customary within the industry, to promptly respond to their policyholders, particularly on an issue as important as this one. But Penn National took more than two years to respond to this demand. During that two years, there was other correspondence between the two parties. In July 2017, Penn National for the first time definitively rejected Beach Mart's request for reimbursement. Instead, Penn National made a counteroffer to settle all outstanding disputes, including this coverage action. This delay by Penn National did not comply with reasonable and commercially-acceptable standards for acting in the best interests of its insured; once an insurer knows that coverage is due under one part of the policy, it is obligated to pay that amount to its policyholder. It cannot use that as leverage to influence settlements under other portions of an insurance policy. Either on purpose or inadvertently, this is a common tactic of insurance adjusters.

After this lawsuit started, Penn National was obligated to attend a mediated settlement conference. Penn National undermined the mediation when it appeared at the settlement conference without authority to settle the entire case, and refused to obtain full settlement authority during the course of the mediation. While industry custom and practice, along with court rules, permit an insurer to attend a mediation with limited amounts of monetary authority, it offends good faith for an insurer to attend a mediation but not have authority to settle the entire case and all outstanding disputes. Unsurprisingly, that mediation ended in an impasse because of Penn National's failure to attempt a fair and equitable settlement.

10

Penn National issued Policy Number BP9 0645388 00 ("Policy") effective January 1, 2008. It was subsequently renewed for several years.

The policy included the Businessowners Liability Coverage Form, which is based on a standard commercial general liability insurance policy form, originally copyrighted by the Insurance Services Office, Inc.; which assists the industry in generating commonly used form policies.

The Policy begins by clearly stating it provides both indemnity coverage for, and that Penn National also has a duty to defend its insured in, any claims or lawsuits for "advertising injury."

11

**A. Coverages**

**1. Business Liability**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage", "personal injury", or "advertising injury" to which this insurance does not apply. We may at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section **D** - Liability And Medical Expenses Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements or medical expenses.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Coverage Extension - Supplementary Payments.

The Policy goes on to state that "This insurance applies . . . to . . . "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services."

When the Penn National claims handlers read the Policy in comparison to the L&L Counterclaim, they had an obligation under the policy to insert this definition of "Advertising injury" and construe it in favor of finding coverage:

12

**F. Liability And Medical Expenses Definitions**

1. "Advertising injury" means injury arising out of one or more of the following offenses:

   a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   b. Oral or written publication of material that violates a person's right of privacy;

   c. Misappropriation of advertising ideas or style of doing business; or

   d. Infringement of copyright, title or slogan.

If the Penn National claims handlers had done so, they would have seen, at a minimum, that the L&L Counterclaims included legal claims for "misappropriation of advertising ideas or style of doing business" with the numerous claims for copying or misappropriating the style of the building, including the trade dress rights claimed by L&L, the layout of the interior of the stores, and the mimicking or copying of advertising slogans, website logos, in-store salutations and telephone greetings. This is indisputably a covered claim, and in my opinion this case would not have been a "close call" for a skilled and experienced claims handler. Industry custom and practice is that claims handlers assigned to complex claims such as this one would already have sufficient skill and experience to understand these issues (rather than simple automobile or general liability matters where the claims issues are simpler).

Having established that the L&L Counterclaim contains at least one covered claim which triggered the duty to defend, the claims handler would then have to review the Policy's exclusions. The Policy further excludes six types of "advertising injury":

p. **Personal Or Advertising Injury**

"Personal injury" or "advertising injury":

(1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured;

(4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement; or

(5) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

(6) With respect to any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess the effects of pollutants; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

14

Based on my review of the materials provided to me, the Penn National claims handlers should have immediately recognized that none of these exclusions applied. First, the facts alleged in the L&L Complaint do not articulate actions that would fall within these exclusions. Second, if there were any close calls, those close calls should be construed in favor of finding coverage for the policyholder.

The Policy also contains an additional exclusion for Advertising Injury:

q. **Advertising Injury**

"Advertising injury" arising out of:

(1) Breach of contract, other than misappropriation of advertising ideas under an implied contract;

(2) The failure of goods, products or services to conform with advertised quality or performance;

(3) The wrong description of the price of goods, products or services; or

(4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

Once again, this exclusion does not apply, and that should have been immediately apparent to the claims handlers. Even though breach of contract allegations accompanying the counterclaims assert claims for breach of contract, that claim only arises from the SUPER WINGS trademark agreement between Beach Mart and L&L. In no respects does that contract relate to the trade dress, slogan, or advertising copying alleged by L&L elsewhere in the counterclaims to constitute unfair competition, infringement, false designation of origin, and unfair and deceptive trade practices.

15

# Opinions

Generally speaking, within the customs and practices of the industry, insurance companies are supposed to liberally construe policy provisions that extend coverage, and narrowly construing provisions that exclude coverage.

Penn National breached its insurance contract, which required the defense of L&L's counterclaim and required Penn National to indemnify Beach Mart from any covered losses arising from that counterclaim.

First, my analysis begins with whether the conditions precedent under the Policy have been met. Here, they have. Penn National has admitted that the premiums were paid, and that the underlying counterclaims brought by L&L were timely tendered to Penn National. Penn National has not argued that it was prejudiced by any late notice, nor has Penn National developed any evidence that would support such a claim of prejudice.

Penn National had a duty to defend the counterclaims brought by L&L, and that duty to defend began immediately. The claims articulated by Penn National fell within the definition of advertising injury contained in its Policy. The Fourth Circuit later ruled in Beach Mart's favor on this issue, but Penn National should have originally come to the same conclusion, had it conducted its claims handling in a fair manner, consistent with custom and practice in the industry.

Penn National's course of conduct in handling this claim demonstrates ample examples of failing to implement reasonable standards for the prompt investigation of claims. Among them are:

- A seven month delay in communicating whether or not it would provide counsel and defend L&L's counterclaim;

- A one year and six month (1.5 years) delay in denying its duty to indemnify, and only doing so when it filed its complaint for declaratory judgment;

- Penn National's failure to clearly respond to Beach Mart's concerns and questions regarding the selection of defense counsel and failure to ensure that the selection of defense counsel with adequate experience in handling complex intellectual property claims was communicated to Beach Mart;

- Penn National's refusal to pay defense costs during what has been called the "interim period" without providing an explanation and reasonable basis for the denial, and Penn National's delay of 2.5 years in communicating that decision;

- Penn National's refusal to pay post tender defense costs, even after losing on appeal in the Fourth Circuit, and presumably also a failure to even reconsider Beach Mart's renewed request for reimbursement.

- Penn National's failure to explain or justify in any respect its refusal to pay Beach Mart's post-tender defense costs.

As to Penn National's handling of Beach Mart's claim, my fundamental opinion is that Penn National failed to follow good, acceptable, and customary claim handling practices in responding to the claim submitted by Beach Mart. In considering the various claim handling customs and practices, I conclude that Penn National failed to comply with reasonable and commercially-acceptable standards for acting in the best interests of its insured,, and that it committed multiple acts with frequency when it transgressed several bounds of reasonable conduct. The numerous facts specifically pointed to above support the contention and my opinion and belief that Penn National acted recklessly with intent to injure Beach Mart (or, acted in a manner that put Penn National's interest above and before its policyholder, Beach Mart). Additionally, because the redacted and/or withheld claims documents of Penn National are not yet available to me, which undoubtedly bear on this opinion, I reserve all rights to amend or supplement the forgoing opinion once these materials are produced.

17

In accord with custom and practice within the industry, Penn National's policy language reserved unto Penn National the full and final power to make all coverage decisions under the Policy. Because the Policy vests Penn National with sole power to make coverage decisions, the law in every single American jurisdiction either implies a duty of good faith and fair dealing in making these decisions, or gives other statutory or regulatory guidelines to limit the insurer's discretion in handling and resolving claims (or both implies a duty and gives guidelines). While Penn National (or any other insurer) cannot make coverage decisions based on undeveloped facts or vague assertions, when determining whether it has a duty to defend, it is required to compare the allegations in the counterclaim against Beach Mart *as they were drafted* or based on additional information provided by Beach Mart, and not misconstrue those counterclaim allegations in a manner that avoids coverage. However, Penn National did exactly that: is purposefully misconstrued the allegations in its favor, and in a method to avoid its defense and coverage obligation. That was a misrepresentation of the policy terms and conditions.

Additionally, while the policy language reserves the right to Penn National to select and control the defense counsel provided to defend the counterclaims, there is a necessary obligation on the part of Penn National to select defense counsel with appropriate expertise and experience to favorably handle the type, nature, and magnitude of the claims asserted against the insured. Here, L&L asserted complex intellectual property and unfair competition claims that required several years of intense litigation by highly experience trademark attorneys to favorably resolve. Moreover, L&L's pursuit of these claims sought damages in excess of $20mm and aimed to totally shut down Beach Mart's long-standing business. Beach Mart questioned at the outset whether the defense counsel selected by Penn National from among its existing insurance defense panel counsel met these qualifications. Furthermore, even after Beach Mart questioned whether, given

the nature of the complex intellectual property claims asserted by L&L in the underlying litigation, given the overarching seriousness of such claims in light of Beach Mart's continuation of business and the amount of damages sought by L&L (in excess of $20mm), and given the progress as of 2013 by Beach Mart's personal counsel, Penn National failed to adequately respond to or explain whether its selection of panel counsel brought sufficient expertise to bear on Beach Mart's behalf to assure a favorable defense of the counterclaims.

When I review the L&L Counterclaims against Beach Mart – just as Penn National's claims handlers were supposed to do – it is immediately apparent that the counterclaims articulate claims and allege conduct covered by the Policy. For example, the Counterclaims allege:

- Deception of L&L's customers and unfair competition; (D.E. 40-10, ¶¶ 24-26; ¶¶ 48- 49)

- Misappropriation of L&L's trade dress and design rights; D.E. 40-10, ¶¶ 23-24; ¶¶ 48-49)

- Infringement of L&L's advertising slogan "All You Need To Reach The Beach"; (D.E. 40-10, ¶¶ 23-24; ¶¶ 48-49)

- Misuse of L&L's advertising concepts on websites; (D.E. 40-10) and

- Misuse of "Hello, Wings!" store and telephone greeting. (D.E. 40-10, ¶ 19).

These allegations *clearly* triggered coverage under the advertising injury section of the Policy. This is not the sort of claim where it is important for a policyholder to explain the assumptions underlying its loss.. Here, the Beach Mart Complaint and L&L Counterclaim, when compared with the Policy, give fair notice of that a duty to defend is triggered. To the extent that Penn National had any question about whether the claim was covered, Beach Mart reasonably and

quickly responded to any questions.  Penn National's later assumption of the defense of this matter show that the allegations of the L&L Counterclaims triggered the duty to defend. Penn National, contrary to its duties to act in good faith towards its insured, turned a blind eye for months to the large number of allegations clearly stated in the Counterclaims, and essentially failed to do any further investigation in to the case materials or discovery available to it.

The L&L Counterclaims against Beach Mart were plain and unambiguous that it contended WINGS and SUPER WINGS were infringements.  But the Counterclaims also make claims of unfair competition and deceptive trade practices arising from copying or imitating L&L's distinctive store environment and façade (trade dress), as well as stealing/passing off/misappropriating L&L's advertising slogans, in-store and telephone greetings, and other materials.

Penn National has an obligation to its policyholders to have educated, informed, and well-trained claims handlers.  Penn National's claims handlers knew – or should have known – that trade dress is covered by the Policy.  The fact that trade dress infringement is covered by the standard "advertising injury" provisions in a commercial general liability policy is not new or novel; it has been known to those trained in the industry for decades.  This was commonly accepted as early as 2001 and had been taught within the industry.  Penn National's claims handlers knew, or should have known and should have been trained, that allegations of trade dress infringement trigger its CGL policy. To the contrary, Penn National's adjusters and supervisors appeared to lack any knowledge of trade dress infringement, had only the most superficial understanding of other forms of advertising injury of the kind as described in the Counterclaims, and lacked any meaningful prior experience or training in handling trade dress or advertising injury claims.  I can only assume a failure of implementation of reasonable training for not accepting such a claim when

the Policy clearly provides coverage for trade dress infringement. Additionally, because the redacted and/or withheld claims documents of Penn National are not yet available to me, which undoubtedly bear on this opinion, I reserve all rights to amend or supplement the forgoing opinion once these materials are produced.

I have reviewed the 2005 contract between Beach Mart and L&L regarding the use of the trademark "WINGS." There was a dispute between the two companies regarding the right to use this trademark. However, that 2005 contract did not contain any provisions or descriptions about general advertising concepts, trade dress, website design, in-store greetings to customers, telephone greetings, the general design of a store façade, or other conceptions of trade dress. Penn National's claims handlers and attorneys were misrepresenting the insurance policy provisions to deny coverage by arguing that all these allegations of trade dress infringement (contained in the counterclaim) were actually included in the 2005 contract. This argument goes beyond the boundaries of fair advocacy and good faith, because it is creating a "fact" that does not actually exist. Penn National may have wished the 2005 contract would have included trade dress, telephone greetings, building design, etc. but it does not address these things. Penn National advanced this argument – and attempts to create this "fact" – in order to advance a coverage position more-favorable to the insurer and defeat coverage for the policyholder. Misrepresenting pertinent facts is not the custom and practice of the insurance industry; the insurer is supposed to take the facts as they are and apply those facts to the provisions of the Policy. The insurer is not supposed to create new facts which are more favorable, in an effort to defeat coverage under the Policy. Additionally, because the redacted and/or withheld claims documents of Penn National are not yet available to me, which undoubtedly bear on this opinion, I reserve all rights to amend or supplement the forgoing opinion once these materials are produced.

Penn National's conduct in insisting certain exclusions apply also misrepresents the insurance policy provisions. Penn National has continued to claim that the prior publication and breach of contract exclusion apply to exclude coverage for this claim.

As explained above, the 2005 contract was solely related to the WINGS and SUPER WINGS trademarks. There can be no dispute that the 2005 trademark agreement relates to and governs only the parties rights relative to the use of WINGS and SUPER WINGS. But L&L's counterclaim alleges claims arising from the design of the store façade and store interior layouts, trade dress, misuse of images on the store website, confusion arising from the slogan "All You Need To Reach The Beach," phrases used in store greetings by employees and used on telephone records, etc. D.E. 40-9, Ex. A. This is the conduct that L&L bases its claims for causing customer confusion (among current L&L customers and future customers) which L&L alleges damaged it. See generally, D.E. 40-10 and 40-12. L&L's claims do not "arise from" the 2005 agreement. Because of these facts do not relate to the 2005 contract, the "breach of contract" exclusion in the Penn National Policy does not apply. The only conclusion I can come to is either Penn National's claims handlers purposefully or recklessly denied this claim. It is my opinion that a well-trained and well-meaning claims handler would only apply a "breach of contract" exclusion to exclude coverage for the L&L allegations which were not contained in the contract in two scenarios: (1) Penn National purposefully sought to avoid coverage so its employees insisted on applying an exclusion contrary to the facts, or (2) Penn National's employees conducted a reckless and cursory (instead of thoroughly and accurately) review of the L&L counterclaim and denied it. Either of these would exhibit a lack of compliance on Penn National's part with reasonable and commercially-acceptable standards for acting in the best interests of its insured. If Penn National's claims handlers had thoroughly reviewed the L&L Counterclaim or had reviewed the entire

22

counterclaim accurately, they should have come to a different conclusion: the breach of contract exclusion cannot apply to avoid coverage for claims not included in the contract.

Adjusters, like other insurance professionals, are supposed to receive education related to the principles of insurance. It is customary, and I would expect, claims handlers like Greg Gross, Gary Gibson, and Steve Oliver to be grounded in the principles of insurance and familiar with why coverage should apply in this matter. Based on his investigation, while it may have been appropriate to consider the 2005 contract at first glance, once it was apparent that the 2005 contract was limited to the trademarks WINGS and SUPERWINGS and did not include copying or misappropriating the style of the building, the layout of the interior of the stores, and the mimicking or copying of in-store salutations and telephone greetings, it was inappropriate to rely on the exclusion for contractual liability. When Penn National doggedly adhered to this exclusion, it was a misrepresentation of the insurance policy provisions, and demonstrated how truly biased their claims analysis and investigation was. Additionally, because the redacted and/or withheld claims documents of Penn National are not yet available to me, which undoubtedly bear on this opinion, I reserve all rights to amend or supplement the forgoing opinion once these materials are produced.

Penn National's *claim function* must fulfill its responsibility to the insured and pay covered claims. Adjusters should construe policies in favor of coverage, construe exclusions narrowly to avoid excluding claims, and not seek to put the insurer's interests ahead of the policyholder. Further, when the claim contains a mixture of covered and uncovered claims; once the claims professional adjudicates that one claim is covered, the insurer's duty to defend all claims is triggered. As the old saying goes, *in for a penny, in for a pound*. If one claim is covered by the policy, the insurer must defend all claims *even if they are excluded*. Here, once the claims handlers were presented with L&L's claims for unfair competition, misappropriation of advertising slogans,

23

and infringement of trade dress  (namely, the distinctive style and appearance of the store buildings and signage), it was a misrepresentation of the insurance policy provisions to attempt to exclude the claim based on other grounds.  But that is precisely what happened when Penn National relied on the contractual liability provision.  Penn National failed to take the plain reading of the pleadings and apply them to the four corners of the policy. Additionally, because the redacted and/or withheld claims documents of Penn National are not yet available to me, which undoubtedly bear on this opinion, I reserve all rights to amend or supplement the forgoing opinion once these materials are produced.

## CONCLUSION:

The handling of Beach Mart's claim was rife with actions that misrepresented the terms and conditions of the policy.  Penn National failed to promptly respond to is policyholder, failed to explain the rational for its refusal to defend Beach Mart, failed to mediate in good faith, and has consistently failed to deal fairly with its insured. Penn National's lack of good faith and fair dealing has continued on throughout this coverage litigation. These are my opinions to a reasonable degree of professional certainty.  Because discovery is ongoing and the numerous withheld or redacted documents, I reserve the right to amend or supplement this report.  I believe supplementation is likely. The withheld documents have prevented me from completing a full analysis of this matter.

_R. Bryan Tilden_
R. Bryan Tilden
CPCU, CLU, ARM, ALCM, ChFC, CIC

24

*Curriculum Vitae*
*of*
*R. Bryan Tilden*
526 Red Gate Road
Pittsboro, North Carolina 27312-7934
*Office:* 919.542.1042 • *Fax:* 919.542.6255 • *E-mail:* tilden@mindspring.com

**EDUCATION:**

**Senior Claim Law Associate,** 2008
AMERICAN EDUCATIONAL INSTITUTE, INC.
Basking Ridge, New Jersey

**Chartered Financial Consultant,** 1983
THE AMERICAN COLLEGE
Bryn Mawr, Pennsylvania

**Associate in Loss Control Management**, 1983
INSURANCE INSTITUTE OF AMERICA
Malvern, Pennsylvania

**Associate in Risk Management**, 1982
INSURANCE INSTITUTE OF AMERICA
Malvern, Pennsylvania

**Chartered Life Underwriter**, 1982
THE AMERICAN COLLEGE
Bryn Mawr, Pennsylvania

**Chartered Property Casualty Underwriter**, 1980
THE AMERICAN INSTITUTE FOR PROPERTY AND LIABILITY
UNDERWRITERS
Malvern, Pennsylvania

**Certified Insurance Counselor**, 1978
SOCIETY OF CERTIFIED INSURANCE COUNSELORS
Austin, Texas

**HONORS/ACTIVITIES:**

Active, Continuing Education for CPCUs, Society of Chartered Property Casualty Underwriters, 2016 - 2020

Grading Panel Member, The American Institute for Property and Liability Underwriters

Grading Panel Member, Insurance Institute of America

National Faculty Member, Society of Certified Insurance Counselors

Faculty, ACORD Power of Change Workshop, 1995 to present

Faculty, Independent Insurance Agents Virtual University, commentator to ISO, AAIS and ACORD

Ernest F. Young Education Award, 1988

North Carolina Independent Agent of the Year, 1989

Frequent contributor the *The John Liner Letter* articles on Business Income, CGL, Auto, Risk Management

Reviewer, various CPCU and Insurance Institute textbooks

**MEMBERSHIPS:**     International Association of Arson Investigators

Society of Certified Insurance Counselors

Society of Chartered Property Casualty Underwriters

Society of Claims Law Associates

Society of Financial Service Professionals

**LICENSES:**     Property and Liability Agent, North Carolina, New Jersey

Life and Health Agent, North Carolina, New Jersey

Medicare Supplement and Long Term Care Agent, North Carolina

**EXPERIENCE:**     April 1997 to Present
**Training and Consulting**
Tilden & Associates
Pittsboro, North Carolina

September 1995 to March 1997
**Director of Technical Affairs**
Independent Insurance Agents of North Carolina, Inc.
Raleigh, North Carolina

March 1990 to August 1995
**Director of Education**
Independent Insurance Agents of North Carolina, Inc.
Raleigh, North Carolina

September 1983 to March 1990
**Account Executive**
Chapel Hill Insurance Agency, Inc.
Chapel Hill, North Carolina

September 1979 to July 1983
**Vice President**
Thomas Rutherfoord, Inc.
Roanoke, Virginia

December 1978 to September 1979
**Account Executive**
Marsh & McLennan, Inc.
Washington, DC

July 1974 to December 1978
**Account Executive**
Herb Holland Company, Inc.
Chapel Hill, North Carolina

**PUBLICATIONS:**     The CPCU Society. "A Guide to the CGL Aggregate Limits", http://www.cpcusociety.org/learning/campus/how.shtml , 1999

The CPCU Society, "A Guide to the Motor Carrier Act", http://www.cpcusociety.org/learning/campus/how.shtml. 1999

The CPCU Society, "A Guide to Value Reporting Form", http://www.cpcusociety.org/learning/campus/how.shtml. 1999

Case 2:14-cv-00008-FL   Document 91-2   Filed 03/10/21   Page 26 of 32

R. Bryan Tilden, *1999 Business Auto Policy, Changes and Issues* (Albany: Professional Insurance Agents, 1999)

----, *2000 Commercial Property Changes* (Malvern: The CPCU Society, 2000)

----, *2000 Homeowners Policy Changes* (Malvern: The CPCU Society, 2000)

----, *2001 Commercial General Liability Policy Changes* (Malvern: The CPCU Society, 2001)

----, *2001 Business Automobile Policy Changes* (Pittsboro, NC: Tilden and Associates, 2001)

----, *2002 Commercial Property Changes* (Malvern: The CPCU Society, 2002)

----, *2004 Commercial General Liability Policy Changes* (Malvern: The CPCU Society, 2004)

----, *2007 Commercial General Liability Policy Changes* (Malvern: The CPCU Society, 2007)

---- *2008 Commercial Property Changes* (Malvern: The CPCU Society, 2008)

----, *2010 Automobile Policy Changes* (Malvern: The CPCU Society, 2011)

----, *2011 Homeowners Policy Changes* (Malvern: The CPCU Society, 2011)

----, *2012 Commercial Property Policy Changes* (Malvern: The CPCU Society, 2013)

----, *2013 Commercial General Liability Policy Changes* (Malvern: The CPCU Society, 2013)

----, *Additional Insured* (Austin: Society of Certified Insurance Counselors, Inc., 1996, 2005, 2013; Malvern: The CPCU Society, 1999, 2001, 2004, 2005, 2013, 2019)

----, *Advanced Business Income* (Malvern: The CPCU Society, 1990 – 2016)

----, *Advanced Inland Marine* (Malvern: The CPCU Society, 2000)

----, *Advanced Pollution Liability* (Malvern: The CPCU Society, 1999 - 2012)

----, *Arson and the Insurance Contract* (Austin: Society of Certified Insurance Counselors, Inc., 1998, 2004, 2012)

----, *Bonus Life and Non-Qualified Deferred Compensation Plans* (Pittsboro, NC: Tilden and Associates, 1998)

----, *Budgeting* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1995)

R. Bryan Tilden and Donald Malecki, *Builders Risk, Wrap-Ups and Course of Construction* (Malvern.  The CPCU Society, 2006)

R, Bryan Tilden, *Business Automobile Coverage Part* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1993, 1994, 1997, 1999, 2002, 2004, 2005, 2006, 2010, 2013)

----, *Business Owner's Policy* (Austin: Society of Certified Insurance Counselors, Inc., 1990 – 2002, 2010, 2013)

----, *Claims Handling* (Pittsboro, NC: Tilden and Associates, 1999)

----, *Closing Gaps in Property Insurance* (Malvern: The CPCU Society, 1999, 2007, 2015)

----, *Commercial Account, The* (Malvern: The CPCU Society, 1999, 2001, 2005)

----, *Commercial Crime Program* (Austin: Society of Certified Insurance Counselors, Inc., 1988, 1991, 1992, 1999, 2000, 2006, 2013; Malvern: The CPCU Society, 2000, 2006, 2009, 2013)

----, *Commercial General Liability Coverage Part* (Austin: Society of Certified Insurance Counselors, Inc., 1989, 1992, 1994, 1996, 1997, 1998, 1999, 2001, 2004, 2007, 2013, 2019)

----, *Commercial Property Coverage Part* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1991, 1996, 2001, 2008, 2012)

----, *Commercial Property Causes of Loss Forms* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1991, 1996, 2001, 2008, 2012)

----, *Contract Bonds* (Pittsboro, NC: Tilden and Associates, 1999)

R. Bryan Tilden and Donald Malecki, *Contractual Risk Transfer* (Malvern. The CPCU Society, 2005)

R. Bryan Tilden, *Director's and Officer's Liability* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1997; 2002 Malvern: The CPCU Society, 1998, 2000, 2002)

----, *Disability Income and Long Term Care Insurance* (Pittsboro, NC: Tilden and Associates, 2006)

----, *Employee Leasing – The New CGL.* Counselor C93 #6 December (1993): 1-4

----, *Employment Related Practices* (Pittsboro, NC: Tilden and Associates, 1999, 2011, 2015)

----, *Endorsements to the Commercial Property Coverage Part* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1991, 1996, 2001, 2008, 2012)

----, *Essentials of Legal Liability* (Austin: Society of Certified Insurance Counselors, Inc., 1995)

----, *Essentials of Life Insurance* (Raleigh, NC: Independent Insurance Agents of North Carolina, Inc., 1991)

----, *Estate Planning* (Pittsboro, NC: Tilden and Associates, 1999)

----, *Estate Planning Techniques, Gifts, Trusts and Family Limited Partnerships* (Pittsboro, NC: Tilden and Associates, 2000)

R. Bryan Tilden and Donald Malecki, *Evolution of the CGL,* (Malvern. The CPCU Society, 2007)

R. Bryan Tilden, *Excess Liability and Commercial Umbrella Policies* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1995, 1997, 2013)

----, *Flood Insurance*, (Austin: Society of Certified Insurance Counselors, Inc., 1998)

----, *Garage Policy* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1993, 1994, 1998, 2006)

----, *Hidden Coverages* (Austin: Society of Certified Insurance Counselors, Inc., 1995, 1997, 2000; Malvern: The CPCU Society, 1998, 2004, 2010, 2013)

----, *Homeowner's Policy* (Pittsboro, NC: Tilden and Associates, 1998, 2001, 2011)

----, *Homeowner's Tricks and Traps* (Austin: Society of Certified Insurance Counselors, Inc., 1989, 1993, 1997, 2001, 2013)

----, *How to Determine the Financial Stability of an Insurance Company* Agents Journal Spring (1985) 18 - 19

----, *Human Resources* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1996)

----, *Insurance Fraud* (Pittsboro, NC: Tilden and Associates, 2001)

----, *Insurance Statute and Rules Update, An Agents' Guide* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1991)

----, *Insuring Contractors* (Malvern: The CPCU Society, 1998, 1999, 2004, 2007, 2013)

----, *Insuring Defective Construction* (Malvern:  The CPCU Society, 2002, 2004, 2007, 2013; Austin: Society of Certified Insurance Counselors, 2002, 2004, 2007, 2013, 2019)

----, *Insuring the E-Commerce Account* (Malvern: The CPCU Society, 2000 – 2019)

----, *Insuring the In Home Business* (Austin: Society of Certified Insurance Counselors, 1998)

----, *Insurance Valuation Problems* (Malvern: The CPCU Society, 1997 – 2013)

----, "It's a Crime Not to Insure! Use New Crime Forms for the Best Coverage," *Resources* (The National Alliance for Insurance Education & Research), (Spring 2001), pp. 10-13.

----, *Law and the Life Insurance Contract* (Pittsboro, NC: Tilden and Associates, 2002)

----, *Leased Properties Exposures* (Austin: Society of Certified Insurance Counselors, Inc., 1989, 1997, 2005; Malvern: The CPCU Society, 1998, 2001, 2005, 2013)

----, *Liability Issues and Solutions* (Austin: Society of Certified Insurance Counselors, Inc., 1998)

R. Bryan Tilden and Donald Malecki, *Malecki and Tilden on the CGL,* (Malvern. The CPCU Society, 2003, 2004, 2005)

R. Bryan Tilden, *Medicare Supplement and Long Term Care* (Raleigh, NC: Independent Insurance Agents of North Carolina, Inc., 1991, 1992)

----, *Mergers, Acquisitions and Joint Ventures* (Malvern: The CPCU Society, 2001; Austin: Society of Certified Insurance Counselors, Inc., 2002, 2013)

----, *More Personal Lines Questions and Answers* (Pittsboro, NC: Tilden and Associates, 1997)

----, *N.C. Insurance Statutes and Rules Update, An Agents' Guide* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1992)

----, *Personal Auto Policy* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1990, 1993)

----, *Personal Auto Policy* (Pittsboro, NC: Tilden and Associates, 1999)

----, *Personal Lines Questions and Answers* (Malvern: The CPCU Society, 1997, 1998, 2012)

----, *Personal Lines, Troublesome Problem Areas* (Indianapolis: Independent Insurance Agents of Indiana, 1997, 1998)

----, *Pollution Liability Coverages* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1991, 1998, 2012)

----, *Pollution and Environmental Liability Coverages* (Malvern: The CPCU Society, 1999, 2012, 2015)

R. Bryan Tilden and John P. Young, *Pre-Licensing Guide* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1988, 1993)

R. Bryan Tilden, *Professional Liability* (Austin: Society of Certified Insurance Counselors, Inc., 1994, 1996, 1998)

----, *Problems and Solutions in Buy-Sell Agreements* (Pittsboro, NC: Tilden and Associates, 1998).

----, *Products and Completed Operations* (Malvern: The CPCU Society, 1999)

----, *Properly Insuring Churches, Clubs, Civic Groups and Other Not-For-Profit Organizations* (Austin: Society of Certified Insurance Counselors, Inc., 1991, 1998, 2001)

----, *Property & Liability Innovations and Solutions* (Austin: Society of Certified Insurance Counselors, Inc., 1998, 1999, 2001)

----, "Puzzled About Commercial Auto?" *Resources* (The National Alliance for Insurance Education & Research), (Fall/Winter 2001), pp. 8-9.

----, *Rental Car Exposures and Coverages* (Austin: Society of Certified Insurance Counselors, Inc., 1988, 1990, 1992, 1999)

----, *Shared Ownership of Property* (Austin: Society of Certified Insurance Counselors, Inc., 1989, 1990, 2001)

----, *Small Employer Group Benefits* (Raleigh, NC: Independent Insurance Agents of North Carolina, Inc., 1992)

----, *Solving Troublesome Liability Issues* (Austin, Society of Certified Insurance Counselors, Inc., 2016)

----, *Solving Troublesome Property Issues* (Austin, Society of Certified Insurance Counselors, Inc., 2016)

----, *Split Dollar Plans* (Pittsboro, NC: Tilden and Associates, 1998)

----, *Time Element Coverages* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1992, 1996, 2001, 2008, 2012)

----, *Tips, Tricks and Traps of the CGL* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1992, 1998, 1999, 2012; Malvern: The CPCU Society, 2000, 2012)

----, *Toxic Mold, Where Is The Coverage?* (Malvern: The CPCU Society, 2003, 2004, 2008, 2010, 2013)

---, *Umbrella and Excess Liability* (Malvern, The CPCU Society, 2004, 2013)

----, *Underwriting Workers Compensation* (Pittsboro, NC: Tilden and Associates, 2003)

----, *Utilizing the New Commercial Coverages* (Albany: Professional Insurance Agents, 2003)

----, *Will the Policy Pay for Rebuilding?* <u>Professional Agent</u> February 1998: 24 - 27

----, *Workers' Compensation* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1992, 1997, 2012)

----, *Workers' Compensation: Treating the Exposure* (Malvern: The CPCU Society, 2000)

----, *Workers' Compensation: Underwriting* (Malvern: The CPCU Society, 2000)

**CASES PAST 4 YEARS:**   *<u>Daniel Island Riverside Developers, LLC, et al</u>, v. The Oaks at Rivers Edge Property Owners Association, Inc., et al,* 2010-CP-08-4318, In the Court of Common Pleas, Fifteenth Judicial Circuit, County of Berkeley, South Carolina.

*Michael McDonald, et al, v. <u>Selective Insurance Company of South Carolina</u>, et al,* 1422-CC00687, In the Circuit Court of St. Louis City, State of Missouri.

*Mark Scott and Merrilee Scott v. <u>LifeSecure Insurance Company,</u>* 2:15-cv-00197-CW-DBP, United States District Court, District of Utah, Central Division.

*Mark Williams v. <u>Soderholm Financial Services</u> v. White Bear Lake Insurance Company,* 26-CV-15-260, District Court of Minnesota, County of Grant, Eighth Judicial District.

*<u>Pamela Shore</u> v. State Farm Mutual Insurance Company,* 4:16-CV-00301, United States District Court, Western District of Missouri.

*Seneca Insurance Group, Inc., v. <u>Hamby & Aloisio, Inc.,</u>* 1:16-CV-00174-WSD, United States District Court, Northern District of Georgia, Atlanta Division.

*<u>Gerald and Marsha Chanan</u> v. Willis Towers Watson, Inc.,* 2016 L 004531, Circuit Court of Cook County, Illinois County Department, Law Division.

*Berkley Regional Specialty Insurance Company v. Mel Foster Co. Insurance, Inc., et al,* 2:15-cv-00027-HEA, United States District Court, Eastern District of Missouri, Northern Division.

*Belmont Confections, Inc. v. Century Insurance Consultants, Ltd. et al,* GD-12-008129, In the Court of Common Pleas of Allegheny County, Pennsylvania.

*BNSF Railway Company, v. Morrison Grain & Ag Services, Inc. and Mid-Continent Casualty Company,* CIV-15-1066-F, United States District Court, Western District of Oklahoma.

*528 North Avenue, LLC, v. Ronald Diskin Associates Corp., et al,* MRS-L-2323-15, Superior Court of New Jersey, Morris County, Law Division.

*Lion Petroleum, Inc., v. Paco Corporation, et al,* 15SL-CC00888, Div. 18, Circuit Court of St. Louis County, State of Missouri.

*Gemini Insurance Company and Berkley Program Specialists, LLC, v. Pelican General Insurance Agency,* 16-CV-02780, United States District Court, Northern District of Illinois, Eastern Division.

*Walker Risk Analysis Management & Services Company v. FKI Industries and Wells Fargo Insurance Services USA, Inc.,* 12 L 161, In the Circuit Court of the 18th Judicial Circuit, DuPage County, Wheaton, Illinois.

*Puerto Rico Electric Power Authority v. Passco, Inc., NIFE Barerias Industrias LTDS, et al (American International Insurance Company),* K AC2007-4896(508), Commonwealth of Puerto Rico, First Instance Court, Superior Court of San Juan.

*USI v. Frieman, et al,* 180100954, Court of Common Pleas, Philadelphia County, Pennsylvania.

*USI v. VanderZanden, et al,* 01-17-0006-6562, American Arbitration Association.

*Carlyle Commodity Management LLC, et al, v. Certain Underwriters at Lloyds, et al,* 651151/2017, Supreme Court of the State of New York, County of New York, Commercial Division.

*Conrad Sales Group, LLC d/b/a Bay Hill Seafood v. Joseph Clyde Jenkins, Jr., Jenkins Insurance Agency, Inc. and Nationwide Mutual Insurance Company,* 16 CVS 493, Superior Court of Guilford County, North Carolina.

*Patsy E. Holden, et al, v. Tedford and Associates, LLC, et al,* CJ-2018-188, District Court of Rogers County, Oklahoma.

*Whitney J. Cagle v. Westfield Insurance Company,* 1816-CV22073, Circuit Court of Jackson County, Missouri, at Independence.