# EXHIBIT 8

IN THE GENERAL COURT OF JUSTICE
EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION COURT
DIVISION
2:14-CV-00008-FL


PENNSYLVANIA NATIONAL MUTUAL      )
CASUALTY INSURANCE COMPANY,       )
                                  )
                Plaintiff,        )
                                  )
     vs.                          )
                                  )
BEACH MART, INC. and L&L Wings,   )
INC.,                             )
                                  )
                Defendants.       )
                                  )
-----------------------------------


_____

VIDEOTAPED DEPOSITION
OF
BRYAN TILDEN

_____


TAKEN AT THE LAW OFFICES OF:
WOMBLE BOND DICKINSON (US), LLP
300 NORTH GREENE STREET, SUITE 1900
GREENSBORO, NC 27401


06-23-21
10:02 O'CLOCK A.M.

_____


Susan Kittle
Court Reporter

Chaplin & Associates
132 Joe Knox Ave, Suite 100-G
Mooresville, NC 28117
(704) 606-1434 │ (336) 992-1954 │ (919) 649-4444

Case 2:14-cv-00008-FL    Document 117-8    Filed 10/15/21    Page 2 of 201

## ATTORNEY NOTES

PAGE/LINE        NOTES

## I N D E X

STIPULATIONS                                    6
EXAMINATION
    By Mr. Levy                            7, 301
    By Mr. Shaw                         284, 311

ADJOURNMENT                                   313
REPORTER CERTIFICATE                          314

### E X H I B I T S

| Name | Offered By | Identified |
|------|-----------|-----------|
| Exhibit 118 (B. Tilden Notice of Deposition) | Mr. Levy | 10 |
| Exhibit 119 (B. Tilden Expert Report and CV) | Mr. Levy | 24 |
| Exhibit 120 (Answer Amended Complaint/Counterclaims 02/23/17) | Mr. Levy | 114 |
| Exhibit 121 (Second Amended Complaint 02/23/17) | Mr. Levy | 117 |

## APPEARANCES OF COUNSEL

FOR THE PLAINTIFF PENNSYLVANIA NATIONAL
MUTUAL CASUALTY INSURANCE COMPANY:

    David L. Levy, Esquire
    HEDRICK GARDNER KINCHELOE & GAROFALO, LLP
    6000 Fairview Road, Suite 1000
    Charlotte, NC 28210
    dlevy@hedrickgardner.com

FOR THE DEFENDANTS BEACH MART, INC.
AND L&L Wings, INC.:

    Stephen Shaw, Esquire
    WOMBLE BOND DICKINSON (US), LLP
    300 North Greene Street, Suite 1900
    Greensboro, NC 27401
    stephen.shaw@wbd-us.com

OTHER APPEARANCES

Ken Morrison, Videographer

## E X H I B I T S (PREVIOUSLY MARKED)

| Name | Identified |
|------|-----------|
| Exhibit 36 (L&L Answer and Counterclaim 11/22/11) | 107 |
| Exhibit 40 (BM Answer and Counterclaim 10/16/17) | 137 |
| Exhibit 41 (BM Answer to Counterclaims 11/06/17) | 285 |
| Exhibit 69 (PN Amended Complaint for DJ 10/02/17) | 129 |
| Exhibit 71 (First ROR letter 07/18/12) | 121 |
| Exhibit 72 (Travelers letter 08/27/12) | 161 |
| Exhibit 73 (Travelers letter to Womble 08/14/13) | 163 |
| Exhibit 74 (Second ROR letter 08/07/12) | 125 |
| Exhibit 75 (Third ROR letter 01/15/13) | 125 |
| Exhibit 77 (Fourth ROR letter 03/14/13) | 126 |

E X H I B I T S (PREVIOUSLY MARKED)

| Name | Identified |
|------|-----------|
| Exhibit 101 (PN's Expert Disclosure 11/16/20) | 271 |
| Exhibit 102 (Supplemenal Expert Report, 03/01/21) | 273 |
| Exhibit 113 (Legal Fees Advisors Report, 11/16/20) | 243 |

NOTE: Quoted material has been reproduced as read or quoted by the speaker.

STIPULATIONS

Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated and was conducted before Susan Kittle, Notary Public in and for the County of Mecklenburg, State of North Carolina at Large.

Notice and/or defect in Notice of time, place, purpose and method of taking the deposition was waived. Formalities with regard to sealing and filing the deposition were waived, and it is stipulated that the original transcript, upon being certified by the undersigned court reporter, shall be made available for use in accordance with the applicable rules as amended.

It is stipulated that objections to questions and motions to strike answers are reserved until the testimony, or any part thereof, is offered for evidence, except that objection to the form of any question shall be noted herein at the time of the taking of the testimony.

Reading and signing of the testimony was waived prior to the filing of same for use as permitted by applicable rule(s).

PROCEEDINGS

(10:02 o'clock a.m.)

THE VIDEOGRAPHER: We're now on the record. Today's date is June 23rd, 2021, and the time is 10:02 a.m. This is the video deposition of Bryan Tilden taken in the case of Pennsylvania National Mutual Casualty Insurance Company versus Beach Mart, Incorporated and L&L Wings, Incorporated. Would counsel now please introduce themselves and the court reporter will swear in the deponent.

MR. LEVY: Dave Levy, for Plaintiff, Penn National Mutual Casualty Insurance Company.

MR. SHAW: Stephen Shaw, of Womble Bond Dickinson for Defendant, Beach Mart, Inc.

The witness, BRYAN TILDEN, being first duly affirmed to state the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. LEVY

Q. Mr. Tilden, good morning.

A. **Good morning.**

Q. Sir, you and I met for the first time off the record this morning. My name is Dave Levy, and we're here today to take your deposition in a case that's pending in the Eastern District of North Carolina concerning coverage under an insurance policy or policies issued by the Plaintiff that I represent, Penn National Insurance Company, to Beach Mart the defendant. Sir, prior to getting started with the process, I did want to ask you, you've been deposed before?

A. **Yes, sir.**

Q. Okay. Then I'll dispense with some of the preliminaries. I would just say that if at any time you need to take a break, please just let me know, and we can do so. I will try to work through this process as efficiently as I can with you, but I also want it to be comfortable, okay?

A. **Agreed.**

Q. What is your full name, sir?

A. **Robert Bryan Tilden, Junior.**

Q. And do you go by Bryan?

A. **Yes, sir.**

Q. Mr. Tilden, what's your current address?

A. **526 Red Gate Road, Pittsboro, North Carolina, 27312.**

Q. And how long have you been in Chatham County?

A. **I moved back there in July of 1983.**

**10**

Q. Are you originally from North Carolina?

A. Yes, sir.

Q. Where did you attend high school?

A. Chapel Hill High School.

Q. And how about college?

A. University of North Carolina.

Q. What year did you graduate?

A. I did not graduate. I attended from '71 to '73.

Q. Yes, sir. Any military service?

A. No, sir.

Q. Did you ever obtain a graduate degree, either in the form of a -- I should say a college degree, in the form of a bachelor's or associate's degree?

A. No, sir.

MR. LEVY: Okay. Let me mark for identification and place in front of you, and this will be Exhibit 118, a document. With Exhibit 118 and any other documentation that I put in front of you, Mr. Tilden, please take whatever time that you need to review it, and then let me know that you've had a chance to do so.

(DEPOSITION EXHIBIT NUMBER 118 WAS MARKED

**11**

FOR IDENTIFICATION)

THE WITNESS: Okay.

Q. (Mr. Levy) Do you recognize Exhibit 118?

A. First time I've seen it.

Q. Okay. So you weren't aware specifically or have not yet had the chance to review this notice of deposition or accompanying subpoena for your appearance here today?

A. That's correct.

Q. Nevertheless, are you appearing here today responsive to a request by my office to take your deposition?

A. Yes, sir.

Q. And sir, are you serving as an expert on behalf of the policy holder, Beach Mart, in this case?

A. Yes, sir.

Q. How many times prior to today have you given deposition testimony?

A. Over 50 times.

Q. And of those times, do you know the breakdown between state and federal court?

A. I've never looked at that.

Q. You know how many of those times were in North Carolina, either in the state or federal courts of North Carolina?

**12**

A. Probably half of them.

Q. Of the 50 or so depositions, have all of them been in your capacity as an expert?

A. Yes, sir.

Q. In other words, you've never given deposition testimony as a party to a case or as a fact witness?

A. That's correct.

Q. In the 50 or so times that you provided testimony, in how many instances were you engaged on behalf of the insured or the policy holder?

A. The last time that I did a count, it was about a third policy holder.

Q. And two-thirds insurer?

A. About a third agent or broker. About one-third insurance company.

Q. Have you testified before in professional negligence cases against agents or brokers?

A. Yes, sir.

Q. In other words, have you been asked before to offer an opinion regarding the standard of care for an insurance broker or an insurance agent?

A. Yes, sir.

Q. Okay. And in those instances, have those been examples of where you have provided testimony for

**13**

or on behalf of the agent or broker?

A. I could be representing the agent or broker, or I could be adverse to the agent or broker.

Q. Okay. So there's been both? You've ---

A. That's correct.

Q. In other words, you've been engaged by what would really just be plaintiff's lawyers, attorneys representing claimants against an agent or broker. And then you've also been engaged by defense attorneys who are representing the agent or broker?

A. Yes, sir.

Q. Separate and apart from that, have you also been engaged in coverage disputes such as the one that brings us here today?

A. Yes, sir.

Q. And of those 50 or so cases, how many of those were coverage disputes?

A. That was my one-third answer.

Q. Okay. So –- and that's where I'm getting a little crossed up because two-thirds of the total depositions were either for insureds or insurers, insurance carriers.

A. Right.

Q. Does that mean that two-thirds is also reflective of those cases in which the matter in

06-23-21                    PNMCIC v Beach Mart/2:14-CV-00008-FL                    COPY

dispute was insurance coverage?

A. Let me try to clean it up.

Q. Sure.

A. If it's a covered claim, the insurance agent is not liable. If it's not a covered claim but the agent representative was covered, the agent could be liable.

Q. Okay.

A. So coverage is something in every case.

Q. Okay. And how many of your cases that you've worked on have there been claims for bad faith?

A. It's an element in all of the insurance company cases.

Q. Sir, do you know what EC or extra-contractual claims are?

A. Yes, sir.

Q. What is your understanding, in general, of EC or extra-contractual claims?

A. That's a broad question, so we'll try to break it down into small pieces. It could be an excess of policy limits. It could be for damages not outlined in the policy. There are various ways that the extra-contractual could arise.

Q. What is your understanding of how the extra-contractual can arise in North Carolina?

A. It feels like you're asking me a question of law. I am not an attorney, but my understanding is that if the fact finder determines that there was some type of breach, then the interrogatories to the jury could include extra-contractual damages.

Q. Okay. So let's get right to that –- that point that you made. Because we'll talk about your report, and we'll have a chance to spend some time with that during our exercise today. But certainly, you did make a statement in your report that you're not an attorney, and you've just done so again today, correct?

A. Correct.

Q. And you've never been licensed as an attorney here in North Carolina or in any other jurisdiction?

A. That's correct.

Q. Have you ever made any inquiry, to start with, with the North Carolina State Bar as to what constitutes the practice of law here in North Carolina?

A. No, sir.

MR. SHAW: Objection.

Q. (Mr. Levy) How come?

A. I had no interest in the question.

Q. Okay. Have you ever visited the North Carolina State Bar's website?

A. No, sir.

Q. Did you know that it would be as simple as going to the North Carolina State Bar's website and clicking on a link on that website to review both the statutes as well as the advisory opinions and formal ethics opinions that the North Carolina State Bar has offered regarding what is appropriate and not appropriate in terms of the practice of law in our state here in North Carolina? Did you know you could do that?

A. No, sir.

MR. SHAW: Objection to form.

Q. (Mr. Levy) Sir, what is your current understanding of what would constitute the practice of law in the State of North Carolina?

A. Providing legal advice to a third party.

Q. Okay. And how would you define legal advice?

A. Interpreting a contract and offering an opinion on the contract.

Q. Okay. Is it true, Mr. Tilden, that you do not intend and do –- are not willing to offer legal advice in as much as you're not a lawyer?

A. That's correct.

Q. Okay. So that's not your intention, whether it be in this case or in any other exercise in your purview. Is that fair?

MR. SHAW: Objection.

THE WITNESS: That's correct.

Q. (Mr. Levy) Okay. So though you serve as an expert and certainly are prepared to offer opinions, for example, not this case but in a case involving a claim against an insurance agent as to what an agent would do, what an ordinary, prudent insurance agent or broker would do, you're not intending to offer legal opinions or advice in this case, true?

A. You –- you used the word this, which changed the question from the agent to this case, which is the Beach Mart case.

Q. That's true.

A. And so I –- I would not offer advice on the legal duties of an agent in a case or in this case.

Q. Okay. And I want to make sure I'm clear on –- on a definition. You just told us that your definition of legal advice is providing interpretation or offering an opinion on a contract to a third party. Is that fair?

A. Yes, sir.

Q. Now, you would agree with me that an insurance policy is a contract between the insurance carrier and the insured, true?

A. That's correct.

Q. I'm not overstating or understanding that, that's a well-accepted precept in the area of insurance coverage, true?

A. Correct.

Q. And in fact, for all the great many years, we'll talk about your experience, that you've not only been in this industry of insurance but also done a lot of teaching to various types of groups and individuals, that may well be something that you've taught folks. That is that, at its core, a policy is a contract between the insured and the insurance carrier. True enough?

A. That's correct.

Q. An insurance policy outlines the rights and obligations of both the carrier and the insureds in terms of each other. True enough?

A. Correct.

Q. Okay. Now, when you accept an expert engagement in any case, but to include this one, who is your client?

A. I only accept engagements from attorneys.

Q. Okay.

A. I do not accept any direct engagement from a policy holder or an insurance agent or broker.

Q. So if, for example, you're engaged, as you were in this case, on behalf of a policy holder, do you regard the law firm as your client? Or, in this case, would you regard Beach Mart as your client?

A. I would regard both.

Q. Okay. So for clarity of the record in this case, your clients and the purpose of your engagement was to offer expert opinions and analysis on behalf of both the Womble Bond Dickinson firm and Beach Mart?

A. I was retained by Womble ---

Q. Yes, sir.

A. --- on behalf of Beach Mart.

Q. Okay. So you're working on behalf of both?

A. I get my directions from Womble. I -- I -- I have no direct contact with Beach Mart.

Q. All right. Meaning you've never had any direct communication at any point in time with any individuals who work for or own Beach Mart?

A. That's correct.

Q. All of the communications that you've had in connection with the case that brings us here today have been with the team at Womble?

A. That's correct.

Q. Okay. And would you agree, sir, that the analysis and opinions that you've provided in your report, which we'll have a chance to discuss, and any supplemental opinions that you may have are being offered on behalf of Beach Mart?

A. Yes, sir.

Q. Would you also agree, sir, that the opinions and analys –- this al –- analysis, excuse me, that you provided are being offered to provide your assessment to Beach Mart?

A. Yes, sir.

Q. Okay. Sir, I understand that you've not had a chance prior to today to take a look at Exhibit 118, and that's totally fair. Do you have somewhere, be it at your home or wherever you maintain documents in connection with your expert work, some gathering of all the materials that you've reviewed in doing your work on this case?

A. Yes, sir.

Q. How do you maintain those materials? Electronic, paper or some combination of the two?

A. Electronic.

Q. Okay. Have all the materials that you've reviewed in doing your work on this case that brings us here today been provided to you by the Womble firm?

A. Yes, sir.

Q. Do you use or rely upon any reference or external materials in formulating your opinions in the case?

A. No, sir.

Q. Did you consult with any individuals, and I'm not asking about your communications with counsel, but I'm asking whether you've consulted with individuals separate from counsel in order to build and -- and create your opinions and analysis in the case?

A. No, sir.

Q. Do you have a set process that you follow in any case in order to go about your work in assessing the facts and coming to your analysis and opinions from the standpoint of being an expert?

A. It depends who my client is.

Q. Okay. Let's kind of limit it to these cases that involve disputes over what a policy does or does not cover, okay?

A. Okay.

Q. And that's a subset. I understand you also get involved in E&O claims. Let's exclude those for right now.

A. Okay.

Q. Just talking about the cases that you get involved in where there's some dispute with respect to insurance coverage, what does your process consist of kind of from the time of engagement until the time that you're prepared to generate a report?

A. This is a liability case, so I look at the Complaint, the Answer, and then compare those documents against my understanding of what the policy is. I — I say my understanding. Sometimes I have a certified copy, sometimes it's uncertified.

Q. Yes, sir.

A. But I try to make it clear if I haven't seen a certified copy. And then I'll look at claim notes and -- and try to get into the mind of the claims processor.

Q. Okay. Are there any other reference points, materials, documents that are critical to you for purposes of doing an analysis in a case such as the one that brings us here today, that is in a case where it's a third-party -- it's a third-party liability dispute? The underlying case is a third-party liability dispute. And I understand this is as distinguished, let's say, from a first-party claim. And so what are those type of things or documents that are critical to you in doing an analysis in a –- in a third-party liability dispute from the standpoint of insurance coverage?

A. Date of loss, confirming coverage, the -- the typical things for file analysis.

Q. Okay. With respect to the cases other than this one that you've worked on concerning third-party liability claims, how many of those have involved personal and advertising injury?

A. Two, in recent memory.

Q. Okay. Now, of those two, were those also cases involving either trademark-related disputes or intellectual property? Were they defamation cases? Or did they fall into other categories?

A. One was defamation. The other one was trademark, trade dress, patent infringement.

Q. Okay. Tell me the name of the other case that you worked on that involved trademark, trade dress or patent infringement?

A. I don't recall the name. It might be in my CV.

Q. Do you know whether it was here in North Carolina?

A. Charlotte.

Q. Okay. Do you recall the –- the names of any of the attorneys involved?

A. Joe Nelson represented the insurance agent, and Joe retained me.

Q. Uh-huh. And was Joe with the Dickie, McCamey firm?

A. Yes, sir.

Q. And do you remember who was on the plaintiff's side?

A. No, sir.

Q. So that particular case really was not a third-party liability dispute, it was an E&O claim?

A. It was failure to procure coverage.

Q. And I don't want to -- maybe I'm not using appropriate terminology, but typically claims against brokers, when I've represented brokers, are sometimes characterized as E&O claims, meaning there's an allegation that a broker didn't do something they should have done. Was that the nature of that dispute?

A. Yes, sir. It was not bodily injury or property damage. It was economic loss.

Q. Okay. Is that the only other time that you can recall working on a case in your expert career involving claims –- underlying claims of trademark or intellectual property type disputes?

A. Those are the only two I can currently recall.

MR. LEVY: Okay. Let me hand you what we'll mark for identification as Exhibit 119.

(DEPOSITION EXHIBIT NUMBER 119 WAS MARKED FOR IDENTIFICATION)

THE WITNESS: Thank you.

MR. LEVY: Sorry to throw that at you.

MR. SHAW: It's fine.

Q. (Mr. Levy) Mr. Tilden, I'm going to take some time as we go through today and work through Exhibit 119. But as a preliminary matter, I hope Exhibit 119 is a document that you recognize.

A. Yes, sir.

Q. And what is Exhibit 119?

A. The first 24 pages are my expert report, and my curriculum vitae follows that.

Q. Okay. If it's okay, I'd like to actually start with the CV ---

A. Okay.

Q. --- just to walk through a little bit more about your background, training and experience, sir. And so I'm looking at what would constitute the last several pages of what's been marked for identification

as Exhibit 119. And is the first page of your CV one which reflects your name and –- and address on the top?

A. Yes, sir.

Q. Do you know how current this CV is? Or is there a way for us to tell within the document?

A. It appears to be as of February.

Q. Okay. And do you know whether or not, and if you don't it's okay, there have been any changes of any substantive nature to this CV between February and the present?

A. Some of the articles have been updated, or publications ---

Q. Okay.

A. --- due to revisions by the insurance industry.

Q. Yes, sir.

A. Additional cases should be added.

Q. Okay. So we'll get to –- to those. But it sounds like the primary areas in which there might be some edits to those that are on here, or additions, would be in the area of some of the articles and then some of the casework that you've done?

A. Yes, sir.

Q. How many cases are you currently working on as an expert?

A. I pause because we're coming out of COVID ---

Q. Yes, sir.

A. --- and I've got a lot of cases that were on the back burner ---

Q. Okay.

A. --- that could be coming forward.

Q. Right.

A. It feels like active cases, three or four. But there are some old cases, pre-COVID, that could be bubbling to the surface in the next year.

Q. Yes, sir. By the way, do you know the date on which you were retained to provide services in the case that brings us here today?

A. No, sir. I'd have to look at my billing.

Q. Do you know whether or not you were retained in calendar year 2020 or this year, calendar year 2021?

A. I don't recall.

Q. Do you know whether you were retained more than a year ago?

A. I recall a discussion with Womble, but the case was stayed, and then it heated back up.

Q. Sure.

A. So the time line, I'm –- I -- I really don't know.

Q. Okay. And by this stay, do you mean that the coverage case was stayed, the underlying case was stayed, or you do not know?

A. I don't recall.

Q. Okay. The other question I should have asked is what are your hourly rates or fees?

A. $300 per hour.

Q. Is that for all services, or is there a different rate for testimony?

A. All services.

Q. And do you know approximately the total amounts that you've invoiced to date for your services?

A. I don't recall a number.

Q. Do you know how many hours approximately you've done work on this case ---

A. No, sir.

Q. --- to the present? Would you have access to that information in as far as your billings for invoicing to date?

A. Yes, sir.

Q. And I suppose your billings or invoicing to date would also reflect the approximate date of retention?

A. Yes, sir.

Q. Do you have the firm engaging you to sign an engagement agreement?

A. No, sir.

Q. Okay. So how do you formalize or memorialize your agreement to serve as an expert in a case?

A. I believe that good faith and fair dealing is implied in all contracts.

Q. Uh-huh.

A. I only work with law firms that I know.

Q. Okay.

A. And it's basically, "Here's my rate." We all agree to it ---

Q. Yes, sir.

A. --- and we move on with life.

Q. Understood. Okay. Is that something at least there's some exchange of e-mail where you inform the firm, "Hey, these are my rates."? Or it's by the phone or some combination of the two?

A. I will put my CV and my rates in an e-mail ---

Q. Okay.

A. --- and send it to the firm.

Q. And then maybe you'll get some sort of response saying, "Yes, we'd like to move forward with you."?

**A. That's our retention agreement.**

Q. Yes, sir. And then when you received materials, is it typically by way of either an e-mail attachment or a Dropbox link or something of that nature?

**A. Yes, sir. I try to avoid paper.**

Q. Okay. All right. Well, you'll have to excuse this exercise today. Let's go back to your CV which is a portion of what's been marked for identification as Exhibit 119. First, just in looking at the education section on that first portion of the CV, does that all appear to be accurate to you?

**A. Yes, sir.**

Q. And so you mentioned earlier during the deposition that you attended at least some period of time at Chapel Hill before moving on?

**A. Yes, sir.**

Q. And did you immediately move into the insurance business? Or were there other activities that you engaged in from a work standpoint?

**A. I was a paid firefighter.**

Q. Okay. And so I suppose you did that from the time that you moved on from being at Chapel Hill until you started working in the area of insurance?

**A. Yes, sir.**

Q. So have you worked continuously in the area of insurance from at least some point in the mid or late 1970s up through the present?

**A. 1974.**

Q. Okay. And does the CV here reflect all of the education that you've had or just what you regard to be some of the more noteworthy education that you've had in the area of insurance?

**A. These are the charters or certificates that I have received.**

Q. Sure. And have you had, for example, a CPCU, which is one of the certifications listed on the education section in your CV? Have you had that continuously from 1980 through the present?

**A. Yes, sir.**

Q. Okay. And with respect to these other items that are listed on the education section, have those also been continuously maintained?

**A. Yes, sir.**

Q. Okay. Now, we'll get over kind of to your work experience, but have you generally worked in the area of serving as an expert witness in the area of insurance since some point in the 1990s through the present?

**A. '97.**

Q. Okay. Had you served in a capacity as an expert prior to '97?

**A. Yes, sir.**

Q. How many times was that?

**A. Less than five.**

Q. Okay. Now conversely, since 1997, have you actively worked doing anything in the insurance arena other than serving as an expert witness?

**A. Writing articles, teaching ---**

Q. Okay.

**A. --- drafting policies, handling claims reviews from claims departments?**

Q. Sure. Have you directly handled any insurance claims or, more specifically, liability claims since –- at any time since 1997?

**A. Not directly. But I would get -- I do get e-mails –- it used to be letters –- wanting a –- a coverage opinion or a review or a round table, as a term of art. You know, what are my thoughts about this particular claim?**

Q. Sure. And I –- I know the word round table in -- that it's used in –- in some respects. I think you and I are probably in some of the same industry. But I guess the –- the question more precisely is have you yourself had responsibility for adjusting or handling any liability claims for the last 24 years?

**A. Not directly, no, sir.**

Q. Okay. Have you had direct supervision or oversight of any individuals directly handling any type of liability claims for the last 24 years?

**A. No, sir.**

Q. Okay. And that's not to minimize anything else that you're doing. So let's go over then, if we can, to the second page, Page 2 of your CV, and just talk a bit more about your experience. First, talking about the positions that you had as an account executive at Herb Holland and as an account executive at Marsh & McLennan. Are these brokers or brokerage firms?

**A. Herb Holland was an agency.**

Q. Okay.

**A. Marsh is brokerage.**

Q. Right. I –- and –- and that I knew. But Herb Holland is an –- is a insurance agency?

**A. Yes, sir.**

Q. What were the responsibilities of an account executive at Herb Holland?

A. Selling insurance, handling changes, small claims under $5,000.

Q. Okay. Any experience at Herb Holland adjusting or directly handling liability claims?

A. They were all first-party property.

Q. Okay. And that was here in North Carolina. I guess that was in Chapel Hill?

A. Yes, sir.

Q. Is Herb Holland still around?

A. The agency sold to another agency.

Q. Okay. And then after that time, you moved I guess up to D.C. for a period of time?

A. Yes, sir.

Q. And while you were with Marsh, what did your responsibilities consist of as an account executive?

A. Handling special accounts.

Q. Okay. Were you directly adjusting or handling liability claims while you were with Marsh?

A. Not directly, no, sir.

Q. Okay. And so then you took a position as a vice president at Thomas Rutherfoord in Roanoke?

A. Yes, sir.

Q. What were your responsibilities -- some of your responsibilities during that time frame?

A. Handling accounts over 100,000 commission, working with London, large liability claims, and set up three workers' comp funds.

Q. Okay. So in your role as vice president of Thomas Rutherfoord up in Virginia, were you directly adjusting or handling any liability claims at that point in time?

A. I was for the London market, yes, sir.

Q. Okay. Did those claims include claims under a –- under general liability policies?

A. These were accounts that retained the first many millions of losses.

Q. Yes, sir.

A. And so they were broad policies, liability policies in excess of the retention.

Q. So would it be fair to refer to Thomas Rutherfoord as a excess and surplus lines broker?

A. I was licensed as an excess and surplus lines broker ---

Q. Uh-huh.

A. --- because of my involvement with the market.

Q. Right.

A. But we also managed claims, sold policies, had five offices ---

Q. Right.

A. --- so there were a lot of functions going on.

Q. I'm going to kind of go through the rest of this, but I don't find it to be useful in depositions or otherwise to be cagey.

A. Oh.

Q. In this case, one of the topics that we'll talk about is the manner in which Penn National adjusted a claim presented to it by Beach Mart starting in June 2012. And in that instance, a claim was presented where there was a pending claim, a liability claim, against the insured. And the insured presents to the carrier and says, "Here, I'm pa –- handing this over to you and asking you to provide a defense. Does that –- am I saying that consistent with your own understanding?

A. Yes, sir.

Q. I'm really trying to gather, as we walk through your CV, the instances in which you individually have sat on a claims team or been associated with receiving in a claim, taking a look at it, making a decision whether or not to provide a defense to an insurer, and handling it from that point forward. That is not something that you did at Thomas Rutherfoord, is it?

A. I would make the recommendation.

Q. Right. The recommendation to whom?

A. The gentlemen was Ed Bresland at Mendes in New York.

Q. Okay. Mendes is a law firm.

A. That –- that's correct.

Q. Right.

A. But I would gather the information ---

Q. Right.

A. --- and then submit the package to Mendes with my recommendations.

Q. Did you have occasion in that period of time, those four years between '79 and '83, to adjust or make recommendations concerning personal and advertising injury claims?

A. Not that I recall.

Q. Okay. And ultimately, was the decision made concerning whether or not to provide a defense and how to proceed from that point by Mendes & Mount?

A. The accounts that I work with had their own legal teams.

Q. Okay.

A. So they would be defending the claim.

Q. Well, Mendes wouldn't defend the claim, but they would assign it out to defense counsel?

A. The policy holder had their own legal staff to defend the claims.

Q. Okay. Let's move forward now to the Chapel Hill Insurance Agency. And that was where you worked, I suppose, for, give or take, about seven years. You moved back to North Carolina?

A. Yes, sir.

Q. And what was your responsibilities as an account executive at the Chapel Hill Insurance Agency?

A. Primarily commercial accounts, underwrote for three -- two insurance companies and handled small claims. I believe my limit was $10,000.

Q. Any opportunity while at the Chapel Hill Insurance Agency to receive in claims from an insurer, do an assessment as to whether or not to provide a defense, and to proceed from there?

A. No, sir.

Q. With regard to the underwriting activities that you did while at the Chapel Hill Insurance Agency, would that have included the process of renewing coverage for insureds?

A. It would be new business and renewal.

Q. Okay. As a general matter in the process of working through renewal of insurance with an insured while you were with the Chapel Hill Insurance Agency, what would the type of questions that might come up with respect to that insured as part of the renewal process?

A. It all depended on the account.

Q. Okay. In your experience, not limited to the time at the Chapel Hill Insurance Agency but also in general, during an insurance renewal process for commercial general liability type insurance for an insured, at times, frequently at times, carriers would like to know through the underwriting process if the insured has been sued in the preceding 12 months. Wouldn't you agree with that?

A. More often than not on new business. Very seldom on renewal.

Q. Okay. Do you agree that whether or not an insured has been subject to a lawsuit can or may affect the risk that the carrier is underwriting in the subsequent year?

A. It may or may not. Each claim is handled on its own.

Q. Okay. Moving forward, after 1990 or starting in 1990, more accurately, you took on a position as the director of education for the Independent Insurance Agents of North Carolina, the IIANC?

A. Yes, sir.

Q. And you've had a pretty strong affiliation with the IIANC over the years. Is that true?

A. Yes, sir.

Q. Describe what the IIANC is.

A. Trade organization.

Q. Is it for independent adjusters?

A. The membership is independent insurance agents, but insurance companies also participate. They're not a member, a voting member, but they participate. Adjusting firms participate. So there are all sorts of different organizations that network through that trade group.

Q. Okay. So it sounds as though the trade group is comprised, at least from a voting standpoint, of agents. Independent adjusters, or IAs, can participate in some of the programming?

A. That's correct.

Q. Do they in fact participate in some of the programming?

A. Yes.

Q. How about adjusters specifically affiliated with a specific carrier? Do they participate in IIANC programs in your experience?

A. Yes, sir.

Q. How does that break down? Is most of the program participation from members which are insurance agents, independent insurance agents, versus independent adjusters versus adjusters affiliated with a -- a specific carrier?

A. The -- the reason that I was brought in was North Carolina was going to mandatory education for agents and adjusters.

Q. Yes, sir.

A. Much like CLEs for attorneys.

Q. Right.

A. And so that was going to be effective in 1991.

Q. Right.

A. And so my function at that time was to develop the courses and teach the agents and adjusters whatever principles they needed to learn.

Q. So fair to say you got familiar with generating outlines and contents, sending them to DOI for approval, getting the approval as a -- for the course, and lecturing and writing resource guides for -- for folks within the industry?

A. Yes, sir. I had 40 instructors working for me.

Q. Okay. Was that to start or as you built it

up over time?

A. That was to start just to get the project rolled out.

Q. Okay. And you stayed with IIANC from 1990 through 1997?

A. Yes, sir.

Q. But your role changed? Or did it -- was it just your title?

A. My role changed.

Q. How so?

A. The job had to be split. The education was overwhelming.

A. Uh-huh.

Q. And so I went over to technical affairs, which was liaison to insurance companies, insurance services offices, national council, the legislature ---

Q. Right.

A. --- whatever was not direct classroom delivery. I still taught ---

Q. Right.

A. --- but I had a different focus.

Q. So through this whole time that you're with IIANC, certainly that was not a time in which you were receiving in liability claims, assessing them for whether or not to provide a defense, and proceeding from there. That's not something you did at IIANC, is it?

A. There were several corporations. One corporation provides the insurance for the State of North Carolina. I did not work for that corporation. But the complex claims would be referred to me for analysis.

Q. And is this the -- the North Carolina Joint Underwriters? What –- what –- what is this organization that you're referencing?

A. I forget the exact legal name today, but we called it the for profit. Being a trade association, we could not be for profit.

Q. Okay.

A. So there was a separate corporation that was the for profit that handles the insurance for the State of North Carolina.

Q. Okay.

A. And the commissions, after expenses, goes back to universities and libraries and altruistic things.

Q. Right. Before we continue on that, you had also mentioned that, at a point, you participated in writing insurance policies.

A. Yes, sir.

Q. Are these manuscript endorsements that are placed on insurance policies? Or have you written or drafted specific forms?

A. The answer is yes to both.

Q. Okay.

A. For specific forms, I have been retained to do commercial general liability and umbrella drafting.

Q. By whom?

A. Mitsui Sumitomo.

Q. Say again.

A. Mitsui was Great American's pup that handled Japanese business. Sumitomo was Chubb's pup.

Q. Okay.

A. And when they merged, they needed to come out with the new product line.

Q. Okay. So these are personal lines?

A. Commercial.

Q. Commercial lines?

A. Commercial.

Q. And umbrella level coverage?

A. Primary and umbrella.

Q. Okay. And you prepared forms for these two outfits at times or had input?

A. I did the actual drafting. I used the AAIS, that's the American Association of Insurance Services, as a backbone, but revised it according to their market segment.

Q. To be clear, you were not involved in any way or manner with the drafting of the business owner's policy or the umbrella policies that are at issue in the case that brings us here today, were you, sir?

MR. SHAW: Objection to form.

THE WITNESS: I don't know. And the reason I don't know is I've worked with ISO for years and have had input in discussion with the staff members on revisions.

MR. LEVY: Okay.

THE WITNESS: I saw that this appeared to be an ISO form or an ISO backbone. And I recognized some of the drafting, you know, from the late '90s. But I don't know if my comments were incorporated or not.

Q. (Mr. Levy) So you're not prepared to testify under oath that this is your form, for example?

A. That's correct.

Q. You just don't know. And were you actually drafting policies at that time or providing comment or

part of a team or group that was trying to work on putting together drafts or revisions?

A. Are we talking about with ISO?

Q. Yes, sir.

A. Howard DeBisschop was a team leader for business owners' policies.

Q. Uh-huh.

A. And so Howard and I would talk, or Dom Yezzi or the different staff members about different issues.

Q. Okay. In any event, you're not -- as we talked about, you're not prepared to -- to testify in this case, "These are my forms," or anything to that effect.

A. That's correct.

Q. Okay. Sir, in this instance -- and we'll get into the full kind of set of facts that brings us here today. But is it fair to say and consistent with your understanding that, at a point in time, Beach Mart presents, or specifically in June 2012, this underlying counterclaim to Penn National and asks Penn National to provide a defense. Is that accurate from your understanding?

A. Yes, sir.

Q. And after that time, an individual named Greg Gross, who is a claims person with Penn National, is assigned the claim and works through that process after that time. Is that also accurate?

A. Before the bifurcation, yes, sir.

Q. Okay. Now, with respect to what Mr. Gross had to do in this case, which is receive in a claim, take a look at what was provided to him, ultimately communicate back to the insured whether or not the carrier is going to provide a defense, how many times in your professional career have you done that?

A. It's got to be over a hundred.

Q. So in other words, you've actually received in claims ---

A. Yeah.

Q. --- gone through, worked through a coverage analysis, and then responded back to the insured and said, "Here, we're going to hire a defense counsel for you."?

A. I did not respond back to the insured. I will respond to Mendes & Mount with my recommendation.

Q. So you're saying that the last time that you would have done that is in 1983 or before?

A. Other than my time with the Independent Insurance Agents. I would make recommendation there. And then, in what I'm doing today, I still get files

in with round tabling, and I'll report back to the adjuster.

Q. Sure. My question, I guess more precisely is, you've never worked for an insurance carrier, have you?

A. No, sir.

Q. You've never been a claims ---

A. Let me -- let me clean that up. Insurance companies have hired me directly to train their staff and do projects for them. But I've always been an independent contractor.

Q. You've never been a claims person for an insurance carrier, have you?

A. That's correct.

Q. You've never supervised a claims team, correct?

A. That's correct.

Q. You've never been responsible as an in-house employee for an insurance carrier to ultimately make decisions regarding a duty to defend or a duty to indemnify, correct?

A. That's correct.

Q. You're familiar, of course, with the phrasing duty to defend. True enough?

A. Yes, sir.

Q. What's your definition of the duty to defend?

A. It's broader than the duty to indemnify.

Q. How do you define, though, the duty to indemn –- the duty to defend? Excuse me. Not how it compares to the duty to indemnify, but what's your definition of the duty to defend?

A. As respects North Carolina, you look at the four corners of the Complaint and compare it against the four corners of the policy.

Q. Okay. And do you know that based on your experience within the industry? Or have you reviewed any publications or authority that has taught you that?

A. Well, I don't recall. I have reference books in the office. And when the question comes up, I will look it up.

Q. Okay. Do you know the case, for example, the -- the appellate case which states that?

A. No, sir.

Q. Okay. Have you ever heard of a case called Waste Management v. Peerless?

A. Oh, yes, sir.

Q. Okay. Does that refresh your recollection as to what the test is in North Carolina concerning

the duty to defend?

A. I read that case many years ago and haven't refreshed my memory of it.

Q. Okay. Next question. What is the duty to indemnify, in your understanding?

A. It's based on the facts. Compare it against the policy.

Q. What facts?

A. The facts established by the investigation.

Q. Okay. Have you ever gone back and tried to reconcile your understanding of the duty to indemnify with what the law is in North Carolina?

A. No, sir.

Q. Have you given or offered opinions or advice to third parties concerning the issue of whether or not there's a duty to indemnify during your professional career?

A. I -- I don't understand the question.

Q. Sure.

A. But let me -- let me try to answer, and then we'll figure out what the question is.

Q. Okay.

A. If the facts indicate that there is coverage in the policy, I would point to whoever is retaining me and give them my opinion.

Q. So I want to break down the notion and word of coverage. Would you agree with me that the word coverage can encompass both a duty to defend and a duty to indemnify in a liability context?

A. It -- it might, but each case is handled on its own.

Q. But in the case of a liability policy, if a insured is seeking coverage under a liability policy, they may be seeking or would be seeking a defense, but also may be seeking indemnification. Does that makes sense to you?

MR. SHAW: Objection.

THE WITNESS: It -- it -- it makes sense, yes, sir.

Q. (Mr. Levy) Would you agree with me that in seeking a defense from a liability insurer, a insured is asking that insurance company to hire a lawyer for them?

A. I don't know what's in the insured's mind. But if a case is tendered, the insurance industry will retain an attorney.

Q. If -- if there is a duty to defend under the policy?

A. Yes, sir.

Q. And there's instances where the policy does not obligate the carrier to defend a claim. Wouldn't you agree with that?

A. Each policy stands on its own. Each claim stands on its own.

Q. Do you agree that there are instances where there is a underlying complaint or set of claims against an insured which would not trigger a duty to defend? Do you agree that that's possible?

A. Yes, sir.

Q. Okay. Now, let's talk for a moment about the duty to indemnify. You talked about why -- how you would measure that, but do you have an understanding of what the duty to indemnify means based on your years of experience?

A. Generally taking the facts and applying it against the policy.

Q. Would you agree, sir, that indemnification, as that word is used in a liability insurance context, means the payment of money by the insurance company to the third-party claimant on behalf of the insured?

A. Each policy is different. But for the purpose of most of the policies, that's a correct statement.

Q. Okay. And your understanding and operating or working belief is that the duty to indemnify is based on the facts as determined through the investigation?

A. Or the jury, the finder of fact.

Q. Well, which one is it?

A. Well, certainly the investigation could come first.

Q. Uh-huh.

A. Sometimes the investigation is different than what the jury finds.

Q. And do you happen to know what that Waste Management case has to say about the duty to indemnify?

A. I don't recall it.

Q. Okay. Now, in terms of offering opinions, at least a measurable percentage of your work concerns these kind of coverage disputes, meaning disputes between an insured and an insurance carrier about what the policy does or does not obligate the insurance company to do. Am I saying that right?

A. That -- that's a ---

Q. I'm just saying part of your expert work.

A. --- that -- that's a large part of what the disagreement is.

Q. Okay. And you'd also agree that, from jurisdiction to jurisdiction, there's different rules

**54**

and laws that govern the interpretation of insurance policies?

A. As a general concept, yes, sir.

Q. In other words, if we've got a policy issued out to an insured in North Carolina, it might work different than one issued to an insured in South Carolina. Isn't that true?

A. That would be the law of the case, yes, sir.

Q. Okay. Well, separate from the law of the case, do you know how it works in terms of determining what state's laws apply in looking at an insurance policy?

A. That's a question the coverage counsel needs to answer.

Q. Okay. Have you rendered expert services in multiple jurisdictions?

A. Yes, sir.

Q. Have you taught in multiple jurisdictions, taught insurance-related matters?

A. Yes, sir.

Q. Does your education experience -- and that's a confusing way to say it, so let me rephrase. Does your experience providing education to others in multiple jurisdictions include educating folks on

**55**

liability insurance policies?

A. Yes, sir.

Q. So in other words, whether it's here in North Carolina or in North Dakota, for that matter, you have provided education in -- in multiple states -- maybe those are bad examples. I assume some of it was here in North Carolina -- about liability insurance.

A. I've taught here in the United States, in the Caribbean, in Europe and the Pacific Basin on liability insurance, and Mexico.

Q. When you go to different jurisdictions to do your teaching, how do you make sure that what you're instructing your audience on is accurate to their jurisdiction?

A. I have references in the office.

Q. Okay. Did you utilize any references in your office for purposes of your work in this case?

A. No, sir.

Q. How come?

A. I wasn't looking at a matter of law, I was looking at a matter of process.

Q. Okay. Did you perform or investigate to any extent what state's laws or what state's rules would apply to any of the processes or analyses that took

**56**

place with respect to the claim that brings us here today?

MR. SHAW: Objection. Form.

THE WITNESS: No, sir.

Q. (Mr. Levy) Do you know what the term coverage trigger means?

A. Trigger is a term of art in the insurance industry.

Q. Right. Do you know what that means?

A. What it takes to activate the policy.

Q. Okay. Do you understand or have you provided opinions in your expert capacity about coverage trigger before?

A. Yes, sir.

Q. Have those opinions been in North Carolina?

A. I don't recall specifically, but I imagine it would include North Carolina.

Q. Do you have any working understanding as to how coverage trigger works in the State of North Carolina?

A. As respects what type of policy?

Q. As respects a liability insurance policy.

A. I'm -- I'm kind of lost. There's an occurrence, there is an offense. Those are two different types of triggers, so that's why I'm lost in

**57**

the question.

Q. Okay. Sure. So in your view and understanding and in your experience, occurrence and offense are two different types of coverage triggers?

A. Yes, sir.

Q. Okay. Do you know what type of coverage trigger analysis is used for purposes of a general liability or an occurrence policy in South Carolina, let's say?

A. My most recent research was in relation to anti-concurrent causation ---

Q. Okay.

A. --- and the trigger there.

Q. Sure. Was the issue of coverage trigger -- did you do any research or analysis of that issue in connection with your work that you did on this case that brings us here today?

A. No, sir.

Q. Okay. And not prepared to offer any opinions on that subject matter?

A. No, sir.

Q. Including not prepared to offer any opinions as to what the operating test is for coverage trigger concerning the Penn National insurance policies that are at issue in this case? You're not going to offer

any opinions on that, are you?

A. I haven't been asked to, sir.

Q. Okay. If you were asked to, would you be willing to offer those kind of opinions?

A. I would have to research it before I came up with an opinion.

Q. Okay. Getting back to your experience, sir, just for clarity of the record, fair to say that you've never precisely sat at any point in your career in the seat that Greg Gross was sitting in with respect to the claim presented by Beach Mart, that is, you've never been working in-house for an insurance carrier where you were on a claims team, where you receive a claim in, you worked with a team to try to assess whether or not to provide a defense, and then ultimately communicate back to the insured what the coverage position is? Is that true?

A. That's correct.

Q. And you've never had to supervise a team doing that type of thing, have you?

A. That's correct.

Q. Have you ever drafted any manuals to be used by a team like we've just described, that is, kind of a process manual, "Here's how I would suggest you do this."?

A. My only recollection was when the known loss or injury wording came out. I did some work on the internal computer programs for the claims units for the carriers I consulted with.

Q. Okay. So specifically, can you cite any example of any point during your professional career where you have drafted a handling manual for a claims team handling liability claims with a carrier that writes general liability insurance -- commercial general liability insurance?

A. I outlined the procedure, I didn't write the manual ---

Q. Okay.

A. --- for the known loss issues.

Q. Just for the known loss issues ---

A. Yeah.

Q. --- but what I'm saying is have you ever drafted a manual of, "Here's kind of the nuts and bolts of how these claims professionals should handle a claim from the time it comes in –- this is a general -- commercial general liability claim -- from the time that it comes in until the time that it's resolved."?

A. I — I don't know. And the reason I don't know is part of my work was in drafting parts of the

CPCU and associating claims textbooks. And I don't know what part of the stuff I did pertains to this subject matter or not. But other than textbooks, the answer is no.

Q. Okay. You've never actually been engaged by a carrier that writes commercial general liability coverage to write a manual on how their claims professionals should handle commercial general liability claims from the time that the claim is first presented until it's end. You've never done that, have you?

A. That's correct.

Q. Have you written any papers on that exact subject matter, that is, you wrote –- you did some scholarship, you wrote a paper that said, "Here's how I think. Here's the research I've done, and here's my opinion on how claims professionals should handle claims from the time they come in, commercial general liability claims, until the time that the claim is resolved."?

A. No, sir.

Q. Do you regard yourself as an expert on that subject matter, that is, how it is that a claims examiner with an insurance company or a claims professional with an insurance company should handle a claim from the time it comes in until the time of resolution in the area of commercial general liability claims?

A. Yes, sir.

Q. And what is it that you draw upon to give you the belief that you qualify as an expert in that area?

A. Studying the CGL since its inception, handling those types of claims and making coverage recommendations, writing about the policy, training adjusters.

Q. Okay. In what instances have you provided training to adjusters with an insurance company who are -- these are claims professionals ---

A. Uh-huh.

Q. --- who are receiving in commercial general liability claims and working through the claims process and adjusting the claims until their point of resolution. What are the instances where you've provided that education or training to them?

A. One that jumps to my memory immediately is Westfield Insurance Company.

Q. Sure. Okay.

A. They retained me when they did a market re-focus, that's the best way to describe it, to

provide education for their adjusters nationally and their outside counsel.

Q. So Westfield, among other things, writes subcontractors, contractors, things like that, other small businesses?

A. This is when they were going to start that project.

Q. Okay. What year was that?

A. I'm thinking 2002, 2003.

Q. Right.

A. They had a president that was a race car driver ---

Q. Uh-huh.

A. --- and he was a risk taker.

Q. Okay.

A. And they changed their book of business.

Q. All right. And so around 2002, 2003, you provided some in-house training for Westfield for their claims professionals?

A. And their outside counsel. Yes sir.

Q. Okay. Did you do so by way of lecture or PowerPoint or both?

A. They had various claims offices, so I would visit the claims office. The class would have a handout. There were PowerPoints. It would be primarily didactic lecture. But, of course, being a group of adjusters, they want to play "What if...?".

Q. I've noticed that. Can you think of any instances that –- that you have provided comparable type programming in the way of training or education to a group of adjusters, claims professionals, in the area of handling commercial general liability claims at any time since 2002 or 2003? So this is in the last 19 or 20 years.

A. I — I did the same type of project for CopperPoint Insurance Company in Phoenix. But I don't recall when it was, five years ago maybe. With COVID, it's hard to ---

Q. Yes, sir.

A. --- figure out time.

Q. Most definitely. Now, I know that Westfield writes in the State of North Carolina.

A. Uh-huh. (yes)

Q. Understood. Does CopperPoint Insurance Company, to your knowledge, write in North Carolina?

A. I don't know what they're doing. They were the residual market workers' comp in Arizona. They had too much money, so I was brought in to help them turn into an insurance company so the legislature didn't strip them of all their cash.

Q. Okay. Does CopperPoint write workers' comp?

A. They write commercial general liability, automobile, so it's a -- a multi-line insurance company now.

Q. But you don't actually know if they do any business here in North Carolina?

A. I don't know what their footprint is.

Q. Okay. Do you know whether you've ever provided any of this type of training on how to handle a commercial general liability claim to claims professionals at any carrier other than Westfield at any point during your professional career?

A. I don't recall who was in on the Mitsui Sumitomo. I know it was more than underwriting, and a loss control was involved.

Q. Would it be fair to say, at least as we sit here this morning, that the only example you can think of where you provided the training that we're talking about during the last few minutes to claims professionals at a carrier that writes insurance in the State of North Carolina concerning commercial general liability claims would have been with Westfield in '02 or 2003?

A. For a direct contract with the carrier, that's correct.

Q. Okay. And I understand, and I'm not really asking about independent adjusters. I'm just asking about claims professionals working for a carrier.

A. When I did a classroom presentation before COVID, I really had no way of knowing who the attendee would be.

Q. Okay.

A. And so it could be an agent, it could be an independent adjuster, an IA, it could be an adjuster from an insurance company. I -- I don't know who the class is made up of.

Q. Okay. Don't the class members –- aren't they required to sign in in order to get credit in North Carolina with DOI?

A. They are in all states. But it's not under my provider number. It would be somebody else handling it.

Q. Okay. So just to be clear, I understand from your testimony that your –- you believe you have the qualifications to offer opinions as to what a claims professional should or should not do in the handling of a commercial general liability claim here in North Carolina, even though you've never sat in that seat personally, you've never overseen a team doing that personally, you've never been responsible

for writing the manual or procedure for those things personally, and you can think of one instance, as we sit here today, where you've actually provided training in-house, that being the Westfield program for commercial general liability claims in 2002-2003. Am I saying all that right?

MR. SHAW: Objection.

THE WITNESS: That's what I can recall.

Q. (Mr. Levy) Okay. Let's kind of go back to the publication section of the CV. This is a portion of what's been marked for identification of Exhibit 119. And you mentioned there may be some additional publications that you've put out there that could be added to this list. Is that –- is that right?

A. ISO has revised the commercial general liability policy. They've also revised the business auto. There's a new homeowners coming out next spring. So as those revisions come in, I will do a presentation on the rollout.

Q. Okay. Well, I'm just at this point talking about your publications, sir.

A. Yeah.

Q. Just with respect to the publications, the ones that I saw, or the only one I'm -- I'm seeing, and correct me on this, that appears to show an update within the last five or so years was this one on –- on AI. Did you do a –- a publication on additional insured or a –- a supplement to it in 2019?

A. Yes, sir.

Q. Have you published a –- a –- anything else in the last five years? I guess I see where you -- this thing on the CGL Coverage Part, Certified Insurance Counselors. This is on Page 4, on 2019.

A. Yes, sir.

Q. And I guess you've got Insuring Defective Construction?

A. Yes, sir.

Q. That's on Page 5.

A. Okay.

Q. Is it possible to insure defective construction under a CGL form? You don't need to answer that. We can talk about that offline.

A. As long as it's property damage caused by an occurrence not excluded or limited.

Q. Sir, have any of these publications concerned analysis of or application of a commercial general liability policy to personal or advertising injury claims?

A. Under defective construction, copyright infringement is mentioned.

Q. Okay.

A. Under CGL, certainly Coverage B is analyzed.

Q. So can you point me to the publications within your list here in which you would have provided some comment on that specific topic, that is, analyzing claims as presented under a CGL for personal or advertising injury?

A. It would be Commercial General Liability. Page 4.

Q. Is that the one that says the Commercial General Liability Coverage Part, Austin: Society of Certified Insurance Counselors?

A. Yes, sir.

Q. Okay. Is that a paper you still have a copy of?

A. More likely than not.

Q. Okay.

A. Also, it would be on Page 3, the CGL Policy Changes, 2001.

Q. Uh-huh.

A. That was a major personal and advertising injury revision.

Q. Also, on Page 3, would this include the '04 and '07 CGL Policy Changes?

A. '04 and '07 really didn't tweak Coverage B.

Q. How about 2013?

A. Same answer.

Q. So your point is that with respect to the ISO form on the business owners, or on a CGL form, there were substantial changes to Coverage B in 2001, but that was not the case in these other years that you've identified in these publications?

A. Yes, sir. The -- the discussion for the revisions related to the Internet started in '98, and the rollout was 2001 or 2000-2001 for the different product lines.

Q. Okay. What's the format of these publications that are referenced in your CV? Are they papers that you've written?

A. Yes, sir. They're student handouts, and they're typically in filing format.

Q. In what format? I'm sorry.

A. Filing format. The new words are underlined, the words taken out are stricken through.

Q. Okay. Have you ever drafted any papers or produced any written publication specifically concerning the application of Coverage B in a commercial general liability policy to trademark or intellectual property claims?

A. Well, in saying that, if you go to Page 5, Insuring the E-Commerce Account.

Q. Uh-huh.

A. It has a -- a large section of intellectual property issues in it.

Q. Okay. And did you reference that paper in doing any of your work on this case?

A. No, sir.

Q. Okay. Any other instances you can think of where you've covered the subject matter I've just mentioned?

A. Well, on Page 5, the second from the bottom, Malecki and Tilden on the CGL, that looked at the historical evolution of personal and advertising injuries since 1933.

Q. Okay.

A. I think on Page 7, under Umbrella and Excess Liability, there's a discussion of non-concurrent wording as respects umbrella and excess sitting over a CGL policy ---

Q. Uh-huh.

A. --- for personal and advertising injury.

Q. Okay. How about Tips, Tricks and Traps of the CGL?

A. That has a limited discussion of the 2001 revisions in it. It's more of a historical approach from 1941 looking at the different editions of the CGL and why the revisions came in.

Q. Sure. Moving down to your case work, this is on Pages 7 and 8 of your CV, which is a portion of what's been marked as Exhibit 119. Is this list accurate and current?

A. It is not current.

Q. When is it current up until? I mean when ---

A. February.

Q. So it was current as of February 2021?

A. Correct.

Q. Is this list, in terms of cases of the past four years, exhaustive? Does it list all the cases that you've worked on in the last four years, except as to those that you've worked on for the last four months that you'd need to supplement this with?

A. These were cases that I've testified in or given depositions in.

Q. So this case list is not exhaustive in the sense that you may have been a consulting expert but you didn't actually testify?

A. That's correct.

Q. As an example, with this case against a broker where Joe Nelson represented the broker in Charlotte, that's not listed on here. But that's because you didn't testify? Or is it listed on here and I missed it?

MR. SHAW: Objection.

THE WITNESS: I didn't testify. I wrote a report.

Q. (Mr. Levy) Okay. Of these cases of the last four years, at least those that have been listed on your CV, in how many of those did you testify in court?

A. Four. One was a mandatory arbitration.

Q. So four including the arbitration?

A. Yes, sir.

Q. Okay. Let's kind of exclude the arbitra –- that was USI versus VanderZanden?

A. Yes, sir.

Q. So what were the other three?

A. Page 7, Daniel Island.

Q. Uh-huh.

A. Puerto Rico Electric Power Authority on Page 8.

Q. Uh-huh.

A. USI v. Frieman.

Q. Okay. So Daniel Island, you testified down at State Court in South Carolina?

A. Yes, sir.

Q. Was that a dispute concerning insurance coverage?

A. It was an illusory policy, yes, sir.

Q. Okay. And were you qualified and tendered as an expert in that case during the course of the trial, based on your understanding?

A. It was a bench trial, and Judge Young stated I was an expert.

Q. Okay. And were you permitted in the Daniel Island case to offer all the opinions that you were prepared to offer? Or was your testimony limited in any way by the judge?

A. It was not limited.

Q. And to be clear, that was a bench trial?

A. Yes, sir.

Q. Okay. In that case, did you represent or was it a dispute between an insurer and an insurance carrier?

A. And insurance broker and wholesaler.

Q. Okay. So was ---

A. So all three.

Q. --- was the insured, the carrier and the broker and the wholesaler involved?

A. My client was the policy holder.

Q. Okay. And were you offering opinions on behalf of the policy holder in that case?

A. Yes, sir.

Q. Much as you're doing here. I mean you're offering opinions on behalf of the policyholder, Beach Mart, in this case?

A. Yes, sir.

Q. Okay. And –- and then going over to the Puerto Rico case ---

A. Yes, sir.

Q. --- I suppose you flew down to Puerto Rico and offered testimony in court in Puerto Rico?

A. Yes, sir.

Q. Okay. In English or Spanish?

A. Yes, sir.

Q. Both?

A. There are no juries in Puerto Rico.

Q. Okay.

A. All of the proceedings have to be in Spanish but everybody speaks fluent English.

Q. Okay. So with respect to that dispute, was that a dispute over insurance coverage?

A. Yes, sir.

Q. And were you appearing in that case on behalf of the insured or the insurance carrier or a different party?

A. The insurance company.

Q. Okay. And were you tendered and qualified as an expert as far as you know?

A. Yes, sir.

Q. What was the area of your expertise in that case?

A. Policy construction and analysis.

Q. Okay. And you were able to offer all the opinions you intended to offer in that case?

A. Yes, sir.

Q. Do you know what area or areas you were tendered in in terms of expertise in the Daniel Island case?

A. Policy construction analysis and custom and practice of insurance agents in procurement of coverage.

Q. Finally, in the USI v. Frieman case, that was up in State Court in Pennsylvania?

A. Yes, sir.

Q. Qualified and tendered as an expert in that case?

A. Yes, sir.

Q. Jury or bench trial?

A. Bench.

Q. How many times have you testified in front of a jury?

A. Ten or 15.

Q. Okay. But none in the last four years, I guess.

A. Not that I can recall.

Q. In what area were you tendered or areas were you tendered as an expert in USI v. Frieman?

A. Agency evaluation.

Q. So that was not a –- a coverage dispute?

A. That's correct.

Q. Okay. Different kind of case?

A. Yes, sir.

Q. In any of these cases listed in the last four years on your CV, Pages 7 and 8, were you asked to offer expertise or opinions concerning how a claims professional should handle a claim from the time that it's presented until the time of resolution?

A. Both the Daniel Island and the PREPA case.

Q. Both the Daniel Island and the other –- and what was the other one?

A. PREPA, Puerto Rican Electric Power Authority.

Q. And then in the Daniel Island case, did you in fact offer opinions about the manner in which the claims professional had handled the claim?

A. Yes, sir.

Q. Who was the carrier in that case?

A. Mount Holly.

Q. What was the type of claim?

A. Construction defect.

Q. And was this a property claim or was it a third-party claim?

A. Third-party liability.

Q. In Daniel Island, in that case, were your opinions critical of the manner in which the claims person had handled the –- the claim?

A. Yes, sir.

Q. And in the Puerto Rico case, were your opinions critical of how the claims person had handled the case or in favor of the claims person?

A. In favor of.

Q. Okay. How long ago was this Daniel Island case on for trial?

A. It would be right at four years.

Q. Okay. It's got a 2010 case number. So that case somehow sat around from 2010, as far as you know, through 2017 before it went to trial. It happens?

A. Yep.

78

MR. LEVY: Okay. All right. We've been going for a good while. Why don't we take a break, if that's okay with you.

**THE WITNESS: Okay.**

MR. LEVY: This is a good breaking point for me as well.

THE VIDEOGRAPHER: Going off the record. The time is 11:33 a.m.

(Brief recess: 11:33 a.m. to 11:46 a.m.)

THE VIDEOGRAPHER: Back on the record. This begins Media Unit Number 2. The time is 11:46 a.m.

Q. (Mr. Levy) Mr. Tilden, we're back on the record in your deposition, and we've taken significant time talking about both what's in your CV as well as some ancillary topics. I'm going to move over to your report here in –- in short order. I just wanted to confirm that really now speaking in terms of the last 10 years, have there been other instances where you have offered testimony concerning what a claims professional should or should not have done in court outside of the Puerto Rico case and the Daniel Island case?

**A. I am sure. But with that COVID gap, it's hard for me to remember time.**

79

Q. So let me rephrase it this way. Can you think of any other instances as you sit here this morning, or now close to into this afternoon, other than the Puerto Rico case and the Daniel Island case, where you have offered testimony in court concerning what a claims professional should or should not do in handling a liability claim?

**A. I recall one for Liberty Mutual in federal court in Kansas City.**

Q. Any idea of the time frame?

**A. No.**

Q. Any idea as to whether that opinion was offered on behalf of the insurance carrier or ---

**A. Liberty Mutual, insurance company.**

Q. It was on behalf of Liberty?

**A. Yeah.**

Q. If it's not listed on this list, would that suggest to you that it was more than four years ago?

**A. Yes, sir.**

Q. To your knowledge, has your testimony in court ever been limited or stricken by the judge?

**A. No, sir.**

Q. To your knowledge, has your testimony ever been challenged by an opposing party concerning whether or not you can offer the opinions that you are

80

prepared to offer in court?

**A. I'm sure it has been, but I'm not aware of it.**

Q. Okay. That would've been handled, I suppose, by the attorneys involved.

**A. Yeah.**

Q. Okay, sir. Let's now turn to what we previously marked for identification as Exhibit 119, but going back to the –- kind of the front page of it, this being the report. And is Exhibit 119 the report that you prepared summarizing the work that you've done in the case that brings us here today?

**A. Yes, sir.**

Q. Have you created or generated any supplements to this report ---

**A. No, sir.**

Q. --- as we sit here today?

**A. No, sir.**

Q. Do you intend to?

**A. Not at the present time. But I understand discovery is still ongoing.**

Q. Okay. I want to use the report if we can to walk through what you did in the case. Fair enough?

**A. Sure.**

Q. And so, by and large, I'll go

81

chronologically through the report, just to give you a forecast, and at times may ask you to look at a –- a small handful documents as we talk about your work and opinions. Okay, sir?

**A. Okay.**

Q. All right. So starting first with the –- the report itself, did you author this report in its entirety?

**A. There are excerpts from my policy in there that I did not author.**

Q. Okay. All right. So we'll look at those.

**A. Yeah.**

Q. And hose are just, for lack of a better way to say it, cut and paste directly out of an insurance policy?

**A. That's correct.**

Q. And true enough, the policies you got in this case were certified.

**A. Okay.**

Q. Did you know that?

**A. No, sir.**

Q. The reason I bring that up is because you had mentioned just as part of your general protocol that that's something you may look at as to whether or not a policy is certified.

A. Yes, sir.

Q. Why is that important to you?

A. It — it gives me a level of comfort that we're all dealing with the same policy.

Q. Do you go through the exercise of trying to reconcile a schedule of forms on a liability insurance policy with what you have to make sure, "Let me make sure I've got the whole policy."?

A. It depends what my task is.

Q. Did you do that in this case?

A. I noted in my report that -- that I did not include the amendatory endorsement that revised the definition of personal and advertising injury and added three exclusions.

Q. Okay. Why didn't you include that?

A. Oversight. It was a separate endorsement.

Q. Okay. In this instance though, did you look back at the policy declarations? For example, the schedule of forms, you're familiar with that term, correct?

A. Yes, sir.

Q. And did you look at that schedule and say, "Okay, I'm going to go through on the –- the bottom right or the bottom left of these pages and make sure I've got in front of me all the forms that are associated with these policies."?

A. No, sir.

Q. Okay. Any reason why you didn't do that?

A. It appeared to be a -- a standard policy with an endorsement, and the issues were very focused.

Q. Okay. So in any event, relative to the report itself and outside any excerpts that you've taken out of the policies, did you author this report in its entirety?

A. Yes, sir.

Q. And did you excerpt out or take any other portions of the report from anything else anybody else had written?

A. Other than myself, no, sir.

Q. Okay. You didn't work, for example, with any other team members or anything like that on this particular exercise? You work alone on these?

A. Yes, sir.

Q. Is Tilden & Associates just you?

A. Today it is. If I have a large project, I might bring in people to help me with the project. But as respects this case, I'm the only one.

Q. Understood. Okay. And so for all of the work, if we were to look at, for example, the timekeeping that you've done on this, it would be only your own? There's not anybody else with Tilden & Associates that's done any work for purposes of the -- what will call this case involving Beach Mart and Penn National?

A. That's correct.

Q. Okay. Looking at Page 2 of Exhibit 119, and more specifically the second paragraph of this, you've already talked about that you were retained in this case by the Womble firm. So the attorney is representing Beach Mart in this coverage litigation?

A. That's my understanding, yes, sir.

Q. Okay. And to –- to provide expert opinions relative to the case. Is that fair?

A. Yes, sir.

Q. You've also indicated through the course of your testimony thus far that you don't and can't say the exact date on which you were retained?

A. It would be in my records, but I don't recall.

Q. And in fact, you can't even say the calendar year in which you were retained?

A. I just recall there was a stay, and the file laid dormant on my computer for a long time.

Q. Is Exhibit 119 a subsequent or second or third draft of a report that you've generated in this case? Or is this the only report that you've generated in this case?

A. My process is to open a word processor and continually edit within the word processor. So there's only one document, lots of edits in one document.

Q. Okay. This was the final edit of that document that you sent over to the Womble firm ---

A. Yes, sir.

Q. --- for them to provide?

A. Yes, sir.

Q. And is the –- is Exhibit 119 reflective and inclusive of all the opinions that you're prepared to offer in the case?

A. Yes, sir. With the understanding that discovery is still continuing.

Q. Sure. The second paragraph of Exhibit 119, Page 2, references you providing "expert opinions related to an insurance claim and the adjustment of a loss, all as explained in this report." Do you see that verbiage?

A. Yes, sir.

Q. The expert opinions that you offer related to the insurance claim, to be more precise, are the claim -- or is the claim that Beach Mart presented to

Penn National for defense and indemnity beginning in June 2012. Is that accurate?

A. Yes, sir.

Q. What do you mean by the "adjustment of a loss"?

A. How the loss mechanically was handled internally.

Q. Okay. One of the items that you listed, just in terms of the generalities of doing one of these expert analyses that you perform, and pieces of information that may be pertinent to you is a date of loss. Is that accurate?

A. Yes, sir.

Q. In other words, when you're willing to receive an assignment and assist with a case, you'd like to know when the date of loss is, right?

A. That's one of the early things you screen for.

Q. Okay. What is -– what is a date of loss?

A. It's a date where there are injury or damages.

Q. And from the standpoint of a duty to defend, would you agree that it's a date or dates on which a damage or injury is alleged to have occurred versus when it may have actually occurred? In other words,

you're looking at a Complaint?

A. You -– you start off with the Complaint. Yes, sir.

Q. Okay. What is your understanding and belief as to the date or dates of loss concerning the claim that brings us here today? What is the date of loss?

MR. LEVY: Objection. Form.

THE WITNESS: Based on the counterclaim for some of the allegations, I could not determine the date of loss.

Q. (Mr. Levy) Could you determine the date of loss for any of the allegations in this matter, that is, the allegations in the underlying action between -– or by L&L Wings against Beach Mart. Are you able to say what you believe to be the date of loss for purposes of any of those claims?

A. The only firm date that I discovered was a contract between Beach Mart and L&L. Other than that, the underlying Complaint alleged -- the Complaint speaks for itself, but let's say ongoing issues.

Q. Do you recall the date or year of this contract that you've just referenced and which was referenced in the underlying pleadings between Beach Mart and L&L?

A. 2005 is coming to memory. I could be

incorrect but...

Q. Okay. So other than the 2005 date associated with the contract, to the best of your recollection, and this being some document in dispute between L&L Wings and Beach Mart, you weren't able to ascertain any other dates from the -– from the pleadings that you reviewed?

A. It appeared in the pleadings that it was an ongoing injury.

Q. Okay. Were you able to ascertain when the injury that was alleged, as you've described it, first occurred or may have first occurred, based on those pleadings?

A. No, sir.

Q. Did you draw any conclusions as to when the injury did or did not first occur based on the reference or inclusion of a 2005, or purported 2005 agreement?

MR. SHAW: Objection to form.

THE WITNESS: I couldn't link some of the ongoing injuries back to the contract or purported contract.

Q. (Mr. Levy) Meaning you couldn't say one way or another?

A. I couldn't say one way or the other.

Q. Did you undertake to look at the materials provided to you to try to ascertain a date or dates of loss? Was that important information to you in this case?

A. Yes, sir.

Q. And why was it important?

A. We've used the word "trigger."

Q. Yes, sir.

A. So as a term of art, it's the offense that activates the policy. And it should be within the policy period.

Q. Okay. Now, how does that work from your understanding, with respect to personal and advertising injury?

A. The policy speaks for itself. But from memory, it's got -- the offense, since '88, has to be committed in the policy territory during the policy period.

Q. Based on your understanding and experience, does it matter whether the offense first occurs within the policy period?

A. There is a older exclusion relating to radio, TV, and magazine that references publication, if it was published. But other than that, if the offense is during the policy period and not otherwise

Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 24 of 201

excluded, the policy could be triggered.

Q. Okay. Let's get away for a moment from an exclusion and talk about the insuring agreement. Is that a term you're familiar with relative to an insurance policy?

A. Yes, sir.

Q. Okay. And you understand the distinction between an insuring agreement versus an exclusion?

A. You have to complete the insuring agreement first before you do an exclusion analysis.

Q. Absolutely. So looking at the insuring agreement, based on your own knowledge and information and specific to a business owner's policy, do you have any understanding or working knowledge as to what the insuring agreement says, if anything, in the business owner's policies such as the one that was in effect, let's say, beginning in 2008 here, and as issued by Penn National, concerning whether an offense needed to be committed during a policy period or needed to be first committed during a policy period? Do you know that information?

A. The qualifier first is not in the insuring agreement.

Q. Okay. Did you specifically review the Penn National policies for that purpose, to take a look at the insuring agreement?

A. I'm sure I did. I don't recall it specifically.

Q. Okay. Now, you've also mentioned in this case that you -- based on your recollection and belief -- and we'll see in your report which verifies that you saw reference to a 2005 contract, right?

A. That's my memory, yes, sir.

Q. And do you remember the inception date of the first Penn National business owner's policy that you reviewed?

A. It was after that date.

Q. Okay. Now, I'll represent to you that the inception date on the first Penn National business owner's policy that's at issue in this case was January 1st, 2008. Okay, sir? And I don't think that specific fact is in dispute. It's a date -- it's a date on the policy. Do -- do you follow me on that?

A. I recall that date.

Q. Okay. What inquiry did you make in terms of policies or coverages that exist, more specifically commercial general liability coverage that Beach Mart had in place before January 1st, 2008?

A. I did not make an inquiry, but I saw that Penn National made an inquiry to answer that question.

Q. Okay. Do you recall what they found?

A. Travelers was the previous insurance company.

Q. Okay. What have you undertaken to analyze Travelers policy obligations, in your view, relative to Beach Mart, concerning the counterclaims asserted by L&L against Beach Mart in the underlying case?

MR. SHAW: Objection.

THE WITNESS: I did not do any analysis.

Q. (Mr. Levy) Okay. Do you agree that as part of an analysis, a comprehensive analysis of trying to ascertain what carriers in your view do or do not have a duty to defend and how claims were handled in this case, in order to be exhaustive, you'd want to look at carriers on a risk during the entire relevant time frame?

MR. SHAW: Objection.

THE WITNESS: If that was my task, yes, sir.

Q. (Mr. Levy) Okay. Do you at least follow the question?

A. Yeah, I follow the question.

Q. In other words, if you're just looking at a -- at a claim in general and you see an allegation in an operate set of pleadings that references a date that predates an inception date of a policy group that you're looking at, wouldn't you want to look at the other policies that were in effect during those preceding years to make sure your analysis was comprehensive?

MR. SHAW: Objection.

THE WITNESS: If I were looking in those years and being asked to look at the Travelers, I think the -- the question we're dancing around is called other insurance. I -- I was not asked to do an other insurance analysis.

Q. (Mr. Levy) And I don't mean to dance around. I'm -- I'll just clarify my question to let you know, Mr. Tilden, I'm not asking about other insurance in the sense that other insurance relates to insurance that is contemporaneous with the policy that may exist. Okay? Other insurance often contemplates different types of policies or sources of coverage that might exist during the same time frame. I'm talking about different time frames here. And so, in this instance, you see a set of pleadings that references a contract from 2005. And you know that Penn National first comes on the risk in 2008. And to make sure that the record is clear, you didn't make

any inquiry at all, did you, relative to that insurance that was in place from 2005, 2006 or 2007?

MR. SHAW: Objection.

THE WITNESS: Other than reading it in the file that an inquiry was made and Travelers was the previous carrier, no, sir.

Q. (Mr. Levy) Okay. So do you have any knowledge or information as we sit here today as to what transpired with Travelers concerning this claim?

MR. SHAW: Objection.

THE WITNESS: The file indicated that they paid some expenses. But other than that, I have no knowledge.

Q. (Mr. Levy) Okay. All right. So in this instance, were you asked, when you received this assignment, to confine your opinions to Penn National?

A. I don't recall that discussion was ever held.

Q. Why did you confine your opinions to Penn National in this case then?

MR. SHAW: Objection.

THE WITNESS: The case was between Penn National and Beach Mart.

Q. (Mr. Levy) I understand that, sir. I mean, I understand who the parties are ---

A. Yeah.

Q. --- on the pleadings. And is it the fact that you saw in the pleadings that it was a dispute between Penn National and Beach Mart, therefore you confined your opinions to Penn National?

A. I don't recall my thinking at the time, but that sounds logical to me.

Q. Okay. And I'm not -- believe me, I'm not trying to be difficult about this subject matter. I'm just going back, and in the context of how this is written in the report, that is, to offer opinions regarding an insurance claim and adjustment of a loss, certainly, in generic terms, it would be useful to be able to evaluate any policies on the risk during the entire relevant time frame. Do you agree with that?

MR. SHAW: Objection.

THE WITNESS: Yes, sir.

Q. (Mr. Levy) And as we sit here today, your analysis is confined to 2008 forward versus 2005 forward. True enough?

A. Let's say prior to 2008.

Q. Okay. Because it could even be earlier years than that?

A. I don't know.

Q. Okay. But you at least had some evidence of

this 2005 date? And you've talked about the date of loss can be a critical piece of information relative to analyses that you do in your expert capacity, correct?

A. That's correct.

Q. And so that's why I say that your analysis was only post-January 1st, 2008. You really didn't make any evaluation of anything that went on concerning this claim on policies that were in effect prior to that time?

A. That's correct.

Q. Okay. Did you request information from counsel for Beach Mart from the Womble firm regarding Travelers?

A. No, sir.

Q. Was there a reason for that?

A. I saw in the Penn National file that Travelers was paying expenses.

Q. Okay. The second and -- excuse me, the third and final paragraph on the second page of your report discusses your experience that you've had over your 46 years, and really coming up on 47 years in as much as you started in '74, within the insurance industry. True enough?

A. I'd be 47 years and 23 days.

Q. Well, congratulations on that. That's a long time to do anything. With respect to that experience, fair enough that that's set out in greater detail on the CV that we took some time to review?

A. Yes, sir.

Q. And I take it that that paragraph is just more or less a summary of that –- that experience.

A. Yes, sir.

Q. Okay. Turning over to Page 3 of the report, the first sentence on Page 3 says, "I'm not an attorney, and nothing in this report should be construed as a legal opinion in any way." You put that in, correct?

A. Yes, sir.

Q. Why do you put that in your report?

A. Oftentimes, in looking at a claim, you have to compare the claim against the policy.

Q. Uh-huh.

A. That's what insurance people do. It's not a legal opinion. It's just comparing the claim against the policy.

Q. Okay. And I just -- we've –- we've sort of revisited this now a couple of times. I'm going to do so again now, and probably do so again as we look at other portions of your –- your –- your report. And

**98**

understand, it's not on my part to be ugly, but simply to define some of this stuff, okay? Now, you've already told me, and I just want to confirm once again, that legal advice would include interpreting a contract and offering an opinion to a third party. I mean, that's how you've defined it for me here today.

A. Yes, sir.

Q. That remains your definition ---

A. Yes, sir.

Q. --- right? So you are not intending and do not intend to interpret a contract or offer a legal opinion to Beach Mart. Is that true?

A. That's correct.

Q. You do not intend to interpret a contract or offer a legal opinion to the court or to a jury in this case, correct?

A. That's correct.

Q. Because that would be rendering legal advice, wouldn't it?

A. The judge will make that determination ---

Q. Okay.

A. --- about what the contract says.

Q. Okay. The judge will make what determination?

A. About what the contract says.

**99**

Q. Okay. And that's not for -- that's not a determination for you to make or for me to make. I can make argument about it. Mr. Shaw can make argument about it, but that's for the court to make that determination of what a contract ---

A. That's correct.

Q. --- says, isn't it?

A. That's correct.

Q. And that's not the type of opinion, you're not going to –- to give opinions as to interpretation of a contract and offer opinions on that, are you?

A. That's correct.

Q. Okay. And there's also a footnote down below that's referenced, footnote 1. And this is from the first sentence of the second paragraph that says, "No portion of my compensation is dependent upon the result of this litigation." Do you see that?

A. Yes, sir.

Q. Are you including that, which is to say that you were hired to take a look at this claim but the outcome of your opinions was not determined by the fact that you're being paid or who was paying you?

A. I like being paid. But I am not on a percentage basis or anything like that. I bill by the hour.

**100**

Q. Sure.

A. And my opinion is my opinion.

Q. Fair enough. And so have you had instances where you're engaged by a client or a law firm, as is your preference, and they give you a something and you say, "You know, I don't see a whole lot here. I can't give you an opinion that's favorable to your –- to your client."?

A. Yes, sir.

Q. Okay. How frequently does that come up?

A. Two, three times a year.

Q. Okay. And then other instances, such as this case or Daniel Island or what have you, where they present it to you and say, "You know, I –- I've taken a look at all this, and I –- I agree with your client's position here."? Is that about right?

A. Yes, sir.

Q. All right. How do you have those type of communications? By e-mail, by phone, or some combination of the two?

A. Phone.

Q. Okay. And with respect to this case, do you know whether you had such a conversation or communication?

A. I don't recall.

**101**

Q. Okay. There's a boldfaced section on Page 3 of your report, Exhibit 119. Do you see that?

A. Yes, sir.

Q. Boldfaced and italicized. There is reference not only here but throughout your report to materials that you received, including materials which reflected redactions, okay?

A. Yes, sir.

Q. Is that accurate to your report?

A. Yes, sir.

Q. Now, you yourself, you're not an expert in application of attorney-client privilege in the context of litigation between an insurance company and an insured, are you?

A. No, sir.

Q. And you don't purport to un -- offer any opinions regarding the application of redactions for purposes of privilege in this case, do you?

A. No, sir.

Q. Have you been provided with any supplemental documents since you prepared this report and published it to us back in February?

A. Yes, sir.

Q. And when did you receive those supplemental materials?

102

A. Yesterday.

Q. Okay. Had you ever had a chance to receive them before that time?

A. No, sir.

Q. Had you requested them?

A. No, sir.

Q. Do you know when those materials were received by the party that provided them to you?

A. No, sir.

Q. Fair to the prior testimony that you must have received those from someone on the team at the Womble firm in as much as that's your only point of contact on this case.

A. That's correct.

Q. Okay. It wouldn't have been fair to you, and I'm not going to ask you whether you've been through all those materials at this point, have you looked at any of those materials?

A. It was one –- excuse me, one item which was an unredacted claim question report.

Q. Okay. And that was provided to you for the first time yesterday?

A. Yes, sir.

Q. Okay. You don't have any sense of when that specific document was received by the Womble firm or

103

the team that provided it to you?

A. Have no idea.

Q. Okay. Did that document impact or affect the opinions that contained or were contained in your report?

A. No, sir.

Q. So you've noted in numerous instances in here that you've received redacted documents, correct?

A. Correct.

Q. And certainly being involved as an expert witness in litigated proceedings, you've seen redacted documents before. Fair?

A. Yes, sir.

Q. Now, you're not causing there to be any opinion one way or another on whether or not documents should or should not be redacted. Isn't that true? I mean, that's for a –- that's for a lawyer or a judge to determine.

A. That's not in my wheelhouse.

Q. Okay. And so the purpose of you stating several times in this report that documents were redacted are simply to restate that very fact that there could be information under there that you can't see?

A. That's correct.

104

Q. And you don't know whether or not that information would have any bearing at all on your opinions in this case, do you?

A. That's correct.

Q. Because you don't know what it is.

A. That's right.

Q. Okay. There's a comment at the bottom of Page 3 that says, and this is just the last phrase, "I expect to supplement this report to complete the analysis required in this matter." And it references above reviewing additional documents and deposition testimony.

A. Yes, sir.

Q. I had asked you, not to contradict this, but just for purposes of gauging where we are, whether or not you had any intention to supplement. Is this still your intention? Or are you pretty well comfortable with what's contained in Exhibit 119?

A. At this point, I'm comfortable.

Q. Okay. Have you reviewed any additional deposition testimony provided to you yesterday or at any other time since February, 2021?

A. I have not been provided any additional deposition testimony.

Q. Okay. So let's, if we can, turn over to

105

Page 4, sir, so that I can attempt to try to know what you have looked at in the case.

A. Okay.

Q. So if I can, I'm not going to hand you every one of these documents. I don't think that's necessary, and the lawyers have exchanged paper copies of these too many times at this point. But I do want to make sure at least we're looking at the –- the correct versions of these. So first, Item Number 1 on Documents Considered is the Complaint by Beach Mart against L&L in the underlying case, and you were given a copy of that.

A. Yes, sir.

Q. And so you have a basic understanding that Beach Mart instituted a lawsuit in federal district court against L&L for matters described in this document Number 1 on Page 4 of your report?

A. Yes, sir.

Q. And you reviewed that as part of your analysis in the case?

A. Yes, sir.

Q. Under what circumstances, Mr. Tilden, would an insurance carrier have an obligation under a general –- a commercial general liability policy to pay for an insured to pursue affirmative claims?

A. Under a CGL, other than subrogation, nothing that I know of.

Q. Okay. So in other words, whereas an insurance carrier under a CGL policy may have an obligation to defend an insured, there are seldom, if ever, instances where a insurance carrier under a CGL form would have to pay for an insured to go pursue their affirmative claims?

A. That's correct.

Q. And with subrogation, that's a claim by the carrier to try to collect back from a third party, isn't it?

A. In -- in theory, that is correct. But each state varies. Some states require the insured to file the claim, some allow the carriers to file the claim.

Q. Sure. The insured may be named in that instance ---

A. Yeah.

Q. --- but it's really an action being pursued by the carrier as subrogee of the insured in order to ---

A. That's correct.

Q. --- collect back. Okay. In any event, you became aware and have gotten a copy of this Complaint in the underlying case that reflects that Beach Mart instituted the proceeding against L&L in September, 2011. Is that accurate?

A. Yes, sir.

MR. LEVY: Okay. Now, the next document listed here, and I'm going to just hand you a copy of this one, is L&L's answer and counterclaim against Beach Mart in the underlying matter, November 22nd, 2011. And what I'll do is I'm going to hand you what has previously been marked for identification, at least on one instance, as Exhibit 36.

THE WITNESS: Okay.

MR. LEVY: Steve, do you want a copy of this one?

MR. SHAW: What –- what is it?

MR. LEVY: It's –- it's the answer and counterclaims in the underlying case.

MR. SHAW: Yes.

Q. (Mr. Levy) The question, Mr. Tilden, is what's been previously marked for identification as Exhibit 36, is that Number 2 in your Documents Considered?

A. Yes, sir.

Q. Okay. Now, you'd agree with me that this is a very important document relative to the matters in front of us in this case?

MR. SHAW: Objection.

Q. (Mr. Levy) And important can be a –- a matter -- a word, or a subject of different people's interpretations. You'd agree with me that this is a document that would have to be considered relative to any claim for a defense under a commercial general liability policy, the counterclaim, the -- or the operative Complaint in this case, true?

A. Yes, sir.

Q. Okay. And sure enough, part and parcel to a lot of your analysis in this case was Exhibit 36. Am I saying that correct?

A. Yes, sir.

Q. So am I overstating it in saying that Exhibit 36 was a critical document for you in doing the work that you did in this -- in this instance?

A. It -- it was a starting point, yes, sir.

Q. Okay. Now, were you provided with the response of Beach Mart to Exhibit 36, that is, Beach Mart's answer to the counterclaim?

A. I believe I was. I'm trying to visualize the computer screen with the files listed.

Q. Sure. Well, and that's -- what I'm –- I'm trying to get at is I'd like to know, and I think in accordance with the –- the federal rule that governs this, is I can take a look at the materials that you've relied upon in forming your opinions in the case.

A. Uh-huh.

Q. So to me, that would include, it's just my interpretation, those pleadings that you've taken a look at in forming your opinions in the case. Are those pleadings exhaustively listed on Pages 4 and 5 of your report, Exhibit 119, or is this's just a sampling?

A. I think Number -- is Number 7? No, that's declaratory judgment. These are the documents I considered.

Q. Okay. I'm trying to get a sense though, did you get additional pleadings that you may have received but didn't –- didn't really do anything with?

A. I -- I don't know.

Q. Do you have a list of all the materials that you reviewed?

A. It's on my computer.

Q. Okay. So that's a list that you could generate? That is a list that says, "Here's all of what I reviewed in the case, even if perhaps Items 1 through 12 on Pages 4 and 5 of your report are reflective of those documents that played into the

opinions."?

A. Yeah, I can do a print screen.

Q. Okay. Do you have any working understanding as to the date on which Beach Mart responded to and answered L&L's original counterclaim in the underlying case?

A. No, sir.

Q. Was that or is that important to you in conducting the analysis and formulating the opinions that you did form in this case?

A. I'm trying to think back if I saw it or not, and I just can't visualize anything. Instinct tells me that the answer would have been filed in February.

Q. Okay. So to be more precise, instinct tells you that an answer to the counterclaim filed and served in November of 2011 would have been filed in February 2012?

A. January would be 60 days.

Q. Okay.

A. Okay.

Q. So you're aware of the fact that there are timing constraints on responding to things like complaints or counterclaims?

A. Yes, sir.

Q. And so you're just applying kind of that general knowledge to thinking that the date on this response or answer to the counterclaim that would've been filed for Beach Mart would have been on or around January or February 2012?

A. Yes, sir.

Q. Okay. And that's a document you may have in your file, but you're not sure?

A. I don't recall it one way or the other.

Q. Okay. Was that timing specific to that response or answer to the counterclaim that's Number 2 on your list, it's Exhibit 36, was that important to you for purposes of the analysis that you did concerning what Penn National did in its handling of the claim in this case?

A. No, sir.

Q. Okay. How come?

A. There was an answer, so there wasn't a default.

Q. Okay. Would you agree that Penn National first received notice of this claim, based on everything that you've received, in June 2012?

A. Yes, sir.

Q. In other words, Penn National did not have any notice at all of this claim or counterclaim that L&L Wings had made back against Beach Mart until June 2012. That was the first time they became aware of this claim.

A. I'm aware that the insurance agent was deposed. I have not read his deposition. When the insurance agent knew, I can't put a date on that. But I saw an intake with Penn National in June.

Q. Okay. Would you agree with me that based on everything that you've reviewed in this case, that by the time Penn National was first placed on notice of this claim by Beach Mart seeking a defense against this counterclaim or counterclaims being made by L&L, Beach Mart had already responded to and answered the counterclaims through private counsel?

A. Yes, sir.

Q. And in that regard, there was not a risk of –- and never was a risk of Beach Mart being defaulted on those counterclaims.

A. As a lay person, I would agree with you.

Q. Okay. Well, you didn't see any risk of that as an expert having reviewed this, did you?

A. I don't know all of the fine points of filing and responses. But if the court accepts the response, it ought to stand.

Q. Okay. The next document listed on your list in your report is Beach Mart's notice of counterclaims to Penn National, June 8th, 2012. Do you see that?

A. Yes, sir.

Q. And that was just an accord form that was filled out?

A. That was the -- the input document ---

Q. Okay.

A. --- or the intake document.

Q. Sure. You mentioned just a moment ago that the agent was deposed recently, whi –- which is true. Have you asked for a copy of the transcript of his deposition when it's prepared?

A. No, sir.

Q. Is that something that you would want to consider, or it's not important to you in forming your opinions?

A. I -- I don't know until I read it.

Q. Okay. Wouldn't you want to read it to ensure that it doesn't contain information that's pertinent to your opinions in the case?

A. My interest would be when the agent had knowledge of the claim.

Q. Okay. Regarding the -- the counterclaim here, Exhibit 36, do you know whether or not during the course of the litigation between Beach Mart and L&L, the underlying case as it's been called, this

counterclaim was ever amended?

A. I don't recall one way or the other. I don't want to get my cases confused.

Q. Yes, sir.

A. And it's very common to see an amended. But if I don't recall, I don't want to testify to it.

Q. Sure. So if someone, a client, comes to you as –- as an expert or in the course of kind of giving advice and input on other claims that may come to you given your role with IIANC or otherwise, you may collect policy documents and you also collect a complaint or a counterclaim to kind of hold those up against one of the other, right?

A. That's correct.

Q. When you get that Complaint document, or in this case Exhibit 36, do you make any inquiry to say, "Hey, is this the most recent version?" In other words, "Has this ever been amended in time so I'm at least looking at the most recent version of this?"

A. I ask for the pleadings.

Q. Okay. By asking for the pleadings, would you want copies of any amendments to a complaint or counterclaim such as Exhibit 36?

A. To me, that's included when I ask for the pleadings.

Q. Okay. Why would it be important to you in the type of work that you do, and particularly offering opinions concerning an insurance coverage dispute, to have the most recent version or any amendments to a complaint or a counterclaim?

A. My experience is that the first complaint is awfully rough, and then the amended complaint hones it down a little bit better.

Q. Okay. When you're doing that side-by-side analysis or review of a pleading and a policy, you want to use the most recent one, don't you? I mean, don't you want to look at the –- sort of final? So if it's been amended, that becomes the operate pleading from the standpoint of coverage, doesn't it?

A. Yes, sir.

MR. LEVY: Okay. I want to hand you a document that we'll mark for identification as Exhibit 120. Thank you.

(DEPOSITION EXHIBIT NUMBER 120 WAS MARKED FOR IDENTIFICATION)

Q. (Mr. Levy) This is not one that's been marked previously in the case. And once again, with any documents that I might hand you, take whatever –- whatever more or little time you might want to flip

through them. And then let me know when you're ready. And for your benefit, I can direct your attention to Page 10 ---

A. Okay.

Q. --- where the Counterclaim starts.

A. Okay. I'm on 10.

Q. First, have you ever seen Exhibit 120 before, to your knowledge, an amended counterclaim?

A. No, I don't recognize Shepard Morrow, that name at all.

Q. Okay. So you were not personally aware that there was a gentleman named Shepard Morrow who was for a period of time a party to the dispute as between Beach Mart and L&L Wings?

A. No, sir.

Q. And as far as you know, have you ever received a copy of this amended counterclaim that was filed and served in this case by L&L against Beach Mart?

A. I don't know.

Q. Okay.

A. I just don't recognize that name Shepard Morrow.

Q. Certainly you'd agree with me that this amended counterclaim, Exhibit 120, is not reflected on your report in the list of the documents that you considered.

A. That's correct.

Q. And we've just talked about that you'd like to have any amendments to the pleadings, including those pleadings that you'd be looking at for purposes of comparing them to the policy terms in order to do the type of work that you were asked to do in this case. True enough?

A. Correct.

Q. What you don't want to do is find yourself in a discovery deposition like today and seeing an amendment to a counterclaim for the first time. True enough?

A. True.

MR. LEVY: Let's go now and look at a separate document, and we're going to come back to this one.

(DEPOSITION EXHIBIT NUMBER 121 WAS MARKED FOR IDENTIFICATION)

Q. (Mr. Levy) I'm going to hand you, sir, what's been marked for identification as Exhibit 121 and have you to flip through this one.

A. Okay.

Q. As with Exhibit 120, you've never had an opportunity to see Exhibit 121 prior to today, have you, sir?

A. No, sir.

Q. And so you were not aware that, in fact, there's a Second Amended Complaint, really a counterclaim by L&L Wings against Beach Mart that was asserted in the underlying action. You didn't know that, did you?

MR. SHAW: Objection. Misstates the document.

THE WITNESS: Again, I don't recall the name Shepard Morrow.

Q. (Mr. Levy) And one thing I don't want to do is -- is misstate anything, Mr. Tilden. So I'll just read from this first paragraph here on Page 1 of Exhibit 121. It says here, "L&L Wings, Inc., by and through its undersigned counsel, brings this Second Amended Complaint asserting claims against Shepard Morrow, Super Wings, LLC, and Beach Mart, Inc., and alleges on knowledge as to itself and otherwise on information belief, as follows." Did I read that first page right, albeit excluding the parentheticals?

A. Yes, sir.

Q. Okay. So you'd agree with me in reading the first page of Exhibit 121, on its face appears to be a Second Amended Complaint by L&L Wings against Beach Mart, the insured, in this underlying lawsuit, true?

A. Yes.

MR. SHAW: Objection. I just have to make a point that you refer to this as a counterclaim and you refer to as underlying litigation. But this is the Complaint from the New York action filed by L&L that was later consolidated with the underlying action which was tendered to Penn National. And it's not the same as the counterclaim that was asserted by L&L in the underlying litigation. And further, I'm curious, if not concerned, as to why we're now using Bates stamped copies of this document that have been produced.

MR. LEVY: I just got this document off PACER. I'll object to the speaking objection, but that's fine. We'll continue.

Q. (Mr. Levy) This document was obtained off PACER, I'll represent to you, sir. I just go on, and I obtain this much as anybody who has a PACER account could do. You've not seen Exhibit 121 before, have you?

A. That's correct.

Q. Once again, sir, you would want to have, when you ask for pleadings, all versions of claims that had been made by L&L Wings, the third-party claimant, against Beach Mart, the insurer, for purposes of doing this side-by-side analysis. Wouldn't you want to have those things?

A. Yes, sir.

Q. And in this instance, you didn't have this document, Exhibit 121, until today, did you?

A. As I've testified, I do not recognize the name Shepard Morrow, sir.

Q. Okay. Now, sir, with respect to these documents, Exhibit 120 and 121, not only did you not have these documents, but you weren't aware procedurally that there had been, as Mr. Shaw has referenced, in New York, litigation at a point in time between these parties or an amendment of the counterclaim at a point in time. Did you know that?

A. I was not aware.

Q. Okay. So you're just kind of first finding that out today?

A. Yes, sir.

Q. All right. And so as far as your analysis went, from the standpoint of pleadings, the document you've kind of been going back to is Exhibit 36, the original counterclaim, without having seen or had the benefit of these additional pleadings from the 2017 time frame.

A. That's correct.

Q. Okay. So going back to Exhibit 119, your report. We're on to Number 4 now. And there's a reference to "Penn National's post tender correspondence and correspondence appointing David Brown to defend the matter. (July 18th, 2012 to January 15th, 2013)." Do you see that?

A. Yes.

Q. Again, not going to do this on every one, but I want to make sure we're looking at the same documents. First one I'm going to hand to you is what's been previously marked really multiple times, but this version of it was marked as Exhibit 71.

A. Yes, sir.

Q. Is this one of the documents that falls within Number 4 on your report, Page 4 of the post tender correspondence?

A. Yes, sir.

Q. This being the document that's dated July 18th, 2012?

A. Yes, sir.

Q. As an aside, do you see on the middle of the page on this one where there's a reflection of the

**122**

term "reservation of rights"?

A. Yes, sir.

Q. Are you familiar with that term?

A. Yes, sir.

Q. What is a reservation of rights letter?

A. It's a statement to the insured, typically in writing, outlining the insurance company's understanding of the claim, the applicable policy provisions, analyzing the two, concluding with a non-waiver.

Q. Okay. Have you yourself -- I –- I don't want to re-plow too much more concerning experience, but have you been involved with the process of drafting reservation of rights letters in the past?

A. Typically, there is a draft ROR, and it is sent to coverage counsel, and coverage counsel tweaks the ROR ---

Q. Uh-huh.

A. --- and then it's provided to the insured.

Q. Okay. Have you yourself drafted RORs?

A. I have drafted the draft to go to the attorney, yes, sir.

Q. Okay. When did you last draft an ROR?

A. It was right at the start of COVID.

Q. And concerning what kind of claim?

**123**

A. COVID business interruption with a virus exclusion and without a virus exclusion.

Q. Okay. And on behalf of what carrier did you draft that reservation of rights?

A. I think it was Mutual Benefit.

Q. Was this specific to a claim, or were you generating a template for them?

A. Template.

Q. Okay. So more specifically, what instances have you drafted RORs for purposes of appending claim?

A. That would be back in my time with Rutherfoord.

Q. Okay. So at some point in 1983 or before?

A. That's correct.

Q. And again, and I'm –- I'm sorry to make you to have to repeat this, what are the -- what are the facets or portions of a reservation of rights letter that you would expect?

A. It has changed over time. There was a federal case that listed ten elements, and I forget the case.

Q. Uh-huh.

A. But it's basically, "Here's our understanding of the facts —

Q. Uh-huh.

**124**

A. --- here is the policy. Here's our analysis of the facts against the policy." The non-waiver and, of course, the catch-all phrase, "If you know any information that could help us in our analysis, please provide it."

Q. Have you ever heard the phrase "providing a defense subject to a reservation of rights"?

A. Yes, sir.

Q. What does that mean from your standpoint?

A. It –- it means that the carrier is still investigating indemnity. It's a non-waiver.

Q. So for clarification, Mr. Tilden, if a carrier -- not yet getting to this case. But if a carrier provides or agrees to provide a defense subject to a reservation of rights, is it your testimony and opinion that the carrier has definitively decided to defend the case and is only focusing on the issue of indemnification? Or does the carrier reserve the right to make subsequent decisions concerning defense as well?

MR. SHAW: Objection.

THE WITNESS: It depends how the letter is worded. I believe the Westfield case, which was in Maryland, Westfield did not state that they could withdraw a defense in their ROR, and the federal court

**125**

precluded the withdrawal of the defense.

Q. (Mr. Levy) Do you have any knowledge or understanding of that specific issue in North Carolina?

A. No, sir. I teach nationally and try to teach national trends.

Q. Okay. I'm now going to hand you what's previously been marked for identification as Exhibit 74 and have you to look at that. Sorry. And wanted to ask, is Exhibit 74 also part of what you're referencing in Number 4 on Documents Considered?

A. Yes, sir.

Q. Okay. And the delineation here is that Exhibit 74, that's a letter that's dated August 7th, 2012, whereas the first letter we looked at, Exhibit 71, is from July 2012?

A. That's correct.

Q. Okay. All right. I just have two more here. I'm now going to hand you what was previously marked for identification as Exhibit 75. And same question, is Exhibit 75 also one of these pieces of correspondence referenced in Number 4 of Documents Considered?

A. Yes, sir.

Q. And so you had a copy of this January 15th,

**126**

2013 letter?

A. Yes, sir.

Q. Okay. Now, I'm going to hand you just one more along this sequence. I have a copy for you, but I don't want to hand this to you if I don't have copies for counsel.

MR. SHAW: What is it?

MR. LEVY: It's Exhibit 77.

MR. SHAW: Can you describe it ---

MR. LEVY: It's a letter dated ---

MR. SHAW: --- in narrative?

MR. LEVY: --- March 14th.

MR. SHAW: March 14th?

MR. LEVY: Yeah.

MR. SHAW: I -- I've got a copy of it.

MR. LEVY: I do have it ---

MR. SHAW: --- if you don't ---

MR. LEVY: --- but I don't want to have him to look at something you don't have. Do -- are you okay for me to show it to him?

MR. SHAW: Sure. I -- I couldn't tell by what you were saying if you had a sufficient number of copies.

MR. LEVY: I don't have sufficient number of copies of this one.

**127**

MR. SHAW: Go ahead.

MR. LEVY: So Stephen, are you okay for me to ---

MR. SHAW: Yeah.

MR. LEVY: --- show him this now? Okay. All right.

Q. (Mr. Levy) So sir, I'm going to hand you just as a final item, Exhibit 77. And this is a -- just another piece of correspondence from March 2013. Have you seen Exhibit 77 before?

A. Yes, sir.

Q. Okay.

A. I've been calling these RORs one, two, three and four.

Q. Understood. So with respect to the Number 4 item here on your -- your report, going back to Exhibit 119, the post tender correspondence here or the reservation of rights letters, this seems to reference just the July through January. But you did in fact have a chance to look at Exhibit 77 as well?

A. Yes, sir.

Q. So you're aware of the four separate reservation of rights letters that came from Penn National to Beach Mart in the course of this time frame, that is from June of 2012 to March of the

**128**

subsequent year, 2013?

A. Yes, sir.

Q. All right. And you had a chance to review those in doing your evaluation in the case?

A. Yes, sir.

Q. All right. Is that basically this post tender correspondence, including the correspondence appointing Mr. Brown as defense counsel, that you're referencing in your report?

A. To the best of my recollection, yes, sir.

MR. LEVY: Okay. And I apologize again, Stephen, for not having sufficient copies of that one.

MR. SHAW: No worries.

Q. (Mr. Levy) Number 5, sir, the Complaint for declaratory judgment action. You were provided with a copy of that?

A. Yes, sir.

Q. So that's a copy of the Complaint in this case. That is the case that brings us here today. You got a copy of the Complaint in the case in which you're offering opinions. Fair enough?

A. Yes, sir.

Q. I would assume that's something you get in every case, that if -- if it's a litigated matter, you

**129**

get a copy of the Complaint or pleadings in the case that bring you there in addition to underlying type pleadings.

A. Yes, sir.

Q. Okay. Matter of fact, you may need that kind of thing to check conflicts or do things of that nature?

A. Absolutely.

Q. Okay. With respect to the Complaint in the case that brings us here today, were you aware that that was amended?

A. I don't know one way or the other.

Q. Okay. So I'm going to hand you now what's previously been marked for identification as Exhibit 69.

A. To -- to keep the record clear, I do recall a "parens 2" on some of the documents ---

Q. Okay.

A. --- which could be the amended.

Q. Okay. All right.

A. I'm just looking at my computer screen.

Q. That's fine. Just gauging what you can recall ---

A. Yeah.

Q. --- as we sit here. So Exhibit 69, I'll

**130**

reference to you, is a Amended or First Amended Complaint filed by Penn National against Beach Mart in the case that we're sitting here on today ---

A. **Right.**

Q. --- okay? Do you know one way or another whether you've seen this Amended Complaint in this case?

A. **I don't recall one way or the other.**

Q. Okay.

A. **The only thing I can recall is the computer screen, and ---**

Q. Yes, sir.

A. **--- the way I sort them is complaint, and then if it's a –- a DJ action, if it's amended, it would be a parens 2. And I just -- flashed in my memory, I saw a lot of "parens 2s" in there.**

Q. Okay. So you're not sure, as you sit here today, if you had received a copy of the Amended Complaint in the declaratory judgment action or not?

A. **I couldn't testify one way or the other.**

Q. Do you know what a declaratory judgment action is?

A. **Yes, sir.**

Q. What is a declaratory judgment action in an insurance context, as far as your understanding?

**131**

A. **A party is asking a judge to interpret the policy and provide guidance.**

Q. Okay. Fair to say that when a party files, be it the insurance carrier or an insured, files a declaratory judgment action. And sure enough, these are filed on both sides, true? That ---

A. **Agreed.**

Q. --- sometimes you have an insurer to file this, sometimes the insurance carrier. Is that true?

A. **Agreed.**

Q. And so when they file it, it's simply saying to the court, "You tell us." I mean, it -- it's saying, "We –- we don't –- we may believe there is or is not coverage. But ultimately, Judge, you're going to tell us whether there is or is not." Is that fair?

A. **That's a good summary.**

Q. Okay. Do you believe that the filing of a declaratory judgment action, not specific to this case but in general terms, concerning a commercial general liability policy equates to taking a coverage position?

A. **It may outline the coverage position, but you're asking the judge to either confirm it or disagree with it.**

Q. Okay. So the mere filing of a declaratory

**132**

judgment action by an insured or an insurance carrier does not mean necessarily a change in position so much as you're asking the court to tell you whether or not there is a duty to defend or a duty to indemnify in the case of a liability policy. Is that fair?

A. **In the case of any policy.**

Q. Okay. And I only say liability policy, Mr. Tilden, in the sense that were it a property policy, let's say, it -- it's not about a defense. It's either it's owed or it's not owed. True enough?

A. **Property policies do have defense.**

Q. Okay. In any case, third-party liability claim -- underlying third-party liability claim as was the case here by L&L Wings back against Beach Mart, multiple counterclaims or claims by these parties. And you have a declaratory judgment action filed first in 2014 by Penn National against Beach Mart concerning duty to defend and duty to indemnify under multiple policies. Is that fair to your understanding?

A. **Yes, sir.**

Q. The mere act of filing that lawsuit was not in and of itself a change in coverage position by Penn National, was it?

A. **The file was heavily redacted. I could not determine their coverage position. A DJ will outline**

**133**

a coverage position.

Q. I'm asking, from your standpoint, was the filing –- the original filing of the lawsuit that brings us here today, in 2014, a change in coverage position by Penn National? I understand it outlines where they were, but did it constitute a change in coverage position?

A. **I could not ascertain that.**

Q. Okay. Assuming for purposes of the question that, as of 2014 and points before, Penn National was providing defense counsel to Beach Mart and that it continued to provide defense counsel to Beach Mart through the present time, would you regard the mere filing of the declaratory judgment action as a change in coverage position?

MR. SHAW: Objection.

THE WITNESS: **I could not ascertain what Penn National's coverage position was, so I can't answer the question.**

Q. (Mr. Levy) Okay. Fair enough. As with the underlying case, when you ask for pleadings in the coverage case, ideally you like to get any amendments to the complaint, true?

A. **That's correct.**

Q. Okay. Number 6, on your list of Documents

Considered, Mr. Tilden, says, "Beach Mart's demand for reimbursement of fees, December 1, 2014, and subsequent correspondence." Was that correspondence between the Womble firm and my firm concerning a request to pay certain legal fees and expenses?

A. I remember the letterhead was Womble. I believe it was your firm, but I'm not sure what file I saw it in.

Q. Yes, sir.

A. It could've been in the Penn file.

Q. Okay. Yes, sir. With respect to the invoicing for these legal fees, were you provided with that invoicing as well?

A. I just saw a -- a -- a summation in the letter ---

Q. Yes, sir.

A. --- of dollars. I did not see a breakdown of the billing.

Q. Okay. So describe for me, amongst those Documents Considered, your review of the invoices from the Womble firm concerning their work in the underlying case for which they are or Beach Mart is seeking reimbursement.

A. I didn't receive the invoices. The only invoices I saw was for some experts. There was a $40,000 or $50,000 invoice. That's the only one that I saw.

Q. Okay.

A. Other than that, the Womble letter described th -- their legal fees, and they -- they had some round numbers in there.

Q. Okay. What did you do to verify those numbers?

A. I didn't do anything.

Q. How come?

A. Because my task was not to verify their billings.

Q. Okay. Do you have any knowledge, training or expertise in legal billing?

A. No, sir.

Q. And you don't purport to offer any opinions in this case as to legal billing?

A. No, sir.

Q. Okay. And so you did nothing to verify whatever the claim was in regards to attorney's fees for any point in time from the standpoint of Beach Mart as to Penn National?

A. I saw in the letter what Womble said they incurred between June 8 and early January, but I did not verify that number.

Q. Okay. Do you know whether the number -- understanding you didn't verify it, do you know whether that number was reflective of all of the fees and expenses that the Womble firm had in that interval, for both defense of a counterclaim as well as prosecution of affirmative claims, or whether it was broken down in some way?

A. I didn't see the invoice.

Q. Okay. Do you follow the –- the question?

A. Yes, sir.

Q. Meaning you've got, on the one hand, the insured making affirmative claims and, on the other hand, the insured defending against counterclaims.

A. I understand.

Q. Would those be distinct to you from the standpoint of a duty to defend?

A. Sometimes a good offense -- or good defense is an offense, so it's very hard to allocate legal fees in that manner. That's way out of my wheelhouse. I'm aware that there are people that can do it, but I just don't do it.

Q. Okay. Is that a saying that you like to use, "sometimes a good defense is a –- is a good offense," or something along those lines?

MR. SHAW: Objection.

THE WITNESS: I have found that in litigation, personally and watching cases, it's a frequently used phrase. I use it when I'm teaching.

Q. (Mr. Levy) Yes, sir. We did talk about, in a generic sense, earlier on in your deposition that commercial general liability carriers do not pay for insurance to go pursue affirmative claims, true?

A. In general, yes, sir.

Q. You'd agree with me that specifically under the policies issued by Penn National, in this case, to Beach Mart, there is no obligation under those policies for Penn National to pay any legal fees or expenses associated with Beach Mart's pursuit of affirmative claims against L&L, is there?

A. As the question is styled, I would agree with you, yes, sir.

Q. Okay. Going down to Number 7 on your list of Documents Considered, and I'll hand you what was previously marked for identification as Exhibit 40. Just wanted to ask if Exhibit 40 is –- is or appears to be what Number 7 is referencing?

A. Yes, sir. It appears to be.

Q. Okay. So this is where Beach Mart responded back to the declaratory judgment action. Is that consistent with your reading?

A. Yes, sir.

Q. Is it also consistent with your reading that in addition to saying, "We disagree with you, Penn National. From the standpoint of Beach Mart, we think there is a duty to defend and indemnify under this policy," they're also making affirmative additional claims back against Penn National. Did you see that?

A. Yes, sir.

Q. And those claims would include breach of contract as well as extra-contractual claims, true?

A. Yes, sir.

Q. And there's citation in this document of a statute that's -- the citation is 58-63-15 subsection 11, okay? That's in the North Carolina General Statutes, and it's what's referred to as the Unfair Claims Settlement Practice Act. I'll just represent that to you.

A. Okay.

Q. Are you familiar with the Unfair Claims Settlement Practice Act?

A. Yes, sir.

Q. Tell me how you're familiar with that act.

A. It flows from the NAIC model act 701 or 702. The difference between the two models is do you have to show a pattern or could it be a single instance? But once you get past that preamble, then it lists certain activities that could rise to the level of unfair trade practices.

Q. Okay. Now, specific to the Unfair Claims Settlement Practice statute in North Carolina, have you ever been called upon to offer opinions as to whether or not a carrier has violated that act?

A. I have been asked and have been instructed, "That's for the finder of fact."

Q. Okay. So in other words, you -- the -- the question was given but the answer was, "No, that's for the fact finder."?

A. Right.

Q. Okay. So were -- when were those instances that you were at least asked the question?

A. It comes up in just about every case.

Q. Okay. Meaning every case where there's an EC allegation?

A. Yes.

Q. Okay. Because there's not EC allegations in every case, is there?

A. Typically, if the carrier is involved, there are extra-contractual claims.

Q. Okay. So to be fair, in your experience, be it North Carolina or in other jurisdictions, there's not simply declaratory judgment actions where you have an insured on one side, a carrier on another side, and they're simply asking the court to resolve that dispute of coverage without there being contentions of extra-contractual damages or bad faith?

A. In my experience, that's the minority of the cases.

Q. Okay. Have you ever been, to your knowledge, permitted in the State of North Carolina to express opinions as to whether or not a carrier has violated the Unfair Claims Settlement Practice statute?

A. I have never been allowed to.

Q. Okay. Have you ever been allowed to -- and that's -- that's inclusive of both state and federal courts, you've never been allowed to offer those kinds of opinions, correct?

A. Correct.

Q. All right. Okay. Moving to Number 8, sir. Does Number 8 just list by policy number those policies from Penn National that you were provided with to review in the case?

A. Yeah, those are the primary policies.

Q. Did you review the umbrella policies as well?

A. I did not look at them.

Q. Okay. So concerning any of the opinions that you've made and -- and are offering in this case, those are -- those are limited to the primary-level policies. You're not offering opinions concerning the umbrellas?

A. My experience is that umbrella policies are right to defend, not duty to defend. A primary policy is right and duty.

Q. You're -- you're familiar though with drop-down coverage, aren't you?

A. Oh, very familiar.

Q. Okay. And I -- I -- you know, I've seen your resume, and so ---

A. Yeah.

Q. --- and I know that you -- you've worked at the different levels. I guess I can more precisely ask this by saying you're not prepared to offer any opinions concerning a duty to defend one way or another under the umbrella policies that were in effect during these same policy years, '08 to 2012, as issued by Penn National to Beach Mart? Your opinions are confined to the -- the business owner policies?

A. The primary policies, yes, sir.

Q. Okay. All right. Fair enough. Were you

142

aware of the fact that the umbrella policies have also been referenced in the declaratory judgment action?

A. Yes, sir.

Q. Okay. You've simply confined your opinions though to the primary level policies?

A. Yes, sir.

Q. Okay. In terms of Number 9, sir, the written discovery responses of Penn National and Beach Mart ---

A. Yes, sir.

Q. --- on this one, you don't list kind of date or dates of those responses. Was this just the original responses? Do you know whether you received supplements? And, in addition, did you receive document productions or not?

A. I — I received one supplement after this report was drafted, which was Penn's expert disclosure.

Q. Okay.

A. Are you asking me to describe what I got?

Q. I am.

A. Yeah.

Q. And if you can't do it without reference to your computer screen, that's fine. But ---

A. All – all the Penn production, they

143

were — I'm going to lump it into two groups. One of them was the redacted document file ---

Q. Uh-huh.

A. --- and the other one was the claims log.

Q. Right.

A. Okay? And I think the claims log is referenced in here.

Q. And perhaps that's Number 10 on Page 5 of your report. Is that where you're referencing the ---

A. Yeah, the claims notes.

Q. --- the claims notes? Okay.

A. The — the little summaries.

Q. And did you also receive the claims notes from the defense file or just from the coverage file?

A. It — it appeared to be both.

Q. Okay.

A. And the reason I say it appeared, that — a lot of the early part of the case, the defense and coverage were in one file.

Q. Sure.

A. And then it got bifurcated, and they were different claim numbers. I did not follow the claim numbers. I was just reading.

Q. Sure. You didn't try to undertake to figure out what you were reading was defense versus the

144

coverage side of the claim?

A. I knew the people's names and understood what their function was ---

Q. Yes, sir.

A. --- and just made the assumption, "Well, this is the coverage note." Or, "This is the liability note."

Q. Okay. For example, were you aware that there has been supplemental document productions by both sides, by both parties that continued into the spring of 2021? I mean, were you provided document supplements that were reflective of discovery continuing into this year?

A. Other than that one document I talked to you about?

Q. Yes, sir.

A. The claims question report.

Q. That was the only singular document?

A. Yes, sir.

Q. Okay. And I — I probably mistakenly assumed you were provided with some voluminous new production. But it in fact was a singular document that you got yesterday?

A. Yes, sir.

Q. Okay. So you've not been given any of the

145

document supplements from either side that were exchanged in 2021 ---

A. That's correct.

Q. --- other than that singular document?

A. That's correct.

Q. Okay. So you wouldn't know whether or not those would bear on your opinion because you haven't seen them yet?

A. That's right.

Q. Okay. I want to get down to Number 12, and then we'll take another break, if that's okay. Number 12 reflects that you were given transcripts of depositions of Greg Gross, Gary Gibson and Steve Oliver. Is that correct?

A. Yes, sir.

Q. And did you review those transcripts?

A. Yes, sir.

Q. Are you aware of the other individuals who were deposed in this case you've referenced, for example, that -- the -- the agent whose name is Monte Ross was deposed?

A. That's the only one I'm aware of.

Q. Okay. Were you aware that individuals associated with Beach Mart were deposed?

A. I assumed they were. There were references

146

in the claims file that in the underlying litigation there were depositions. That's the extent of my knowledge.

Q. Okay. You weren't given copies of those depositions?

A. No, sir.

Q. Were you aware that the technical director of Penn National, Adam Parsons, was deposed by ---

A. No, sir.

Q. --- by Beach Mart?

A. No, sir.

Q. You didn't get a copy of that transcript?

A. No, sir.

Q. Were you aware that the expert designated and identified for Penn National, David Paige, was deposed?

A. No, sir.

Q. Okay. So you don't have a copy of his deposition transcripts?

A. No, sir.

Q. All right. And so you couldn't -- obviously couldn't have taken those things into account in forming your opinions in the case.

A. That's correct.

Q. And don't know whether or not they would

147

bear on the opinions in the case. Is that true?

A. That's true.

Q. All right. And it sounds like you were not provided with any legal invoices or billing invoices from the Womble firm, submitted by the Womble firm to Beach Mart for payment for the work that the Womble firm did for Beach Mart in the underlying case. You've not seen a single page of invoices, correct?

A. No, sir.

Q. Okay. So couldn't have taken that into account.

A. That's correct.

Q. Were you given a copy of the order entered by the court in the declaratory judgment proceeding which -- at –- at –- at the point at which the court entered judgment on the pleadings for Penn National? In other words, entered judgment for Penn National in this dec action finding that there was no duty to defend back in 2018.

A. No, sir.

Q. Did you know that?

A. Yes, sir.

Q. So in other words, you were aware of the fact that the trial court, at a point, said, "I've looked at this, and I find there's no duty to defend."

148

A. That's correct.

Q. Okay. But you've not seen the order on that?

A. No, sir.

Q. Were you aware that the case -- the declaratory judgment case was appealed?

A. Yes, sir.

Q. And that the appeal reversed the trial court on -- on the findings that the trial court made on that. Did you know that?

A. Yes, sir.

Q. Have you been provided with a copy of the opinion issued by the Fourth Circuit Court of Appeals in the declaratory judgment case?

A. Yes, sir.

Q. So you've had the chance to review that?

A. Yes, sir.

Q. Was that something that you considered in forming your opinions in the case?

A. I received that yesterday.

Q. Okay. You'd never seen that prior to that time?

A. That's correct.

Q. All right. Did you review it in advance of today?

149

A. Yes, sir.

Q. All right. What was your understanding in reviewing that appellate opinion in this dec action case?

A. I'm trying to summarize it in 25 words or less, but it was the trigger issue of when the injuries occurred.

Q. Okay. Would you agree, based on your reading of that appellate opinion, that there was a disagreement between the Court of Appeals and the trial court with the higher court saying, "No, we don't agree that you should have dismissed this case based on this prior publication exclusion."?

A. Yes, sir.

Q. Okay. And that that was what the opinion concerned itself with was application of the prior publication exclusion to the facts as alleged in this 2011 counterclaim.

A. I think there was more in there, but that's a good summary.

Q. Okay. All right. Can you think of any other documents as you sit here today that you reviewed or considered in forming your opinions in the case?

A. No, sir.

150

MR. LEVY: All right. If it's okay with you and with Stephen, can we take a break now?

MR. SHAW: Do you think that we'll be done in the next hour? Should we plan for lunch?

MR. LEVY: I –- I would rather plan for lunch, so I wanted to take a break in deference to you guys and see what you'd like to do.

MR. SHAW: Okay. There's a sandwich shop downstairs ---

MR. LEVY: Okay.

MR. SHAW: --- that's open until 2:00.

THE VIDEOGRAPHER: Go off the record?

MR. SHAW: Yes, we can go off.

THE VIDEOGRAPHER: We're going off the record. The time is 1:16 p.m.

(Lunch recess: 1:16 p.m. to 2:06 p.m.)

THE VIDEOGRAPHER: Back on the record. This begins Media Unit Number 3. The time is 2:06 p.m.

Q. (Mr. Levy) Mr. Tilden, we're back on the record in your deposition, and we're going to continue ostensibly where we left off in your report. And as I outlined for you just a moment ago off the record, my objectives in the final segments here of your deposition are to, one, spend a little bit more time

151

walking through kind of the procedural and chronological history of events, and number two, to make sure that we review all of the opinions that you're prepared to offer in the case, okay?

A. Okay.

Q. In that respect, sir, I may jump around in your report. I'll reference to you each time. That is to say, after we review the background I'm going to go into your opinion section before I talk to you about the summary of opinions that's actually up at the front, okay?

A. Okay.

Q. So if you would now turn to Page 7 of your report, which we previously marked as Exhibit 119.

A. Yeah.

Q. This background section in the report itself, which begins on Page 7 and continues through Page 10, the bottom of Page 10 of your report, where did you obtain the information contained in this section to translate it into this format?

A. Pulling from documents.

Q. Okay. Was that the only source of information that you considered in putting together what is both a summary and, in some respects, a chronology of events concerning this claim?

152

A. Yes, sir.

Q. Okay. Did you receive any information from counsel for Beach Mart that you relied upon in forming your opinions in the case, other than documentation, that is, were you verbally or in writing informed of information, let's say by email, that you relied upon in forming your opinions in the case?

MR. SHAW: Objection.

THE WITNESS: No email. If I had a question, it was answered.

Q. (Mr. Levy) Okay. In other words, I'm not trying to and I'm not entitled to know the full scope of your communications with counsel. I'm only asking about information that you relied upon in forming your opinions in the case. Does that make sense?

A. Yes, sir.

Q. It sounds like in a substantial, if it not an exclusive part, you formed those on the basis of the documents that we've talked about?

A. Yes, sir.

Q. Okay. I want to walk through the chronology here with you, okay? Some of this is going to be in your report and some may not be. First, we've already talked about that the original underlying suit was filed on or around September 2011. Is that consistent

153

with your understanding?

A. Yes, sir.

Q. Next, we've talked about that the response or the answer and counterclaim, which has been marked previously for identification as Exhibit 36, that's the one in front of you, that that was then filed and served in November 2011 ---

A. Yes, sir.

Q. --- correct? Were you aware of the fact that Beach Mart renewed its coverage, specifically its commercial general liability coverage and umbrella coverage, with Penn National at the end of 2011 coming into 2012?

A. I did not consider it, but I saw that it was a calendar-year policy.

Q. Okay. So just by implication, fair to say, you knew that these policies were renewed first of the year come 2012?

A. That's right.

Q. Okay. Do you know whether or not there was any inquiry of Beach Mart, the insured, about the pendency of any lawsuits at the time of renewal at the end of 2011, in the context of renewing commercial general liability coverage?

A. I did not see the underwriting file. I did

**154**

not see the reference in the claims file.

Q. Is that something that you would typically consider in trying to assess the history or the relevant history from your standpoint in looking at a presentation of a claim?

A. More often than not, if the trigger was claims made, yes.

Q. Okay.

A. If the -- the -- the trigger is offense or occurrence, the answer is no.

Q. Okay. And that makes sense to me. And, of course, with a CGL, it's always -- it's always going to be the latter, isn't it? You don't have claims-made CGL?

A. There is a claims-made CGL, but it's not used often in the marketplace.

Q. Okay. Fair enough. So we don't see that nearly ever. Is that fair to say?

A. Unless it's a products or something hyper critical that you know how to bucket your damages.

Q. Okay. In this instance, in any event, you didn't make any inquiry. You didn't consider any information concerning disclosure of the pendency of the lawsuit at the time of policy renewal by Beach Mart with Penn National on these business owner

**155**

policies that you've looked at, correct?

A. That is correct. I saw no reference to misrepresentation or novation ab initio in the Penn National documents.

Q. You're at least familiar, it sounds like, with these doctrines of -- that can relate to underwriting, of making disclosures or the obligation of disclosures to be made in the context of either application for a renewal of policy coverage?

A. Yes, sir.

Q. Okay. Continuing forward into 2012. Earlier in your deposition, I'd asked you the question about the timing of a responsive pleading, an answer to the counterclaims from Beach Mart. And you had indicated your belief was that Beach Mart answered, Exhibit 36, and responded to these counterclaims, through counsel, let's say, in January or February of 2012. Does that sound right?

A. Yes, sir.

Q. Okay. We then have talked about, and even referenced in your report, a date of June 8th, 2012, when you have notification, formal notification by Beach Mart through their agent, to Penn National of the claim that brings us here today. Is that fair to your understanding of the case?

**156**

A. I pause. You said "their agent".

Q. Beach Mart's agent.

A. And also Penn's agent.

Q. Okay. Well ---

A. I'm not going to debate agency but ---

Q. Sure. Okay.

A. --- I just wanted the record clear that the "insurance agent" versus "agent" ---

Q. Okay. And that's ---

A. --- received first notice in 2018.

Q. Okay. Fair enough. It's not 2018, and so I want the record ---

A. Just ---

Q. Yeah. That wouldn't be fair ---

A. You're right.

Q. --- to Beach Mart, quite frankly. So the first notice that -- that Beach Mart provided to Penn National of the claim was June 8th, 2012.

A. Correct.

Q. And this is reflected in your report, Page 7.

A. Yes.

Q. Okay. I had asked you earlier and just want to confirm, have you reviewed any information thus far which suggests that Beach Mart placed Penn National on

**157**

notice of this claim before Ja -- June 8th, 2012?

A. That's the only document I could find.

Q. Okay. So that's the date you know of as we sit here today?

A. That's correct.

Q. So would you agree that there was a period of greater than six months between the time that Beach Mart, the insured, receives the counterclaim from L&L, Exhibit 36, and the time that they place Penn National on notice of the claim?

A. Yes, sir.

Q. Okay. Have you done any analysis of that issue, that is, the timeliness or lack of timeliness of Beach Mart's notice to Penn National of the existence and filing and service of the counterclaim?

A. That is a short question requiring a long answer.

Q. Okay.

A. I am aware of prompt notice ---

Q. Okay.

A. --- which is the standard we use in the United States now, that New York has come on board. New York was a 30-day state. But we're going to use prompt notice. Having done work in the area of known loss doctrine, it appears that the case law is split

06-23-21                  PNMCIC v Beach Mart/2:14-CV-00008-FL                 COPY

on this point. One –- the majority view is the insured has to be aware that there would be coverage under the policy. And at that point, we start timing prompt notice.

Q. And rather than me –- and I probably didn't delineate this well, but rather than me asking could you or will you do that analysis, I'm just trying to get a sense of the extent to which you've done that analysis at this point relative to the timeliness or lack of timeliness of the notification provided by Beach Mart to Penn National of the existence of this counterclaim and the request for coverage?

A. I considered it and -- and could not find prejudice.

Q. Okay. So you –- you went into some degree of analysis?

A. Yes.

Q. Okay. All right. So we'll talk about that. All right. So next, after this claim is first presented to Penn National by Beach Mart in June 2012, were you aware or are you aware of any communications during June 2012 between Beach Mart or any representatives of Beach Mart, including counsel for Beach Mart at the Womble firm, and Penn National?

A. I don't want to misspeak, but I think there was a claims note that Penn National reached out to Womble.

Q. Okay. All right. So at least some of the materials you –- you've reviewed suggest that there may have been communications, even if verbal, as between Penn National and counsel for Beach Mart, the Womble firm, during June 2012. Am I saying that accurately?

A. Yes, sir. But I don't want to misspeak. I -- I don't want to be confused with other conversations later in the file.

Q. Okay. All right. And I'm just sort of gauging your working understanding underscoring the opinions in the case.

A. Right.

Q. Fair to say your working understanding is that there was a –- a point of contact or a means of contact, communication between the Womble firm on the one side, for Beach Mart, and Penn National during the month of June 2012 about this claim?

A. I would say before the first reservation of rights letter.

Q. Okay. And then I had already handed to you, before we took our break for lunch, a document that was previously marked as Exhibit 71. Agree with me

that that appears to be the first reservation of rights letter sent by Penn National to Beach Mart on or about July 2012?

A. It was July, yes, sir.

Q. Okay. All right. And then coming into August 2012, fair to say that you also had in your file this Exhibit 74, so that's the August 7th, 2012 re –- Reservation of Rights Letter Number 2, a second communication from Penn National -- second formal communication from Penn National to Beach Mart concerning this claim?

A. Yes, sir.

Q. And with all of these reservation of rights letters, you'd agree that they are carbon copied both to the agency, the insurance agent, as well as to the Womble firm and the –- the team representing Beach Mart, private counsel in the case?

A. I'll accept that representation.

Q. Okay. That would be typical, wouldn't it?

A. Yes, sir.

Q. Now, also in August 2012, I had asked you, prior to our break, what information you had about the presentation of the claim to Travelers as well as a series of related questions, in response to which I gather you really didn't have much information at all.

Is that –- is that true?

A. Just the notes in the claims file.

Q. Okay. But beyond the notes in the claims file, didn't know much of anything about the original presentation of the claim to Travelers, true?

A. That's correct.

Q. Okay. I want to hand you what's previously been marked for identification as Exhibit 72.

A. Okay.

Q. Have you seen Exhibit 72 prior to today, Mr. Tilden?

A. No, sir.

Q. Okay. And so fair to say that you were not aware that Travelers sent a letter to Beach Mart on August 27th, 2012, concerning the same claim -- same underlying claim as the one that brings us here today?

A. I'm assuming it's the same underlying claim. It says claimant is L&L Wings, Inc.

Q. Okay. Well, I'll -- assuming that that is the same claim, and I'll represent to you that it is, you weren't aware that Travelers had sent this correspondence to –- to Beach Mart in August 2012?

A. No.

Q. And part of the reason I'm asking you that, sir, is, looking at the first paragraph of this

letter, would you agree with me that this letter marked as Exhibit 72 is a declination of coverage. It's a denial of coverage by Travelers for this claim?

**A. Yes, sir. That's what it says.**

Q. So I'm not spinning that at all. This is Travelers saying, "Beach Mart, you submitted a claim to us for defense and potential indemnification related to this dispute with L&L Wings. We've looked at it, and we denied. We deny your claim."

**A. That's correct, under their policy.**

Q. Okay. Or policies? Because as you sit here today ---

**A. It just shows one policy number.**

Q. --- this is the one here. We don't really -- you don't know what –- what policy periods Travelers had in effect?

**A. Correct.**

Q. Okay. And this is the first you're finding out that Travelers at one point denied this claim?

**A. That's what the letter says.**

Q. Okay. Well, independent of that, you didn't know that Travelers had denied this claim, did you?

**A. No, sir.**

Q. You only saw claims notes that reflect that at some point in time Travelers comes on board and –- and participates in the defense of the claim.

**A. I don't know if they were participating in the defense. I saw they were paying expenses.**

Q. Okay. All right. And maybe this is a good time. I'll hand you what's been marked for identification as Exhibit 73, previously marked as Exhibits 73. This will help to clarify that.

**A. Okay.**

Q. All right. You've not seen this document, Exhibit 73, prior to today either?

**A. That's correct.**

Q. Do you see and have had a chance to read Paragraph 2 of this letter from Travelers to counsel for Beach Mart here at the Womble firm?

**A. That's what it says.**

Q. Would you agree with me that from your reading of this letter, it appears that Travelers changed its coverage position and went from, in the one hand, denying the claim to deciding to defend the case subject to a reservation of rights?

**A. I haven't read the entire letter, but that is what the second paragraph says.**

Q. Okay. Well, do you have any reason to think that that's not what Ms. Baev goes on and –- and says in here that, "You know what, we changed our mind,

we're going to get involved."

**A. It says they're going to participate in defense.**

Q. Assuming that that's the case, assuming that Travelers, in 2012, specifically August 2012, disclaimed coverage for this claim and then a year later, August 2013, says, "No, we changed our mind, we'll participate in the defense," would you agree that that's a change in coverage position on the part of Travelers?

**A. To go from no coverage to defense, yes, sir.**

Q. Okay. So that would represent a change in coverage position in your mind?

**A. Yes, sir.**

Q. Okay. All of this information we've just discussed concerning Travelers was not anything you knew prior to today and prior to me showing you these letters, was it?

**A. Other than what I've testified to in the claims notes.**

Q. Okay. But you didn't see anything in the claims notes specifically referencing these communications, did you?

**A. It's the first time I'm seen these.**

Q. Okay. And so you've not considered and

would not have a chance to have considered these very same issues that you look at in your analysis and opinions in this case relative to Travelers because you didn't have all this documentation. True enough?

MR. SHAW: Objection. Asked and answered.

**THE WITNESS: I did not see the letters.**

MR. LEVY: Okay.

**THE WITNESS: I will note that Travelers says this was a commercial general liability policy. The Penn National was a business owner's policy.**

MR. LEVY: Okay.

**THE WITNESS: And those are two different types of policies.**

Q. (Mr. Levy) I understand that, sir. And I'm not asking about a coverage analysis, per se. I'm just asking about a coverage position. Do you understand the distinction there?

**A. Yeah.**

Q. And so I'm just introducing to you that as part of this chronology that you have put together in terms of what happened from the time you first have any litigation between Beach Mart and L&L all the way

up to the end point of your analysis, these were two items that could not and would not have been included in that time line. True enough?

A. That's correct.

Q. And therefore, items you did not consider in the context of your opinions.

A. Correct.

Q. Okay. So then, going back to kind of on the Penn National side of this, sir, we talked about that there was this second reservation of rights letter that you received in August of 2012 from Penn National to Beach Mart. Coming up into September 2012, what is your understanding of any communications or activities that took place on the Penn National side relative to evaluation of this claim during that time frame?

A. It appears there's activity in the file, but it was heavily redacted, and I could not ascertain other than some file monitoring ---

Q. Sure.

A. --- and sending stuff to home office and home office responding back. I — I couldn't ascertain what was going on.

Q. Okay. Would you agree with me that the unredacted version of the coverage question report that you reviewed, it sounds like as recently as yesterday, would reflect that that report was ultimately submitted by Penn National at the claims professional and local office level up to the home office for review and consideration during August 2012?

A. It – it was a piece of paper, and I couldn't tie it to an e-mail. But it was represented to me that that was the document sent from the local claims office up to home office.

Q. Okay. And does that time frame seem more or less accurate with your understanding of how things transpired in this case?

A. Yes, sir.

Q. Okay. Meaning what you have is you have, at the claims professional level, a claims professional and his manager, Greg Gross and Gary Gibson, taking a look at this claim, preparing this coverage question report and submitting it to their home office or to a superior level within the claims organization at Penn National sometime on or around August 2012. Does that seem consistent with your understanding?

A. My understanding is there were -- there was actually two.

Q. Okay.

A. One was for the BOP only ---

Q. Right.

A. --- and one was for the BOP in the excess.

Q. Right. And so –- and that's consistent with the reservation of rights, right?

A. That's correct.

Q. Because you have ROR number one in July, only referencing -- only referencing the BOP policies, and ROR number two, in August 2012, representing both the BOP policies and the umbrella policies.

A. Right.

Q. And you have two versions of this CQR, an initial one which just covers the BOP and a second in August of 2012 covering the BOP and the umbrellas, correct?

A. Correct.

Q. Okay. Were you aware of the fact that in September of 2012, and this would be reflected in the claims notes, that Penn National makes the decision to seek an outside coverage opinion on this?

MR. SHAW: Objection.

THE WITNESS: I was aware that coverage counsel was sought. I don't remember the date.

Q. (Mr. Levy) Okay. And so –- and I'm just moving chronologically through the time frame here. In September 2012, certainly there was evidence within the documents you reviewed that there was communications between Penn National and my firm to obtain a coverage opinion.

MR. SHAW: Objection.

THE WITNESS: Again, I don't recall the date, but I'll accept September.

Q. (Mr. Levy) Okay. Do you know whether or not there was communications between myself on the one hand, for Penn National, and Mr. Shaw, on the other hand, for Beach Mart in this time frame? So as –- as far back as –- as September or October 2012?

A. I don't recall in the claims notes that I saw, everything was heavily redacted, that there was any communication.

Q. Was it important to you to evaluate the degree and extent of activities by Penn National in working through this claim and evaluating it in terms of your assessment of how Penn National handled the claim?

A. I'm not following the question.

Q. Okay. I'll ask it again, but try to do so in a different way. Was is it important to you to establish a time line or chronology of activity by Penn National in terms of what it did with this claim from the time that it receives the claim, June 8th,

2012, until the time that Penn National sends the letter identifying David Brown, January 15th, 2013? Was that –- was that degree of activity important to you?

A. Yes, sir.

Q. Meaning you wanted to know what was the claims team doing at Penn National to adjust this claim.

A. Yes, sir.

Q. You would have to know that in order to evaluate it for whether or not, in your view, it falls within industry standards and norms or not. True enough?

A. Yes, sir.

Q. Okay. Where within your report have you detailed all the activities that Penn National engaged in concerning this claim between the time it first received it and January 15, 2013?

A. Other than the references you see, nowhere else.

Q. Okay. But thus far, in terms of us walking through this chronology, you don't have any reason based on your review of the materials to disagree with some of these dates I'm giving you? I'm not making up these dates. I'm trying myself to reference these very documents that you've looked at. I mean, you don't have any reason to disagree with my dates, do you?

A. No, sir.

Q. Okay. The materials produced through discovery in this case also reflect that there was in fact correspondence or communications about the claim between my office and the Womble firm about the status of review in October of 2012. Did you see those?

A. I saw some later dates.

Q. Okay. Did you see in the claims notes that Penn National reaches out to defense counsel to engage defense counsel in November 2012?

A. I saw that was the start of the process.

Q. Okay. And then, you have talked about Reservation of Rights Number 3, January 15, 2013, that goes to the insured and said, "We were hiring defense counsel ---

A. Right.

Q. --- on your behalf." By "you", I mean Beach Mart. In terms of the activities that took place between November of 2012 and January of 2013, what did you do to catalog or chronologize those activities?

A. Again, the file was heavily redacted, but all I could see was questions about, "Has Mr. Brown contacted the insured? Have you contacted him?" There was a lot of I'm going to call it toing and froing on those issues.

Q. Sure. What inquiry have you made of the insured, of Beach Mart, one of your clients in this case, as to contacts they received or didn't receive from Mr. Brown during the time frame when he was first engaged by Penn National until the time frame that the letter is received in January of 2015?

A. I -- I did not ask the question of Beach Mart.

Q. Have you asked that question of counsel for Beach Mart?

A. Yes, sir.

Q. What response did you receive?

A. It –- it's best couched in there was Thanksgiving, there was Christmas, there were left messages between Penn National and Mr. Brown. And apparently the week after Christmas, as close as I could put together in the file, is when Penn National or Mr. Brown accepted the assignment.

Q. What I'm trying to gather is whether Mr. Brown himself or anyone from his office reached out to the Womble firm or to representatives of Beach Mart, to the agent or anybody else, between November 2012 and January 15th, 2013. Did you make any inquiry into that issue?

A. No, sir. I saw he accepted the assignment in -- I think it was December 30 in the file. And then the next thing that went out after the holiday was the ROR announcing that Mr. Brown would be the assigned defense counsel.

Q. Okay. I promise I won't ask another one after this one on this subject matter. Did you make any attempt to identify what, if any, points of contact Mr. Brown had between mid-November 2012 and January 2013 with either Beach Mart or the Womble firm as counsel for Beach Mart?

A. You –- you have a broad date range there. I'm –- I'm pondering how he would have authority before he accepted the case to reach out. And my reading the file, that was December 30.

Q. I –- I –- I'm not sort of asking, sir, what your assessment -- again, please don't take any disrespect in the question. I –- I'm not asking what the assessment of authority is, coulda, woulda, shoulda, I'm just asking what you tried to do to ascertain the degree of communications, if any, between David Brown or any representatives of his firm and the insured or any of the insured's

**174**

representatives within a finite period of two months.

A. Two things. I read the Penn National file ---

Q. Yes, sir.

A. --- and then I asked Womble, and they thought the delay was because of the holidays.

Q. Okay. But did you get a definitive answer from Womble to say, "We did or did not hear from this attorney during this time frame."?

A. I don't recall I asked the question, sir.

Q. Okay. I'm only asking you this because five minutes ago, or a little bit more, I asked you wouldn't you want to know the timing, nature and extent of all the communications and touch points that Penn National had on this claim in this interval that we've been talking about now, June of '12 all the way up to January of '13, as part and parcel to your evaluation of how it was handled? I mean, wouldn't you want to know all that?

A. Yes, sir. And I'm sure it's in the claims file, but all of that was heavily redacted.

Q. Okay.

A. I could only glean certain dates.

Q. Okay. So is it your testimony that you couldn't ascertain this information because of

**175**

redactions in the claims file?

A. There were e-mails and there were dates. And it was, "What's the status?" type e-mails in the Penn National file. But below that was redacted.

Q. Okay. It would've been possible, and we'll move on after this, for you to have reached out either to counsel here at the Womble firm or directly to one or more representatives of Beach Mart and say, "Do you have any recollection or record of any communications to or from Penn National or David Brown in this two-month time frame?" You could have done that.

A. Yes, sir.

Q. You just didn't.

A. That's right.

Q. Okay. Let's take a look over onto -- well, let's start on Page 7, sir, at the bottom. There's a sentence at the bottom that says, "But after defense of the counterclaims was tendered to it, Penn National substantially delayed in responding to Beach Mart." Do you see that?

A. Yes, sir.

Q. Is that an opinion that you're prepared to offer in this case?

A. Yes, sir. It's a timing situation.

Q. Okay. What evidence did you rely upon in

**176**

forming the opinion that there was "substantial delay" in Penn National's response to Beach Mart?

A. The Penn National claims file.

Q. Okay. Is this your opinion, even though we've discussed points of contact between Penn National or myself, counsel, outside coverage counsel for Penn National, with Beach Mart or representatives of Beach Mart in June, July, August, September, October of 2012? That's still your opinion?

A. Yes, sir.

Q. Okay. And that's still your opinion even though you haven't exhaustively tried to undertake to write out all the points of contact. It's still your opinion that there was substantial delay in response?

A. Yes.

Q. And by response, do you mean communication at all or making a determination as to how Penn National was going to proceed?

A. How Penn National was going to proceed.

Q. So from your standpoint, it was not so much a matter of the points of -- of contact as it was come to a decision?

A. Yes, sir.

Q. Okay. You then go on to say, "Instead of complying with North Carolina law and the industry

**177**

standards and customs," -- you say "it", but it's referencing Penn National ---

A. Yes.

Q. --- "delayed in providing a defense, and sent a series of 'reservation of rights' letters which neither definitively denied coverage nor agreed to provide a defense". Do -- do you see where you've written that?

A. Yes, sir.

Q. What North Carolina law are you referencing?

A. 58-63-15.

Q. Okay. And what specific provision of 58-63-15 are you referencing?

A. There are 11 paragraphs, so I would have to have it in front of me.

Q. Okay. And so you're preparing this report, both for purposes of this litigation and also giving your analysis to Beach Mart, presumably, of what these findings are or what your opinion is here. And true enough, your report that we're now looking at expresses an opinion to Beach Mart about what you perceived to be a violation of the Unfair Claims Settlement Practice statute in North Carolina. True enough?

A. Yes, sir.

178

MR. SHAW: Objection. Misstates document.

Q. (Mr. Levy) Okay. And that's not to be exhaustive, but at least one of those opinions. And you've now told me that specifically you were referencing here the Unfair Claims Settlement Practice statute.

A. Yes, sir.

Q. Explain how you delineate doing what you've just described from providing analysis or interpretation of application of the law that a lawyer would do to a client.

MR. SHAW: Objection.

Q. (Mr. Levy) Why is it appropriate from your standpoint, as somebody who –- who has background and experience in the insurance area and substantial experiences in the insurance agents and that type of thing, to express opinions to a client on what you perceive to be violations of North Carolina law?

MR. SHAW: Objection.

THE WITNESS: It's up to the attorneys and the judge to fight about the law.

MR. LEVY: Right.

THE WITNESS: This was a case set for trial in March of –- do my dates -- '13, I believe.

179

And Beach Mart still did not have an answer were they going to be getting a defense.

Q. Sure. Okay. I understand your broader opinion, but was it a consideration for you in drafting this report to make certain that you did not tread on what could be the –- the practice of law in rendering the opinions that you did, including this one here about whether or not an entity has complied with the Unfair Claims Settlement Practice statute?

A. I try not to opine on law.

Q. Okay. And you've already mentioned that you've never been able to express an opinion in a court of law in our state regarding this exact subject matter, have you?

MR. SHAW: Objection.

THE WITNESS: To the ultimate conclusion of bad faith, that's correct.

Q. (Mr. Levy) Okay. What industry standards and customs are you referencing on the bottom of Page 7?

A. Going up to Page 8?

Q. Yes, sir.

A. Okay. The -- the –- the concept that the insured needs to have a prompt resolution or status report from the carrier.

180

Q. Uh-huh. And what do you draw upon that contains that standard, that is, this work prompt?

A. It –- it depends on the case. There are cases that say that three months is not prompt. There are cases that say four months is a delay. Each case is specific.

Q. Okay. So in North Carolina, and do –- do you agree, sir, that the analysis in this case is subject to North Carolina law?

A. Yes, sir.

Q. And so with respect to this case, what standards are you relying upon in North Carolina in referencing the same within your report?

A. That this is an insured that has a trial pending and still doesn't have a resolution whether the insurance carrier is going to accept defense or not.

Q. Okay. And you say that Penn National issued a "series of reservation of rights -- 'reservation of rights' letters which neither definitively denied nor agreed to provide a defense". Are you specifically referencing in this time frame just those first two?

A. Yeah, one and two.

Q. Okay. And that's what I wanted to clarify, that letters one and two are what you're talking about

181

here. Because you'd agree with me, at least on letter three in January of 2013, Penn National does, in fact, inform Beach Mart, "We're going to hire a defense attorney for you subject to the reservation of rights."

A. That's correct.

Q. So in other words, Reservation of Rights Number 3, Exhibit 75 in this case, you would agree is a letter which does in fact, Penn National at that point informs the insured, "Yes, we are hiring defense counsel for you subject to a reservation of rights and non-waiver."

A. Right.

Q. Okay. Is your point in reference to the preceding two reservation of rights letters is that they don't explicitly answer the question of how Penn National intends to proceed?

A. That's correct.

Q. Okay. And your opinion with respect to the timeliness is based on the June 8th presentation of the claim and, in your assessment, the January 15th, 2013, hiring of defense counsel?

A. That's correct.

Q. Okay. And the standards that you pointed to –- we talked about the law, but the standards, are

those anything that I could find from your standpoint in any type of publication, treatis, or other written materials if I were to want to look?

A. I have not researched it, but if I were going to look, I would look at Westlaw's claim coverage checklist.

Q. Okay. But you didn't do that in this case?

A. That's correct.

Q. And it sounds like, in –- in –- at least in part, but, you know, not to overstate or understate, one of the factors that you considered was the phase or state of the underlying case versus the decision-making process on Penn National's part. That is to say, where it stood in terms of discovery or trial setting relative to the decision-making process. Is that fair?

A. I didn't follow your question.

Q. The question was, was a –- was a factor in your expressing your opinion in the case the timing of when Penn National was being presented with this claim and asked for a decision versus when the trial setting might be in that underlying case and other ongoing activity?

A. Yes, sir.

Q. Okay. Moving forward to the –- the point now, and this is discussed now on Page 8 of your report. There is a suggestion here, or there's a statement that says, and this is at the top, sir, it's not a full paragraph. It says, "But discovery has shown that Gary Gibson, a claims supervisor at Penn National, had already suggested denying the claim within the first month after the claim was tendered." Do you see that?

A. Yes, sir.

Q. Is that information that you derived either from the CQR or the claims notes?

A. It was the claims notes originally. The CQR was redacted.

Q. What's ---

A. But in the claims notes, it said, "Recommend deny coverage."

Q. --- What's the pertinence of this point here, that is any suggestion or opinion by Mr. Gibson, who's a –- a claims team manager with Penn National, if the ultimate decision that was communicated to the insured was that Penn National would defend the case subject to a reservation of rights?

A. It started off with denied coverage. Seven months later, after coverage counsel was retained,

defense was provided.

Q. Okay. So do you take issue or do you have an opinion, more precisely, as to a suggestion in a claims file that there may not be coverage even if the ultimate decision is more favorable to the insured?

A. When I saw the unredacted version, there were two references that coverage may apply. And it puzzled me why a recommendation was made to deny coverage.

Q. How is it of any relevance to your ultimate opinions, if the ultimate decision was to retain defense counsel and defend subject to a reservation of rights, that there may have been some discussion that some or all aspects of a claim were not covered?

A. The -- the -- the document was inconsistent when I read the unredacted version.

Q. Right.

A. There was a finding of coverage in two points, but then a recommendation to deny coverage.

Q. Okay.

A. And I couldn't reconcile that.

Q. Okay. Did that –- did that document in and of itself inform the opinions or specifically this opinion that you're offering in this case regarding the manner in which Penn National handled the claim during this six or seven-month interval, 2012 to 2013?

A. When this report was prepared, all I saw was the recommendation of denial of coverage early on, let's say in July. When I saw the claim question report unredacted, that's where it said coverage could apply. And so we're talking two different points of time. When I wrote this, all I saw was deny coverage. That's the outset.

Q. Okay. Meaning what you now saw as of yesterday reflects at least a more thorough assessment of all the claims that had been asserted in the underlying counterclaim from 2011?

MR. SHAW: Objection.

THE WITNESS: I wouldn't call it thorough that -- I –- I would say that there were five captions with the counts in the underlying claim. And they said there was no Coverage A, there was no bodily injury or property damage. And then on two of the counts, there's a potential for coverage under advertising injury.

Q. (Mr. Levy) Have you formulated an opinion, sir, that you're prepared to offer in the case about how long it should have taken, in your view, Penn National to review this claim from the time of presentation and communicate back a coverage decision,

**186**

that is, a decision whether or not it was going to provide a defense to Beach Mart based on everything that you've reviewed?

A. In this particular claim -- every claim is different. In this particular claim, in -- in my opinion, it should've been done before Thanksgiving that year.

Q. Okay. And that is to say that given the timing of this claim, given the nature, complexity, et cetera, and all the other factors, if it was presented as it was in June 2012, in your opinion Penn National should have made a determination before the Thanksgiving in November of 2012 and communicated that back to the insured?

A. That's correct.

Q. Okay. And instead, fair to say that that communication took place in January 2013?

A. That's correct.

Q. Okay. Penn National's communication in January 2013, which is Exhibit 75, says, "We have finally made this -- we've made this determination, we're going to provide a defense to you, Beach Mart. Penn National is subject to the reservation of rights and with the non-waiver." Fair?

A. Agreed.

**187**

Q. And Penn National hasn't changed that position since that time, continuing through the present day, have they?

MR. SHAW: Objection.

THE WITNESS: It's my understanding they are still providing defense.

Q. (Mr. Levy) Okay. Have you reviewed any information that suggests that Penn National has ever changed that position?

A. The only file that I saw was redacted, so I -- I don't know what their opinions are.

Q. Well, but you were provided, were you not, with a copy of the defense file, weren't you?

A. A redacted copy of the defense file.

Q. So separate and apart from the documents, Mr. Tilden, did you just ask Mr. Shaw or one of the other members of the team here at –- at the Womble firm, "Has the defense firm, David Brown and his firm, the defense attorney that was hired by Penn National, has Penn National ever pulled him from the case? Or has he continued to be on board and participate in this case, in whatever form or fashion, from at least January 15th, 2013, through the present?"

A. Yes, I asked that question. And the answer was, "He's still participating."

**188**

Q. Okay. Was there ever any identification to you of any point in time, range of time, when Mr. Brown or his firm, defense counsel hired by Penn National on behalf of Beach Mart, is pulled from the case?

A. Not to my knowledge.

Q. Okay. So Penn National, even in –- in your view, made its decision and communicated its position to Beach Mart in January 2013, and that's basically been its position from January 2013 through today's date, through June 2021?

A. That's my understanding.

MR. SHAW: Objection.

Q. (Mr. Levy) Okay. Fast forward or into now the time frame between January 2013 and the end of March 2013. Okay? Do you follow me as far as the time line?

A. Yes, sir.

Q. Were you aware, sir, that a dispute arose as to the selection of defense counsel by Penn National versus the insured, Beach Mart, expressing either directly or through counsel, which is that Penn National retain the Womble firm?

A. I'm aware that a letter was written and also an email on behalf of Beach Mart. I'm aware coverage

**189**

counsel, Parker Poe, was retained —

Q. Okay.

A. --- by Beach Mart.

Q. Do you have any opinion that you're prepared to offer in reference to that specific issue, that is, the selection of counsel by Penn National in this case, or that is in the underlying case?

A. I noted that Penn National did not respond to Beach Mart's concerns.

Q. Okay.

A. There's nothing in the file that I saw. But again, I only saw a redacted file.

Q. Okay. Sure enough. So first, with respect to the business owner's policies that you reviewed, Penn National was vested with the exclusive right to select the attorney or attorneys that would defend Beach Mart in the case. Fair enough?

A. Agreed.

MR. SHAW: Objection.

Q. (Mr. Levy) Would you agree with that?

A. Agreed.

Q. Okay. In other words, in this instance the insured didn't have any say-so in terms of what attorney was selected. True enough?

A. That's the way the contract reads, yes, sir.

Q. Okay. That's not atypical for a liability insurance policy in North Carolina or elsewhere, is it, that is, that an insured very often does not have any say so as to who the carrier hires to defend it when a request is made for defense? And I'm just saying ---

A. You ask a blanket question.

Q. Well, that's fine.

A. Yeah.

Q. And I'm saying absent special conditions, absent an SIR, were not talking about a claims-made form.

A. Yeah. There –- there are endorsements related to selection of counsel that could be put on policy.

Q. Sure.

A. Setting that aside, the -- the timing of selection, 30 day -- or excuse me, 60 days out from trial, getting the attorney up to speed is of concern.

Q. Okay. Given that the trial didn't transpire until November 2020, did –- did you know that the trial took place in November of 2020?

A. Yes, sir.

Q. Okay. You know what the outcome of the trial was?

A. Yes, sir.

Q. What was that?

A. That Beach Mart won.

Q. Okay. And do you know what the status of any counterclaims was either during or prior to that trial? Those are claims by L&L against Beach Mart. Do you know what happened to any of those claims?

A. I saw a note in the claims file that one was dismissed with prejudice, with sanctions. And then there was a question would Penn National seek reimbursement of legal fees. And the file went black again with redactions. And then I understand in talking with Womble that a –- a judgment was rendered in Beach Mart's behalf.

Q. Okay. No money at all was awarded to L&L. True enough?

A. Correct.

Q. Beach Mart does not owe one penny to L&L Wings and shouldn't owe one penny to L&L Wings. Are you good with that?

A. As long as the appeals don't occur, I –- I will agree with that.

Q. Okay. Getting back to this issue of hiring of defense counsel, what inquiry did you personally make into the qualifications, appropriateness,

competency of David Brown and his firm to come in and to have defended the counterclaims asserted by –- or –- or those counterclaims that were pending against Beach Mart as of the time that he was engaged?

A. I know Mr. Brown and have dealt in other matters with Mr. Brown.

Q. Yes, sir.

Q. And I know his law firm, and I don't feel qualified to say he is a better or a worse attorney than anybody else.

Q. You know that he's been around for a good long while, haven't you?

A. He's my age.

Q. Well, I don't mean that. I mean that as a compliment, not –- not as a ---

A. Yeah.

Q. --- disparaging remark.

A. Yeah.

Q. I mean, I think you probably know that.

A. Yeah.

Q. I've sat in trials with Mr. Brown. I'm just going to represent that to you. I have sat side by side with Mr. Brown in trial as recently as three years ago. Have you ever observed Mr. Brown in trial?

A. Not at trial.

Q. Okay. Have you ever observed Mr. Brown in court?

A. Not in court.

Q. Okay. Have you ever received any education from Mr. Brown?

A. If my memory serves me correct, I was on the committee that drafted the mold endorsement for the homeowners' policy, and he was counsel to the North Carolina Rate Bureau. And so I got a lesson that day.

Q. Yes, sir. Sir, you're not going to offer any opinions in this case about whether or not Mr. Brown was competent, qualified or otherwise had the appropriate requisite experience to come in and to have defended, as he did and his firm did, Beach Mart in this underlying case, true?

A. That's correct.

Q. Are you prepared to offer any opinions concerning the selection of defense counsel by Penn National for Beach Mart in this case?

MR. SHAW: Objection.

THE WITNESS: Other than not discussing the issue or explaining the issue to Beach Mart, no, sir.

Q. (Mr. Levy) Okay. Did you make any inquiry of counsel or of Beach Mart directly, independent of

the claims file, as to the extent of any communications between Penn National and Beach Mart about concerns Beach Mart expressed regarding the selection of David Brown?

**A. I saw the letter, I saw the email, and then I saw the response internally from Penn National, "We're going use David Brown."**

Q. Sure. So is that no, you didn't ask that question?

**A. To speed things up, I have not contacted Beach Mart. So all of my information would come from counsel.**

Q. Sure. And that's why I'm asking if you asked counsel. The –- the question was -- you can see what you can see in the documents.

**A. Yeah.**

Q. Separately, Greg Gross is the –- is the claims professional working on this file as of this time frame, the first quarter of 2013. True to what you've read?

**A. Yes, sir.**

Q. So was there an inquiry counsel to say, "Hey, I –- I'm just trying to make certain what was the degree, if any, of communications from Mr. Gross back to the insured or back to you, Womble firm, as representing the insured, regarding concerns that you articulated about the selection of Mr. Brown and his firm as defense counsel."?

**A. No, sir.**

Q. Okay. You didn't make that question?

**A. No, sir.**

Q. Wouldn't it be useful to kind of know the full picture there in order to express opinions as to whether or not that communication was sufficient?

**A. It was written out in the claims file that, "We like Brown."**

Q. Okay. Let's skip down on Page 8 of Exhibit 119. We're still on Page 8 of your report here. And at the bottom, this is the last paragraph, it says that, "From January 2013 to February 2014, Penn National's panel counsel" -- by the way, does that preference David Brown and his firm?

**A. Yes, sir.**

Q. Okay. "Worked to assist in the provision of a defense to Beach Mart, as counter-claim defense counsel." Is that accurate, what you've written there?

**A. Yes, sir.**

Q. Why do you cut that off at 2014? Or excuse me, at February 2014?

**A. You're asking me something that I did four months ago, and I don't have a clue.**

Q. Okay. I –- and I'm –- again, this is not to be critical, but I just -- we have a –- a case that proceeded on for –- for many years.

**A. Uh-huh.**

Q. Okay? And it went through a tortured procedural history is the best way that I can say it, but one which culminated in a trial result very favorable to Beach Mart in 2020. And so Mr. Brown's been involved since January 2013 through the present. Why does your report referenced this date, if you know?

**A. It could be the next sentence. The mediation had come up, I think was the next thing. That's the only thing I can think of.**

MR. SHAW: Okay. And Dave, to the extent we're still on Page 2 of nine pages of background material in the report, I'm happy to stipulate that we've never taken the position that David Brown has stopped his capacity as defense counsel.

MR. LEVY: Okay.

MR. SHAW: Okay?

MR. LEVY: That's –- that's fine.

MR. SHAW: I –- I see the sentence you're pointing at, and I –- I understand. But we're not disputing that David Brown stopped in –-

MR. LEVY: That –- that's helpful.

MR. SHAW: --- at any point prior to today ---

MR. LEVY: And I, and I can miss stuff.

MR. SHAW: --- and he hasn't stopped.

MR. LEVY: You know, I'm –- I'm trying to -- if I could have -- but that's helpful so long as there's not any dispute that David was involved from January of '13 through the present ---

MR. SHAW: Yes.

MR. LEVY: --- as defense —

MR. SHAW: No dispute.

MR. LEVY: All right. Then let's –- let's just move on here for one sec. And this is going to subsume stuff that's later in the report. I know you're watching the clock, Stephen, and understandably so.

Q. (Mr. Levy) You –- you say here, Mr. Tilden, Penn National changed its position impliedly in 2014. How –- how did –- how does the filing of a dec action, Mr. Tilden, represent a change in position in this claim? Because I asked you this question in a

198

generic sense a little bit earlier in the day, and I'm trying to understand your opinion as to why a filing of a dec action would be a change in position versus simply a request to the court to tell us one way or another?

**A. When I read the dec action, I -- I think one of the statements, and that could've been a new response, was that Penn acted in good faith. They were saying all of the good things that they did. But they wanted a action to withdraw defense, you know, the coverage determination.**

Q. But true -- true enough, they never withdrew per the stipulation that Stephen was kind enough to offer, never withdrew their defense. And in fact, didn't do so even after the trial court in 2018 agreed with them. I mean, you're now aware of that, right?

**A. Yes, sir.**

Q. I guess, sir, is it still your opinion that Penn National at any point changed its coverage position in this case? And if so, why?

**A. In July, the recommendation was to deny coverage. Coverage counsel was retained, defense was offered seven months later. And then, after a year of litigation, it -- it appeared that this was about the same time that the expert fees were being submitted.**

199

**I forgot the name of the intellectual property firm. COSAR?**

Q. CONSOR?

**A. CONSOR, yeah.**

Q. Okay.

**A. It appeared it all came at the same time. And when the fees came in -- again, the file was redacted, but when those, the $40,000 or $50,000 of fees came in, the question to myself was, "Was that the precipitating action that caused Penn to file the DJ?"**

Q. Okay.

**A. But again, the claims file was redacted, and I couldn't see what was going on.**

Q. Sure. I'll just ask one more time, we'll at least move onto the next page. Is it your opinion and contention in this case, as an expert for Beach Mart, that Penn National ever changed its coverage position such as it was communicated to the insured in January -- on January 15th, 2013?

**A. I could never figure out what their coverage position was.**

Q. Would you agree with me that Penn National communicated on January 15th, 2013 -- we've read this letter, we've talked about already ---

200

**A. Yeah.**

Q. --- a few times, that Penn National was going to defend this case subject to a reservation of rights and with a non-waiver?

**A. Yes, sir. But in reading the four RORs, I could not determine Penn's coverage position.**

Q. In what you observed, independent of these letters -- we now have a stipulation Mr. Brown has been involved as defense counsel from January of 2013 through the present time, okay? How and when has Penn National changed its coverage position such as there's reference to them doing on Pages 8 and 9 and elsewhere in your report marked as Exhibit 119?

MR. SHAW: And I'll object to the extent that you're invoking stipulation. Stipulation was related to the defense being provided, not to the coverage position.

Q. (Mr. Levy) That's -- that's fine. I'm -- I'm just saying, sir, whe -- when do you contend, after January 15th, 2013, that Penn National did anything other than provide a defense subject to a reservation of rights, from everything you've reviewed?

**A. That's all they did.**

Q. So there really wasn't a change in position,

201

was there?

**A. They never had a coverage position communicated to the insured that I could see.**

Q. I understand your point there. Now, I'm talking about what they did, what actually happened. We also know that Mr. Brown is involved now for eight and half years. That's never changed, has it?

**A. No, sir.**

Q. So in terms of what actually happened here, Penn National did provide a defense counsel subject to a reservation of rights with a non-waiver. And that has been the case for the last eight and a half years, hasn't it?

**A. Yes, sir.**

Q. Okay. Let's go over to Page 9. And I know this is background, but it is actually going to subsumed most of your opinions. I'll -- I'll do my very best when we get to those not to -- not to be duplicative. The second full paragraph here on Page 9 starts out, "It is my opinion that" -- Do you see that?

**A. Yes, sir.**

Q. And you go on to say that Penn National "did not comply with reasonable and commercially-acceptable standards for acting in the best interests of its

insured, and this general business practice of Penn National continued on throughout the coverage action." First, what commercially-acceptable standards are reasonable and commercially-acceptable standards are you referencing there?

A. Disclosing the coverage position and the reservation of rights letter.

Q. Okay. And so looking at Exhibit 75, is it your opinion that Exhibit 75 did not sufficiently articulate Penn National's coverage position?

A. When I reviewed the letter -- and this is on Bates 9246.

Q. Yes, sir. I'm looking at it.

A. Yeah.

Q. Yeah.

A. It says, "But rather informed Beach Mart of a potential coverage issue." The coverage issue was never discussed. The policy was provided to Beach Mart.

Q. Sure. And I –- I –- I understand that. So what you're saying is that you didn't feel and don't feel that the letter dated January 15th, 2013, Exhibit 75, sufficiently communicated Penn National's coverage position to the insured, Beach Mart?

A. All four of the letters were basically the same ---

Q. Okay.

A. --- on that point.

Q. Do you agree that the January 15th, 2015 letter did affirmatively inform the insured, Beach Mart, that defense counsel was hired?

A. That's correct.

Q. And what you, in your opinion, just want to make sure I understand it, are saying is missing is more of an analysis or discussion of these potential coverage issues?

A. That's correct.

Q. Okay. And it's your opinion that that was violative of reasonable and commercially-acceptable standards?

A. Yes, sir.

Q. How is it that you believe, if you have a belief or opinion, Penn Nat –- excuse me, Beach Mart was damaged or affected by that?

A. Sitting here today, other than unreimbursed legal fees from June to January, the court ruled that there were no damages.

Q. Okay. So other than those legal fees for that six or seven-month period, you can't think of anything else?

A. The court's already ruled there are no damages.

Q. Sure. And you don't know anything about the amount or extent to those legal fees? Don't have an opinion on those fees themselves?

A. None whatsoever.

Q. Okay. Are you relying upon any written documentation, treatises or published standards with this reference to commercially-acceptable standards? Or is it just based on your experience within the industry?

A. I would have to research the treatises. If it were located anywhere, it would be in the AIC textbooks.

Q. Sure.

A. But generally, experience in the industry.

Q. Okay. I want to skip down midway through that same paragraph.

A. I –- I want to complete the record.

Q. I'm sorry, I didn't realize ---

A. My mind jumps, I apologize. There's also the Federal Court of Appeals case that outlined the requisites of an ROR and said that you had to do an analysis of what the coverage pieces were.

Q. Okay. So that's another authority or factor that you're taking into account from general knowledge?

A. Randy Maniloff wrote extensively on it with White and Williams.

Q. Uh-huh. So he's in Philadelphia or somewhere?

A. Yes, sir.

Q. Okay.

A. Philadelphia lawyer. I've always wanted to say that.

Q. All right. I wanted to skip down. There's a sentence midway through the paragraph on Exhibit (sic) 9 at the bottom, "Beach Mart could have defaulted on the counterclaim, (exposing Penn National to policy-limits liability), but it spent its own money to defend this claim." Do you see that?

A. Yes, sir.

Q. This claim by Beach Mart was not tendered before an answer came due, was it?

A. Again, I -- I don't remember when their answer was due, but let's say January, February.

Q. Uh-huh.

A. It was tendered in June.

Q. So why –- why have you referenced the possibility or prospect of default when Beach Mart,

the insured, didn't even tender this case for defense until multiple months after it had already answered?

**A. Two reasons. I am aware that sometimes the court will go after the insurance company, particularly in bankruptcy situations ---**

Q. Uh-huh.

**A. --- on -- on faults like this. And number two is the good faith and fair dealing is to mitigate damages, regardless. So I think what Beach Mart did was to mitigate the damages, and Penn benefited from it.**

Q. Okay. Penn National and any carrier, any liability carrier that's writing CGL or similar type policies like a BOP policy, cannot participate or even respond to a claim for a defense on a claim it's not made aware of, can it?

**A. No, sir.**

Q. All right. Now, on the bottom of Page 9 and continuing for that first paragraph of Page 10, you provide some discussion in here of communications or back and forth that took place between the time that Beach Mart, through counsel, presents invoices for consideration or payment by Penn National in December, 2014, through a time frame in July, 2017. Is that accurate to what that talks about?

**A. Yes, sir.**

Q. Are you prepared to offer any opinion as to that issue in this case?

**A. They were tendered. They haven't been paid.**

Q. You -- you've never looked at those invoices. We've already established that, right?

**A. That's correct.**

Q. Were you aware that those invoices were substantially redacted?

**A. I didn't see the invoices, so there's ---**

Q. Okay.

**A. --- I could not testify one way or the other.**

Q. I know you've not actually seen the documents. So you've not independently been made aware that those invoices have redactions on them?

**A. No, sir.**

Q. You weren't independently made aware that those invoices accounted for all legal fees incurred by Beach Mart during that time frame rather than legal fees just assoti -- associated with defense of the counterclaim? You didn't -- you didn't know that, did you?

**A. The only thing that I gleaned from the letter, it was from the tender until January '15.**

Q. Okay.

**A. That's all I know.**

Q. Okay. You didn't make any inquiry of the Womble firm, for example, to understand what the nature or extent of communications were about those invoices between the Womble firm and my firm during that time frame, did -- did you? You didn't ask that question?

**A. I just saw the letters.**

Q. Okay. Do you know whether or not -- or did you know that this coverage case was stayed for three years?

**A. I was aware of that.**

Q. Okay. So the coverage case itself was not pending during the time frame for the -- predominantly during the time frame that -- that's referenced here? Did you know that?

MR. SHAW: Objection. Misstates the status of the case.

**THE WITNESS: I -- I know it was stayed.**

Q. (Mr. Levy) Okay. Well, did you undertake to document precisely when the coverage case was stayed and when the stay was lifted?

**A. No, I previously testified this morning that I got a file in, I was informed it was the stay.**

Q. Sure.

**A. And I don't know the time frame.**

Q. Okay. Are you prepared to offer any opinions as to the conduct of Penn National from the time of presentation of -- based on a letter of some batch of invoices through 2017, or any other date, concerning payment or non-payment of those invoices?

**A. Not to the quantum of the invoices.**

Q. Only your opinion that they should be paid?

**A. Reasonable expenses should be paid.**

Q. Reasonable expenses should be paid ---

**A. Yes.**

Q. --- and reasonable fees should be paid?

**A. That's correct.**

Q. Okay. With respect to that same issue, have you done any independent analysis separate from the invoices as to what would constitute reasonable fees or expenses for defense of the counterclaim during that interval?

**A. No, sir.**

Q. Would you agree that your opinion that reasonable fees and expenses should be paid for that six or seven-month interval is based on the notion that there is a duty to defend under the policy?

210

A. Yes.

Q. That's the foundation of that opinion, right?

A. Yes, sir.

Q. In this case, the coverage case on which you're kind enough to sit for this lengthy deposition today, has the court yet determined whether or not Penn National ever had a duty to defend?

A. When I read the Court of Appeals decision, I did not even focus on that.

Q. Okay. It's still pending, isn't it? I mean, otherwise we wouldn't be ---

A. I saw it was remanded.

Q. Yeah. Otherwise we wouldn't be here today.

A. Yeah.

Q. And you've mentioned already you understand discovery is ongoing?

A. Yes.

Q. Were you aware of the fact that the parties have not yet filed dispositive motions in the case, motions for summary judgment?

A. Yeah, that's normally after discovery closes.

Q. Okay. All right. So hypothetically, if the court were to determine that Penn National never had a

211

duty to defend, -- I know you disagree with that. But if the court were to make the determination that Penn National never had a duty to defend, then Penn National wouldn't owe any fees, would they?

A. I would agree with that.

Q. Okay. Let's go down to the bottom of Page 10 and that paragraph at the bottom of Page 10. So read that over and let me know when you've had a chance to do so.

MR. SHAW: Dave, are you referring to the second full paragraph on Page 10?

MR. LEVY: Yes, sir. That –- that's more precise.

MR. SHAW: Thank you.

Q. (Mr. Levy) So I'm asking about the paragraph after this lawsuit started, and then it ends with ---

A. Yes, sir. Okay, I've read it.

Q. --- "fair and equitable settlement."

A. Yeah.

Q. Have a chance to look that over? This discussion now and -- and opinion that's contained at the bottom of Page 10 is now a new subject area. True enough?

A. Yes, sir.

212

Q. And is it accurate to say that what you're referencing on the bottom of Page 10 is a mediated settlement conference that took place in this coverage case?

A. I couldn't tell from the claims notes.

Q. Okay.

A. I saw it was a mediation.

Q. Okay.

A. It was hard to -- it's –- it's hard to read a document that's heavily redacted and figure out what the heck is going on.

Q. Sure. And by the way, that's why I asked you about the legal invoices. You didn't know those were redacted either?

A. That's correct.

Q. Okay. So going back to the bottom of Page 10, are you prepared to offer an opinion specific to the conduct of Penn National at a mediated settlement conference?

A. I am not sure when it occurred, but I saw notes that Penn National was going to offer $50,000 for a global settlement, which would have left Beach Mart exposed in this particular claim.

Q. And that's why I want to be precise here. Is it your understanding and belief that the mediation

213

that's referenced in Paragraph 2 on Page 10 of Exhibit 119 was won in the underlying case?

A. That's my recollection, yes, sir.

Q. Okay. The reason I'm asking that is because, at times during this litigation, Beach Mart has raised allegations and made statements about Penn National's conduct at mediations within the coverage case.

A. I saw that too.

Q. Okay. Are you prepared to offer any opinions as an expert in this case regarding Penn National's conduct or activities during a mediation within the coverage case?

A. Other than it's custom and practice to mediate in good faith.

Q. Do you have expertise mediating settlement conferences?

A. I've been involved in them.

Q. Okay. Are you a –- a North Carolina certified mediator?

A. No, sir. I –- I have been representing my client in the case.

Q. Okay. Been involved as an –- as an attendee at a mediation? Or on –- in what capacity?

A. In –- in the adjusting chair.

**214**

Q. Okay. All right. So in the chair of the carrier?

A. Yes.

Q. All right. With respect to the specific rules governing mediations, that's not –- that's not necessarily your area of expertise, is it?

A. That's correct.

Q. Okay. Fair to say that, as you sit here today, you can't even provide a date or any particulars or anything further as to what, if any, conduct Penn National did or did not engage in that you're referencing on this last paragraph on Page 10, Exhibit 119?

A. Not at the present time, no, sir.

Q. Okay. Don't even know whether that mediation was in the underlying case or the coverage case?

A. I don't recall.

MR. LEVY: Okay. All right. If we can let's go ahead and take a -- this is a good place for a pause and if anybody needs to use the restroom.

MR. SHAW: We'll go off the record.

THE VIDEOGRAPHER: Going off the record. The time is 3:27 p.m.

(Brief recess: 3:27 p.m. to 3:36 p.m.)

**215**

THE VIDEOGRAPHER: Back on the record. This begins Media Unit Number 4. The time is 3:36 p.m.

Q. (Mr. Levy) Okay. Mr. Tilden, we're back on the record in your deposition. And I next wanted to talk to you about the portion of your report, Exhibit 119, that's contained in Pages 11 through 15 of the report, okay?

A. Okay.

Q. And which contains the heading The Penn National Policy. It would appear to me, and you correct me if I'm wrong, that Pages 11 through 15 reflect your efforts and analysis of the original counterclaim in the case, which we've previously discussed and which was marked as Exhibit 36 in the underlying action, and at least one of the business owner's policies issued, the first of the business owner's policies issued by Penn National to Beach Mart. Is that true?

A. Yes, sir.

Q. Why did you undertake to do that exercise?

A. Claims handling as comparing the complaint against the four corners of the policy.

Q. Okay. So in other words, were you putting yourself in that same seat of the claims handler in

**216**

this case or the claims professional?

A. That's what I try to do.

Q. Okay. In the course of -- and we've already talked about it. The policy itself is a –- is a contract between -- in this case between Penn National and Beach Mart, true?

A. That's correct.

Q. And so what you were doing was analyzing the insurance policy contract, this –- this instance, the 2008 BOP policy, and providing opinions and analysis to the client, to the Womble firm or to Beach Mart, as to what you think those two things resulted, and that is whether or not Penn National has a duty to defend under the policy. I mean, isn't that what you're doing here?

A. Taking the plain meaning of words and comparing them against the complaint.

Q. Okay. Again, I'm not trying to be coy with you, but how does that distinct from what you described as, "Legal advice, which is interpreting a contract and offering an opinion."?

MR. SHAW: Objection.

THE WITNESS: Adjusters and claims examiners will take the complaint and compare it against the plain reading of the policy every day.

**217**

That's what's done.

Q. (Mr. Levy) I understand that, sir, except they don't go out and offer that opinion to a third party, do they?

MR. SHAW: Objection.

THE WITNESS: I don't know if they do or do not.

Q. (Mr. Levy) And that's –- that's the distinction here, sir, that I'm –- I'm asking about.

A. Yeah.

Q. With a claims professional like Greg Gross in this case, he was in that seat. I mean, that's fair to your reading of the record, right?

A. Correct.

Q. And so Mr. Gross receives this –- this claim as the claims professional assigned to it at the time that it comes in at Penn National. And he's got to work through the process of ultimately getting back to the insured and saying whether they're going to disclaim coverage or will defend it or defend it subject to a reservation of rights, right?

A. Correct.

Q. In that instance, he's just accepting it. The process was what it was. You've told me what your opinion was in that respect. But he doesn't go out to

a –- a party outside his organization, did he? And start saying, "Well, here's my opinion on this."? Is that fair? I mean, you didn't see any record of that, did you?

A. No, he never put his opinion in the reservation of rights letter.

Q. Okay. But I'm asking about did he go out and express an opinion to an unrelated third party on this?

A. No, sir.

Q. So I'm contrasting that with your services as an expert witness here. Does it concern you even in the least that what you've exercised and done here with respect to the policy could constitute the practice of law in North Carolina?

A. If that's what the court says, so be it. But this is what claims examiners and adjusters do every day.

Q. Okay. And this is exactly why, and I didn't do so to be ugly or anything like that, I asked you up front whether or not you've made an inquiry with the North Carolina State Bar. There's a person named David Johnson who's been there at least as long as I've been a lawyer in this state. They have an entire department devoted to questions related to the practice of law within the state, such that inquiries can be submitted. But it sounds like you've never gone to them and said, "Hey, is it all right for me to express opinions to a third party here about my analysis of an insurance policy contract under circumstances of being an expert witness?" You have not made that inquiry before.

MR. SHAW: Objection.

THE WITNESS: That's correct.

Q. (Mr. Levy) Okay. Did you intend for your review of this policy, and this is just one of the singular policies, but the 2008 BOP policy and the counterclaim, to be exhaustive? Meaning, do you feel like you covered all of the sections of the policy and all of the different considerations in looking at this?

A. There are different parts of the policy, but these were the pertinent parts.

Q. Do you ---

A. I can make this report 200 pages long.

Q. Yes, sir. Do you agree with me that the question of whether there is a duty to defend under the policies that are at issue in this coverage case are those which should and ought to be decided by the court –- by the judge?

A. Absolutely.

Q. Okay. With respect to the issue of indemnity, while we've talked about it in general terms, we have not talked about it in any great degree of specificity as to the claim that Beach Mart submitted with Penn National. You following me so far on that?

A. Yes, sir.

Q. Would you agree with me that, based on your understanding of the result in the underlying case, including the ultimate judgment that was entered in Beach Mart's favor, Penn National has no duty to indemnify Beach Mart because no money is owed to L&L Wings, the third-party claimant?

A. As respects that part of the case, yes, sir.

Q. Are you prepared to otherwise offer any opinions as an expert in this case concerning the duty to indemnify?

A. There were no damages awarded, therefore there's no duty to indemnify.

Q. Okay. And by that you mean Penn National has no duty to indemnify Beach Mart. True enough?

A. Beach Mart did not have a loss and have to pay to L&L.

Q. Okay. So is it fair to say that your opinions, as we sit here today and consistent with this report, concern the -- the issue of duty to defend?

A. Yes, sir.

Q. Okay. Let's skip over, if we can ---

A. So –- so the record's complete, my report was missing the amendatory endorsement that Penn National had attached. It –- it doesn't change my opinions.

Q. Okay. I understand that, and I –- I just wanted to get a sense of that section.

A. Yeah.

Q. That's okay. I'm actually not –- I want to sort of move over to the Opinions section of your report.

A. Okay.

Q. It's beginning on Page 16. Okay? And see if we can take just primarily the remaining time that we have left to –- to make sure that I've covered all your opinions in the case, okay?

A. Okay.

Q. And so I'm going to go through these in order. But if we've already had the opportunity to discuss them, I'll –- I'll try to just confirm that and then move on.

222

A. Okay.

Q. I want to start with the –- the second –- well, let's start with the first paragraph in the Opinions section. Okay? Just to take this sequentially. And you state here, "insurance companies are supposed to liberally construe policy provisions that extend coverage, and narrowly construe provisions that exclude coverage." Do you see that?

A. Yes, sir.

Q. Is that what you believe to be the law in North Carolina, or standards, customs and practices applicable to companies like Penn National?

A. Yes.

Q. Meaning both?

A. Yes.

Q. Okay. And in this instance, how is it, if at all, that you believe that Penn National did anything that violated what you contend is this custom and practice within the industry and law regarding policy construction and application?

A. In the amendatory endorsement, one of the exclusions had a savings clause for trade dress, which meant there was coverage for trade dress.

Q. In your opinion?

A. In my -- it –- it says there's coverage for

223

trade dress. I –- I'm not comparing the trade dress against the allegations in the complaint. Just the plain reading says, "But this exclusion doesn't apply," and it lists some things. And one of the words in there is "trade dress."

Q. And you're –- what you're calling a savings clause but is also referred to within the parlance of insurance as an exception to an exclusion?

A. Yes, sir. But exception to an exclusion is five words. And when you teach, you truncate it to savings clause.

Q. Fair point. And that's the way it works with a coverage analysis, isn't it? You first determine whether or not it falls –- first you determine whether or not the conditions precedent have been met or that the general conditions of the policy have been met.

A. Correct.

Q. Then you work and see if it falls within the insuring agreement. Then you see if any exclusions apply, and then you see if there's any exceptions to the exclusions.

A. And then the –- any endorsements modifying.

Q. Okay. Now, you don't happen to know, do you, what the burden shifting is under North Carolina

224

law concerning those very items, do you?

A. Not specifically under North Carolina, but the insured has to put themselves within the four corners of the insuring agreement. The adjuster has to prove up the exclusion, the insured has to prove up the exception to the exclusion.

Q. Okay. And that's how it works in North Carolina, just for your ratification. You weren't previously aware of that?

A. It's just a principle that I teach.

Q. Okay. So that's something that exists in multiple jurisdictions?

A. Worldwide.

Q. Okay. Moving down to that second paragraph, you've expressed the opinion that "Penn National breached its insurance contract, which required the defense of L&L's counterclaim and required Penn National to indemnify Beach Mart for any covered losses arising from that counterclaim." Does that remain your opinion?

A. Yes, sir.

Q. How specifically do you say that Penn National breached the insurance contract?

A. They have not reimbursed the insured for the defense cost.

225

Q. The defense costs between?

A. June to January.

Q. Okay. Do you agree that that opinion is predicated on a finding that there is a duty to defend?

A. Yes, sir.

Q. And that finding would need to be made by the court?

A. Yes, sir.

Q. And as you sit here today, you don't know whether or not the court's made that finding?

A. No, sir.

Q. Wouldn't you want to have established that, that is, whether or not the court has made the finding in regards to whether or not there's a duty to defend, prior to putting together the opinions that you have in this report, Exhibit 119?

A. It would be conclusive when the court rules.

Q. Okay. Assuming for purposes of this question, that the court has not yet issued an order on the –- on the ultimate question of whether or not Penn National had a duty to defend the original counterclaim, isn't it true that this opinion you have regarding breach of contract would only come into play if, in fact, the court determines later that there was

a duty to defend?

A. Yes, sir.

Q. Okay. With respect to the opinions that are contained in Exhibit 119 and also the analysis that we briefly touched upon on Pages 11 through 15 of Exhibit 119, you've not done any type of analysis or assessment or evaluation of any of the issues in this case concerning these other pleadings from the underlying action, meaning, 1 -- what we've marked for identification today as Exhibit, I believe, 121 and 122 -- excuse me, 120 and 121, in as much as you had never seen those prior to today. True enough?

A. That's true.

MR. SHAW: Same objection as before, to the extent that the documents marked today as exhibits differ from those previously produced in the record.

MR. LEVY: Okay. And that -- that's fine. I'm just asking about documents. I'll just represent for purposes of the record, these are just documents I obtained off PACER. So I don't want to characterize or mischaracterize these as anything other than what the pleading says.

Q. (Mr. Levy) And just was asking you, Mr. Tilden, you've not seen the versions of these that I've provided to you that I'll represent I took off of PACER.

A. I have not seen the PACER versions ---

Q. Okay.

A. --- that's correct.

Q. All right. And your opinions really in this report, we've already established, only concern the business owner policies, not the umbrella policies.

A. That's correct.

Q. And then more narrowly, the Coverage section or, that is, the analysis of Coverage section in your report, Pages 11 through 15, specifically concerns the 2008, BOP policy?

A. Yes, sir.

Q. Okay. You go on to discuss here on the paragraph, "First, my analysis begins," and that paragraph discusses the timing or the timeliness of the tender of the claim to Penn National and the question of prejudice. Do you agree that that's what the paragraph talks about?

A. Yes, sir.

Q. Do you believe that Beach Mart and is it your opinion that Beach Mart timely presented a claim for defense of the underlying counterclaims filed in November of 2011 to Penn National in June 2012?

A. Yes, sir.

Q. I don't -- and -- I want to be clear. I'm not asking about whether or not there was prejudice, I'm just asking was it timely? Is it your opinion that that was timely?

A. Yes, sir.

Q. So to be clear, it's your opinion, with all your years and experience in the industry, that if an insured were to present a case like this, a claim like this, a counterclaim, to its general liability carrier eight months after it received that counterclaim, that that's timely?

A. As I testified to this morning, the timing begins when they became aware there could be coverage.

Q. Okay. Well ---

A. So eight -- eight months is the outside. I think that, based on questions I asked to Womble, we're in the 30 to 60-day range.

Q. Well, what type of questions were those?

A. When did the insured become aware they might have coverage?

Q. When was that?

A. I could not get an exact date. It could've been as early as May. It could've been a little earlier than that.

Q. How did the insured become aware that they might have coverage or their -- their belief that they might have coverage?

A. I don't know. I haven't read any depositions.

Q. Okay. Wouldn't you want to get a little bit more precision on that item in order to first know those dates before expressing an opinion about the timeliness of their notice?

A. I asked the question, I got an answer.

Q. Okay. All right. In general, doesn't eight months seem like a long time for an insured to wait before providing notice of a complaint or counterclaim to a carrier if they're seeking defense?

A. It depends on the case. Every case is different.

Q. What did you do to examine the events that transpired in the underlying case between November 2011 and June 2012 to assess whether or not the carrier was prejudice at all by the -- the timing of the notice?

A. Just questions on when a response was filed and -- which I think was January or February, and then discovery started.

Q. Any examination of the docket report or other record of the case that would show filings or

activities during that time frame?

A. No, sir.

Q. Okay. So how did you come to the conclusion about material prejudice or prejudice in this case?

A. Looking at the file and looking at what was being done. The insured filed a response, and discovery started and depositions started.

Q. Okay. All right. Let's skip down now to the next paragraph on Page 16 of your report which starts out, "Penn National had a duty to defend the counterclaims brought by L&L, and that duty to defend began immediately." Do you see that?

A. Uh-huh. (yes)

Q. That conclusion ---

A. To be clear, the immediately would be the June date.

Q. Right. In other words, you're not –- you're not opining that somehow Penn National has a duty to defend a claim at points in time prior to having ever received it?

A. That's correct.

Q. So in your view, the duty to defend, your opinion is that Penn National's duty to defend began on the date you cite in your report, June 8th, 2012?

A. Correct.

Q. And with respect to the –- the notion of or the statement of, "Penn National had a duty to defend the counterclaims first," you're talking about Exhibit 36, the original counterclaims, right?

A. Yes, sir.

Q. Not any amendments that could or may have been made to those later in time because you never looked at those.

A. Correct.

Q. And second, that is an opinion on your part rather than a statement of fact. Isn't that true?

A. Yes, sir.

Q. And similarly, when you go on to say, "The claims articulated by Penn National fell within the definition of advertising contained in this policy," that is your opinion. Is it not?

A. It -- it should not say "by", it should say to Penn National. I apologize for my fat fingers.

Q. Okay. The claims were presented to ---

A. Correct.

Q. --- Penn National. And –- and I understand what you mean there. And you have the opinion that they fell within the definition of advertising injury in the policy, right?

A. Yes, sir.

Q. And in that respect, you're just expressing an opinion about your interpretation of the policy contract to –- to Beach Mart and whomever else may be reading this report?

MR. SHAW: Objection.

THE WITNESS: The -- the plain reading of the words, and also it was in the claims question report. I –- I have trouble with that CQR. It was also articulated in that report.

Q. (Mr. Levy) Okay. You go on here to say, "The Fourth Circuit later ruled in favor" -- excuse me, "The Fourth Circuit later ruled in Beach Mart's favor on this issue, but Penn National should have originally come to the same conclusion had it conducted its claim handling in a fair manner, consistent with custom and practice in the industry." Do you see that?

A. Yes, sir.

Q. What conclusion did the Fourth Circuit reach?

A. That there was a series of ongoing advertising injuries. I'm trying to truncate whatever it was, 20 or 30 pages.

Q. As you sit here today, are you prepared to offer an opinion on the Fourth Circuit's opinion?

A. No, sir.

Q. That speaks for itself, doesn't it?

A. That's correct.

Q. Okay. Are you assuming for purposes of stating as you have in this third –- or excuse me, fourth paragraph on Page 16 of your report, are you –- are you not assuming that the Fourth Circuit concluded that there was a duty to defend?

A. I think so, yes, sir.

Q. Let's assume for the purpose of –- of this discussion that they did not make such a conclusion, but instead simply reversed the trial court on its finding concerning a prior publication exclusion.

A. I don't disagree with that.

Q. Okay. And a prior publication exclusion is just but one exclusion. It does not necessarily address an insuring agreement or other pol –- portions of the policy. And you understand that consistent with your analysis, true?

A. That's correct.

Q. So I'm trying to kind of reconcile what you've written here with what we're saying. What you've written here seems to suggest that the Fourth Circuit definitively ruled that Beach Mart has a duty to defend. But in fact, as we're discussing, you –-

you recognize that the Fourth Circuit merely reversed the trial court on application of a singular exclusion.

A. I think that sentence modifies the previous one.

Q. Okay. How come you don't mention in here that the trial court found that there was no coverage at a point in time, that is, that the trial court granted a judgment in favor of Penn National on this case in March '18. How come that's not mentioned in your report?

A. Because of -- the Court of Appeals disagreed.

Q. So reasonable minds in that respect disagreed on this. Wouldn't you agree with that?

MR. SHAW: Objection.

Q. (Mr. Levy) You have a Article III Judge in Judge Boyle who found as he did in this case.

A. Yeah.

Q. And then you have Jim Wynn, and whoever the other panel members were at the Fourth Circuit, who saw the application of that exclusion differently. I mean, that's true to the record of the coverage case, isn't it?

A. Yes, sir.

Q. So there you got some pretty smart minds looking at this question. True enough?

A. At least two or three.

Q. Okay. I mean, these are federal judges looking at this exact issue.

A. Yes.

Q. And yet you're saying that Greg Gross, this ought to have been obvious to him, even as these federal judges we're looking at just but one of all the exclusions in this policy and coming to different conclusions.

A. This is duty to defend. And in that original claims question report it was raised that there was a possibility of advertising injury coverage.

Q. I -- I understand that, sir. My point is Penn National has defended this case subject to a reservation of rights continuously since January 2015 -- 2013. We talked about that, okay?

A. Yes, sir.

Q. And so you're saying now Penn National should've very quickly or, by your standards, by Thanksgiving 2012, have come to a decision that -- on its coverage and should have determined, in your view, by Thanksgiving 2012 that there was a duty to defend.

Is that accurate?

A. Yes, sir.

Q. Okay. And yet you've also taken into account that, given the history of this case itself, there was differences of opinion at the judicial level, even at the analysis as to one particular exclusion. You've taken that into account.

A. Yes, sir.

Q. So at least those judges disagreed on application of that exclusion. True enough?

A. Yes, sir.

Q. Okay. All right. So let's go through these bullet points. And where I think you've already answered them, starting on 16 continuing to 17, I'm just going to ask you if you've got anything to add. Or otherwise, you can defer to your testimony thus far, okay?

A. Okay.

Q. You've already offered testimony and explained to me your position regarding the seven month-period between June of 2012 and January of 2013. Any further testimony you want to offer in respect to that opinion?

A. Not at the present time.

Q. Okay. Now, top one, "A one year and six month delay in denying its duty to indemnify, and only doing so when it filed its Complaint for Declaratory Judgment." What -- what does that opinion mean?

A. It means that reading the DJ, Penn National's position was that there's no coverage.

Q. But it continued to provide a -- a defense subject to a reservation of rights at that time. True enough?

A. That's correct.

Q. Okay. Would you agree with me that in as much as there was no award for L&L, there's no -- do you really intend to offer any opinions in regard to indemnification when we've agreed there is no duty to indemnify?

A. Penn National never took a coverage position and communicated it to the insured until the filing of the DJ. When you look at the RORs, it simply says there's a coverage issue, period.

Q. How -- how was Beach Mart damaged by what you've just described?

A. They ---

Q. Other than what you've already talked about, which is the fees, the -- the reasonable fees and expenses incurred between January -- excuse me, June 8th, 2012, and January 13th, 2013, how else, if at

238

all, are you aware that Beach Mart was damaged?

A. They have no damages.

Q. Okay.

A. With respect to this next one, just moving on, defense counsel and the selection of defense counsel, do you have any additional testimony that you'd like to offer? Or would you simply defer to our discussion already on this point?

A. Previous discussion.

Q. Okay. Regarding the payment of defense costs, do you have any additional testimony you'd like to offer? Or would you defer to our discussion already on the point?

MR. SHAW: Objection.

THE WITNESS: Not at the present time.

Q. (Mr. Levy) Okay. And I'm just going down the bullet point here. And you recall when we discussed that portion under the -- what was really the background section in your report?

A. Yes, sir.

Q. Okay. The next one down also deals with the defense costs, okay? And by the way, do you even know the amount that was being sought in fees and –- and expenses?

A. There was a number cited in the letters.

239

Q. Okay. You don't know that offhand though?

A. I –- I don't like to guess, but it was in the $400,000 or $500,000 range.

Q. Okay. And you understand that was what was being asked for for six or seven months worth of work?

A. It appeared that way.

Q. Okay.

A. I didn't see the invoices so ---

Q. Yes, sir. All right. Now, let's look for a moment at this next one down because this incorporates multiple topics. And it says, "Penn National's refusal to pay post tender defense costs" -- and by costs, do you mean fees and expenses?

A. Yes, sir.

Q. Okay. And it says, "even after losing on appeal in the Fourth Circuit, and presumably also after a failure to even reconsider Beach Mart's renewed request for reimbursement."

A. Yes.

Q. Okay. First of all, regarding the Fourth Circuit opinion, we just talked about that, right?

A. Yes, sir.

Q. And Fourth Circuit opinion did not definitively decide the duty to defend issue. Fair enough?

240

A. Correct.

Q. Okay. Is it your opinion that Penn National should still offer to back pay defense costs even before the duty to defend issue is decided?

A. I read the opinion as the exclusion that Penn National was asserting did not apply.

Q. Did you read, for example, Footnote 2 of the opinion where Jim Wynn, the authoring circuit judge specifically says what the court is not considering?

A. I don't recall that one way or the other.

Q. Okay. Specifically as to what Penn National has or has not offered to pay Beach Mart, what information do you have in that regard?

A. I'm not following the question.

Q. Sure.

A. I –- I'm aware that Penn National made a couple of offers. They were in the claims file.

Q. Okay. What offers are those?

A. Fifty thousand and a global, and I believe a 250 and a global.

Q. Okay.

A. Are we speaking of something other than that?

Q. No. Let's talk about the $250,000 offer.

A. Okay.

241

Q. Okay? So you're aware from looking at the claims file that Penn National offers $250,000 to –- to Beach Mart to resolve its claims in this –- in this coverage matter?

A. Yes.

Q. Okay. And you're also aware that a 500-some thousand number. And that offer was made, I'll represent to you, after this decision at the Fourth Circuit level.

A. Okay.

Q. And you're also aware that –- that that offer was rejected?

A. Apparently.

Q. And you're also aware that a 500-some thousand number was presented back in December of 2014, based on your recollection. And that's what you've testified to?

A. I saw the 500

Q. Sure.

A. --- round number. I don't recall the date.

Q. Okay. You used the word refusal here. Do you regard offering fees as a refusal or offering amounts of money as a refusal to pay?

MR. SHAW: Objection.

THE WITNESS: I did not see the

invoices. We're just talking at a quantum number, $500,000. The counteroffer was 250. To me, when you have a counteroffer, it's a refusal of the offer.

Q. (Mr. Levy) Okay. So you're not saying there's been no offer at all, you're just saying they didn't pay what was demanded of them in the 500-some thousand?

A. Yes.

Q. Were you aware, sir, that Beach Mart served a supplemental discovery response most recently on Penn National indicating that they're seeking $5 million or more in attorney's fees in this lawsuit?

A. No.

Q. Did you know that? You didn't know that at all?

A. No, sir.

Q. And I'm not misstating the number. This is $5 million, another zero ---

A. Okay.

Q. --- on the end, not 500,000. You didn't know any of that?

A. No, sir.

MR. SHAW: Objection.

Q. (Mr. Levy) You don't have any knowledge or information and not taken that into account in forming your opinions in the case?

A. If I didn't know about it, I couldn't take it into account.

Q. Okay. On the bottom bullet point here, "Penn National's failure to explain or justify in any respect its refusal to pay Beach Mart's post-tender and defense costs." Do you see that?

A. Yes, sir.

Q. What's the basis of your opinion that you've stated here in this final bullet point on Page 17 of Exhibit 119?

A. Normally, when I see billing disputes, there is a analysis of how we disagree. And you set aside what we can agree on, and you work on what we disagree. I -- I did not see that. I just saw a number, 50,000 and the 250.

Q. Okay. I'm going to hand you a -- a document that has previously been marked for identification as Exhibit 113. If you would, keep 119 in front of you, okay?

A. I'll try to get these out of the way.

Q. Have you seen Exhibit 113 before?

A. No, sir.

Q. Were you aware that, among other things that Penn National has done to assess and meaningfully look at these fees and costs that were submitted, that it engaged this Legal Fee Advisers firm that's owned by David Paige to take a look at these invoices?

A. Is David Paige Penn's expert?

Q. Yes.

A. Okay. I want to understand who we're talking about.

Q. Yes, sir.

A. No, I was not aware of this document.

Q. Were you –- so you weren't aware of the fact, for example, that Mr. Paige, as part of his work and review in this case, took a look at and analyzed these invoices, not for purposes of figuring out what was affirmative claims versus defensive, the counterclaims, but looking at these -- these invoices for the reasonableness of them and otherwise reviewing them. Did you know that?

A. No, sir.

Q. Okay. When you're involved in a case, sir, would it not ordinarily be something that you'd asked for to get any materials or reports prepared by the expert who's working by or on behalf of the opposing party?

MR. SHAW: Objection.

THE WITNESS: I am working for the defense. Normally, the expert of the plaintiff goes first. I was not provided a expert plaintiff's report.

Q. (Mr. Levy) Sir, I'll represent to you that the report, including Exhibit 113 but not limited to Exhibit 113, was served by the Plaintiff on the Defendant in this case on or about November 16th, 2020, okay?

A. Okay.

Q. Assuming that to be the case, you'd agree with me that this report was available before you prepared and tendered your report, Exhibit 119, in February 2021. True enough?

A. Based on that statement, yes.

Q. You just weren't given a copy of it.

A. That's correct. But I do note that he concludes that 298,930.42 is recommended total fees and expenses.

Q. Re –- reading that now?

A. Yeah, it's on Page 25.

Q. Right. But were you aware of the fact -- as you've not read this before, you weren't also aware of the fact that Mr. Paige was not trying to delineate of that 294 or 290-some. One of that relates to defense of the counterclaims versus one of that relates to

prosecution of Beach Mart's affirmative claims. Do you follow me on all that?

A. I haven't read his report, so I don't know what he's trying to analyze.

Q. Okay. Do –- do you understand the distinction between those two items? On the one hand, just saying overall what's reasonable for all the legal work, and then, separately, one of this legal work relates to prosecution of claims and one of it relates to defensive claims.

A. I understand what you're saying.

Q. Okay. In any case, you weren't aware prior to today that Mr. Page has done this comprehensive analysis of the fees submitted, for example, by Beach Mart to Penn National for reimbursement.

A. That's correct.

Q. And you couldn't have taken that into account in putting your opinions in this report. True enough?

A. That's true.

Q. What other communications took place, for example, between my firm and the team at the Womble firm regarding the fees that had been submitted for reimbursement over the last seven years, based on your understanding?

A. They were just letters and files. It started off with Mr. Mason.

Q. Sure.

A. And finished up with Mr. Shaw.

Q. Okay. Do you know what my communications were with Mr. Mason? Or have you made any inquiry of the Womble firm about those communications before Mr. Mason passed away?

A. I don't recall seeing -- I –- I recall seeing some Hedrick letterhead, but I don't want to misspeak and ---

Q. Do you know what the nature of the communications were with an attorney, Garth Gersten, who was here at the Womble Firm and my firm, concerning the –- the fees in this –- this subject matter of this case?

A. No.

Q. You know who Mr. Gersten is?

A. Garth and I are close friends.

Q. Okay. So you do know -- you know Mr. Gersten, but you hadn't talked to him about this –- this particular case?

A. No.

Q. All right. Do you know what the nature was between anybody on my team and anybody at the Womble

firm about this exact subject matter over the last period of years since this was first presented?

A. No, sir.

Q. Do you know what efforts in total Penn National has undertaken to try to ascertain and assess these fees that have been presented or costs that have been presented for reimbursement since they were first presented?

A. Other than this document, no, sir.

Q. Okay. So you now have seen this document itself, and you've got this opinion that Penn National has failed "to explain or justify in any respect its refusal to pay Beach Mart's post-tendered fees -- defense costs." Does that remain your opinion?

A. Yes, sir.

Q. Okay. And so you –- you have the opinion that Penn National has wholesale failed to explain or justify its position, even though you've never actually seen these invoices that are the subject of this claim, you've never seen this report prior to today generated by the Legal Fee Advisors firm, and you don't -- have not reviewed in totality all the communications and correspondence concerning these invoices from December 2014 through the present?

A. That's correct.

MR. SHAW: Objection.

Q. (Mr. Levy) Okay. Let's go down –- excuse me, on Page 17 in that bottom paragraph there, and I want you to take a look at the sentence that starts out, "The numerous facts specifically pointed to above."

A. Okay.

Q. Now what you've stated here, it says, "The numerous facts specifically pointed to above support the contention and my opinion and belief that Penn National acted recklessly with intent to injure Beach Mart (or, acted in a manner that put Be -- Penn National's interest above and before its policy holder, Beach Mart). Is it your opinion that Penn National acted recklessly with an intent to injure Beach Mart in this case?

A. Yes, sir.

Q. What is the basis for that opinion?

A. They never conveyed their coverage opinion to Beach Mart.

Q. How is it that you feel qualified to opine as to the intent of either an individual or corporate actor in a –- in a lawsuit or in any case?

A. I'm not looking at intent, I'm looking at letters. And in the four RORs it said, "their

Bryan Tilden                                                          Pages 250 to 253

**Page 250**

coverage concerns," period. And there was no discussion of what the coverage concern was.

Q. Sir, I understand and have heard your opinions. Received. It doesn't matter whether I personally agree or Beach Mart -- or excuse me, Penn National personally agrees with your opinions in regards to whether or not Penn National's handling of this claim between June of 2012 and January 2013, complied with standards and customs within the industry. We're now talking about something totally different. You used the phrase "intent to injure." What did you review, Mr. Tilden, in any of the materials that you found, where it reflected to you that Beach Mart –- excuse me, that Penn National had some intent to injure Beach Mart in anything that it did with this, even knowing the Penn National defended Beach Mart in this underlying case from January 2013 through its conclusion? How does that reflect an intent to injure?

A. **They did not disclose their coverage position.**

Q. So the only fact that you are citing in support of your opinion about the mental state of, in this case, a corporate litigant, Penn National, an insurance carrier, is the fact that you feel that the

**Page 251**

reservation of rights letters, in your opinion, were incomplete?

MR. SHAW: Objection.

THE WITNESS: **A corporation's nothing more than a piece of paper. We're really talking about the claims examiner. And the claims examiner started off with an opinion to deny coverage. Coverage counsel was retained, defense was offered, but Penn National's position was never conveyed by a human being.**

Q. (Mr. Levy) How do you get from the point of, okay, you say that this does not comply with custom and practice to saying there was some sort of malintent or intent to injure? How do you get from point A to point B?

MR. SHAW: Objection.

THE WITNESS: **We're contrasting omission with commission. Penn National omitted the reasons they were taking. Omissions can be intentional also.**

Q. (Mr. Levy) What evidence do you have that what you contend was an omission was intentional versus mistaken?

A. **Custom and practice is that an insurance company discloses their coverage position.**

**Page 252**

Q. What evidence did you see in any of the materials that you reviewed, any documents that you reviewed, that there was some intent by Penn National to injure Beach Mart with any of its conduct in this case?

A. **The documents were heavily redacted. However, in the initial claims question referral —- that's a hard term for me, so they need to change the term. But the CQR, the unredacted version indicated they found coverage, but they still recommended denying coverage.**

Q. What ultimately happened, though, we've said several times now, is they defend subject to a reservation of rights, right?

A. **That's correct.**

Q. So how did Penn National -- how is that ultimate decision making simply because there's internal discussion though the ultimate decision is a favorable one to the insurer? And you'd agree with that, that it's more favorable to have a defense subject to a reservation of rights than it is a denial of coverage?

A. **That's correct.**

Q. You'd agree with me, right? So that ultimate decision is more favorable to Penn

**Page 253**

National -- excuse me, to Beach Mart, to defend subject to a reservation of rights. How is that reflective, that ultimate decision, of an intent to injure, that is, how does defending an insured -- how does Penn National defending its insured from January of '13 to the conclusion of this action reflect an intent to injure Beach Mart?

A. **Finally, Penn National took up the defense, but they never explained their coverage position.**

Q. How –- how does that matter if they continued to defend?

A. **When I read the ROR's, it simply says their coverage issues, period.**

Q. And it cites policy terms?

A. **Sure. But it doesn't cite what the coverage issues are.**

Q. Right. And I understand why you believed the ROR's. Your view should be more detailed or include additional analysis. But in the end of the day, as a practical matter, what's the difference if defense counsel has been provided for the duration?

A. **I don't know how to explain it any other way.**

Q. Okay. Let's skip over now to Page 18. And there's a discussion in the first paragraph on Page

Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 65 of 201

06-23-21                    PNMCIC v Beach Mart/2:14-CV-00008-FL                    COPY

18. And –- and in the interest of time, sir, if you'll just read the first paragraph on Page 18 and let me know when you've had a chance to do so.

THE WITNESS: Can we go off the record for a second?

MR. LEVY: Absolutely.

THE VIDEOGRAPHER: Going off the record. The time is 4:24 p.m.

(Brief recess: 4:24 p.m. to 4:25 p.m.)

THE VIDEOGRAPHER: Back on the record. This begins Media Unit Number 5. The time is 4:25 p.m.

Q. (Mr. Levy) Mr. Tilden, we're talking now and were talking prior until briefly going off the record about the first paragraph on Page 18 of your report and the opinions contained inside of it. And I'll just kind of skip down to –- to the conclusory portion of it. In the last –- or second to the last, excuse me, sentence of Page 18 of Exhibit 119, you say, "Penn National did exactly that:" –- it –- is -- I think it meant it, "purposefully misconstrued the allegations in its favor and in a method to avoid its defense and coverage obligations."

Is there anything that you'd like to add on that opinion other than what you've testified this far, that is, what -- on what do you base the contention and opinion that Penn National ever purposefully misconstrued allegations and attempted or did avoid its defense obligation, even knowing that it's defended this case for eight-plus years?

A. It -- it appeared that the analysis of the 2005 licensing agreement was all that was done, and coverage was denied based on that.

Q. What –- what was coverage ever denied to Beach Mart for by Penn National? Because we know it was denied by Travelers now, right?

A. And then Travelers rescinded that and provided defense.

Q. Right.

A. Penn National provided defense.

Q. By the way, what –- why wouldn't Travelers owe a portion of these defense costs, if it's your opinion that Penn National would?

A. I have not considered that.

Q. But that's something that you at least, in theory, could consider. True enough?

MR. SHAW: Objection.

THE WITNESS: It could be considered, yes, sir.

Q. (Mr. Levy) Okay. Penn National never denied or disclaimed coverage, did they?

MR. SHAW: Objection.

THE WITNESS: No, sir.

Q. (Mr. Levy) All right. In what instance or instances do you contend and opine that Penn National purposefully misconstrued allegations in its favor through it's communications with Beach Mart or otherwise?

A. The claims file was heavily redacted, and so I –- I could not get into their coverage analysis.

Q. I'm not asking for any speculation or assumptions as to what may or may not be in redacted portions of a claims file. Of what you reviewed, what you had access to, what example can you provide of any instance when you believe and contend and will opine that Penn National purposefully misconstrued an allegation in the Complaint or the Counterclaim in the underlying case?

A. It –- it appeared in the Counterclaim and -- and it jumped out at me that one of the complaints was trade dress, which is an exception to the exclusion. Penn National did not pick up on that for whatever reason.

Q. When did Penn National misconstrue or misrepresent anything concerning the allegations in the original counterclaim in the underlying case to its policy holder, to its insured? I understand you've referenced internal documentation where opinions are being floated around, but an ultimate decision is made to defense subject to a reservation of rights. When do you see any misrepresentation by Penn National to Beach Mart at any point in time?

A. This sentence does not say to a Beach Mart. This sentence is talking about Penn National misconstrued the allegations in its favor.

Q. Penn National never misrepresented anything to Beach Mart concerning this claim, did it?

A. No, they've never took a coverage position.

Q. They did not misrepresent any of the terms of the policies to Beach Mart nor did they ever misrepresent any of the terms of the underlying and original counterclaim to Beach Mart, did they?

A. I did not compare the ROR statement. It appeared the ROR was pulled from internal notes that looked at the captions in the counterclaim.

Q. You're not able to offer any opinion as we sit here today that Penn National ever misrepresented anything to its insured, Beach Mart, in connection with this claim for a defense ---

A. No.

258

Q. --- with the underlying action, are you?

A. That's correct.

Q. Okay. In cases other than this one that you've worked on, either in a expert forensic capacity or prior to that time in your many years within the insurance industry, certainly you've seen a good number of times when carriers have provided a defense subject to a reservation of rights. Have you not?

A. Yes, sir.

Q. And that in and of itself means that the carrier will provide that defense counsel to the insured. However, it reserves the right to change or modify that position. True enough?

A. If the letter such state, yes, sir.

Q. Okay. And it also does not and cannot articulate a position in regard to indemnification because the facts have not yet been proven at trial. True enough?

A. Or developed, yes, sir.

Q. Okay. Well, what –- what is the standard in North Carolina, if you know it? What is the standard measuring stick for a duty to indemnify under a policy issued in the State of North Carolina?

A. Facts.

Q. Facts from what?

259

A. It could be during discovery, it could be a trial.

Q. Okay. And that's your understanding as to what the standard is in our state here in North Carolina?

A. Yes, sir.

Q. You'd at least agree with me that all of the policies that you looked at, those BOP policies, were mailed out from Penn National to an address in Kitty Hawk, North Carolina, where Beach Mart maintains its offices?

A. I did not look at the mailing address, but I –- I'm aware that Beach Mart is in Kitty Hawk, and the insurance agent is in Dare County.

Q. Okay.

A. So that makes sense.

Q. Okay. I want to skip now –- again, I'm trying to make –- I know your eyes are getting tired. Steve's got to go. Can we go to Page 20 of your report? And I want to look down at the last portion, and it's the –- it's the last paragraph. It's a partial paragraph on the report, and I'm going to read it to you ---

A. Okay.

Q. --- just for your benefit, the portion of it

260

I want you to listen to. "Penn National's adjusters and supervisors appeared to lack any knowledge of trade dress infringement and only had the most superficial understanding of other forms of advertising injury of the kind described in the counterclaims and lacked any meaningful prior experience or training in handling trade dress or advertising injury claims. I can only assume a failure of implementation of reasonable training for not accepting such claims when the policy clearly provides coverage for trade dress infringement." Did you hear me read all that?

A. Uh-huh. (yes)

Q. The reason I'm asking you about this specific statement within your report, Mr. Tilden, is not to rehash the portions of that, what I just read, that you've already gone through, but rather to talk about the issue of training, which we have not yet talked about in regards to the claims professionals at Penn National. Are you prepared to offer any opinions in this case regarding the training of the claims professionals in Penn National?

A. No, sir.

MR. LEVY: Okay. I want to now skip forward again. I've got some notes, but they've been

261

subsumed by conversation we've had, and I'm now on to Page 22 of Exhibit 119. Okay? And it –- it sounds like it is easiest for you to –- to read the section. So Steve, to orient you, I'm on the middle of ---

MR. SHAW: I'm good.

MR. LEVY: You there?

MR. SHAW: Yeah.

Q. (Mr. Levy) Okay, good. All right. So in the middle part of Page 22, sir, what it says is, "L&L's claims do not arise from the 2005 agreement. Because of these facts do not relate to the 2005 contract, the "breach of contract" exclusion in the Penn National policy does not apply. The only conclusion I can come to is either Penn National's claims handlers purposefully or recklessly denied this claim." You hear all that?

A. Yes, sir.

Q. Just want to have it in this portion of the record, sir. At no point did Penn National ever deny this claim to its insured, Beach Mart, did it?

A. That's correct.

Q. Okay. And so when you make a statement in here about the handlers purposefully or recklessly denying this claim, you, from your testimony thus far, sounds like are referencing things that you may have

262

read in the CQR, the coverage question report, but you cannot point to any instance where Penn National has disclaimed coverage to its insured or denied this claim. Because that didn't happen, did it?

A. **Your statement is correct.**

Q. Okay. What did you review within all of the materials that you had that would cause you to opine and believe that Penn National purposefully sought to avoid coverage?

A. **The –- the CQR was contradictory. It said there were two instances where there's possibly advertising coverage, but the recommendation was to deny anyway.**

Q. Have you ever, other than this claim, experienced instances where there is disagreement within a claims organization ---

A. **Oh, absolutely.**

Q. --- as to whether or not something's covered?

A. **That's the purpose of round tables.**

Q. And there's not anything untoward in and of itself about that, is there?

A. **No, there's not.**

Q. That is to say that sometimes the first-level claims professional may believe something is or

263

is not covered, and their manager may agree, but home office may disagree on that, and so forth. There can be reasonable disagreement, particularly on coverage which does have some gray areas among it. Fair enough?

A. **Yes, sir.**

Q. So that in and of itself, having internal disagreement and comment about coverage is not anything out of the ordinary, out of the standards within the industry or untoward from your standpoint. True enough?

A. **When I teach adjusters, we always open with the prayer, you look for coverage, and then we do our training session from there. Until home office made the statement to look for coverage, my concern was that the claim handler early on was looking to deny coverage.**

Q. Right. And yet the outcome –- I –- we're not talking about the timing but the outcome of the coverage determination, at least the outcome insofar as the hiring of defense counsel and providing a defense subject to the ROR, is consistent with what you think should have happened. True enough?

A. **Yes, sir.**

Q. You just believe it should have happened

264

sooner?

A. **Yes, sir.**

Q. You're saying November of 2012 versus January of 2013. Fair enough?

A. **Yes, sir.**

Q. Okay. There's a statement as well on Page 22 of your report that, "Penn National has continued to claim" –- and this is at the top. "Penn National has continued to claim that the prior publication and breach of contract exclusions apply to exclude coverage for this claim." Do you see that?

A. **Yes, sir.**

Q. Where are the specific instances that you are talking about or Penn National has maintained that the prior publication exclusion applies to this claim from the standpoint of duty to defend after the issuance of the opinion by the Fourth Circuit Court of Appeals?

A. **Nothing after.**

Q. Okay. So you'd agree that Penn National has accepted the ruling of the Fourth Circuit Court of Appeals concerning that exclusion, and it's never gone back to its insured and said, "We still think this applies."

A. **I haven't seen any evidence of that.**

265

Q. Okay. Now, regarding the breach of contract exclusion, there's a discussion of it. And I now want to turn over to Page 23. And I'm doing my very best to make sure we do this in a timely way, both for you and –- and Stephen. There's a discussion on Page 23 on the first full paragraph which seems to include what you've already referenced as a 2005 contract, okay?

A. **Okay.**

Q. I'm going to read some of this paragraph but not all of it to you so you can hear it and then ask you a quick follow-up question, okay? All right. What it says here is –- and this is referencing Greg Gross. "Based on his investigation, while it may have been appropriate to consider the 2005 contract at first glance, once it was apparent that the 2005 contract was limited to the trademarks WINGS and SUPERWINGS and did not conclude copying or misappropriating the style of the building, the layout of the interior of the stores, and the mimicking or copying of in-store salutations and telephone greetings, it was inappropriate to rely on the exclusion for contractual liability." Did you hear me read all that?

A. **Yes, sir.**

266

Q. In this instance, you were just expressing an opinion as to whether or not you believe the contract –- the contractual liability exclusion in the BOP policy, which I'm sure is well known to you, would or would not apply to the allegations in the counterclaim. Is that fair to say what you're doing here with respect to your opinion?

**A. Yes, sir. There's an exception for trade dress.**

Q. Okay. There's an exception to the contractual liability exclusion?

**A. Well, there's an exception for advertising in the contractual.**

Q. Okay.

**A. But there is another exclusion that specifically mentions there is coverage for trade dress.**

Q. So what I've just read to you is just part of your overall coverage analysis here, your analysis of this policy contract and expression of opinions concerning it regarding application to the original counterclaims.

**A. Yes, sir.**

Q. Fair? You then go on to say, "When Penn National doggedly adheres to this ex -- adhered to

267

this exclusion, it was a misrepresentation of the insurance policy provisions and demonstrated how truly biased their claims analysis and investigation was." What did you review that suggested to you and allows you to opine that Penn National doggedly adhered to a breach of contract, or I should say contractual liability exclusion, in the BOP policy in anything that it did even as it has defended this case for eight-plus years?

**A. It was in their internal documents.**

Q. Okay. So again, here we're referring to internal documents, not any communications with the insured?

**A. I didn't see any communications to the insured on that.**

Q. Okay.

**A. To be clear, other than the ROR.**

Q. Okay. Okay. All right. I'm now over on Page 24 in the Conclusion section of your report, sir. And –- and I promise we're getting there. And I'm looking at the first sentence of the Conclusions section of the report. And it starts out, I'll read it to you, "The handling of Beach Mart's claim was rife with actions that misrepresented the terms and conditions of the policy." Okay?

268

**A. Yes, sir.**

Q. Now, we've already established, and you'd agree with me that you can't think of and would not prepare to express any opinion that Penn National ever made any misrepresentations concerning the policy or the allegations in the original counterclaim to its insured, Beach Mart. True enough?

**A. True.**

Q. Other than what you've already testified to concerning your review of the CQR reports, can you think of any other examples where you believe Beach Mart's claims file, its internal documents, misrepresented terms and conditions of the policies?

**A. I couldn't tell. It was heavily redacted.**

Q. Is it your belief that the CQR report itself, Penn National's internal reporting between a field office here in Greensboro and its home office in Harrisburg, Pennsylvania, contain misrepresentations of policy terms?

**A. I really couldn't tell. The CQR was a two-page summary.**

Q. So what misrepresentations are you talking about when you say the claim file was rife with actions that misrepresented the terms and conditions of the policy? What –- what are you talking about

269

there?

**A. The –- the unredacted portions were that there was acknowledgment that coverage could apply in advertising injury, but the prior publication and contractual exclusion could apply with a recommendation of denial of coverage.**

Q. With that said, can you point to a single instance within the claims file documents where Penn National internally misrepresented? I understand you feel that the analysis was incorrect. You have your opinion in that regard. You've expressed your opinion in regards to the timing or the timeliness of the claims decision. But what examples can you point to where there's some misstatement or misrepresentation of policy terms within Penn National's internal documents?

**A. They were redacted. There was no way I could tell.**

Q. So you can't point to any example as we sit here today?

**A. Other than the one unredacted document that I was able to see.**

Q. Where within that unredacted document did you see an example of what you believed to be a misrepresentation of a policy term?

270

A.  Where it acknowledged coverage with a recommendation to deny.

Q.  Okay.  Is –- and you regard that as a misrepresentation?

A.  Yes, sir.

Q.  Okay.  Any other examples that you can think of?

A.  The file was heavily redacted.

Q.  And I'm only asking about other examples, Mr. Tilden, because you used the -- the verbiage here, you said the claim was "rife with actions."  That usually suggests that it's a –- a multiple occurrence kind of thing, not just one example.  You didn't say, "There was one isolated incident that I found."  You say, "It was rife with actions."

A.  There was a series of e-mails in July and August recommending denial of coverage up to home office.

Q.  Okay.

A.  But there was no analysis because it was all redacted.

Q.  Okay.  So you believe there were some e-mails from the July -- June and July instance regarding a –- a thought process on the part of the –- the field office representatives of potentially

271

denying the claim ---

A.  Yes, sir.

Q.  --- as well as what you've seen in this coverage question report?

A.  Yes.

Q.  Are those –- are those the totality of the examples you can –- you can think of that support that opinion?

A.  From what I could see, yes, sir.

Q.  Okay.  Let me hand you what was previously marked for identification as Exhibit 101.  So, sir, I know to this point I've asked you to start reading stuff, and your eyes are getting tired.

A.  Yeah.

Q.  So maybe a way I can kind of expedite this for you, I'll represent to you that Exhibit 101 is Penn National's expert disclosure ---

A.  Okay.

Q.  --- which was originally served on -- it looks like it got my writing in it –- on –- on Beach Mart, through Beach Mart's counsel in November 2020.  Have you ever had a chance to review or assess Exhibit 101?

A.  I have not had a chance to assess it, no, sir.

272

Q.  Okay.  Have you ever heard of David Paige, Penn National's expert in this case?

A.  You mentioned it about 20 minutes ago.

Q.  I –- I mean independent of me mentioning Mr. Paige, have you ever heard of him?

A.  No, sir.

Q.  Did you know Penn National had an expert?

A.  No, sir.

Q.  And so as we sit here today, you're not prepared to offer any opinions as to whether you agree or disagree with anything Mr. Paige has to say?

A.  First time I've had this in front of me.

Q.  Okay.  I had asked 20 minutes ago wherever we talked about it, do you ever affirmatively request when you're engaged as an expert from the attorneys that hire you to say, "Hey, does the other side have an expert?  In this case, it's Penn National. If so, could you send me their report so I can take a look at what the other side's expert is saying on some of these issues."?  Is that something that you typically do?

A.  I'm used to on the plaintiff's side, the -- the plaintiff's expert goes first.

Q.  Uh-huh.

A.  And seeing I'm on the defense side, I assume

273

they're going to be sending it to me if there is one.

Q.  Do you recall asking for it in this case, that is ---

A.  No.  No, sir.

Q.  Okay.  You never went and said, "Look, I'm just curious, does –- does Penn National have an expert?  You never asked about that?

A.  No.

Q.  Is that something independently you've wondered about?

A.  It didn't cross my mind.

Q.  Okay.  In other words, you're –- you're out there and giving opinions on the subject matter that you're giving opinions on, it didn't cross your mind that Penn National might have somebody out there opining on those very same things?

A.  You're asking me something that would be last fall, and I -- I just don't recall.

Q.  Okay.  Sure enough.  Just in the interest of completeness of the record, I'm also going to hand –- hand to you something that was previously marked for identification as Exhibit 102.  And I'll represent to you that Exhibit 102, Mr. Tilden, is a supplement that Mr. Paige prepared to his report in March of 2021 after he had had the chance to review

274

your report. Have you had a chance to -- or I should say, you've not had a chance to review Exhibit 102 prior to today.

A. **First time.**

Q. Okay. So you weren't aware that Penn National had an expert who not only has expressed opinions on substantially these same issues or some of the same issues that you've opined on but also had a chance, looked at –- at your report and –- and revisited his opinions and has both Exhibits 101 and 102 to express whatever his opinions are. Didn't know that?

A. **No.**

Q. And didn't know that Mr. Shaw deposed him and –- and asked him lots of questions like I've done with you about his opinions.

A. **I –- I knew he had been deposed.**

Q. Okay.

A. **I found out that this morning.**

Q. Okay. All right. But don't have the transcript is the way I should say it.

A. **Yeah.**

Q. Okay. In terms of our review to this point of Exhibit 119, have we covered to the best of your recollection all of the opinions that you intend to

275

offer in this case on behalf of Beach Mart?

A. **At the present time, understanding that discovery is still open.**

Q. Okay. But at the present time, have we covered all of the opinions that you intend to offer in the case and at trial, if the case proceeds to that form, on behalf of Beach Mart?

A. **Yes, sir.**

MR. LEVY: Okay. If it's okay, can we go off the record and let me see what, if anything, further I've got?

MR. SHAW: Yeah.

MR. LEVY: Okay.

THE VIDEOGRAPHER: Going off the record. The time is 4:52 p.m.

(Brief recess: 4:52 p.m. to 5:01 p.m.)

THE VIDEOGRAPHER: Back on the record. This begins Media Unit Number 6. The time is 5:01 p.m.

Q. (Mr. Levy) Mr. Tilden, we're back on the record in your deposition for what I think will be the final session for the day. I appreciate your time and patience thus far. And the last thing I want to do with you is take a look at Exhibit 119, Page 5 and 6, and the summary of your opinions as a final effort to

276

make certain that we've covered all of the subject matter on which you're prepared to opine on the case.

A. **Okay.**

Q. Okay? And as we did before, if you've got nothing more on it, that's -- that's totally fine.

A. **Okay.**

Q. You can defer. Okay. Number 1 and Number 2 essentially talk about investigation conducted by Penn National. Number 1, Page 5 says, "Penn National failed to adequately investigate the claim before determining whether coverage applied." Number 2 says, "Penn National failed to conduct an investigation that followed the custom and practice of the insurance industry in considering all the facts to make an informed decision." Did you hear those?

A. **Yes, sir.**

Q. What, if anything, can you point to that Penn National failed to do in its investigation of this claim that was presented by Beach Mart? I understand your opinion, don't need to hear -- or if you don't want to offer more about the timing of the claim decision, but what is your critique or opinion relative to the investigation itself for the claim?

A. **Most of the file was redacted. I just saw some snippets in the file of what I'm going to call**

277

**captions, and a recommend to deny. It did not appear that there was an analysis, from what I saw, of the underlying counterclaim.**

Q. Okay. You'd agree with me though that Penn National did complete at the -- at the district officer, at the local office level here in Greensboro, this coverage question report and multiple coverage question reports that you've seen discussing these issues. True enough?

A. **I've seen one. I'm aware there were two, one including umbrella.**

Q. You'd agree that there was involvement of an attorney named Adam Parsons at the home office level for review of this matter, true?

A. **I didn't –- I didn't know he was an attorney, but I saw Adam Parsons in the file.**

Q. Okay. You'd agree with the fact that there was a reference out to my firm to obtain further input on the coverage review process, right?

A. **Yes, sir.**

Q. And all of what I've just described to you, as well as any sort of internal round tabling or conferencing of this claim, that would all be the things you would expect a claims team to do in assessing whether or not or how it's going to make its

**278**

coverage determination, correct?

A. Yes, sir.

Q. So what is it that you say that Penn National didn't do?

A. It — it appeared from what I saw that they took the captions from the counterclaim and did the analysis based on the captions. There was no further analysis of some of the allegations underneath the captions.

Q. I see. So in your opinion and review, you believe that one or more individuals internally with Penn National were looking at headings on causes of action versus the specific allegations?

A. That's the document I saw.

Q. Okay. But did you make any further inquiry of that within the claims diary or otherwise?

A. It was redacted.

Q. Okay. So do you actually know one way or another whether or not Penn National did a sufficient investigation on this claim?

A. From what I saw, it was just the captions.

Q. Okay.

A. That's not sufficient.

Q. All right. But you're making an assumption that that was exhaustive?

**279**

MR. SHAW: Objection.

THE WITNESS: I'm not making an assumption. I — you -- you see what you see.

MR. LEVY: Sure.

THE WITNESS: And if the entire claim file is redacted, except for whatever it was, five -- well, there five subheads with two lines for each subhead. If that's the analysis, then you're not getting into the words of the actual Complaint.

Q. (Mr. Levy) Okay. So the documentary evidence that you can point to in support of these opinions regarding investigation are once again where you saw in a CQR report referenced to headings from a claim?

A. Yes, sir.

Q. Okay. Number 3 on your summary says, "The manner that Penn National handled the claim failed to give consideration to the policyholder's interests and failed to look for coverage in the claim." Do you have anything you want to add on that one?

A. No, sir.

Q. Number 4 says, "Penn National failed to properly or reasonably consider or respond to the insurance concerns of the selection of defense counsel and whether such action was -- by Penn National was in

**280**

the best interest of the insured." Anything you want to add on that one?

A. No, sir.

Q. Okay. Number 5 is, "Penn National's delay in initially responding, delay in paying post tender defense costs, and refusal to accept its coverage obligation promptly in this matter was inappropriate, contrary to industry custom and practice, and Penn National had more than enough information at a very early juncture in this case to make these decisions." Anything supplemental you want to add to your testimony thus far on those items?

A. No, sir.

Q. All right. Six here is, "Penn National's refusal to accept its obligations promptly in this matter can only be attributed to its misrepresenting facts and insurance policy provisions. Had Penn National been fairly treating its policy holder, it would have accepted its insurance obligations promptly, began defending the claim, and would have reimbursed Beach Mart for its post tender defense costs." Do you have anything you want to add on any of that?

A. No, sir.

Q. So you defer on all those various items to

**281**

the testimony that you've already provided thus far?

A. Yes, sir.

Q. Okay. Number 7, "Penn National misrepresented the terms and conditions of the policy." Nothing more that you want to add on that one?

A. No, sir.

Q. And we've already talked about pretty clearly Penn National never misrepresented the terms and conditions of the policy to Beach Mart, did they?

MR. SHAW: Objection.

THE WITNESS: In the RORS, they -- they provided the policy. They didn't provide an analysis.

Q. (Mr. Levy) I understand that, but there's not a single instance you can point to where Penn National misrepresented the terms or conditions of the policy to its insured, Beach Mart, correct?

A. I can't think of it at the present time.

Q. Okay. Number 8, "Penn National did not clearly explain the basis of its coverage" -- excuse me, "the basis of its opinion that coverage did not apply." Anything supplemental you want to add on that one?

A. No, sir.

Q. Number 9, "Penn National did not clearly

282

explain the basis and justification for its selection of defense counsel, forcing Beach Mart to retain personal counsel to assure a successful defense of the underlying litigation." Now, a portion of this we've covered, which is the selection of defense counsel. You'd agree we've –- we've been through that.

A. Yes, sir.

Q. Anything more you want to add on that?

A. No, sir.

Q. "Successful defense of the underlying litigation." What assessment did you do of the great many years that the underlying case was pending to analyze why the outcome was successful in the defense of the counterclaims asserted by L&L?

A. I did not do a retrospective analysis, but looking at the point of time of mid-January ---

Q. Uh-huh.

A. --- the trial was 60 days out.

Q. Yes, sir. But knowing now that that case went on and on for a great many years after that, you're not able to give any opinion, are you, as to what factors were at play as to why Beach Mart successfully defended itself or whether the role that David Brown did or did not have in that? I mean, you're not going to opine on any of that, are you?

283

A. No, sir.

Q. And so –- because you haven't looked at it. True enough?

A. That's correct.

Q. Okay. Number 10 says, "Penn National did not clearly explain the basis of its refusal to reimburse Beach Mart for its post tender defense costs." We've discussed that. Do you have anything supplemental to add to your existing testimony?

A. No, sir.

Q. Number 11, "Penn National did not properly consider additional information which was provided by Beach Mart." Forgive me if we have covered this one, but I don't have a specific recollection of asking you what –- what additional information was provided by Beach Mart that Penn National didn't consider?

A. The letter from the insured and the email from the office manager related to selection of counsel.

Q. Okay. So that ties back into that issue, the selection of counsel. And those are just your opinions as to you believe Penn National should have responded more directly or in a more –- a –- a different fashion to those –- those items expressed by –- by the insured?

284

A. No is not an answer. But that's the answer that Penn National kind of in summary said.

Q. However, you're not expressing an opinion one way or another about the continued retention of David Brown, are you?

A. That's correct. I'm not expressing an opinion.

Q. Okay. And now, once again, having now gone through this list here and all the other testimony, is your belief that we've covered all the opinions that you're prepared to offer in this case and at trial, if this case proceeds to this point, subject to any other discovery materials that you may receive?

A. Yes, sir.

MR. LEVY: Okay. Well, those are the questions that I have for you at this point, subject to Mr. Shaw's follow-up. I'll reserve the right to reopen your deposition and ask you additional questions only to the extent that you provide any supplements to your report which change, modify or add to the opinions you're prepared to offer.

THE WITNESS: Yeah.

MR. LEVY: I appreciate your time today. I will tell you that off the record. And it was and is nice to meet you.

285

MR. SHAW: Thank you.

EXAMINATION

BY MR. SHAW:

Q. All right. And Mr. Tilden, I'll try to be quick here. I know you spoke at the break we took off the record a little while ago that you were having trouble with your vision?

A. Yes, sir.

Q. I'll try to minimize the amount of reading that I ask you to do. Are you –- other than that, are you generally feeling okay? Are you having any other things that are affecting your testimony this afternoon?

A. Of course, tired.

Q. How do you feel your mental acuity is?

A. Not as sharp as this morning.

Q. The –- I'm going to hand you what was previously marked as Exhibit 41. Well, actually, before I do that, let me ask you a couple other questions. To your understanding, are you being offered as a damages expert in this case?

A. I am not, sir.

Q. And have you made any claim in your report that you're a damages expert?

A. No, sir.

286

Q.  You're not a damages expert?

A.  No, sir, not in this case.

Q.  And you're not offering opinion in this case one way or another as to whether -- as to whether any damages were suffered or the amount of Beach Mart's damages, are you?

A.  No, sir.

MR. LEVY:  Objection.  Form.

Q.  (Mr. Shaw)  If you can flip to your report, Page 5, it's Exhibit 119, and look at Item 10 at the top.  One of the items you reference that you reviewed and relied on in preparing your report was Penn National's claim file.  Is that correct?

A.  They're redacted, yes, sir.

Q.  All right.  And of those redacted or partially redacted documents, do you recall how many thousands of pages were included in that material?

A.  It felt like it took about a day to get through.  It was electronic but it was just slogging through.

Q.  It's your –- is it your understanding that those documents were produced by Penn National in the course of this coverage litigation?

A.  Yes, sir.

Q.  And do you recall whether all those

287

documents in Penn National's claims file had Bates stamp numbers on the bottom of them?

A.  They appeared to.

Q.  And do you recall from reviewing over the course of a full day, those thousands of pages, whether pleadings and underlying litigation documents in the case were included in the claims file?

A.  They were included.

Q.  And to the extent you testified earlier that you had not seen Exhibit 120 or Exhibit 121 which don't have Bates numbers on them, do you recall whether those were included in the claims file that you reviewed?

A.  I was paging through, and I wasn't looking for people's names.  And so when they were shown to me today, all I saw was the cross-claim on the bottom, and I wasn't even focusing on that when I was paging through files.

Q.  You don't claim to have a perfect memory, do you?

A.  No, sir.

Q.  And you understand today is not a memory test, correct?

A.  I hope not.

Q.  Do you recall Mr. Levy –- Levy asking you

288

when did Penn National ever deny that there was coverage?

A.  Yes, sir.  I recall that question.

Q.  I'm going to hand you what was previously marked as Exhibit 41.  You can flip forward to Paragraph 9.  And if your vision permits you to, can you read the first sentence?

A.  "Penn National denies that Beach Mart has insurance coverage for the underlying counterclaims pursuant to any Penn National policy."

Q.  And if you flip forward to Paragraph 26, can you read that sentence also?

A.  "Penn National admits that it has no duty to defend or indemnity Beach Mart against the underlying counterclaims and amended counterclaims."

Q.  And if you flip forward to Paragraph 53, can you read that last -- that sentence is the last item.

A.  "Penn National denies it owes any reimbursement of attorney's fees to Beach Mart and further denies the allegations contained in Paragraph 53."

Q.  For those allegations or admissions that you read in document –- or Exhibit 41, do those strike you as equivocal in any way?

MR. LEVY:  Objection.

289

THE WITNESS:  It –- it appears that the answer, this is an answer to a counterclaim, is they're denying coverage here.

Q.  (Mr. Shaw)  And in connection with that denial, does –- are you able to tell whether Penn National is denying its duty to defend under the policies?

MR. LEVY:  Objection.

THE WITNESS:  It appears to.

Q.  (Mr. Shaw)  And in connection with that denial, can you tell whether Penn National is refusing to make any reimbursement of attorney's fees to Beach Mart?

MR. LEVY:  Objection.

THE WITNESS:  It appears to.

Q.  (Mr. Shaw)  And if you look briefly back at Exhibit 69 that we looked at before, that's Penn National's Complaint in the coverage action.  It should have a ---

A.  Okay, yeah.

Q.  Okay.  And so you, you've been going over the Complaint, flip to Paragraph 29 for me on Page 7.

A.  Okay.

Q.  And I'll read a portion of Paragraph 29 that begins, "Penn National was informed and believes and

therefore alleges that Penn National has no obligation to provide liability coverage to Beach Mart or L&L under the BL policies including without limitation defense." Do you see that section?

A. Yes, sir.

Q. Okay. So does it appear to you whether or not going back to the Complaint in the coverage action that Penn National took a position on whether it had an obligation to provide a defense?

MR. LEVY: Objection.

THE WITNESS: It states that no liability and no defense.

Q. (Mr. Shaw) Other than whether the ongoing defense by Mr. Brown was ever withdrawn, which I think has been covered, are there any other acts you can think of that represent a denial of coverage by Penn National either in whole or in part?

A. No, sir.

Q. Was Penn National's refusal to pay the requested amount of Beach Mart's defense costs a denial of coverage, at least in part?

MR. LEVY: Objection.

THE WITNESS: In part, yes, sir.

Q. (Mr. Shaw) Do you recall Mr. Levy asking you during deposition whether -- or asking you to

agree that Penn National –- that "Penn National never misrepresented anything to Beach Mart, did it?"

A. I recall that.

Q. Still on Exhibit 69, can you refer to Page 8?

A. Okay.

Q. Do you see in Paragraph 36 where Penn National asserts, "All of the claims for relief in the underlying counterclaim and amended counterclaim relate directly or derivatively to Beach Mart's alleged breach of an express contract with L&L." Do you see that?

A. Yes, sir.

Q. All right. Does that –- is it your opinion -- do you have an opinion whether that is a misrepresentation of the application of the policy terms to the facts in this case?

MR. LEVY: Objection.

THE WITNESS: In my opinion, reading the counterclaim, it is.

Q. (Mr. Shaw) And why is that?

A. Because the counterclaim specifically related to the trademark WINGS, it didn't apply to trade dress and other forms of intellectual property.

Q. When you say "it didn't apply" ---

A. The counterclaim.

Q. The counterclaim. And did the contract that was asserted as part of the breach of contract claim and the counterclaims relate to those items either?

A. No, sir.

Q. If you continue to flip forward to Page 9 of Exhibit 69, do you see Penn National's third claim for relief?

A. Yes, sir.

Q. Okay. If you could review briefly 40 -- Paragraph 40 and 41 there so you're familiar with those allegations. I'll represent to you that this claim for relief is based on the prior publication exclusion. Based on your review of those paragraphs, do you agree with that?

A. No, sir.

Q. No, you do not agree that this is based on the prior publication?

A. No, I don't agree with these two paragraphs.

Q. Correct. But the -- at least these are allegations of Penn National, you understand?

A. That -- that's correct.

Q. And taking them as true, do you agree that the allegations that no coverage exist here are based on the prior publication exclusion as it is commonly

referred to in the policies?

MR. LEVY: Objection.

THE WITNESS: Yes, sir.

Q. (Mr. Shaw) And despite the ruling of the Fourth Circuit Court of Appeals, do you know whether Penn National has withdrawn this claim for relief in this case?

MR. LEVY: Objection.

THE WITNESS: I'm not aware that they have.

Q. (Mr. Shaw) If you can flip forward to Page 11 of that same document. And I'm going to refer you to Paragraph 52, which states in part, "The claims for relief in the underlying counterclaim and amended counterclaim related directly or derivatively to Beach Mart's alleged unauthorized use and infringement of the WINGS trademark." Do you see that ---

A. Yes, sir.

Q. --- allegation? Do you have an opinion as to whether that is an accurate representation of the facts in the underlying counterclaims as applied to the policy terms and provisions?

MR. LEVY: Objection.

THE WITNESS: My review of the counterclaim indicates that it was broader than just

the WINGS trademark.

Q. (Mr. Shaw) And how was it broader?

MR. LEVY: Objection.

THE WITNESS: It dealt with trade dress, the WINGS logo. I'm –- I'm not using the word W-I-N-G-S, I'm talking about the waves on top of the building, the pergola as you enter the building, coloration and things of that nature.

Q. (Mr. Shaw) In recalling all the -- we're done with Exhibit 69. Recalling all of the reservation of rights letters that we've gone through at length today and that you reviewed in preparing your expert opinions in this case, to the extent that any of those reservation of rights letters involve Penn's recital or summary of what it views as the relative -- relevant facts in the case, are you able to tell whether Penn omitted any discussion of L&L's allegations of slogan misappropriation?

A. It –- it wasn't ---

MR. LEVY: Objection.

THE WITNESS: It was not identified as a fact.

Q. (Mr. Shaw) So what –- are you saying that L&L's allegation was not cited in the reservation of rights letter?

A. That's correct.

MR. LEVY: Objection.

Q. (Mr. Shaw) Was it omitted?

A. I'm not following that.

Q. When Penn National summarized the rel -- what it viewed as the relevant facts of the case ---

A. Yeah.

Q. --- and its reservation of rights letters, did it include allegations of slogan misappropriation as one of those relevant facts?

A. I'm looking, Exhibit 75?

Q. Yes, sir. That's one of them.

A. I don't see anything. It just refers to WINGS as a US trademark.

Q. And you don't see any reference in the reservation of rights letter, Exhibit 75, to slogan misappropriation, do you?

A. No, sir.

MR. LEVY: Objection to form.

Q. (Mr. Shaw) Do you recall seeing allegations of slogan mis –- misappropriation in the underlying counterclaims?

A. Yes, sir.

MR. LEVY: Objection.

Q. (Mr. Shaw) In Exhibit 75, in the facts that Penn National chose to reflect as relevant, do you see any reference to building trade dress misappropriation?

MR. LEVY: Objection.

THE WITNESS: No reference, sir.

Q. (Mr. Shaw) Do you recall in reviewing the allegations of the underlying counterclaims whether there were allegations of building trade dress misappropriation by L&L?

MR. LEVY: Objection.

THE WITNESS: Yes, there were, and there were accompanying photographs.

Q. (Mr. Shaw) With respect to the review during the deposition of the years of your experience and the dates in which you may have authored relevant articles, treatises or other materials, do you recall off the top of your head the date of the applicable ISO forms for CGL and umbrella policies used by Penn National ---

MR. LEVY: Objection.

MR. SHAW: --- that are implicated in this case?

MR. LEVY: Objection. It's a BOP policy.

MR. SHAW: Sorry. All right. I'll rephrase to the extent the question referred to CGL, it refers to BOP.

THE WITNESS: It appears by the amendatory endorsement, it reflects the 2001 ISO revisions.

Q. (Mr. Shaw) And do you remember the specific year referenced that the –- in the footer of the BOP policy that's implicated in this case?

A. Are you talking about the amendatory endorsement?

Q. No, sir.

A. Or the BOP policy?

Q. The BOP policy.

A. I did not look at that. The endorsement was in '06.

Q. And is it your testimony today that, based on your review of the file, Mr. Gross's initial assessment of coverage occurred during 2012 and 2013?

A. Yes, sir.

Q. I –- I believe your early testimony in –- in the case was that you have gone through the process of receiving a claim, analyzing coverage, determining a defense approach approximately a hundred times. Is that what you said?

A. At least, yes, sir.

Q. Okay. And in each of those cases, you were doing that analysis in order to provide a recommendation either to Mendes, IIANC, or in connection with current consulting engagements?

A. Yes, sir.

Q. Is that process of investigating a claim and analyzing coverage the same general process you previously referred to as adjusting a claim?

A. Yes ---

MR. LEVY: Objection.

THE WITNESS: --- yes, sir.

Q. (Mr. Shaw) Based on your review of this file, did Greg Gross make the decision of Penn National on whether a duty to defend was triggered in this case? Or did he just received the claim, investigate the facts, analyze coverage and make a recommendation?

A. He did the latter, received the claim, analyzed it and made a recommendation.

Q. Sir, have you ever been accused of the unauthorized practice of law?

A. No, sir.

Q. Has anyone ever suggested to you in your 47-and-a-quarter years of teaching, consulting work, writing or expert witness testimony that your work constitutes the practice of law or the unauthorized practice of law?

A. No, sir.

Q. On Page 5 of your CV in Exhibit 119, you referenced an article you authored called North Carolina Insurance Statutes and Rules Update and Agents Guide. Do you recall that work?

A. Yes, sir.

Q. That article consist of legal advice or the practice of law?

A. No, sir. It was an analysis of the administrative code and North Carolina General Statutes applicable to agents, adjusters.

Q. And are North Carolina Sta -- General Statutes and other legal rules in North Carolina relevant to insurance professionals and adjusters?

A. They're required to study them.

Q. Mr. Levy asked you at the outset the deposition whether the duties and obligations between an insured and insurer are contained in the policy document, i.e. the contract. Do you recall that question?

A. Yes, sir.

Q. Is that description accurate in your opinion?

A. Certainly, a -- a statute or an administrative code would be embodied in it. But the contract is the contract.

Q. So in addition to the contract, are there also laws or statutes or other legal rules that can create additional duties, obligations or rights of either the insured or the insurer?

MR. LEVY: Objection.

THE WITNESS: Yes, sir. That's why 30 percent of the exam is based on North Carolina insurance law.

Q. (Mr. Shaw) And –- and other than referring to the applicable rules that are generally followed by insurance professionals in North Carolina, you're not offering a legal opinion in this case as to how the law should be applied to this case by the court, are you?

A. That is correct. I'm not offering a legal opinion.

Q. When Greg Gross interpreted the policy contract and advised Beach Mart as to his opinion, to the extent he did so in any of the reservation of rights letters, do you think he was practicing law or providing legal advice?

MR. LEVY: Objection.

THE WITNESS: No, sir.

Q. (Mr. Shaw) In your opinion, do you think that Greg Gross or anyone at Penn National, to the extent they were interpreting a policy contract and res -- reaching a conclusion as to coverage, were simply performing a normal job function of an insurance adjuster or claims professional? Or do you think they were practicing law?

MR. LEVY: Objection.

THE WITNESS: Taking the plain reading of the policy and applying it against the facts in a case is what insurance professionals do.

MR. SHAW: That's all the questions I have.

FURTHER EXAMINATION

Q. (Mr. Levy) Mr. Tilden, in follow-up to Mr. Shaw's questions to you. I asked you a good many questions beginning at 10:00 o'clock this morning and continuing till after 5:00 p.m., after which Mr. Shaw conducted his redirect of you. During that time frame, I asked you no less than a half dozen times about instances when you believe Penn National made any misrepresentations either concerning the policy terms, the pleadings or otherwise to its insured,

06-23-21                      PNMCIC v Beach Mart/2:14-CV-00008-FL                      COPY

302

Beach Mart. And in each and every instance I asked you that question, you could not site a single example. Do you agree with that ---

A. Yes, sir.

Q. --- as my summary? You've also told us and in response to Mr. Shaw's questions that your -- it does get a little bit harder during the day to answer questions, that's for anybody ---

A. Yeah.

Q. --- not just to you. Is that fair?

A. That's right.

Q. And we come back from a break here, Mr. Shaw asks you on redirect ---

MR. SHAW: Objection.

MR. LEVY: --- and he started asking you a question about ---

MR. SHAW: I –- I started asking redirect not after a break but immediately following your conclusion of questioning.

Q. (Mr. Levy) Okay. So shortly before I concluded my questioning we had a break, to get the sequence right. And then Mr. Shaw starts asking you his redirect. And one of the areas of inquiry of you was Exhibit 41, an answer to counterclaims. Now, sir, you understand certainly, all your years in the

303

business, that the term denial or disclaimer of coverage is a term of art in insurance. Is it not?

A. Yes, sir.

Q. There's also a different use of the word denial in pleading practice, is there not?

A. I don't disagree.

Q. Okay. And so when people make pleadings in a –- in a legal case, you've had a good chance to look at those over the years for the exact reasons that bring us here, to look at things like coverage. You have parties making allegations on the one side. And on the other hand, you have parties that will admit or deny those allegations. Am I saying that right to your experience?

A. Yes, sir.

Q. And so when we talk about a party admitting or denying something in the pleading, that's something very different than an insurance carrier notifying their insured that they are accepting or denying a claim, is it not?

A. It is not a letter to the insured. I agree to that.

Q. Okay. And at no point in time did Penn National ever send any correspondence to Beach Mart indicating they were denying this claim, did they?

304

A. They never sent a letter.

Q. And they never communicated to Beach Mart. Penn National, the company never communicated to its insured that it was denying the claim. To the contrary, they've defended the case subject to a reservation of rights for eight-plus years.

A. They never sent him a letter denying coverage, that's correct.

Q. And so true enough that when we look at pleadings, the pleadings speak for themselves. You're not an attorney, we've been through that exhaustively here, and you're also not an expert in the interpretation of legal pleadings, are you?

A. No, sir.

Q. And so the pleadings speak for themselves when we talk about disclaimer or denial of coverage, that's something that a carrier does do. In fact, you've learned today, Travelers did do that in August 2012 by letter. They notified their insured and say "We've received your claim. We deny it. Here's why." True enough?

A. That's correct.

Q. And that never happened in terms of Penn National and Beach Mart in this case. Penn National never denied the claims, right?

305

A. That's correct, in –- as a letter.

Q. Okay. Well, they never denied -- they never denied the claims, such they said, "We're not going to provide a defense. We're not going to pay any money in your –- in your behalf." Penn –- Penn National never did that, did they?

A. They never notified the insured of that by letter, that's correct.

Q. Okay. Now, separate and apart from that, you've been given an opportunity and you were asked a series of questions regarding these reservation of rights letters towards the end of the day here by Mr. Shaw, of what is or is not in them. Understood, not asking to rehash that. But with respect to these reservation of rights letters, I hear your testimony as you feel like there's additional things that should have been in here that weren't. Am I saying that incorrectly?

A. No, that's correct.

Q. Where within these reservation of rights letters that you can point to one example where Penn National has misrepresented anything in regards to either the policies or the allegations in this counterclaim, this original category?

A. By omission.

306

Q. Well –- well, I under –- I get that. You're saying if it's not in there, it's a misrepresentation?

A. **Yes, sir.**

Q. Where within these reservation of rights letters does it say it's exhaustive?

A. **It doesn't say that.**

Q. So I –- I would understand your position if there was some representation by the point of Penn National saying recovering everything in here, okay? But if Penn National says, "Here's what we're putting out there," and they include a –- a very typical disclaimer of, "As we learn more information, this may be supplemented, non-waiver," and all the things you've talked about in your testimony. Why is it that you take the position now that anything that's not in here in the form of an allegation somehow –- somehow constitutes a misrepresentation by Penn National?

A. **I think you can misrepresent by making a false statement. I think you can misrepresent by omission.**

Q. Okay. You certainly have not seen any evidence of false statements in anything you've looked at in this case. True enough?

A. **Not in correspondence between Penn National and the insured.**

307

Q. And that's all I'm asking about. I'm not asking about pleadings that make averments sometimes upon information and belief or otherwise. I'm asking about communications between the carrier on the one hand, Beach Mart, and –- excuse me, the carrier on one hand, Penn National and the insured on the other hand, Beach Mart.

A. **Yeah.**

Q. Because that's what counts, isn't it?

A. **Yes.**

Q. I mean, that's what you're looking at, is how was the -- how is the carrier dealing with its insured. That's the conduct that you've examined, right?

A. **Yes, sir.**

Q. You're not examining the pleading practice in this case for what allegations have been made, except for purposes of the underlying case where you're looking at those counterclaims because that's what was presented to Greg Gross back in June of 2012. Fair enough?

A. **That's correct.**

Q. Okay. Now with respect to this hundred or so times where you've looked at claims and worked through them, I just want to be clear again. Number

308

one, we're talking about the work -- counsel reference when you're working with Mendes & Mount. So this is pre-1983 is –- and with the London ---

A. **Well, that's an incorrect representation. I did one last week for a carrier.**

Q. Okay. And what did you do last week for a carrier?

A. **It's Puerto Rico, monopolistic state, fatality of a subcontractor, and the coverage issue with the CGL injury to employee, exclusion apply, and how would stop gap apply.**

Q. Okay. And you worked through and reviewed it and rendered an opinion to the carrier on that issue?

A. **I was unable to render an opinion because I -- in the adjuster's analysis to me, I could not ascertain whether the subcontractor was a de facto employee or not.**

Q. Okay. You've never sat though in the seat, as we discussed, that Greg Gross sat in back in 2012, 2013 ---

A. **True.**

Q. --- as a claims person for an insurance carrier where you received claims and then worked through that. You've never done that role?

309

A. **That's correct.**

Q. And you've never been the supervisor of that person, right?

A. **That`s correct.**

Q. You've never written a manual or training guide for people in that seat for a insurance carrier, correct?

A. **That's correct.**

Q. And you've never been in a home office type position for a carrier like that where you're making ultimate coverage decisions, correct?

A. **That's correct.**

Q. And we talked about with Westfield, for example, and with this carrier out in Arizona where you may have provided training to claims professionals doing those types of exercises. True enough?

A. **That's true.**

Q. When's the last time you had responsibility for accepting and looking at a claim concerning alleged trademark infringement, breach of contract in the context of IP litigation yourself? And separate from the assignment that brings us here today.

A. **I had a disparagement case in December of 2018, but that's as far back as my memory goes.**

Q. Okay. By disparagement, defamation?

**A.** Disparagement of a business.

**Q.** Okay. All right. And who did you handle that case for?

**A.** I forgot the carrier.

**Q.** Carrier calls you up and just says, "Hey, can you let us know your thoughts on coverage on this?"

**A.** That's how it started, yes, sir.

**Q.** And then did you actually write something up for them?

**A.** Yes, sir.

**Q.** What you write up for them, would you call that an opinion letter or a memorandum?

**A.** I just gave them the points that I saw on the case.

**Q.** Okay. When's the last time that you would have done any kind of adjusting of a personal or advertising injury claim yourself?

**A.** It really wasn't an issue when I was doing adjusting.

**Q.** So are you certain that you ever adjusted a personal or advertising injury claim yourself?

**A.** You know, that's a -- that's a big area. When you -- when you put in personal, that includes libel, slander. Those are more prevalent.

**Q.** Sure.

**A.** The advertising are the minority of the cases.

**Q.** Fair point. Let's just limit it then to the advertising injury. Are –- can you say whether you've ever adjusted one of those type of claims?

**A.** The only thing that comes to mind is that December of 2018 issue that I had.

**Q.** And that really wasn't adjusting the claim so much as providing an external opinion to an insurance carrier regarding what you thought might be pertinent to the coverage analysis?

**A.** That's correct.

**Q.** Okay. But you can't necessarily think of a single instance during your professional career over a great many years where you've done or did do what Greg Gross was called upon to do in this case?

**A.** That's correct.

MR. LEVY: Okay. Those are my follow-up questions, subject to the reservations that I made earlier.

FURTHER EXAMINATION

BY MR. SHAW:

**Q.** Did any of Penn's letters to Beach Mart, based on your review, ever communicate a position one way or another on whether coverage was or was not provided under the policies based on the allegations of the underlying counterclaims?

**A.** There was never an analysis or a conclusion.

**Q.** Was there even a position?

**A.** No, sir.

**Q.** Other than the admissions that Penn National made in its pleadings in this case, is there any other document you have seen where Penn National articulates its position ---

MR. LEVY: Objection. Move to strike.

**Q.** (Mr. Shaw) --- on whether coverage of defense obligations is or is not provided under the policies?

MR. LEVY: Objection. Move to strike.

THE WITNESS: The only thing I can think of is the Reservation of Rights Letter Number 3 where they accepted defense, subject to the reservation of rights.

**Q.** (Mr. Shaw) Subject to a reservation of rights. Do you recall whether the Reservation of rights Letter Number 3 took a position on whether there was or was not coverage?

**A.** It did not state it one way or the other.

MR. SHAW: That's all I got.

MR. LEVY: Let's leave it at that. It's late enough.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: This deposition is adjourned. Going off the record at 5:48 p.m.

WHEREUPON, at 05:48 o'clock p.m., the deposition was adjourned.

314

### CERTIFICATION

I, Susan Kittle, Notary Public in and for the County of Mecklenburg, State of North Carolina at Large, do hereby certify:

That said witness was sworn by me to state the truth, the whole truth, and nothing but the truth, in said cause and appeared before me at the time and place herein aforementioned and the foregoing consecutively numbered pages are a complete and accurate record of all the testimony given by said witness;

That the undersigned is not of kin, nor in any way associated with any of the parties to said cause of action, nor their counsel, and not interested in the event(s) thereof.

Reading and signing of the testimony was waived.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of July, 2021.

_____

CHAPLIN & ASSOCIATES
Notary No. 201732600053

06-23-21               PNMCIC v Beach Mart/2:14-CV-00008-FL             COPY

### Exhibits

**7741 Bryan Tilden 6-23-2021 Exhibit 118**  4:14 10:19,24,25 11:3 20:14

**7741 Bryan Tilden 6-23-2021 Exhibit 119**  4:16 25:4,5,6,13,14, 16 26:1 30:13 66:11,12 71:6 80:8,10 84:6,24 85:12,17 101:2 104:18 109:9 121:4 127:17 151:14 195:12,13 200:13 213:1,2 214:13 215:6,7 225:17 226:4,5,6 243:11 245:12 254:19 261:2 274:24 275:24 286:10 299:5

**7741 Bryan Tilden 6-23-2021 Exhibit 120**  4:18 115:17,18,19, 20 116:7,25 118:1 120:12 287:10

**7741 Bryan Tilden 6-23-2021 Exhibit 121**  4:20 117:19,20,23 118:2,17 119:1,22 120:8 287:10

### $

**$10,000**  38:12

**$250,000**  240:24 241:2

**$300**  28:9

**$40,000**  135:1 199:8

**$400,000**  239:3

**$5**  242:11,18

**$5,000**  34:2

**$50,000**  135:1 199:8 212:21

**$500,000**  239:3 242:2

### 0

**02**  64:23

**04**  68:23,25

**05:48**  313:6

**06**  297:16

**07**  68:24,25

### 1

**1**  99:14 105:9,17 109:23 118:16 134:2 226:9 276:7,9

**10**  78:19 116:3,6 143:8 151:18 206:19 211:7,11,23 212:2,17 213:1 214:12 283:5 286:10

**100,000**  34:25

**101**  271:11,16,23 274:10

**102**  273:22,23 274:2,11

**10:00**  301:19

**10:02**  8:2,5

**11**  138:14 177:14 215:7,12 226:5 227:11 283:11 293:12

**113**  243:19,22 245:5,6

**118**  10:19,25 11:3 20:14

**119**  25:4,6,13,14,16 26:1 30:13 66:12 71:6 80:8,10 84:6,24 85:12,17 101:2 104:18 109:9 121:4 127:17 151:14 195:13 200:13 213:2 214:13 215:7 225:17 226:4,6 243:11,19 245:12 254:19 261:2 274:24 275:24 286:10 299:5

**11:33**  78:8,9

**11:46**  78:9,11

**12**  39:11 109:24 145:10,12 174:16

**120**  115:18,20 116:7,25 118:1 120:12 226:11 287:10

**121**  117:20,23 118:2,17 119:1,22 120:8, 12 226:10,11 287:10

**122**  226:11

**13**  174:17 178:25 197:12 253:6

**13th**  237:25

**14th**  126:12,13

**15**  76:4 170:18 171:16 207:25 215:7,12 226:5 227:11

**15th**  121:9 125:25 170:2 173:1 181:21 187:23 199:20,24 200:20 202:22 203:4

**16**  221:17 230:9 233:6 236:14

**16th**  245:7

**17**  236:14 243:10 249:3

**18**  234:10 253:24 254:1,2,15,19

**18th**  121:8,22

**19**  63:9

**1933**  70:15

**1941**  71:2

**1970s**  31:6

**1974**  31:7

**1980**  31:17

**1983**  9:25 47:22 123:13

**1990**  39:21,22 42:4

**1990s**  32:1

**1991**  41:13

**1997**  32:9,18 42:5

**1:16**  150:15,16

**1st**  91:16,23 96:7

### 2

**2**  33:12 78:11 84:6 85:18 107:20 111:10 129:17 130:15 160:8 163:13 196:18 213:1 240:7 276:7,11

**20**  63:9 232:23 259:19 272:3,13

**200**  219:20

**2000-2001**  69:10

**2001**  68:19 69:5,10 70:25 297:5

**2002**  62:9,17 63:8

**2002-2003**  66:5

**2003**  62:9,17 63:8 64:23

**2005**  87:25 88:2,17 91:7 93:23 94:2 95:19 96:1 255:7 261:10,11 265:7,15,16

**2006**  94:2

**2007**  94:2

**2008**  90:17 91:16,23 93:24 95:19,21 96:7 216:10 219:12 227:12

**2010**  77:22,23

**2011**  107:2,8 110:16 149:18 152:25 153:7,12,23 185:12 227:24 229:18

**2012**  36:10 46:19 86:2 110:17 111:4,21 112:1 113:1 121:8,22 125:15,16 127:25 141:21 153:13,18 155:11,18,21 156:18

Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 82 of 201
PNMCIC v Beach Mart/2:14-CV-00008-FL                    COPY

157:1 158:20,22 159:7,20 160:3,6,7,21 161:15,22 164:5 166:11,12 167:5,20 168:8,13,17,25 169:11 170:1 171:9,13,22 172:25 173:11 176:9 185:1 186:11,13 227:24 229:18 230:24 235:23,25 236:21 237:25 250:8 264:3 297:19 304:19 307:20 308:20

**2013** 69:1 121:9 126:1 127:10 128:1 164:7 170:2,18 171:16,22 173:1,12 181:2,22 185:1 186:17,20 187:23 188:9, 10,15,16 194:19 195:15 196:11 199:20, 24 200:9,20 202:22 235:19 236:21 237:25 250:8,17 264:4 297:19 308:21

**2014** 132:17 133:4,10 134:2 195:15,24, 25 197:22 206:24 241:16 248:24

**2015** 172:9 203:4 235:19

**2017** 77:24 121:1 206:24 209:7

**2018** 147:19 156:10,11 198:15 309:24 311:8

**2019** 67:3,8

**2020** 27:18 190:21,22 196:10 245:8 271:21

**2021** 8:4 27:19 71:12 104:22 144:11 145:2 188:11 245:13 273:25

**22** 261:2,9 264:7

**22nd** 107:8

**23** 96:25 265:3,5

**23rd** 8:4

**24** 25:17 33:4,8 267:19

**25** 149:5 245:20

**250** 240:20 242:2 243:16

**26** 288:11

**27312** 9:22

**27th** 161:15

**29** 289:22,24

**290-some** 245:24

**294** 245:24

**298,930.42** 245:17

**2:00** 150:11

**2:06** 150:16,18

**2s** 130:16

---

**3**

**3** 68:18,23 97:9,10 101:1 104:8 150:18 171:16 181:8 279:16 312:17,22

**30** 173:4,17 190:18 228:17 232:23 300:10

**30-day** 157:23

**36** 107:10,20 108:11,15,19 111:11 113:23 114:16,23 120:24 153:5 155:16 157:9 215:15 231:4 291:7

**3:27** 214:24,25

**3:36** 214:25 215:2

---

**4**

**4** 67:8 68:9 105:1,17 109:8,24 121:5,18 125:11,22 127:15 215:2 279:22

**40** 41:23 137:19,20 292:11

**41** 285:18 288:5,23 292:11 302:24

**46** 96:22

**47** 96:22,25

**47-and-a-quarter** 298:25

**4:24** 254:8,9

**4:25** 254:9,11

**4:52** 275:15,16

---

**5**

**5** 67:13 70:1,12 109:8,24 128:15 143:8 254:11 275:24 276:9 280:4 286:10 299:5

**50** 11:19 12:2,9 13:16

**50,000** 243:16

**500** 241:18

**500,000** 242:20

**500-some** 241:6,14 242:6

**52** 293:13

**526** 9:21

**53** 288:16,21

**58-63-15** 138:13 177:11,13

---

**5:00** 301:20

**5:01** 275:16,18

**5:48** 313:5

---

**6**

**6** 133:25 275:18,24

**60** 110:18 190:18 282:18

**60-day** 228:17

**69** 129:15,25 289:17 291:4 292:7 294:10

---

**7**

**7** 70:17 71:5 72:19 76:16 109:11 137:17, 21 151:13,17 156:21 175:16 179:20 281:3 289:22

**701** 138:23

**702** 138:23

**71** 10:8 121:15 125:16 159:25

**72** 161:8,10 162:2

**73** 10:9 163:6,7,10

**74** 96:23 125:9,10,14 160:7

**75** 125:20,21 181:8 186:20 202:8,9,23 295:12,17 296:1

**77** 126:8 127:8,10,20

**79** 37:13

**7th** 125:14 160:7

---

**8**

**8** 71:5 72:22 76:16 135:24 140:19,20 179:21 183:2 195:12,13 200:12 281:19 291:5

**83** 37:13

**88** 89:16

**8th** 113:1 155:21 156:18 157:1 169:25 181:20 230:24 237:25

---

**9**

**9** 142:7 200:12 201:15,19 205:13 206:18 281:25 288:6 292:6

**90s** 45:18

**9246** 202:12

**97** 32:3,5

**98** 69:9

**A**

**a.m.** 8:2,5 78:8,9,12

**AAIS** 44:25

**ab** 155:3

**absent** 190:10,11

**absolutely** 90:11 129:8 220:1 254:6 262:17

**accept** 18:22,25 19:2 160:18 169:6 180:16 280:6,15

**accepted** 172:21 173:3,16 264:21 280:19 312:18

**accepting** 217:23 260:10 303:19 309:19

**accepts** 112:22

**access** 28:20 256:14

**accompanying** 11:7 296:13

**accord** 113:3

**accordance** 108:25

**account** 33:14,15,24 34:15 38:9 39:4 70:2 119:21 146:22 147:11 205:1 236:4,7 242:25 243:3 246:18

**accounted** 207:19

**accounts** 34:16,25 35:10 37:20 38:10

**accurate** 30:15 46:21 47:2 55:14 71:7 86:2,12 101:9 107:2 167:11 195:21 206:25 212:1 236:1 293:20 299:25

**accurately** 39:22 159:8

**accused** 298:21

**acknowledged** 270:1

**acknowledgment** 269:3

**act** 132:21 138:16,20,22,23 139:7

**acted** 198:8 249:11,12,15

**acting** 201:25

**action** 87:13 106:19 118:8 119:8,9 128:16 130:14,19,22,24 131:5,18 132:1, 16 133:14 137:24 142:2 147:18 149:3 197:24 198:3,6,10 199:10 202:2 215:16 226:9 253:6 258:1 278:13 279:25 289:18 290:7

**actions** 140:1 267:24 268:24 270:11,15

**activate** 56:10

**activates** 89:10

**active** 27:10

**actively** 32:10

**activities** 30:22 38:18 139:2 166:13 169:16 170:16 171:21,23 213:12 230:1

**activity** 166:16 169:23 170:4 182:24

**actor** 249:23

**acts** 290:15

**actual** 44:25 279:9

**acuity** 285:15

**Adam** 146:8 277:13,16

**add** 236:15 254:24 279:20 280:2,11,22 281:5,22 282:8 283:9 284:20

**added** 26:18 66:14 82:14

**addition** 129:2 138:3 142:14 300:5

**additional** 26:18 66:12 67:2 104:11,20, 23 109:15 121:1 138:6 238:6,11 253:19 283:12,15 284:18 300:7 305:16

**additions** 26:21

**address** 9:20 26:2 233:17 259:9,12

**adequately** 276:10

**adhered** 266:25 267:5

**adheres** 266:25

**adjourned** 313:5,7

**adjust** 37:13 170:7

**adjusted** 36:9 310:21 311:6

**adjuster** 48:2 65:9 224:4 301:8

**adjuster's** 308:16

**adjusters** 40:7,16,22 41:4,8,16 61:11,13 62:1 63:2,6 65:2 216:23 218:17 260:1 263:12 299:14,17

**adjusting** 33:3 34:4,17 35:5 40:11 61:18 213:25 298:9 310:17,20 311:9

**adjustment** 85:19 86:4 95:12

**administrative** 299:13 300:3

**admissions** 288:22 312:7

**admit** 303:12

**admits** 288:13

**admitting** 303:16

**advance** 148:24

**adverse** 13:3

**advertising** 23:9 37:15 67:22 68:7,21 70:14,22 82:13 89:14 185:20 231:15,23 232:22 235:14 260:5,8 262:12 266:12 269:4 310:18,22 311:2,5

**advice** 16:18,20,25 17:13,18,22 50:14 98:4,19 114:9 216:20 299:10 300:25

**advised** 300:22

**Advisers** 244:2

**Advisors** 248:21

**advisory** 16:7

**affairs** 42:14

**affect** 39:17 103:3

**affected** 203:19

**affecting** 285:12

**affiliated** 40:22 41:4

**affiliation** 40:2

**affirmative** 105:25 106:8 136:6,12 137:7,14 138:6 244:14 246:1

**affirmatively** 203:5 272:14

**affirmed** 8:17

**afternoon** 79:3 285:13

**age** 192:13

**agency** 33:18,22 34:10 38:4,9,14,20,25 39:6 76:10 156:5 160:15

**agent** 12:15,22 13:1,2,3,8,10 14:4,6 17:10,11,15,19 19:3 24:2 65:8 112:3,5 113:9,20 145:20 155:23 156:1,2,3,8 160:15 172:25 259:14

**agents** 12:18 39:24 40:9,16 41:3,8,16 47:24 75:17 178:17 299:8,14

**agree** 18:1 20:2,8 29:15 39:12,15 51:2, 15 52:2,5,8,17 53:24 86:23 92:11 95:15

100:15 107:23 108:4 111:19 112:7,18 116:24 118:25 137:9,15 149:8,12 157:6 159:25 160:14 162:1 163:16 164:8 166:23 180:8 181:1,8 189:20 191:22 199:23 203:4 209:22 211:5 219:21 220:9 225:3 227:18 234:15 237:10 243:14 245:10 250:5 252:19,24 259:7 263:1 264:20 268:3 272:10 277:4,12,17 282:6 291:1 292:15,17,19,23 302:3 303:21

**agreed** 9:15 131:7,10 177:6 180:21 186:25 189:18,21 198:15 237:13

**agreement** 29:4,7 30:4 88:18 90:3,8,9, 12,15,23 91:1 223:20 224:4 233:17 255:7 261:10

**agrees** 124:14 250:6

**ahead** 127:1 214:20

**AI** 67:2

**AIC** 204:13

**albeit** 118:23

**allegation** 24:17 92:25 139:18 256:17 293:19 294:24 306:16

**allegations** 87:9,12,13 139:20 213:6 223:2 254:22 255:3 256:6,25 257:10 266:5 268:6 278:8,13 288:20,22 292:12, 21,24 294:18 295:10,21 296:8,9 303:11, 13 305:23 307:17 312:2

**alleged** 86:24 87:19 88:11 149:17 291:11 293:16 309:20

**alleges** 118:21 290:1

**allocate** 136:18

**allowed** 140:13,14,16

**altruistic** 43:21

**amendatory** 82:12 221:7 222:21 297:5, 10

**amended** 114:1,5,18 115:7,13 116:8,17, 25 118:6,19 119:2 129:11,19 130:1,6,14, 18 288:15 291:9 293:14

**amendment** 117:13 120:16

**amendments** 114:22 115:5 117:5 133:22 231:6

**American** 45:1

**American's** 44:12

**amount** 204:4 238:23 285:9 286:5 290:20

**amounts** 28:14 241:23

**analys** 20:9

**analyses** 55:25 86:10 96:3

**analysis** 19:11 20:3,9 21:11,16 22:19 23:1,5 43:8 47:15 57:7,15 67:21 75:9,16 90:10 92:10,12 93:5,12 95:19 96:6 104:10 105:20 108:11 110:9 111:12 115:10 120:4,22 124:1,4 157:12 158:7,9, 16 165:2,18 166:1 177:18 178:10 180:8 203:10 204:24 209:17 215:13 216:10 219:5 223:13 226:4,6 227:10,15 233:19 236:6 243:13 246:14 253:19 255:6 256:10 266:19 267:3 269:10 270:20 277:2 278:7,8 279:8 281:13 282:15 298:3 299:12 308:16 311:12 312:4

**analyze** 92:4 246:4 282:13 298:17

**analyzed** 68:2 244:12 298:20

**analyzing** 68:6 122:9 216:8 297:23 298:8

**ancillary** 78:16

**announcing** 173:6

**anti-concurrent** 57:11

**apologize** 128:11 204:21 231:18

**apparent** 265:16

**apparently** 172:19 241:13

**appeal** 148:8 239:16

**appealed** 148:6

**appeals** 148:13 149:10 191:21 204:22 210:9 234:12 264:18,22 293:5

**appearance** 11:8

**appeared** 45:15 83:4 88:8 143:15,17 198:24 199:6 239:6 255:6 256:19 257:19 260:2 278:5 287:3

**appearing** 11:10 74:25

**appears** 26:7 66:25 119:1 137:20,22 157:25 160:1 163:17 166:16 289:1,9,15 297:4

**appellate** 49:19 149:3,9

**appending** 123:10

**applicable** 122:8 222:12 296:18 299:14 300:14

**application** 67:21 69:23 101:12,17 149:16 155:9 178:11 222:20 234:2,22

236:10 266:21 291:16

**applied** 276:11 293:21 300:17

**applies** 264:15,24

**apply** 54:12 55:25 184:7 185:6 223:4,21 240:6 261:13 264:10 266:5 269:3,5 281:22 291:23,25 308:10,11

**applying** 52:15 110:25 301:12

**appointing** 121:7 128:8

**approach** 71:1 297:24

**appropriateness** 191:25

**approval** 41:20

**approximate** 28:25

**approximately** 28:13,17 297:24

**arbitra** 72:16

**arbitration** 72:12,13

**area** 18:6 26:22 31:2,4,11,25 61:2,7 63:7 75:7,13 76:8 157:24 178:16 211:23 214:6 310:23

**areas** 26:20 75:13 76:8 263:4 302:23

**arena** 32:10

**aren't** 141:11

**argument** 99:3,4

**arise** 14:23,25 261:10

**arising** 224:19

**Arizona** 63:22 309:14

**arose** 188:19

**art** 32:22 56:7 89:9 303:2

**article** 234:17 299:6,10

**articles** 26:12,22 32:12 296:17

**articulate** 202:10 258:16

**articulated** 195:2 231:14 232:9

**articulates** 312:9

**ascertain** 88:6,10 89:2 92:13 133:8,17 166:17,22 173:23 174:25 248:5 308:17

**asks** 46:20 302:13

**aspects** 184:14

**asserted** 92:6 118:8 119:11 185:11 192:2 282:14 292:3

**asserting** 118:19 240:6

**asserts** 291:8

**assess** 58:15 154:3 229:18 243:25 248:5 271:22,24

**assessing** 21:15 42:25 277:25

**assessment** 20:10 38:15 169:18 173:19, 21 181:21 185:10 226:7 282:11 297:19

**assign** 37:25

**assigned** 47:1 173:7 217:16

**assignment** 86:15 94:16 172:21 173:3 309:22

**assist** 86:15 195:19

**associate's** 10:14

**Associates** 83:19 84:2

**associating** 60:1

**association** 43:13 45:1

**assoti** 207:21

**assume** 55:6 128:24 233:10 260:8 272:25

**assumed** 144:21 145:25

**assuming** 133:9 161:17,19 164:4 225:19 233:4,7 245:10

**assumption** 144:5 278:24 279:3

**assumptions** 256:12

**assure** 282:3

**attached** 221:8

**attachment** 30:7

**attempt** 105:1 173:10

**attempted** 255:3

**attend** 10:3

**attended** 10:8 30:18

**attendee** 65:5 213:23

**attention** 116:2

**attorney** 15:2,11,15 51:21 84:9 97:11 122:22 174:9 181:4 187:19 189:16,24 190:19 192:9 247:13 277:13,16 304:11

**attorney's** 135:20 242:12 288:19 289:12

**attorney-client** 101:12

**attorneys** 13:7,9 18:25 24:1 41:10 80:5 178:21 189:16 272:15

**attributed** 280:16

**atypical** 190:1

**audience** 55:14

**August** 125:14 160:6,7,21 161:15,22 164:5,7 166:11 167:4,20 168:8,13 176:8 270:17 304:18

**Austin** 68:11

**author** 81:7,10 83:8

**authored** 296:16 299:6

**authoring** 240:8

**authority** 49:13 72:21 76:24 173:15,21 204:25

**auto** 66:17

**automobile** 64:3

**averments** 307:2

**avoid** 30:9 254:22 255:4 262:9

**award** 237:11

**awarded** 191:15 220:19

**aware** 11:5 80:2 106:24 110:21 112:1,3 116:11 118:5 120:13,18 127:22 129:10 136:20 142:1 144:8 145:18,22,23 146:7, 14 147:23 148:5 153:9 157:19 158:2,21 161:14,21 168:16,21 188:19,24,25 198:16 206:3,16 207:8,16,18 208:13 210:19 224:9 228:13,19,25 238:1 240:16 241:1,6,11,14 242:9 243:24 244:9,10 245:21,22 246:12 259:13 274:5 277:10 293:9

### B

**bachelor's** 10:14

**back** 9:25 27:6,24 30:11 38:6 43:21 47:7,15,18 48:1 50:10 58:7,16 66:9 78:10,13 80:9 82:18 88:21 95:10 101:22 106:11,23 110:11 111:25 117:17 120:24 121:4 123:11 127:16 132:14 137:24 138:7 147:19 150:17,20 166:8,21 169:11 185:25 186:14 191:23 194:25 206:21 212:16 215:1,4 217:18 240:3 241:15 254:10 264:23 275:17,20 283:20 289:16 290:7 302:12 307:20 308:20 309:24

**backbone** 45:2,16

**background** 25:23 151:8,16 178:15 196:19 201:16 238:19

**bad** 14:11 55:6 140:5 179:17

**Baev** 163:24

**bankruptcy** 206:5

**Bar** 15:19 16:8 218:22

**Bar's** 16:5

**Bar's** 16:2

**base** 255:1

**based** 49:11 50:6 52:14 53:1 73:8 87:8 88:12,16 89:19 90:12 91:5 111:20 112:7 149:8,13 170:23 181:20 186:2 204:10 209:6,24 220:9 228:16 241:16 245:14 246:24 255:8 265:14 278:7 292:13,14,17, 24 297:17 298:13 300:11 311:25 312:2

**basic** 105:14

**basically** 29:14 123:23 128:6 188:9 202:25

**Basin** 55:10

**basis** 99:24 152:18 243:9 249:18 281:20, 21 282:1 283:6

**batch** 209:7

**Bates** 119:13 202:12 287:1,11

**Beach** 8:7,14 9:4 11:15 17:16 19:7,12, 15,18,21 20:6,11 36:9 46:18 58:11 74:6 84:3,10 85:25 87:14,18,23 88:5 91:22 92:6,7 94:23 95:4 96:13 98:12 105:10,15 106:25 107:7 108:19 110:4 111:3,25 112:10,12,16,25 113:24 116:14,18 118:7, 20 119:2 120:3 127:24 130:2 132:14,17 133:11,12 134:1,22 135:21 137:11,13,23 138:4 141:22 142:8 145:24 146:10 147:6, 7 152:3 153:10,21 154:24 155:14,15,23 156:2,16,17,25 157:7,14 158:11,20,22, 23,24 159:6,19 160:2,10,16 161:14,22 162:6 163:14 165:25 166:12 169:10 171:20 172:5,10,13,24 173:12,13 175:8, 19 176:2,7,8 177:18,21 179:1 181:3 186:2,22 188:4,9,21,25 189:3,9,17 191:3, 6,14,18 192:4 193:14,19,22,25 194:2,3, 11 195:20 196:10 199:17 202:16,18,24 203:5,18 205:13,18,25 206:9,22 207:20 212:22 213:5 215:18 216:6,11 220:5,12, 13,22,23 224:18 227:21,22 232:3,12 233:24 237:19 238:1 239:17 240:12

241:3 242:9 243:6 246:1,14 248:13 249:11,14,16,20 250:5,14,15,17 252:4 253:1,7 255:10 256:7 257:7,8,12,15,17, 23 259:10,13 261:20 267:23 268:7,11 271:20,21 275:1,7 276:19 280:21 281:10, 17 282:2,22 283:7,13,16 286:5 288:8,14, 19 289:12 290:2,20 291:2,10 293:15 300:22 302:1 303:24 304:2,24 307:5,7 311:24

**bear**  145:7 147:1

**bearing**  104:2

**began**  230:12,23 280:20

**beginning**  86:1 90:17 221:17 301:19

**begins**  78:11 150:18 151:17 215:2 227:15 228:13 254:11 275:18 289:25

**behalf**  11:15 12:11 13:1 19:5,11,15,16 20:6 52:20 74:3,6 75:1 79:13,15 123:3 171:20 188:4,25 191:14 244:22 275:1,7 305:5

**belief**  52:25 61:6 87:4 91:6 118:22 155:15 203:18 212:25 229:1 249:10 268:15 284:10 307:3

**believed**  253:17 269:24

**believes**  289:25

**bench**  73:9,16 75:25 76:1

**benefit**  116:2 121:1 123:5 259:25

**benefited**  206:10

**biased**  267:3

**bifurcated**  143:21

**bifurcation**  47:3

**big**  310:23

**bill**  99:24

**billing**  27:16 134:18 135:14,17 147:4 243:12

**billings**  28:21,24 135:12

**bit**  25:22 33:13 115:8 150:25 174:12 198:1 229:5 302:7

**BL**  290:3

**black**  191:11

**blanket**  190:7

**board**  157:22 162:25 187:21

**bodily**  24:20 185:17

**boldfaced**  101:1,4

**bolts**  59:19

**Bond**  8:13 19:12

**book**  62:16

**books**  49:16

**BOP**  167:25 168:2,7,9,12,13 206:14 216:10 219:12 227:12 259:8 266:4 267:7 296:24 297:3,8,13,14

**bottom**  70:12 82:23,24 104:7 151:18 175:16,17 179:19 195:14 205:13 206:18 211:6,7,23 212:2,16 243:4 249:3 287:2, 16

**Boyle**  234:18

**breach**  15:4 138:9 225:24 261:12 264:10 265:1 267:6 291:11 292:3 309:20

**breached**  224:16,23

**break**  9:11 14:20 41:1 51:1 78:3 145:11 150:2,6 159:24 160:22 285:5 302:12,18, 21

**breakdown**  11:21 134:17

**breaking**  78:5

**Bresland**  37:3

**briefly**  226:5 254:14 289:16 292:10

**bring**  81:22 83:21 129:2 303:10

**brings**  13:14 19:24 20:25 22:20 27:15 45:7 46:16 56:1 57:17 80:12 87:6 118:18 128:20 129:10 133:4 155:24 161:16 309:22

**broad**  14:19 35:13 173:14

**broader**  49:3 179:3 293:25 294:2

**broken**  136:7

**broker**  12:15,22 13:1,2,3,8,10 17:12 19:3 24:17 35:16,18 72:1 73:21,25

**brokerage**  33:16,20

**brokers**  12:18 24:15 33:16

**brought**  41:6 63:23 230:11

**Brown**  121:8 128:8 170:2 171:25 172:7, 18,21,23 173:6,11,24 175:10 187:18 188:3 192:1,5,6,21,23,24 193:1,5,12 194:4,7 195:2,11,17 196:21 197:3 200:8 201:6 282:24 284:5 290:14

**Brown's**  196:10

**Bryan**  8:5,16 9:17,18

**bubbling**  27:12

**bucket**  154:20

**build**  21:10

**building**  265:19 294:7 296:3,9

**built**  41:25

**bullet**  236:13 238:17 243:4,10

**burden**  223:25

**Bureau**  193:9

**burner**  27:6

**business**  30:22 38:22 39:13 44:13 45:5 46:6 62:16 64:6 66:16 69:4 90:13,15 91:10,14 123:1 141:23 154:25 165:12 189:14 202:1 215:16,17 227:7 303:1 310:1

**businesses**  62:5

---

## C

**cagey**  36:5

**calendar**  27:18 84:20

**calendar-year**  153:15

**call**  84:3 172:2 185:14 276:25 310:12

**called**  43:13 49:21 93:11 113:25 139:6 299:6 311:17

**calling**  127:13 223:6

**calls**  310:5

**capacity**  12:3 32:4 56:12 96:3 196:21 213:24 258:4

**captions**  185:16 257:20 277:1 278:6,7,9, 21

**car**  62:11

**carbon**  160:14

**care**  12:21

**career**  24:23 47:9 50:17 58:9 59:6 64:12 311:15

**Caribbean**  55:10

**Carolina**  9:2,22 10:1,6 11:24,25 14:25 15:15,19,21 16:2,5,8,11,17 23:23 34:6 38:6 39:24 41:7 43:6,9,18 49:8,25 50:12

54:5,7 55:4,7 56:15,17,20 57:8 63:17,20 64:6,21 65:14,23 73:1 125:4 138:14 139:5,25 140:9 176:25 177:10,23 178:19 180:7,9,12 190:2 193:9 213:19 218:15,22 222:11 223:25 224:2,8 258:21,23 259:5,10 299:7,13,15,16 300:11,15

**carrier** 18:3,16,19 36:13 39:17 40:23 41:5 47:8 48:4,13,19 52:1 53:17 58:13 59:8 60:6 64:11,20,24 65:3 73:20,24 75:1 77:4 79:13 94:6 105:23 106:4,6,11,20 123:3 124:10,13,14,16,19 131:4,9 132:1 139:7,22 140:2,10 179:25 180:16 190:4 206:12,13 214:2 228:9 229:13,19 250:25 258:11 303:18 304:17 307:4,5,12 308:5,7,13,24 309:6,10,14 310:4,5 311:11

**carriers** 13:22 39:9 59:4 92:13,16 106:15 137:6 258:7

**case** 8:6,25 11:15 12:6 14:9 17:3,9,13,15,16,19 18:23 19:5,7,10,24 20:19,25 21:5,12,15 22:7,19,20,22 23:17 24:10,23 27:15,24 28:4,18 29:8 36:7 45:7 46:12 47:5 49:18,19,21 50:2 51:5,7,20 53:11 54:8,11 55:18 57:17,25 69:6 70:7 71:4,21,25 73:7,12,18 74:3,7,10,25 75:8,11,15,19,23 76:13,20,25 77:4,11,15,17,20,22,23 78:22,23 79:4 80:12,23 81:18 82:10 83:22 84:3,9,13 85:1,2,14 86:15 89:4 91:5,15 92:7,15 94:20,22 98:16 100:13,22 101:18 102:13 104:3 105:2,11,20 106:25 107:16,25 108:8,11 109:3,7,23 110:6,10 111:14 112:8 113:19,25 114:16 115:23 116:18 117:9 123:20,21 124:13,17,23 128:4,20,21,25 129:1,10 130:3,7 131:18 132:5,6,12,14 133:21,22 134:22 135:17 137:10 139:16,17,21 140:22 141:3 143:18 145:19 146:23 147:1,7 148:5,6,14,19 149:4,12,24 151:4 152:4,7,15 155:25 157:25 159:14 160:17 163:20 164:4 165:3 167:12 171:6 172:6 173:16 175:23 178:24 180:3,5,8,11 181:8 182:7,13,20,23 183:22 184:24 185:22 187:20,22 188:5 189:7,17 193:11,15,19 196:4 198:20 199:17 200:3 201:12 204:22 206:1 207:3 208:11,14,19,23 210:5,20 212:4 213:2,8,11,13,22 214:16,17 215:14 216:1,5 217:12 219:23 220:10,15,17 221:20 226:8 228:8 229:14,17,25 230:4 234:10,18,23 235:17 236:4 243:1 244:12,19 245:7,10 246:12 247:16,22 249:16,23 250:17,24 252:5 255:5 256:18 257:1 260:21 267:8 272:2,17 273:2 275:1,6 276:2 280:10 282:12,19 284:11,12

285:21 286:2,3 287:7 291:17 293:7 294:13,16 295:7 296:23 297:9,22 298:16 300:16,17 301:13 303:8 304:5,24 306:23 307:17,18 309:23 310:3,15 311:17 312:8

**cases** 12:18 13:16,25 14:10,13 21:19 22:2 23:6,12,13 26:18,25 27:5,10,11 71:14,15,19 72:8 76:15 114:3 137:2 140:7 180:4,5 258:3 298:2 311:3

**casework** 26:23

**cash** 63:25

**Casualty** 8:7,12

**catalog** 171:23

**catch-all** 124:3

**categories** 23:14

**category** 305:24

**causation** 57:11

**caused** 67:18 199:10

**causing** 103:14

**certificates** 31:12

**certifications** 31:15

**certified** 22:11,14 67:7 68:12 81:18,25 213:20

**cetera** 186:10

**CGL** 61:8 67:7,16 68:2,6,18,24 69:4 70:13,20,24 71:2 106:1,4,6 154:12,14,15 206:13 296:19 297:2 308:10

**chair** 213:25 214:1

**challenged** 79:24

**chance** 10:23 11:6 15:8 20:4,14 102:2 127:20 128:3 148:16 163:12 165:1 211:9,21 254:3 271:22,24 273:25 274:1,2,9 303:8

**change** 132:2,22 133:4,6,14 164:9,12 197:24 198:3 200:25 221:8 252:9 258:12 284:20

**changed** 17:14 42:7,9 62:16 123:19 163:18,25 164:7 187:1,9 197:22 198:19 199:18 200:11 201:7

**Chapel** 10:4 30:19 31:1 34:7 38:3,9,13,19,25 39:6

**characterize** 226:21

**characterized** 24:16

**Charlotte** 23:24 72:2

**charters** 31:12

**Chatham** 9:23

**check** 129:6

**checklist** 182:6

**chose** 296:2

**Christmas** 172:17,19

**chronological** 151:2

**chronologically** 81:1 168:24

**chronologize** 171:23

**chronology** 151:25 152:21 165:23 169:23 170:22

**Chubb's** 44:13

**circuit** 148:13 232:11,12,19 233:7,24 234:1,21 239:16,21,23 240:8 241:9 264:17,21 293:5

**Circuit's** 232:25

**circumstances** 105:22 219:6

**citation** 138:12,13

**cite** 59:5 230:24 253:15

**cited** 238:25 294:24

**cites** 253:14

**citing** 250:22

**City** 79:9

**claim** 14:4,5 17:10 22:14,24 24:11 32:23 36:9,10,11,12,21 37:23,24 39:19 47:1,5 52:1,3 56:1 58:11,14 59:20,21 60:9,19 61:1 64:10 65:22 76:18 77:2,6,8,9,13 79:7 85:19,24,25 87:5 92:25 94:9 95:12 96:9 97:16,17,20 99:20 102:20 106:10,15 108:6 111:14,20,24 112:2,10 113:21 122:8,25 123:6,10 132:13 135:20 143:22 144:1 151:25 154:5 155:24 156:18 157:1,10 158:19 159:20 160:11,23 161:5,15,16,17,20 162:3,6,9,19,22 163:1,19 164:6 166:15 167:17 169:17,19,24,25 170:8,17 171:7 174:15 181:21 182:5,21 183:7,8 184:14,25 185:4,16,24 186:4,5,9 197:25 205:16,18 206:15 212:23 217:15 220:5 227:17,22 228:8 230:19 232:15 248:20 250:8 257:12,24 261:16,20,24 262:4,14 263:16 264:8,9,11,15 267:23 268:23 270:11 271:1 276:10,19,22,23 277:23 278:20 279:5,14,17,19 280:20 285:23

286:13 287:19 292:3,7,13 293:6 297:23 298:7,9,16,19 303:20,25 304:4,20 309:19 310:18,22 311:9

**claimant** 52:20 120:3 161:18 220:14

**claimants** 13:8

**claims** 14:11,15,18 21:24 22:15 23:8 24:14,16,24 32:14,15,17,18 33:4,8 34:2, 4,18 35:1,5,8,23 36:20 37:15 38:2,12,14 42:25 43:7 46:25 47:12 48:7,12,15 52:6 58:13 59:3,7,8,19 60:1,7,9,17,18,19,23, 24 61:3,9,14,17,18 62:19,23,24 63:6,7 64:10,19,22 65:3,21 66:5 67:23 68:6 69:25 76:17 77:2,12,16,17 78:20 79:6 87:16 92:14 105:25 106:8 114:9 118:19 120:1 132:15 136:6,12 137:7,14 138:7,9, 10,16,19 139:4,23 140:11 143:4,6,10,11, 13 144:17 146:1 154:1,7 159:1 161:2,3 162:24 164:20,22 167:2,8,15,19 168:18 169:12 170:7 171:11 174:20 175:1 176:3 177:22 178:6 179:9 183:6,12,13,16,20 184:4 185:11 191:6,7,8 194:1,18 195:10 199:13 212:5 215:22,25 216:1,23 217:11, 16 218:17 231:14,19 232:7 235:13 240:17 241:2,3 244:14 246:1,9,10 251:6 252:7 256:9,13 260:8,10,19,21 261:10,15 262:16,25 267:3 268:12 269:8,13 277:24 278:16 287:1,7,12 291:8 293:13 301:8 304:25 305:3 307:24 308:23,24 309:15 311:6

**claims-made** 154:14,15 190:11

**clarification** 124:12

**clarify** 93:14 163:7 180:24

**clarity** 19:9 58:8

**class** 62:24 65:11,12

**classroom** 42:19 65:4

**clause** 222:22 223:7,11

**clean** 14:2 48:8

**clear** 17:20 22:13 45:4 65:18 73:16 93:25 129:16 156:7 228:1,6 230:15 267:17 307:25

**CLES** 41:10

**clicking** 16:6

**client** 18:24 19:6,7 21:18 74:1 100:4,8 114:7 178:12,18 213:22 216:11

**client's** 100:16

**clients** 19:10 172:5

**clock** 197:19

**close** 79:3 172:19 247:19

**closes** 210:23

**clue** 196:2

**code** 299:13 300:3

**collect** 106:11,23 114:11

**college** 10:5,13

**coloration** 294:8

**combination** 20:22 29:21 100:20

**comfort** 82:3

**comfortable** 9:14 104:18,19

**comment** 45:25 68:5 104:7 263:8

**comments** 45:18

**commercial** 38:10 39:8 44:8,18,19,20 59:9,21 60:6,8,18 61:2,16 63:7 64:2,10, 21 65:22 66:5,15 67:21 68:8,10 69:24 91:22 105:24 108:6 131:19 137:6 153:11, 23 165:11

**commercially-acceptable** 201:24 202:3,4 203:14 204:9

**commission** 34:25 251:18

**commissions** 43:20

**committed** 89:17 90:19,20

**committee** 193:7

**common** 114:5

**commonly** 292:25

**communicate** 47:7 58:16 185:25 311:25

**communicated** 183:21 186:13 188:8 199:19,24 201:3 202:23 237:16 304:2,3

**communication** 19:20 100:24 159:18 160:9,10 169:14 176:16 186:17,19 195:9

**communications** 19:23 21:8 100:19 152:13 158:21 159:5 164:23 166:13 169:2,8 171:7 173:23 174:14 175:9 194:2,24 206:20 208:5 246:21 247:5,7,13 248:23 256:7 267:12,14 307:4

**comp** 35:2 63:22 64:1

**companies** 38:11 40:9 42:15 48:9 222:6,12

**company** 8:7,12 9:4 12:16 14:13 51:17 52:19 53:19 60:24,25 61:13,22 63:11,20, 24 64:4 65:10 75:3 79:14 92:3 101:13 206:4 251:25 304:3

**company's** 122:7

**comparable** 63:4

**compare** 22:8 49:9 50:6 97:17 216:24 257:18

**compares** 49:6

**comparing** 97:20 117:7 215:22 216:17 223:1

**compensation** 99:16

**competency** 192:1

**competent** 193:12

**complaint** 22:8 49:9 52:6 87:1,2,19 105:10 106:24 108:8 114:12,15,22 115:5, 6,7 118:6,19 119:2,8 128:15,19,21 129:1, 9 130:2,6,13,19 133:23 215:22 216:17,24 223:2 229:12 237:2 256:17 279:9 289:18, 22 290:7

**complaints** 110:23 256:21

**complete** 90:9 104:9 204:19 221:6 277:5

**completeness** 273:20

**complex** 43:7

**complexity** 186:9

**complied** 179:8 250:9

**compliment** 192:15

**comply** 201:24 251:12

**complying** 176:25

**comprehensive** 92:12 93:6 246:13

**comprised** 40:15

**computer** 59:3 84:23 108:22 109:20 129:21 130:10 142:24

**concept** 54:3 179:23

**concern** 190:19 218:12 221:2 227:6 250:2 263:15

**concerned** 67:21 119:13 149:16

**concerns** 53:15 189:9 194:3 195:1 227:11 250:1 279:24

**conclude** 265:18

**concluded**  233:7 302:21

**concludes**  245:17

**concluding**  122:9

**conclusion**  179:17 230:3,14 232:14,19 233:11 250:18 253:6 261:14 267:19 301:6 302:19 312:4

**conclusions**  88:15 235:11 267:21

**conclusive**  225:18

**conclusory**  254:17

**conditions**  190:10 223:15,16 267:25 268:13,24 281:4,10,16

**conduct**  209:5 212:18 213:7,12 214:11 252:4 276:12 307:13

**conducted**  232:15 276:8 301:21

**conducting**  110:9

**conference**  212:3,19

**conferences**  213:17

**conferencing**  277:23

**confine**  94:16,19

**confined**  95:5,19 141:23 142:4

**confirm**  78:18 98:3 131:23 156:24 221:24

**confirming**  23:4

**conflicts**  129:6

**confused**  114:3 159:10

**confusing**  54:23

**congratulations**  97:1

**connection**  19:24 20:17 57:16 257:23 289:4,10 298:5

**consideration**  167:4 179:4 206:23 279:18

**considerations**  219:15

**considered**  105:10 107:21 108:5 109:13 117:2 125:11,23 134:1,20 137:18 148:18 149:23 151:23 158:13 164:25 165:1 182:12 255:19,23

**consist**  22:4 34:15 299:10

**consistent**  36:16 46:17 137:25 138:2 152:25 167:21 168:3 221:1 232:16 233:18 263:22

**consolidated**  119:9

**CONSOR**  199:3,4

**constitute**  16:16 25:24 133:6 209:18 218:14

**constitutes**  15:20 299:2 306:17

**constraints**  110:22

**construction**  67:11,16,24 75:9,16 77:7 222:20

**construe**  222:6,7

**construed**  97:12

**consult**  21:7

**consulted**  21:9 59:4

**consulting**  71:22 298:5,25

**contact**  19:18 102:13 159:17,18 173:11 176:5,13,21

**contacted**  172:1 194:10

**contacts**  172:6

**contained**  103:4 104:18 151:19 211:22 215:7 226:4 231:15 254:16 288:20 299:21

**contemplates**  93:18

**contemporaneous**  93:17

**contend**  200:20 222:18 251:22 256:5,15

**contention**  199:17 249:10 255:2

**contentions**  140:4

**contents**  41:19

**context**  51:4 52:18 95:10 101:13 130:25 153:23 155:8 166:6 309:21

**continually**  85:4

**continue**  43:23 119:18 150:21 292:6

**continued**  133:12 144:10 187:21 202:2 237:6 253:11 264:7,9 284:4

**continues**  151:17

**continuing**  85:16 144:13 155:11 187:2 206:19 236:14 301:20

**continuously**  31:4,17,21 235:18

**contract**  16:21,22 17:23 18:2,15 64:24 87:18,22 88:3,21,22 91:7 93:23 98:5,11, 14,22,25 99:5,11 138:10 189:25 216:5,9, 21 219:5 224:16,23 225:24 232:3 261:12

264:10 265:1,7,15,17 266:3,20 267:6 291:11 292:2,3 299:22 300:4,5,22 301:5 309:20

**contractor**  48:11

**contractors**  62:4

**contracts**  29:10

**contractual**  265:23 266:3,11,13 267:6 269:5

**contradict**  104:14

**contradictory**  262:10

**contrary**  280:8 304:5

**contrasting**  218:11 251:17

**control**  64:15

**conversation**  100:23 261:1

**conversations**  159:11

**conversely**  32:9

**conveyed**  249:19 251:9

**copied**  160:14

**copies**  105:6 114:22 119:14 126:6,23,25 128:12 146:4

**Copperpoint**  63:11,19 64:1

**copy**  22:11,14 68:14 105:12 106:24 107:6,12 113:10 116:17 125:25 126:4,15 128:17,19,21 129:1 130:18 146:12,18 147:13 148:12 187:13,14 245:15

**copying**  265:18,21

**copyright**  67:24

**core**  18:14

**corners**  49:9,10 215:23 224:4

**corporate**  249:22 250:24

**corporation**  43:5,6,16

**corporation's**  251:4

**corporations**  43:4

**correct**  11:9 12:8 13:5 15:12,13,17 17:1, 6 18:4,8,17,21 19:22 20:1 37:6 40:18 45:23 46:14 48:14,16,17,21,22 52:22 58:18,21 60:12 64:25 66:25 71:13,24 76:12 81:16 82:20 84:5 96:4,5,11 97:13 98:13,16,17 99:6,8,12 102:14 103:8,9,25 104:4 105:9 106:9,13,22 108:12 114:14 117:3,10 119:24 121:3 123:14 125:17

133:24 140:17,18 145:3,5,14 146:24 147:8,12 148:1,23 153:9 155:1,2 156:19 157:5 161:6 162:10,17 163:11 166:4,7 168:5,14,15 179:17 181:6,18,23 182:9 186:15,18 191:17 193:6,16 203:7,12 207:7 209:15 212:15 214:7 215:12 216:7 217:14,22 219:9 223:18 227:4,8 230:21, 25 231:9,20 233:3,20 237:9 240:1 245:16 246:16 248:25 252:15,23 258:2 261:21 262:5 278:1 281:17 283:4 284:6 286:13 287:23 292:20,22 295:1 300:19 304:8,22 305:1,8,19 307:22 309:1,4,7,8,11,12 311:13,18

**correspondence** 121:7,19 125:22 127:9,17 128:7 134:3 161:22 171:7 248:23 303:24 306:24

**COSAR** 199:2

**cost** 224:25

**costs** 225:1 238:11,22 239:12,13 240:3 243:7 244:1 248:6,14 255:17 280:6,22 283:8 290:20

**couched** 172:16

**could've** 198:7 228:22,23

**coulda** 173:21

**could've** 134:10

**council** 42:16

**counsel** 8:9 21:8,10 37:25 47:16 54:14 62:2,20 96:13 112:13 118:18 122:16 126:6 128:8 133:11,12 152:3,13 155:17 158:23 159:6 160:17 163:13 168:22 171:12,13,18 172:12 173:7,13 175:7 176:6 181:11,22 183:25 184:12 188:3,20, 22 189:1,6 190:14 191:24 193:8,18,25 194:12,14,22 195:3,16,21 196:22 198:22 200:9 201:10 203:6 206:22 238:5,6 251:8 253:21 258:11 263:21 271:21 279:24 282:2,3,5 283:19,21 308:1

**Counselors** 67:8 68:12

**count** 12:12

**counter-claim** 195:20

**counterclaim** 46:20 87:8 107:6 108:7, 20 110:5,15 111:2,10,24 112:11 113:22 114:1,12,23 115:5 116:5,8,17,25 117:13 118:7 119:6,11 120:17,25 136:5 149:18 153:4 157:8,15 158:12 185:12 205:14 207:22 209:19 215:14 219:13 224:17,19 225:23 228:9,10 229:12 256:17,19 257:1,

17,20 266:6 268:6 277:3 278:6 289:2 291:9,20,22 292:1,2 293:14,15,25 305:24

**counterclaims** 92:6 107:16 110:23 112:11,13,17,25 132:15 136:13 155:14, 16 175:18 191:5 192:2,3 227:23 230:11 231:3,4 244:15 245:25 260:6 266:22 282:14 288:9,15 292:4 293:21 295:23 296:8 302:24 307:19 312:3

**counteroffer** 242:2,3

**counts** 185:16,19 307:9

**County** 9:24 259:14

**couple** 97:23 240:17 285:19

**courses** 41:16

**court** 8:9 11:21 72:11 73:1 74:13 75:20 78:21 79:5,9,21 80:1 98:15 99:4 105:16 112:22 124:25 131:12 132:3 140:3 147:14,15,24 148:8,9,13 149:10,11 179:13 193:2,3 198:4,15 203:21 204:22 206:4 210:7,9,25 211:2 218:16 219:25 225:8,14,18,20,25 233:12 234:2,7,8,12 240:9 264:17,21 293:5 300:17

**court's** 204:1

**courts** 11:24 140:16

**court's** 225:11

**cover** 21:21

**coverage** 9:2 13:13,17 14:1,9 18:7 22:4 23:3,4 24:12 28:4 32:21 38:21 44:21 47:14 50:23 51:2,3,8 53:16 54:14 56:6, 13,19 57:4,6,14,23 58:17 60:7 61:9 67:7 68:2,11,25 69:5,23 73:4 74:23 75:18 76:11 84:10 91:22 93:19 115:3,14 122:16 131:14,20,22 132:22,25 133:1,4,7,15,18, 22 140:4 141:11 143:14,19 144:1,6 153:10,11,12,24 155:9 158:2,12 162:2,3 163:18 164:6,9,11,13 165:18,19 166:24 167:17 168:19,21 169:3 176:6 177:6 182:6 183:17,24,25 184:4,7,9,18,19 185:3,5,7,17,19,25 188:25 198:11,19,22 199:18,21 200:6,11,17 201:2 202:2,6,10, 17,23 203:11 204:24 208:11,14,23 210:5 212:3 213:7,13 214:16 217:20 219:23 222:7,8,23,25 223:13 227:9,10 228:13,20 229:1,2 234:7,23 235:15,24 237:5,15,18 241:4 249:19 250:1,2,20 251:7,8,25 252:10,11,22 253:9,13,15 254:23 255:8,9 256:1,10 257:13 260:11 262:1,3,9,12 263:3,8,13,15,17,20 264:11 266:16,19 269:3,6 270:1,17 271:4 276:11 277:7,19

278:1 279:19 280:6 281:20,21 286:23 288:2,9 289:3,18 290:2,7,16,21 292:24 297:19,23 298:8,17 301:6 303:2,10 304:8,16 308:9 309:11 310:6 311:12 312:1,12,23

**coverages** 91:21

**covered** 14:4,5,6 70:10 184:14 219:14 221:19 224:18 262:19 263:1 274:24 275:5 276:1 282:5 283:13 284:10 290:15

**covering** 168:13

**covers** 168:12

**COVID** 27:2 63:12 65:5 78:24 122:24 123:1

**coy** 216:18

**CPCU** 31:15 60:1

**CQR** 168:11 183:12,13 232:8 252:9 262:1,10 268:10,15,20 279:13

**create** 21:11 300:7

**created** 80:14

**credit** 65:13

**critical** 22:18 23:1 77:12,16 96:2 108:15 154:20 196:4

**critique** 276:22

**cross** 273:11,14

**cross-claim** 287:16

**crossed** 13:20

**culminated** 196:9

**curious** 119:12 273:6

**current** 9:20 16:15 26:5 71:7,8,9,12 298:5

**curriculum** 25:18

**custom** 75:16 213:14 222:18 232:16 251:13,24 276:13 280:8

**customs** 177:1 179:19 222:11 250:9

**cut** 81:14 195:24

**CV** 23:21 25:20 26:1,5,10 29:22 30:11, 15 31:8,16 33:12 36:19 66:10 69:13 71:5 72:10 76:16 78:15 97:4 299:5

## D

**D.C.** 34:12

**Dakota** 55:4

**damage** 24:21 67:18 86:24 185:18

**damaged** 203:19 237:19 238:1

**damages** 14:21 15:5 86:21 140:5 154:20 203:22 204:2 206:9,10 220:19 238:2 285:21,24 286:1,5,6

**dance** 93:13

**dancing** 93:10

**Daniel** 72:19,25 73:11 75:14 76:20,21, 25 77:11,19 78:22 79:4 100:13

**Dare** 259:14

**date** 8:4 23:4 27:13 28:14,22,25 84:17 86:11,16,19,20,23 87:5,6,10,11,15,17,21 88:2 89:2 91:9,12,14,17,18,19 93:1,2 96:1 110:4 111:1 112:5 142:11 155:21 157:3 168:22 169:6 173:14 188:11 196:12 209:7 214:9 228:22 230:16,24 241:20 296:18

**dated** 121:21 125:14 126:10 202:22

**dates** 86:23 87:5 88:6 89:2 142:12 170:24,25 171:2,10 174:23 175:2 178:25 229:7 296:16

**Dave** 8:11,24 196:17 211:10

**David** 121:7 146:15 170:2 173:24 175:10 187:18 192:1 194:4,7 195:17 196:21 197:3,11 218:23 244:3,4 272:1 282:24 284:5

**day** 187:3 190:18 193:9 198:1 216:25 218:18 253:20 275:22 286:18 287:5 302:7 305:12

**days** 96:25 110:18 190:18 282:18

**de** 308:17

**dealing** 29:9 82:4 206:8 307:12

**deals** 238:21

**dealt** 192:5 294:4

**debate** 156:5

**Debisschop** 46:5

**dec** 147:18 149:3 197:23 198:3,6

**December** 134:2 173:4,17 206:23 241:15 248:24 309:23 311:8

**decide** 239:24

**decided** 124:17 219:24 240:4

**deciding** 163:19

**decision** 36:22 37:17 168:18 176:22 182:22 183:21 184:5,11 185:25 186:1 188:8 210:9 235:23 241:8 252:17,18,25 253:3 257:5 269:13 276:15,22 298:14

**decision-making** 182:14,16

**decisions** 48:20 124:19 280:10 309:11

**declarations** 82:18

**declaratory** 109:12 128:16 130:19,21, 24 131:5,18,25 132:16 133:14 137:24 140:1 142:2 147:14 148:6,14 237:2

**declination** 162:2

**defamation** 23:13,15 309:25

**default** 111:18 205:25

**defaulted** 112:17 205:14

**defect** 77:7

**defective** 67:10,15,24

**defend** 37:24 38:2 48:20,24 49:2,5,7 50:1 51:3,22 52:1,8 86:22 92:14 106:5 121:8 124:17 132:4,18 136:16 138:5 141:8,19 147:19,25 163:19 183:22 184:12 189:16 190:4 200:3 205:16 209:25 210:8 211:1,3 216:13 217:20 219:22 221:3 225:5,15,22 226:1 230:10, 11,19,22,23 231:2 233:8,25 235:12,25 239:24 240:4 252:13 253:1,11 264:16 288:14 289:6 298:15

**defendant** 8:14 9:5 245:7

**defended** 192:2 193:14 235:17 250:16 255:5 267:8 282:23 304:5

**defending** 37:23 136:13 253:4,5 280:20

**defense** 13:9 36:15,23 37:18,25 38:16 43:1 46:21 47:8,16 51:9,16 58:15 86:1 108:6 112:10 124:7,14,20,25 125:1 128:8 132:9,11 133:11,12 136:5,17,23 143:14, 18,25 162:7 163:1,3 164:3,8,11 171:12, 13,17 173:7 175:17 177:4,7 179:2 180:16,21 181:3,10,22 184:1,12 186:2,22 187:6,13,14,18,19 188:3,20 190:5 191:24 193:18 195:3,20 196:21 197:14 198:10,

14,22 200:9,16,21 201:10 203:6 206:1,15 207:21 209:19 224:17,25 225:1 227:23 229:13 237:6 238:5,10,22 239:12 240:3 243:7 245:1,24 248:14 251:8 252:20 253:8,21 254:23 255:4,13,15,17 257:5,24 258:7,11 263:21,22 272:25 279:24 280:6, 21 282:2,3,5,10,13 283:7 290:4,9,12,14, 20 297:24 305:4 312:13,18

**defensive** 244:14 246:10

**defer** 236:16 238:7,12 276:7 280:25

**deference** 150:6

**define** 16:19 49:4 98:2

**defined** 98:6

**definition** 17:21,22 49:1,7 82:13 98:8 231:15,23

**definitive** 174:7

**definitively** 124:17 177:6 180:20 233:24 239:24

**degree** 10:12,14,15 158:15 169:16 170:4 173:23 194:24 220:4

**delay** 174:6 176:1,14 180:5 237:1 280:4, 5

**delayed** 175:19 177:4

**delineate** 158:6 178:9 245:23

**delineation** 125:13

**delivery** 42:20

**demand** 134:1

**demanded** 242:6

**demonstrated** 267:2

**denial** 162:3 185:3 252:21 269:6 270:17 289:5,11 290:16,21 303:1,5 304:16

**denied** 162:9,19,22 177:6 180:20 183:24 255:8,9,11 256:1 261:15 262:3 304:25 305:2,3

**denies** 288:8,18,20

**deny** 162:9 183:17 184:8,19 185:7 198:21 251:7 261:19 262:13 263:16 270:2 277:1 288:1 303:13 304:20

**denying** 163:19 183:7 237:1 252:11 261:24 271:1 289:3,6 303:17,19,25 304:4,7

**department** 218:25

**departments** 32:15

**depended** 39:4

**dependent** 99:16

**depends** 21:18 82:9 124:22 180:3 229:14

**deponent** 8:10

**deposed** 9:6 112:4 113:9 145:19,21,24 146:8,16 274:14,17

**deposition** 8:5,25 10:24 11:7,12,18 12:6 25:5 30:18 78:14 104:11,21,24 112:4 113:11 115:19 117:12,19 137:5 146:19 150:21,25 155:12 210:6 215:5 275:21 284:18 290:25 296:15 299:20 313:4,7

**depositions** 12:2 13:21 36:4 71:20 145:13 146:2,5 229:4 230:7

**derivatively** 291:10 293:15

**derived** 183:11

**describe** 40:5 61:25 126:9 134:19 142:20

**description** 299:25

**designated** 146:14

**detail** 97:4

**detailed** 170:16 253:18

**determination** 98:20,24 99:2,5 176:17 186:12,21 198:11 211:2 263:20 278:1

**determine** 87:9,11 103:18 132:25 200:6 210:25 223:14,15

**determined** 53:1 99:21 210:7 235:24

**determines** 15:3 225:25

**determining** 54:11 276:11 297:23

**develop** 41:16

**developed** 258:19

**devoted** 218:25

**diary** 278:16

**Dickie** 24:4

**Dickinson** 8:14 19:12

**didactic** 63:1

**didn't** 109:16 204:20 207:22 277:15

**differ** 226:16

**difference** 138:24 253:20

**differences** 236:5

**differently** 234:22

**difficult** 95:9

**direct** 19:2,18,20 33:6 42:19 64:24 116:2

**directions** 19:17

**directly** 32:16,19 33:5,7 34:4,17,19 35:4 48:9 81:14 175:7 188:22 193:25 283:23 291:10 293:15

**director** 39:23 146:7

**disagree** 131:24 138:3 170:23 171:2 211:1 233:14 243:13,15 263:2 272:11 303:6

**disagreed** 234:13,15 236:9

**disagreement** 53:23 149:10 262:15 263:3,8

**disclaim** 217:20

**disclaimed** 164:6 256:1 262:3

**disclaimer** 303:1 304:16 306:12

**disclose** 250:20

**discloses** 251:25

**Disclosing** 202:6

**disclosure** 142:18 154:23 271:17

**disclosures** 155:7,8

**discovered** 87:17

**discovery** 80:21 85:16 117:12 142:8 144:12 171:6 182:15 183:5 210:17,22 229:23 230:7 242:10 259:1 275:3 284:13

**discuss** 20:4 221:24 227:14

**discussed** 164:16 176:5 183:2 202:18 215:15 238:18 283:8 308:20

**discusses** 96:21 227:16

**discussing** 193:21 233:25 277:8

**discussion** 27:23 45:12 69:8 70:18,25 94:17 184:13 203:10 206:20 211:22 233:11 238:8,9,12 250:2 252:18 253:25 265:2,5 294:17

**dismissed** 149:12 191:9

**disparagement** 309:23,25 310:1

**disparaging** 192:17

**dispense** 9:9

**dispositive** 210:20

**dispute** 14:1 22:3,22,23 23:2 24:11,19 73:3,19 74:22,23 76:11 88:4 91:17 95:3 115:4 116:13 140:4 162:8 188:19 197:11, 15

**disputes** 13:13,17 21:20 23:12 24:25 53:16 243:12

**disputing** 197:3

**disrespect** 173:20

**distinct** 136:15 216:19

**distinction** 90:7 165:20 217:9 246:6

**distinguished** 22:24

**district** 9:1 105:15 277:5

**DJ** 130:14 132:25 199:11 237:4,17

**docket** 229:24

**doctrine** 157:25

**doctrines** 155:6

**document** 10:19 25:14 26:6 85:5,6,8 88:4 102:25 103:3 105:17 107:5,24 108:5,15 111:6 112:24 113:5,7 114:15 115:17 117:17 118:11 119:14,16,19 120:8,23 121:21 138:12 142:15 143:2 144:9,11,14,18,22 145:1,4 157:2 159:24 163:9 167:8 178:2 184:15,22 208:23 212:10 243:17 244:9 248:9,10 269:21,23 278:14 288:23 293:12 299:22 312:9

**documentary** 279:10

**documentation** 10:20 152:4 165:4 204:8 257:3

**documents** 20:16 22:9,18,25 81:3 101:21 103:8,12,15,21 104:11 105:5,10 107:20 109:12,25 114:11 115:24 117:1 120:12,13 121:13,17 125:11,22 129:17 133:25 134:20 137:18 149:22 151:21 152:19 155:4 169:1 171:1 187:15 194:15 207:15 226:15,18,20 252:2,6 267:10,12 268:12 269:8,16 286:16,22 287:1,6

**doggedly** 266:25 267:5

**DOI** 41:19 65:14

**dollars** 134:17

**Dom** 46:8

**don't** 126:17,19 131:13 228:1 247:9 248:22

**dormant** 84:23

**downstairs** 150:9

**dozen** 301:22

**draft** 84:25 122:15,21,23 123:4

**drafted** 44:4 58:22 59:7,18 69:21 122:20,21 123:10 142:17 193:7

**drafting** 32:14 44:8,25 45:5,17,25 59:25 122:14 179:5

**drafts** 46:2

**draw** 61:5 88:15 180:1

**dress** 23:16,19 222:22,23 223:1,5 256:21 260:3,7,11 266:9,17 291:24 294:5 296:3,9

**driver** 62:12

**drop-down** 141:11

**Dropbox** 30:7

**due** 26:15 205:19,21

**duly** 8:16

**duplicative** 201:19

**duration** 253:21

**duties** 17:19 299:20 300:7

**duty** 48:20,24 49:1,3,4,5,6,7 50:1,4,11, 16 51:3,4,22 52:7,11,13,25 53:11 86:22 92:14 132:4,18 136:16 138:5 141:8,9,19 147:18,25 209:25 210:8 211:1,3 216:13 219:22 220:12,17,20,22 221:2 225:4,15, 22 226:1 230:10,11,18,22,23 231:2 233:8,24 235:12,25 237:1,13 239:24 240:4 258:22 264:16 288:13 289:6 298:15

## E

**E&o** 21:24 24:11,16

**E-COMMERCE** 70:2

**e-mail** 29:19,22 30:6 100:19 167:7

**e-mails** 32:20 175:2,3 270:16,23

**earlier** 30:17 95:22 137:5 155:12 156:23 198:1 228:24 287:9 311:21

**early** 86:17 135:24 143:18 185:3 228:23 263:16 280:10 297:21

**easiest** 261:3

**Eastern** 9:1

**EC** 14:14,18 139:18,20

**economic** 24:21

**Ed** 37:3

**edit** 85:4,7

**editions** 71:2

**edits** 26:21 85:5

**educating** 54:25

**education** 30:14 31:9,10,16,20 39:23 41:7 42:11 54:22,24 55:5 61:20 62:1 63:5 193:4

**effect** 46:13 90:16 93:4 96:9 141:21 162:16

**effective** 41:12

**efficiently** 9:13

**effort** 275:25

**efforts** 215:13 248:4

**eight-plus** 255:5 267:9 304:6

**Electric** 72:21 76:23

**electronic** 20:22,23 286:19

**element** 14:12

**elements** 123:20

**email** 152:6,9 188:25 194:5 283:17

**embodied** 300:3

**employee** 48:19 308:10,18

**encompass** 51:3

**end** 60:10 153:12,23 166:1 188:15 242:20 253:19 305:12

**endorsement** 82:12,16 83:5 193:7 221:7 222:21 297:5,11,15

**endorsements** 44:2 190:13 223:23

**ends** 211:16

**engage** 171:12 214:11

**engaged** 12:10 13:6,9,13 19:4 30:23 60:5 100:4 170:16 172:8 192:4 244:2 272:15

**engagement** 18:23 19:2,10 22:5 29:4

**engagements** 18:25 298:5

**engaging** 29:3

**English** 74:15,21

**ensure** 113:18

**enter** 294:7

**entered** 147:13,16,17 220:11

**entire** 92:16 95:15 163:21 218:24 279:5

**entirety** 81:8 83:9

**entitled** 152:12

**entity** 179:8

**equates** 131:20

**equitable** 211:19

**equivocal** 288:24

**essentially** 276:8

**establish** 169:23

**established** 50:9 207:6 225:13 227:6 268:2

**ethics** 16:8

**Europe** 55:10

**evaluate** 95:14 169:15 170:11

**evaluating** 169:17

**evaluation** 76:10 96:8 128:4 166:15 174:18 226:7

**event** 46:10 83:6 106:23 154:21

**events** 151:2,25 229:16

**evidence** 95:25 168:25 175:25 251:21 252:1 264:25 279:11 306:22

**evolution** 70:14

**exact** 43:12 60:13 84:17 179:13 228:22 235:5 248:1 303:9

**exam** 300:11

**examination** 8:19 229:24 285:2 301:16 311:22

**examine** 229:16

**examined** 307:13

**examiner** 60:24 251:6

**examiners** 216:24 218:17

**examining** 307:16

**examples** 12:25 55:6 268:11 269:13 270:6,9 271:7

**exception** 223:8,9 224:6 256:21 266:8, 10,12

**exceptions** 223:21

**excerpt** 83:11

**excerpts** 81:9 83:7

**excess** 14:21 35:14,16,17 70:17,19 168:2

**exchange** 29:19

**exchanged** 105:6 145:2

**exclude** 21:24 72:15 222:8 264:10

**excluded** 67:19 90:1

**excluding** 118:23

**exclusion** 89:22 90:3,8,10 123:2 149:13, 17 223:3,8,9 224:5,6 233:13,15,16 234:3, 22 236:7,10 240:5 256:22 261:12 264:15, 22 265:2,23 266:3,11,15 267:1,7 269:5 292:14,25 308:10

**exclusions** 82:14 222:22 223:20,22 235:10 264:10

**exclusive** 152:18 189:15

**excuse** 20:9 30:11 49:5 96:19 102:19 190:18 195:24 203:18 226:11 232:11 233:5 237:24 249:2 250:5,14 253:1 254:19 281:20 307:5

**executive** 33:15,25 34:15 38:9

**exercise** 15:9 17:3 30:11 82:5 83:17 215:21

**exercised** 218:13

**exercises** 309:16

**exhaustive** 71:15,21 92:15 178:4 219:13 278:25 306:5

**exhaustively** 109:8 176:12 304:11

**Exhibit** 10:19,24 11:3 20:14 25:4,5,13, 14,16 26:1 30:13 66:11 71:6 80:8,10 84:6,24 85:12,17 101:2 104:18 107:10,20 108:11,15,19 109:9 111:11 113:23 114:16,23 115:17,19 116:7,25 117:19,23 118:1,2,17 119:1,22 120:8,12,24 121:4, 15 125:8,10,14,15,20,21 126:8 127:8,10, 17,20 129:14,25 137:19,20 151:14 153:5 155:16 157:9 159:25 160:7 161:8,10

162:2 163:6,10 181:8 186:20 195:12 200:13 202:8,9,22 205:12 213:1 214:13 215:6,15 225:17 226:4,5,10 231:3 243:11,19,22 245:5,6,12 254:19 261:2 271:11,16,22 273:22,23 274:2,24 275:24 285:18 286:10 287:10 288:5,23 289:17 291:4 292:7 294:10 295:12,17 296:1 299:5 302:24

**exhibits** 163:7 226:15 274:10

**exist** 91:21 93:18,20 292:24

**existence** 157:15 158:11

**existing** 283:9

**exists** 224:11

**expect** 104:9 123:18 277:24

**expedite** 271:15

**expenses** 43:20 94:12 96:18 134:5 136:4 137:13 163:3 209:11,12,19,23 237:24 238:24 239:13 245:18

**experience** 18:10 25:23 31:24 33:13 34:3 39:5 40:24 49:12 52:14 54:22,24 57:3 58:7 89:19 96:21 97:3,7 115:6 122:12 139:24 140:6 141:7 178:16 193:13 204:10,16 228:7 260:7 296:15 303:14

**experienced** 262:15

**experiences** 178:17

**expert** 11:14 12:3 17:8 18:22 19:11 20:17 21:17 24:23 25:17 27:1 29:7 31:25 32:5,11 53:21 54:16 56:12 60:22 61:6 71:22 73:7,10 75:5,22 76:9 84:12 85:18, 23 86:10 96:3 101:11 103:10 112:20 114:8 142:17 146:14 198:25 199:17 213:11 218:12 219:6 220:17 244:4,22 245:1,2 258:4 271:17 272:2,7,15,17,19, 23 273:7 274:6 285:21,24 286:1 294:13 299:1 304:12

**expertise** 75:7,14 76:17 135:14 213:16 214:6

**experts** 134:25

**explain** 178:9 243:5 248:12,17 253:22 281:20 282:1 283:6

**explained** 85:20 236:20 253:9

**explaining** 193:22

**explicitly** 181:16

**exposed** 212:23

**exposing** 205:14

**express** 140:10 178:18 179:12 195:8 218:8 219:4 268:4 274:11 291:11

**expressed** 194:3 224:15 269:11 274:6 283:24

**expresses** 177:21

**expressing** 182:20 188:21 229:7 232:1 266:1 284:3,6

**expression** 266:20

**extend** 222:7

**extensively** 205:3

**extent** 55:24 146:2 158:8 169:16 174:14 194:1 196:18 200:14 204:4 208:5 226:15 284:19 287:9 294:13 297:2 300:23 301:5

**external** 21:4 311:10

**extra-contractual** 14:15,18,23,25 15:5 138:10 139:23 140:5

**eyes** 259:18 271:13

**F**

**face** 119:1

**facets** 123:17

**fact** 12:6 15:3 18:9 40:19 53:3 77:1 84:20 91:17 95:2 99:22 103:22 110:21 118:5 127:20 129:5 139:9,12 142:1 144:22 147:24 153:9 168:16 171:7 181:2, 9 198:14 210:19 225:25 231:11 233:25 244:11 245:21,23 250:22,25 277:17 294:22 304:17

**facto** 308:17

**factor** 182:19 204:25

**factors** 182:12 186:10 282:22

**facts** 21:16 46:16 50:6,8,9,23 52:15 53:1 123:24 124:2 149:17 249:5,9 258:17,24, 25 261:11 276:14 280:17 291:17 293:21 294:16 295:6,11 296:1 298:17 301:12

**failed** 248:12,17 276:10,12,18 279:17, 19,22

**failure** 24:12 239:17 243:5 260:9

**fair** 17:4,24 20:15 29:9 35:15 41:18 46:17 58:8 64:16 80:23 84:13 97:3 100:3

102:10,15 103:12 128:22 131:3,15 132:5, 19 133:20 139:24 141:25 153:16 154:17, 18 155:24 156:11,14 159:16 160:6 161:13 182:17 186:16,24 189:17 206:8 211:19 214:8 217:13 218:3 220:25 223:12 232:15 239:24 263:4 264:4 266:6, 24 302:10 307:21 311:4

**fairly**  280:18

**faith**  14:11 29:9 140:5 179:17 198:8 206:8 213:15

**fall**  23:14 273:18

**falls**  121:17 170:11 223:14,19

**false**  306:19,22

**familiar**  41:18 48:23 82:19 90:4 122:3 138:19,22 141:10,12 155:5 292:11

**fashion**  187:22 283:24

**Fast**  188:14

**fat**  231:18

**fatality**  308:9

**faults**  206:7

**favor**  77:17,18 220:12 232:11,13 234:9 254:22 256:6 257:10

**favorable**  100:7 184:5 196:10 252:19, 20,25

**February**  26:7,10 71:11,12 101:22 104:22 110:13,17 111:4 155:17 195:15, 25 205:21 229:22 245:13

**federal**  11:21,24 79:8 105:15 108:25 123:20 124:25 140:15 204:22 235:4,9

**Fee**  244:2 248:21

**feel**  192:8 202:21,22 219:13 249:21 250:25 269:10 285:15 305:16

**feeling**  285:11

**feels**  15:1 27:10

**fees**  28:8 134:2,5,12 135:5,20 136:4,19 137:12 191:11 198:25 199:7,9 203:21,23 204:4,5 207:19,21 209:14,18,23 211:4 237:23 238:23 239:13 241:22 242:12 244:1 245:17 246:14,23 247:15 248:6,13 288:19 289:12

**fell**  231:14,23

**felt**  286:18

**field**  268:17 270:25

**Fifty**  240:19

**fight**  178:22

**figure**  50:21 63:15 143:24 199:21 212:10

**figuring**  244:13

**file**  23:5 84:22 94:5,11 96:17 106:14,15 111:7 131:8,11 132:24 134:7,10 143:2, 14,19 146:1 153:25 154:1 159:11 160:7 161:2,4 166:16,18 171:24 172:20 173:4, 17 174:2,21 175:1,4 176:3 184:4 187:10, 13,14 189:11,12 191:8,11 194:1,18 195:10 199:7,10,13 209:1 230:5 240:17 241:2 256:9,13 268:12,23 269:8 270:8 276:24,25 277:16 279:6 286:13 287:1,7, 12 297:18 298:14

**filed**  110:13,15,16 111:3 116:18 119:8 130:2 131:6 132:16 152:25 153:6 210:20 227:23 229:21 230:6 237:2

**files**  47:25 108:22 131:3,4 247:1 287:18

**filing**  69:16,18 112:22 131:17,25 132:21 133:3,14 157:15 197:23 198:2 237:16

**filings**  229:25

**filled**  113:4

**final**  85:7 96:20 115:12 127:8 150:24 243:10 275:22,25

**finally**  75:19 186:21 253:8

**find**  36:4 117:11 147:25 157:2 158:13 182:1

**finder**  15:3 53:3 139:9,12

**finding**  120:19 147:18 162:18 184:18 225:4,7,11,14 233:13

**findings**  148:9 177:19

**finds**  53:9

**fine**  25:10 112:21 119:18 129:22 142:24 190:8 196:25 200:18 226:18 276:5

**fingers**  231:18

**finished**  247:4

**finite**  174:1

**firefighter**  30:24

**firm**  19:6,12 21:1 24:5 29:3,20,25 37:5 84:9 85:8 87:17 96:13 100:4 102:12,25 134:4,7,21 136:4 147:5,7 158:24 159:7,

18 160:16 163:14 169:2 171:8 172:24 173:12,24 175:7 187:18 188:3,23 192:1,8 193:14 194:25 195:3,17 199:1 208:4,6 216:11 244:2 246:22,23 247:7,14 248:1, 21 277:18

**firms**  29:12 33:17 40:11

**first-**  262:24

**first-party**  22:24 34:5

**flashed**  130:15

**flew**  74:12

**flip**  115:25 117:24 286:9 288:5,11,16 289:22 292:6 293:11

**floated**  257:4

**flows**  138:23

**fluent**  74:21

**focus**  42:22 210:10

**focused**  83:5

**focusing**  124:18 287:17

**folks**  18:14 41:22 54:25

**follow**  21:14 91:18 92:21,23 136:9 143:22 182:18 188:16 246:2

**follow-up**  265:12 284:17 301:17 311:20

**footer**  297:8

**footnote**  99:13,14 240:7

**footprint**  64:7

**forcing**  282:2

**forecast**  81:2

**forensic**  258:4

**forget**  43:12 123:20

**Forgive**  283:13

**forgot**  199:1 310:4

**form**  10:13,14 16:14 45:9,16,21 56:3 67:16 69:4 87:7 88:19 106:7 110:10 113:3 187:22 190:12 275:7 286:8 295:20 306:16

**formal**  16:7 155:22 160:9

**formalize**  29:6

**format**  69:12,16,17,18 151:20

**formed**  152:18

**forming** 109:2,7 113:14 146:23 148:19 149:23 152:3,7,14 176:1 242:25

**forms** 44:4,7,23 46:12 82:6,19,25 260:4 291:24 296:19

**formulated** 185:21

**formulating** 21:4 110:9

**forward** 27:8 30:2 36:24 38:3 39:21 95:19,20 155:11 183:1 188:14 260:25 288:5,11,16 292:6 293:11

**found** 92:1 137:1 234:7,18 250:13 252:10 270:14 274:19

**foundation** 210:2

**fourth** 148:13 232:11,12,19,25 233:6,7, 23 234:1,21 239:16,20,23 241:8 264:17, 21 293:5

**frame** 34:24 79:10 92:17 93:20 95:15 121:2 127:25 166:15 167:10 168:24 169:10 172:7,8 174:9 175:11 180:22 188:15 194:19 206:24 207:20 208:7,15, 16 209:3 230:1 301:22

**frames** 93:21

**frankly** 156:16

**frequently** 39:9 100:10 137:3

**Frieman** 72:24 75:19 76:9

**friends** 247:19

**froing** 172:3

**front** 10:18,20 76:2 80:9 82:25 107:25 151:11 153:6 177:15 218:21 243:19 272:12

**full** 9:16 46:16 152:12 183:5 195:8 201:19 211:11 265:6 287:5

**function** 41:15 144:3 301:7

**functions** 36:1

**funds** 35:2

## G

**gap** 78:24 308:11

**Garth** 247:13,19

**Gary** 145:13 167:16 183:6

**Gate** 9:21

**gather** 36:18 37:8 160:25 172:22

**gathering** 20:17

**gauging** 104:15 129:22 159:13

**gave** 310:14

**general** 14:17 35:9 38:23 39:7,8 44:8 54:3 57:7 59:9,10,21 60:6,8,18 61:2,16 63:7 64:2,10,22 65:22 66:5,15 67:22 68:8,11 69:24 81:23 91:22 92:25 105:24 108:6 111:1 131:19 137:6,8 138:14 153:11,24 165:11 202:1 205:1 220:3 223:16 228:9 229:10 298:8 299:13,15

**generalities** 86:9

**generally** 31:24 52:15 204:16 285:11 300:14

**generate** 22:6 109:22

**generated** 80:14 84:25 85:2 248:21

**generating** 41:19 123:7

**generic** 95:13 137:5 198:1

**gentleman** 116:12

**gentlemen** 37:3

**Gersten** 247:13,18,21

**Gibson** 145:13 167:16 183:6,19

**give** 38:5 50:25 61:5 81:1 99:10 100:5,7 279:18 282:21

**giving** 114:8 170:24 177:17 273:13,14

**glance** 265:16

**glean** 174:23

**gleaned** 207:24

**global** 212:22 240:19,20

**good** 8:21,22 29:9 78:2,5 131:16 136:17, 23 149:20 163:4 191:20 192:11 198:8,9 206:8 213:15 214:20 258:6 261:5,8 301:18 303:8

**govern** 54:1

**governing** 214:5

**governs** 108:25

**graduate** 10:7,8,12

**granted** 234:9

**gray** 263:4

**great** 18:9 44:12 220:4 282:11,20 311:16

**greater** 97:3 157:7

**Greensboro** 268:17 277:6

**Greg** 46:25 58:10 145:13 167:16 194:17 217:11 235:7 265:13 298:14 300:21 301:4 307:20 308:20 311:16

**Gross** 46:25 47:4 58:10 145:13 167:16 194:17,24 217:11,15 235:7 265:14 298:14 300:21 301:4 307:20 308:20 311:17

**Gross's** 297:18

**group** 40:13,15 46:1 63:2,6 93:2

**groups** 18:12 143:1

**guess** 33:2 34:7,12 48:3 67:6,10 76:6 141:17 198:18 239:2

**guidance** 131:2

**guide** 299:8 309:6

**guides** 41:21

**guys** 150:7

## H

**half** 12:1 201:7,12 301:22

**hand** 25:3 105:4 107:5,8 115:16,24 117:22 121:13 125:7,19 126:3,5 127:7 129:13 136:11,13 137:18 161:7 163:5,19 169:9,10 243:17 246:6 271:10 273:21 285:17 288:4 303:12 307:5,6

**handed** 159:23

**handful** 81:3

**handing** 36:14

**handle** 59:19 60:8,17,25 64:9 76:18 310:2

**handled** 32:16 38:11 39:19 44:12 51:5 77:2,13,16 80:4 86:6 92:14 169:18 174:18 184:25 279:17

**handler** 215:25 263:16

**handlers** 261:15,23

**handles** 43:17

**handling** 32:14 33:4,7 34:1,4,16,18,25 35:5 36:23 59:7,8 61:9 63:7 65:17,22 79:7 111:13 215:22 232:15 250:7 260:7 267:23

**handout** 62:25

**handouts** 69:15

**happen** 53:10 223:24 262:4

**happened** 165:24 191:7 201:5,9 252:12 263:23,25 304:23

**happy** 196:19

**hard** 63:13 78:25 136:18 212:9 252:8

**harder** 302:7

**Harrisburg** 268:18

**hasn't** 197:8

**haven't** 192:12

**Hawk** 259:10,13

**head** 296:18

**heading** 215:10

**headings** 278:12 279:13

**hear** 174:8 260:12 261:16 265:11,23 276:15,20 305:15

**heard** 49:21 124:6 250:3 272:1,5

**heated** 27:24

**heavily** 132:24 166:17 169:13 171:24 174:21 212:10 252:6 256:9 268:14 270:8

**heck** 212:11

**Hedrick** 247:10

**held** 94:18

**helpful** 197:4,10

**Herb** 33:15,18,22,25 34:3,9

**Here's** 123:23

**Hey** 29:20 114:17 194:23 219:3 272:16 310:5

**He's** 187:25

**high** 10:3,4

**higher** 149:11

**Hill** 10:4 30:19 31:1 34:7 38:4,9,13,19,25 39:6

**hire** 47:16 51:17 181:3 272:16

**hired** 48:9 99:20 187:19 188:3 203:6

**hires** 190:4

**hiring** 171:17 181:10,22 191:23 263:21

**historical** 70:14 71:1

**history** 151:2 154:3,4 196:8 236:4

**hold** 114:12

**holder** 11:15 12:11,13 19:3,5 38:1 74:1, 3 249:14 257:2 280:18

**holiday** 173:5

**holidays** 174:6

**Holland** 33:15,18,22,25 34:3,9

**Holly** 77:5

**home** 20:16 166:20,21 167:3,9,18 263:1, 14 268:17 270:17 277:13 309:9

**homeowners** 66:17

**homeowners'** 193:8

**hones** 115:7

**hope** 25:13 287:24

**hose** 81:13

**hour** 28:9 99:25 150:4

**hourly** 28:8

**hours** 28:17

**Howard** 46:5,8

**human** 251:10

**hundred** 47:10 297:24 307:23

**hyper** 154:19

**hypothetically** 210:24

**I**

**i.e.** 299:22

**IA** 65:9

**IAS** 40:16

**idea** 79:10,12 103:2

**ideally** 133:22

**identification** 10:18 11:1 25:4,7,25 30:13 66:11 80:8 107:9,19 115:17,21 117:21,23 125:8,20 129:14 137:19 153:5 161:8 163:6 188:1 226:10 243:18 271:11 273:22

**identified** 69:7 146:15 294:21

**identify** 173:10

**identifying** 170:2

**if...?".** 63:2

**IIANC** 39:25 40:3,5,23 42:4,24 43:2 114:10 298:4

**III** 234:17

**illusory** 73:5

**imagine** 56:16

**immediately** 30:21 61:21 230:12,15 302:18

**impact** 103:3

**implementation** 260:9

**implicated** 296:22 297:9

**implication** 153:16

**implied** 29:10

**impliedly** 197:22

**important** 82:2 89:3,6 107:24 108:2 110:8 111:11 113:14 115:1 169:15,22 170:4

**in-house** 48:18 58:12 62:18 66:4

**in-store** 265:21

**inappropriate** 265:22 280:7

**inception** 61:8 91:9,14 93:2

**incident** 270:14

**include** 15:5 18:23 35:8 54:25 56:17 68:23 82:12,15 98:4 109:5 138:9 253:19 265:6 295:10 306:11

**included** 38:20 114:24 166:2 286:17 287:7,8,12

**includes** 310:24

**including** 57:22 72:13 99:19 101:6 117:5 128:7 158:23 179:7 220:11 245:5 277:11 290:3

**inclusion** 88:17

**inclusive** 85:13 140:15

**incomplete** 251:2

**inconsistent** 184:15

**incorporated** 8:8 45:19

**incorporates** 239:10

**incorrect** 88:1 269:10 308:4

**incorrectly** 305:18

**incurred** 135:24 207:19 237:24

**indemn** 49:5

**indemnification** 51:10 52:17 124:18 162:7 237:13 258:16

**indemnify** 48:21 49:3,6 50:5,11,16 51:4 52:11,13,25 53:12 132:4,18 138:5 220:13,18,20,22 224:18 237:1,14 258:22

**indemnity** 86:1 124:11 220:3 288:14

**independent** 39:24 40:7,8,16 41:3,4 47:23 48:11 65:2,9 162:21 193:25 200:7 209:17 272:4

**independently** 207:15,18 273:9

**indicating** 242:11 303:25

**individual** 46:24 249:22

**individually** 36:20

**individuals** 18:13 19:21 21:7,10 33:7 145:18,23 278:11

**industry** 18:11 26:16 33:1 41:22 49:12 51:20 56:8 96:24 170:12 176:25 179:18 204:11,16 222:19 228:7 232:16 250:10 258:6 263:10 276:14 280:8

**inform** 29:19 181:3 184:23 203:5

**information** 28:21 37:8 86:11 89:3 90:12,21 94:8 96:2,12 103:23 104:2 113:18 118:22 124:4 151:19,23 152:2,6, 14 154:23 156:24 160:22,25 164:15 174:25 183:11 187:8 194:11 240:13 242:25 280:9 283:12,15 306:12 307:3

**informed** 152:5 202:16 209:1 276:15 289:25

**informs** 181:10

**infringement** 23:16,19 67:25 260:3,11 293:16 309:20

**initial** 168:12 252:7 297:18

**initially** 280:5

**initio** 155:3

**injure** 249:11,15 250:11,15,19 251:14 252:4 253:4,7

**injuries** 70:15 88:21 149:7 232:22

**injury** 23:9 24:20 37:15 59:2 67:23 68:7, 22 70:22 82:13 86:20,24 88:9,11,16 89:14 185:18,20 231:23 235:14 260:5,8

**inmate** 269:4 308:10 310:18,22 311:5

**input** 44:24 45:12 113:5 114:9 277:18

**inquiries** 219:1

**inquiry** 15:18 91:20,24,25 94:1,5 114:16 153:21 154:22 172:4 173:1 191:24 193:24 194:22 208:3 218:21 219:7 247:6 278:15 302:23

**inside** 254:16

**instance** 36:10 46:15 66:2 82:17 93:22 94:15 106:17 107:10 108:16 120:7 138:25 154:21 189:22 216:9 217:23 222:16 256:4,15 262:2 266:1 269:8 270:23 281:15 302:1 311:15

**instances** 12:10,24 36:19 51:25 52:5 61:12,19 63:4 70:9 78:19 79:2 100:3,12 103:7 106:6 123:9 139:14 256:5 262:11, 15 264:13 301:23

**instinct** 110:12,14

**instituted** 105:15 107:1

**instructed** 139:8

**instructing** 55:14

**instructors** 41:23

**insurance** 8:7,12 9:2,4 12:16,22 13:22 14:1,4,12 17:10,11 18:2,7,11,15,18 19:3 22:4 23:3 24:2 26:15 30:22 31:2,5,11 32:1,10,17 33:22 34:1 38:4,9,11,14,19, 24,25 39:6,7,8,24 40:8,9 41:2,3 42:15 43:5,17,25 44:3 45:1 47:24 48:4,8,13,19 51:17,20 52:18,19 53:17,18 54:1,12 55:1, 8,11 56:7,22 57:24 58:12 59:9,10 60:24, 25 61:13,22 63:11,19,24 64:3,20 65:10 67:8 68:12 73:3,19,21 74:23 75:1,3,17 79:13,14 81:14 82:6 85:19,24 90:5 92:2 93:11,12,16,17,18 94:2 95:12 96:23 97:19 101:13 105:23 106:4,6 112:3,5 115:3 122:7 130:25 131:4,9 132:1 137:7 156:8 160:15 178:16,17 180:16 190:2 206:4 216:9 219:5 222:5 223:8 224:16,23 250:25 251:24 258:6 259:14 267:2 276:13 279:24 280:17,19 288:9 299:7,17 300:12,15 301:8,13 303:2,18 308:23 309:6 311:11

**insurance-related** 54:20

**insure** 67:15

**insured** 12:11 18:3,15 36:12 38:24 39:2, 9,11,16 47:7,15,18 51:8,16 52:7,20 53:17 54:5,6 58:16 67:3 73:24 75:1 101:14 105:25 106:5,7,14,16,20 119:3 122:6,19 131:4 132:1 136:12,13 140:2 153:21 157:8 158:2 171:17 172:1,5 173:25 179:24 180:14 181:10 183:21 184:5 186:14 188:21 189:23 190:3 194:25 195:1 199:19 201:3 202:1,24 203:5 206:1 217:19 224:3,5,24 228:8,19,25 229:11 230:6 237:16 253:4,5 257:2,23 258:12 261:20 262:3 264:23 267:13,15 268:7 280:1 281:17 283:17,25 299:21 300:8 301:25 303:19,21 304:4,19 305:7 306:25 307:6,13

**insured's** 51:19 173:25

**insureds** 13:21 18:19 38:21

**insurer** 12:14 36:23 38:14 51:16 73:19 120:3 131:8 252:19 299:21 300:8

**insurers** 13:21

**insuring** 67:10 70:2 90:3,8,9,11,15,22 91:1 223:20 224:4 233:17

**intake** 112:6 113:7

**intellectual** 23:13 24:25 69:25 70:4 199:1 291:24

**intend** 16:24 80:19 98:11,14 219:10 237:12 274:25 275:5

**intended** 75:11

**intending** 17:12 98:10

**intends** 181:17

**intent** 249:11,15,22,24 250:11,15,19 251:14 252:3 253:3,7

**intention** 17:2 104:16,17

**intentional** 251:20,22

**interest** 15:25 113:20 249:13 254:1 273:19 280:1

**interests** 201:25 279:18

**interior** 265:20

**internal** 59:3 252:18 257:3,19 263:7 267:10,12 268:12,16 269:15 277:22

**internally** 86:7 194:6 269:9 278:11

**Internet** 69:9

**interpret** 98:11,14 131:1

**interpretation** 17:22 54:1 99:10 109:6 178:11 232:2 304:13

06-23-21        PNMCIC v Beach Mart/2:14-CV-00008-FL        COPY

**interpretations** 108:4

**interpreted** 300:21

**interpreting** 16:21 98:4 216:20 301:5

**interrogatories** 15:4

**interruption** 123:1

**interval** 136:5 174:15 185:1 209:20,24

**introduce** 8:9

**introducing** 165:22

**investigate** 55:23 276:10 298:17

**investigating** 124:11 298:7

**investigation** 50:9 53:2,5,8 265:14 267:3 276:8,12,18,23 278:20 279:12

**invoice** 135:1 136:8

**invoiced** 28:14

**invoices** 134:20,24,25 147:4,8 206:22 207:6,8,10,16,19 208:6 209:7,8,9,18 212:13 239:8 242:1 244:3,13,15 248:19, 24

**invoicing** 28:22,24 134:12,13

**invoking** 200:15

**involve** 21:20 294:14

**involved** 21:24 22:3 23:8,18 24:1 45:4 64:15 73:25 80:5 103:10 122:13 139:22 164:1 196:11 197:11 200:9 201:6 213:18, 23 244:19

**involvement** 35:20 277:12

**involving** 17:9 23:12 24:24 84:3

**IP** 309:21

**Island** 72:19,25 73:12 75:14 76:20,21,25 77:11,19 78:22 79:4 100:13

**ISO** 45:11,16 46:3 66:15 69:4 296:19 297:5

**isolated** 270:14

**issuance** 264:17

**issue** 45:7 50:15 57:14,16,25 91:15 124:18 125:3 149:6 157:13 173:2 184:2 189:5 191:23 193:22 202:17 207:3 209:16 219:23 220:2 221:2 232:13 235:5 237:18 239:24 240:4 260:18 283:20 308:9,14 310:19 311:8

**issued** 9:3 54:4,6 90:17 137:10 141:22

148:13 180:18 215:17,18 225:20 258:23

**issues** 46:9 59:14,15 70:5 83:5 87:20 165:2 172:3 203:11 226:7 253:13,16 272:20 274:7,8 277:9

**italicized** 101:4

**item** 102:19 105:9 127:8,16 229:6 286:10 288:17

**items** 31:19 86:8 109:23 166:2,5 224:1 246:6 280:12,25 283:24 286:11 292:4

**it's** 25:10 29:20 47:10 59:22 91:17 107:15 111:11 126:8 154:12 206:15 212:9 213:14 259:21 270:12 286:10,21 308:8

**I'll** 48:1 129:25 201:17 221:24 285:4

**I'm** 28:1 36:13 66:24 69:17 83:22 93:14 108:23 119:12 123:15 143:1 172:2 173:15 192:21 197:9 200:19 217:9 221:13 261:5 285:17 288:4 293:12 294:5

**I've** 63:3 70:10 211:18 226:25 275:11

---

**J**

**Ja** 157:1

**January** 91:16,23 110:18 111:4 121:9 125:25 127:19 135:24 155:17 170:2,18 171:16,22 172:9 173:1,12 174:17 181:2, 21 186:17,20 187:23 188:9,10,15 195:15 196:11 197:12 199:20,24 200:9,20 202:22 203:4,21 205:21 207:25 225:2 229:22 235:18 236:21 237:24,25 250:8, 17 253:5 264:4

**Japanese** 44:13

**Jim** 234:20 240:8

**job** 42:11 301:7

**Joe** 24:2,3,4 72:1

**Johnson** 218:23

**Joint** 43:9

**judge** 73:9,14 79:21 98:20,23 103:17 131:1,14,23 178:22 219:25 234:17,18 240:8

**judges** 235:4,9 236:9

**judgment** 109:12 128:16 130:19,21,24 131:5,18 132:1,16 133:14 137:24 140:1 142:2 147:14,16,17 148:6,14 191:13

210:21 220:11 234:9 237:3

**judicial** 236:5

**july** 9:25 121:8,21 125:16 127:19 160:3, 4 168:6 176:8 185:4 198:21 206:24 270:16,23

**jump** 151:6

**jumped** 256:20

**jumps** 61:21 204:21

**juncture** 280:10

**June** 8:4 36:10 46:19 86:2 111:21,25 112:6 113:1 127:25 135:24 155:21 156:18 157:1 158:20,22 159:7,20 169:25 174:16 176:8 181:20 186:11 188:11 203:21 205:23 225:2 227:24 229:18 230:16,24 236:21 237:24 250:8 270:23 307:20

**Junior** 9:17

**juries** 74:18

**jurisdiction** 15:16 53:25 55:15

**jurisdictions** 54:17,19,25 55:12 139:25 224:12

**jury** 15:4 53:3,9 75:25 76:3 98:15

**justification** 282:1

**justify** 243:5 248:12,18

---

**K**

**Kansas** 79:9

**kind** 21:19 22:5 31:23 36:3 46:16 53:16 56:23 58:4,23 59:18 66:9 72:15 76:13 80:9 110:25 114:8,12 120:19,24 122:25 129:6 142:11 151:1 166:8 195:7 198:13 210:6 233:21 254:17 260:5 270:13 271:15 284:2 310:17

**kinds** 140:16

**Kitty** 259:9,13

**knew** 33:21 112:5 144:2 153:17 164:17 274:17

**knowing** 65:5 250:16 255:4 282:19

**knowledge** 63:20 79:20,23 90:12,14 94:8,13 111:1 113:21 116:8 118:21 125:2 135:13 140:9 146:3 188:6 205:2 242:24 260:2

## L

**L&l** 8:8 87:14,18,24 88:5 92:7 105:11,16 107:1 111:25 112:11 113:25 116:14,18 118:7,17 119:2,8,11 120:2 132:14 137:14 157:8 161:18 162:8 165:25 191:6,15,18, 19 220:13,24 230:11 237:11 282:14 290:2 291:11 296:10

**L&l's** 107:6 110:5 224:17 261:10 294:17,24

**lack** 81:13 157:13 158:10 260:2

**lacked** 260:6

**laid** 84:23

**large** 35:1 53:22 70:4 80:25 83:20

**late** 31:6 45:18 313:2

**law** 15:2,20 16:10,17 19:6 29:12 37:5 50:12 54:8,10 55:21 100:4 157:25 176:25 177:10 178:11,19,22 179:6,10,13 180:9 181:25 192:8 218:15 219:1 222:10,19 224:1 298:22 299:2,3,11 300:12,17,24 301:9

**laws** 54:1,12 55:24 300:6

**lawsuit** 39:16 105:15 119:3 132:21 133:3 154:24 211:16 242:12 249:23

**lawsuits** 153:22

**lawyer** 16:25 51:17 103:17 178:11 205:9 218:24

**lawyers** 13:7 105:6

**lay** 112:18

**layout** 265:19

**leader** 46:5

**learn** 41:17 306:12

**learned** 304:18

**leave** 313:1

**lecture** 62:21 63:1

**lecturing** 41:21

**left** 82:24 150:22 172:17 212:22 221:19

**legal** 16:18,19,24 17:12,19,22 37:21 38:1 43:12 97:12,20 98:4,11,15,18 134:5,12 135:5,14,17 136:18 137:12 147:4 191:11 203:21,23 204:4 207:19,20 212:13 216:20 244:2 246:8 248:21 299:10,16

300:6,16,19,25 303:8 304:13

**legislature** 42:16 63:24

**length** 294:12

**lengthy** 210:6

**lesson** 193:9

**letter** 122:5 123:17 124:22 125:14,15 126:1,10 134:15 135:4,23 159:22 160:2,8 161:14 162:1,20 163:13,17,21 166:10 170:2 172:9 181:1,9 188:24 194:5 199:25 202:7,11,22 203:5 207:25 209:6 218:6 258:14 283:17 294:25 295:17 303:21 304:1,7,19 305:1,8 310:13 312:17,22

**letterhead** 134:6 247:10

**letters** 32:20 122:14 127:18,23 160:14 164:18 165:8 177:5 180:20,25 181:15 200:8 202:25 208:9 238:25 247:1 249:25 251:1 294:11,14 295:9 300:24 305:12,15, 21 306:5 311:24

**let's** 197:17

**level** 44:21 82:3 139:2 142:5 167:3,15,19 236:6 241:9 262:25 277:6,13

**levels** 141:17

**Levy** 8:11,20,24 10:17 11:3 15:24 16:15 17:7 25:3,9,11 45:14,20 51:15 56:5 66:9 72:8 78:1,5,13 87:7,11 88:23 92:11,21 93:13 94:7,14,24 95:18 107:4,12,15,18 108:2 115:16,22 117:16,22 118:14 119:16,19 125:2 126:8,10,12,14,16,18,24 127:2,5,7 128:11,15 133:20 137:4 150:1, 5,10,20 152:11 165:9,14,17 168:23 169:7 178:3,14,23 179:18 185:21 187:7 188:14 189:20 193:24 196:23,25 197:4,7,9,14, 16,21 200:18 208:22 211:12,15 214:19 215:4 217:2,8 219:10 226:17,23 232:10 234:17 238:16 242:4,24 245:4 249:2 251:11,21 254:6,13 255:25 256:4 260:24 261:6,8 275:9,13,20 279:4,10 281:14 284:15,23 286:8 287:25 288:25 289:8,14 290:10,22,24 291:18 293:2,8,23 294:3,20 295:2,20,25 296:5,11,21,24 298:11 299:19 300:9 301:1,10,17 302:15,20 311:19 312:11,15 313:1

**liability** 22:7,21,23 23:2,8 24:11 32:17 33:4,8 34:4,18 35:1,5,9,13 36:12 39:8 42:25 44:8 51:4,7,8,16 52:18 55:1,7,11 56:22 57:8 59:8,9,10,21 60:6,9,19 61:2, 17 63:7 64:2,10,22 65:22 66:5,16 67:22 68:8,11 69:24 70:18 77:10 79:7 82:6

91:22 105:24 108:7 131:20 132:5,7,12,13 137:6 144:7 153:11,24 165:11 190:1 205:15 206:13 228:9 265:23 266:3,11 267:7 290:2,12

**liable** 14:5,7

**liaison** 42:15

**libel** 310:25

**liberally** 222:6

**Liberty** 79:8,14,15

**libraries** 43:21

**licensed** 15:14 35:17

**licensing** 255:7

**life** 29:17

**lifted** 208:24

**limit** 21:19 38:12 311:4

**limitation** 290:3

**limited** 39:5 67:19 70:25 73:13,15 79:21 141:4 245:5 265:17

**limits** 14:21

**lines** 35:16,18 44:17,19 69:11 136:24 279:7

**link** 16:6 30:7 88:20

**list** 66:14 68:4 71:6,14,15,21 79:17 109:18,21,22 111:11 112:24 117:1 133:25 137:17 140:20 142:11 284:9

**listed** 31:15,20 72:2,3,9 76:15 79:17 86:8 107:5 108:22 109:8 112:24 123:20

**listen** 260:1

**lists** 139:1 223:4

**litigant** 250:24

**litigated** 103:11 128:25

**litigation** 84:10 99:17 101:13 113:24 119:7,12 120:15 137:2 146:1 165:25 177:17 198:24 213:5 282:4,11 286:23 287:6 309:21

**LLC** 118:20

**local** 167:3,8 277:6

**located** 204:13

**log** 143:4,6

**logical** 95:7

**logo** 294:5

**London** 35:1,7 308:3

**long** 9:23 67:18 77:19 84:23 97:2 157:16 185:23 191:21 192:12 197:10 218:23 219:20 229:11

**looked** 11:22 70:13 102:18 105:2 125:15 147:25 155:1 162:8 171:1 207:5 231:8 257:20 259:8 274:9 283:2 289:17 306:22 307:24

**losing** 239:15

**loss** 23:4 24:21 59:1,14,15 64:15 85:20 86:5,6,12,16,19 87:5,6,10,12,16 89:3 95:12 96:2 157:25 220:23

**losses** 35:11 224:19

**lost** 56:23,25

**lot** 18:12 27:5 36:1 100:6 108:11 130:16 143:18 172:2

**lots** 85:5 274:15

**lump** 143:1

**lunch** 150:4,6,16 159:24

**M**

**made** 15:7,18 37:17 65:11 91:25 94:5 111:25 112:11 120:2 141:3 144:5 148:9 154:7 155:8 172:4 184:8 186:12,21 188:8 190:5 206:16 207:15,18 213:6 218:21 219:7 225:7,11,14 231:7 240:16 241:7 247:6 257:5 263:14 268:5 285:23 298:20 301:23 307:17 311:21 312:8

**magazine** 89:23

**mailed** 259:9

**mailing** 259:12

**maintain** 20:16,21

**maintained** 31:21 264:14

**maintains** 259:10

**major** 68:21

**majority** 158:1

**make** 15:10 17:20 22:13 37:1,14 47:24 48:19 55:13 82:7,24 91:20,24 93:5,25 96:8 98:20,23 99:2,3,4 105:8 114:16 119:6 121:12 123:15 124:19 151:3 152:15 154:22 173:1,9 179:5 191:25

193:24 194:23 195:5 203:9 208:3 211:2 219:20 221:19 233:11 259:18 261:22 265:4 276:1,14 277:25 278:15 280:10 289:12 298:14,17 303:7 307:2

**makes** 51:10,13 154:11 168:18 259:16

**making** 36:22 61:9 136:12 138:6 155:7 170:24 176:17 252:17 278:24 279:2 303:11 306:18 309:10

**Malecki** 70:13

**malintent** 251:14

**managed** 35:23

**Management** 49:22 53:11

**manager** 167:16 183:20 263:1 283:18

**mandatory** 41:7 72:12

**Maniloff** 205:3

**manner** 36:8 45:5 77:1,12 136:19 184:25 232:15 249:12 279:17

**manual** 58:24 59:7,12,18 60:7 66:1 309:5

**manuals** 58:22

**manuscript** 44:2

**March** 126:12,13 127:9,25 178:25 188:16 234:10 273:25

**mark** 10:17 25:4 115:17

**marked** 10:25 25:6,25 30:12 66:11 71:6 80:8 107:9,19 115:20,23 117:20,23 121:14,15 125:8,20 129:14 137:19 151:14 153:4 159:25 161:8 162:2 163:5,6 200:13 215:15 226:9,15 243:18 271:11 273:22 285:18 288:5

**market** 35:7,21 45:3 61:24 63:22

**marketplace** 154:16

**Marsh** 33:16,20 34:14,18

**Mart** 8:7,14 9:4 11:15 17:16 19:7,12,15, 18,21 20:6,11 36:9 46:19 58:11 74:7 84:3,10 85:25 87:14,18,24 88:5 91:22 92:6,7 94:23 95:4 96:13 98:12 105:10,15 106:25 107:7 108:19 110:4 111:3,25 112:10,12,16 113:24 116:14,19 118:7,20 119:3 120:3 127:24 130:2 132:14,17 133:11,12 134:22 135:22 137:11,23 138:4 141:22 142:9 145:24 146:10 147:6, 7 152:3 153:10,21 154:25 155:14,15,23 156:16,17,25 157:8 158:11,20,22,23,24

159:6,19 160:2,10,17 161:14,22 162:6 163:14 165:25 166:12 169:10 171:21 172:5,11,13,24 173:12,13 175:8,19 176:2,7,8 177:18,21 179:1 181:3 186:2, 22 188:4,9,21,25 189:3,17 191:3,6,18 192:4 193:14,19,22,25 194:2,3,11 195:20 196:10 199:17 202:16,19,24 203:6,18 205:13,18,25 206:9,22 207:20 212:23 213:5 215:19 216:6,11 220:5,13,22,23 224:18 227:21,22 232:3 233:24 237:19 238:1 240:12 241:3 242:9 246:15 249:12, 14,16,20 250:5,14,15,17 252:4 253:1,7 255:10 256:7 257:7,8,12,15,17,23 259:10,13 261:20 268:7 271:21 275:1,7 276:19 280:21 281:10,17 282:2,22 283:7, 13,16 288:8,14,19 289:13 290:2 291:2 300:22 302:1 303:24 304:2,24 307:5,7 311:24

**Mart's** 108:20 112:25 156:2 157:14 189:9 191:14 232:12 239:17 243:6 248:13 267:23 268:12 271:21 286:5 290:20 291:10 293:16

**Mart's** 134:1 137:13 220:12 246:1

**Maryland** 124:24

**Mason** 247:2,6,8

**material** 196:19 230:4 286:17

**materials** 20:18,21,24 21:4 22:18 30:6 89:1 101:6,25 102:7,17,18 109:1,18 159:4 170:23 171:5 182:3 244:21 250:13 252:2 262:7 284:13 296:17

**matter** 13:25 25:13 38:23 55:4,21,22 57:20 60:3,14,23 70:10 87:12 89:20 95:9 104:10 107:7 108:3 121:8 128:25 129:5 173:9 176:21 179:14 241:4 247:16 248:1 250:4 253:10,20 273:13 276:2 277:14 280:7,16

**matters** 54:20 105:16 107:24 192:6

**Mccamey** 24:5

**Mclennan** 33:16

**meaning** 19:19 24:16 53:16 88:23 136:11 139:17 167:14 170:6 185:9 216:16 219:13 222:14 226:9

**meaningful** 260:6

**meaningfully** 243:25

**means** 52:13,19 56:6,9 124:10 159:17 237:4 258:10

**meant** 222:23 254:21

**measurable** 53:15

**measure** 52:12

**measuring** 258:22

**mechanically** 86:6

**Media** 78:11 150:18 215:2 254:11 275:18

**mediate** 213:15

**mediated** 212:2,18

**mediating** 213:16

**mediation** 196:15 212:7,25 213:12,24 214:16

**mediations** 213:7 214:5

**mediator** 213:20

**meet** 284:25

**member** 40:10

**members** 41:2 45:13 46:9 65:12 83:16 187:17 234:21

**membership** 40:8

**memorandum** 310:13

**memorialize** 29:7

**memory** 23:10 50:3 61:21 87:25 89:16 91:8 130:16 193:6 287:19,22 309:24

**Mendes** 37:3,5,10,19,24 47:19 298:4 308:2

**mental** 250:23 285:15

**mention** 234:6

**mentioned** 30:17 43:24 66:12 67:25 70:11 81:23 91:4 113:8 179:11 210:16 234:10 272:3

**mentioning** 272:4

**mentions** 266:16

**mere** 131:25 132:21 133:13

**merged** 44:15

**messages** 172:18

**met** 8:23 223:16,17

**method** 254:22

**Mexico** 55:11

**mid** 31:5

**mid-january** 282:16

**mid-november** 173:11

**middle** 121:24 261:4,9

**midway** 204:17 205:12

**military** 10:10

**million** 242:12,18

**millions** 35:11

**mimicking** 265:20

**mind** 22:15 51:19 163:25 164:7,13 204:21 273:11,14 311:7

**minds** 234:14 235:1

**minimize** 33:10 285:9

**minority** 140:6 311:2

**minutes** 64:19 174:12 272:3,13

**mis** 295:22

**misappropriating** 265:19

**misappropriation** 294:18 295:10,18, 22 296:4,10

**mischaracterize** 226:21

**misconstrue** 256:24

**misconstrued** 254:21 255:3 256:6,16 257:10

**misrepresent** 256:25 257:14,16 306:18,19

**misrepresentation** 155:3 257:6 267:1 269:14,25 270:4 291:16 306:2,17

**misrepresentations** 268:5,18,22 301:24

**misrepresented** 257:11,22 267:24 268:13,24 269:9 281:4,9,16 291:2 305:22

**misrepresenting** 280:16

**missed** 72:4

**missing** 203:9 221:7

**misspeak** 158:25 159:9 247:11

**misstate** 118:15

**misstatement** 269:14

**Misstates** 118:10 178:1 208:18

**misstating** 242:17

**mistaken** 251:23

**mistakenly** 144:20

**mitigate** 206:8,10

**Mitsui** 44:10,12 64:13

**model** 138:23

**models** 138:24

**modifies** 234:4

**modify** 258:13 284:20

**modifying** 223:23

**mold** 193:7

**moment** 52:10 90:2 113:8 150:23 239:10

**money** 52:19 63:23 191:15 205:16 220:13 241:23 305:4

**monitoring** 166:18

**monopolistic** 308:8

**Monte** 145:20

**month** 159:20 183:8 237:1

**month-period** 236:21

**months** 39:11 71:18 157:7 174:1 180:4, 5 183:25 196:2 198:23 206:2 228:10,15 229:11 239:5

**morning** 8:21,22,24 64:17 79:3 208:25 228:12 274:19 285:16 301:19

**Morrow** 116:9,12,23 118:13,20 120:10

**motions** 210:20,21

**Mount** 37:19 47:19 77:5 308:2

**move** 29:17 30:2,21 38:3 78:16 175:6 197:17 199:16 221:14,25 312:11,15

**moved** 9:25 31:1 34:11 38:6

**moving** 30:19 39:21 71:4 140:19 168:24 183:1 224:14 238:4

**multi-line** 64:3

**multiple** 54:17,19,25 55:5 121:14 132:15,18 206:2 224:12 239:11 270:12 277:7

**Mutual** 8:7,12 79:8,14 123:5

# N

**NAIC** 138:23

**named** 46:24 106:16 116:12 218:22 277:13

**names** 23:25 144:2 287:15

**narrative** 126:11

**narrowly** 222:7 227:9

**Nat** 203:18

**national** 8:6,12 9:4 36:8 42:16 46:20,21, 25 57:24 84:4 86:1 90:18,25 91:10,14,25 93:24 94:16,20,23 95:4,5 96:17 111:13, 19,23 112:6,9 113:1 119:10 125:6 127:24 130:2 132:17,23 133:5,10 135:22 137:10, 12 138:4,7 140:21 141:22 142:8 146:8,15 147:16,17 153:12 154:25 155:4,23 156:18,25 157:9,14 158:11,20,24 159:1, 6,19 160:2,9,10 165:12 166:9,11,14 167:2,20 168:18 169:2,9,16,18,24 170:1, 7,16 171:12 172:8,18,20 174:2,15 175:4, 10,18 176:3,6,7,18,19 177:2 180:18 181:2,9,17 182:21 183:7,20,22 184:25 185:24 186:11,23 187:1,8,19,20 188:4,7, 20,23 189:6,8,15 191:10 193:19 194:2,6 197:22 198:19 199:18,23 200:2,11,20 201:10,23 202:2 205:14 206:12,23 209:5 210:8,25 211:3,4 212:18,21 214:11 215:11,18 216:5,13 217:17 220:6,12,21 221:8 222:12,17 224:15,18,23 225:22 227:17,24 230:10,18 231:2,14,18,21 232:13 234:9 235:17,21 237:15 240:2,6, 11,16 241:2 242:11 243:25 246:15 248:5, 11,17 249:11,15 250:6,14,16,24 251:18 252:3,16 253:1,5,8 254:20 255:2,10,15, 18,25 256:5,16,22,24 257:7,9,11,22 259:9 260:20,22 261:13,19 262:2,8 264:7,8,14,20 266:25 267:5 268:4 269:9 272:7,17 273:6,15 274:6 276:9,12,18 277:5 278:4,12,19 279:17,22,25 280:9,18 281:3,9,16,19,25 283:5,11,16,22 284:2 286:22 288:1,8,10,13,18 289:6,11,25 290:1,8,17 291:1,8 292:21 293:6 295:5 296:2,20 298:15 301:4,23 303:24 304:3, 24 305:5,22 306:9,10,17,24 307:6 312:7, 9

**National's** 121:6 133:18 176:2 182:14 186:19 195:16 202:10 230:23 237:5 239:11 243:5 249:13 251:9 261:14 268:16 269:15 271:17 272:2 280:4,14

287:1 289:18 290:19 292:7

**nationally** 62:1 125:5

**National's** 202:23 213:7,12 250:7 260:1 286:13

**nature** 24:18 26:10 30:8 129:7 174:13 186:9 208:5 247:12,24 294:8

**necessarily** 132:2 214:6 233:16 311:14

**needed** 41:17 44:15 90:18,19

**negligence** 12:18

**Nelson** 24:2 72:1

**network** 40:12

**nice** 284:25

**non-concurrent** 70:18

**non-payment** 209:8

**non-waiver** 122:10 124:2,11 181:12 186:24 200:4 201:11 306:13

**normal** 301:7

**norms** 170:12

**North** 9:1,21 10:1,6 11:24,25 14:25 15:15,19,20 16:1,5,8,11,17 23:22 34:6 38:6 39:24 41:7 43:6,9,18 49:8,25 50:12 54:5 55:4,7 56:15,17,19 63:17,20 64:6,21 65:14,23 125:3 138:14 139:5,25 140:9 176:25 177:10,23 178:19 180:7,9,12 190:2 193:8 213:19 218:15,22 222:11 223:25 224:2,7 258:21,23 259:4,10 299:6,13,15,16 300:11,15

**note** 144:6,7 159:1 165:10 191:8 245:16

**noted** 82:11 103:7 189:8

**notes** 22:14 143:10,11,13 161:2,3 162:24 164:20,22 168:18 169:12 171:11 183:12, 13,16 212:5,21 257:19 260:25

**noteworthy** 31:10

**notice** 11:6 111:20,24 112:9,25 156:10, 17 157:1,10,14,19,24 158:4 229:8,12,20

**noticed** 63:3

**notification** 155:22 158:10

**notified** 304:19 305:7

**notifying** 303:18

**notion** 51:1 209:24 231:1

**novation** 155:3

**November** 107:7 110:16 153:7 171:13, 22 172:25 186:13 190:21,22 227:24 229:17 245:7 264:3 271:21

**number** 10:25 25:6 28:16 65:16 77:22 78:11 105:9,17 107:20 109:11 111:10 115:20 117:20 121:5,18 125:11,22 126:22,25 127:15 128:15 133:25 135:25 136:2,3 137:17,21 140:19,20 142:7 143:8 145:10,11 150:18 151:2 160:8 162:13 168:6,8 171:16 181:8 206:7 215:2 238:25 241:7,15,20 242:1,17 243:16 254:11 258:7 275:18 276:7,9,11 279:16,22 280:4 281:3,19,25 283:5,11 307:25 312:17,22

**numbers** 135:6,8 143:22,23 287:2,11

**numerous** 103:7 249:5,9

**nuts** 59:18

# O

**oath** 45:21

**object** 119:17 200:14

**objection** 15:23 16:14 17:5 45:9 51:12 56:3 66:7 72:5 87:7 88:19 92:8,18 93:7 94:3,10,21 95:16 108:1 118:10 119:5,17 124:21 133:16 136:25 152:8 165:5 168:20 169:4 178:1,13,20 179:15 185:13 187:4 188:13 189:19 193:20 208:18 216:22 217:5 219:8 226:14 232:5 234:16 238:14 241:24 242:23 244:24 249:1 251:3,16 255:22 256:2 279:1 281:11 286:8 288:25 289:8,14 290:10,22 291:18 293:2,8,23 294:3,20 295:2,20,25 296:5, 11,21,24 298:11 300:9 301:1,10 302:14 312:11,15

**objectives** 150:24

**obligate** 52:1 53:18

**obligation** 105:23 106:5 137:11 155:7 255:4 280:7 290:1,9

**obligations** 18:19 92:5 254:23 280:15, 19 299:20 300:7 312:13

**observed** 192:24 193:1 200:7

**obtain** 10:12 119:21 151:19 169:3 277:18

**obtained** 119:19 226:20

**obvious** 235:8

Case 2:14-cv-00008-FL    Document 117-8    Filed 10/15/21    Page 104 of 201

**occasion** 37:12

**occur** 88:16 191:21

**occurred** 86:24,25 88:12 149:7 212:20 297:19

**occurrence** 56:24 57:3,8 67:19 154:10 270:12

**occurs** 89:20

**October** 169:11 171:9 176:9

**offense** 56:24 57:4 89:9,16,20,25 90:18 136:17,18,24 154:9

**offer** 12:21 16:24 17:8,12,18 19:11 57:19,22,25 58:4 65:20 73:12,13 75:10, 11 76:17 77:1 79:25 80:1 85:14,23 95:11 98:11,15 99:11 101:16 135:16 139:6 140:16 141:18 151:4 175:23 185:22 189:5 193:10,17 198:14 207:2 209:4 212:17,21 213:10 217:3 220:16 232:25 236:22 237:12 238:7,12 240:3,24 241:7, 12 242:3,5 257:21 260:20 272:10 275:1,5 276:21 284:11,21

**offered** 16:9 20:6,10 50:14 74:13 78:20 79:5,13 198:23 236:19 240:12 251:8 285:21

**offering** 16:21 17:23 53:14 74:2,6 98:5 115:3 128:22 141:3,5 184:24 216:21 241:22 286:3 300:16,19

**offers** 240:17,18 241:2

**offhand** 239:1

**office** 11:11 49:16 55:16,18 62:24 166:20,21 167:3,4,9,18 171:8 172:23 263:2,14 268:17 270:18,25 277:6,13 283:18 309:9

**officer** 277:6

**offices** 35:24 42:16 62:23 259:11

**offline** 67:17

**Oftentimes** 97:16

**older** 89:22

**Oliver** 145:14

**omission** 251:18,22 305:25 306:20

**Omissions** 251:19

**omitted** 251:18 294:17 295:3

**one-third** 12:16 13:18

**ongoing** 80:21 87:20 88:9,21 182:23 210:17 232:21 290:13

**open** 85:3 150:11 263:12 275:3

**operate** 93:1 115:13

**operating** 52:24 57:23

**operative** 108:8

**opine** 179:10 249:21 256:5,15 262:7 267:5 276:2 282:25

**opined** 274:8

**opining** 230:18 273:16

**opinion** 12:21 16:22 17:23 32:21 50:25 58:6 60:17 79:12 97:12,20 98:5,12,15 99:9 100:2,7 103:15 124:16 145:7 148:13 149:3,9,15 151:9 168:19 169:3 175:22 176:1,4,9,11,14 177:19,21 179:4,12 181:19 182:20 183:19 184:3,24 185:21 186:6,11 189:4 198:2,18 199:16 201:20 202:9 203:8,13,18 204:5 207:2 209:10,22 210:2 211:22 212:17 216:21 217:3,25 218:2,5,8 222:24 224:15,20 225:3,23 227:22 228:3,6 229:7 230:23 231:10,16, 22 232:2,25 236:5,23 237:3 239:21,23 240:2,5,8 243:9 248:11,14,16 249:10,14, 18,19 250:23 251:1,7 254:25 255:2,18 257:21 264:17 266:2,7 268:4 269:11 271:8 276:20,22 278:10 281:21 282:21 284:3,7 286:3 291:15,19 293:19 300:1, 16,20,22 301:3 308:13,15 310:13 311:10

**opinions** 16:7,8 17:8,13 19:11 20:3,5,8 21:4,11,16 50:14 53:14 56:12,15 57:20, 22 58:1,4 65:20 73:12 74:2,6 75:11 76:17 77:1,12,16 79:25 81:4 84:12 85:13,18,23 94:16,19 95:5,11 99:10,11,21 101:17 103:4 104:3 109:2,7 110:1,9 113:15,19 115:3 128:22 135:16 139:6 140:10,17 141:2,5,19,22 142:4 146:23 147:1 148:19 149:23 151:3,10 152:4,7,15 159:14 165:3 166:6 178:4,18 179:7 184:11,23 187:11 193:11,17 195:8 201:17 209:5 213:11 216:10 219:4 220:17 221:1,9,14,20 222:4 225:16 226:3 227:5 237:12 243:1 246:18 250:4,6 254:16 257:4 260:20 266:20 272:10 273:13,14 274:7,10,11,16,25 275:5,25 279:12 283:22 284:10,21 294:13

**opportunity** 38:13 118:2 221:23 305:10

**opposing** 79:24 244:22

**order** 21:10,15 65:13 78:17 92:15 106:20 117:7 147:13 148:2 170:10 195:8 221:23 225:20 229:6 298:3

**ordinarily** 244:20

**ordinary** 17:11 263:9

**organization** 40:6 43:11 167:19 218:1 262:16

**organizations** 40:12

**orient** 261:4

**original** 110:5 120:25 133:3 142:13 152:24 161:4 215:13 225:22 231:4 235:13 257:1,17 266:21 268:6 305:24

**originally** 10:1 183:13 232:14 271:19

**ostensibly** 150:22

**outcome** 99:21 190:24 263:18,19,20 282:13

**outfits** 44:24

**outline** 131:22 132:25

**outlined** 14:22 59:11 150:23 204:22

**outlines** 18:18 41:19 133:5

**outlining** 122:7

**outset** 185:8 299:19

**overseen** 65:24

**oversight** 33:7 82:16

**overstate** 182:11

**overstating** 18:5 108:14

**overwhelming** 42:12

**owe** 191:18,19 211:4 255:17

**owed** 132:10 220:13

**owes** 288:18

**owned** 244:2

**owner** 141:23 154:25 227:7

**owner's** 90:13 91:10,15 165:12

**owners** 46:6 69:4

**owner's** 45:6 90:16 189:14 215:17,18

## P

**p.m.** 150:15,16,19 214:24,25 215:3 254:8,9,12 275:15,16,19 301:20 313:5,6

**pa** 36:14

**PACER** 119:17,20,21 226:20 227:1,2

**Pacific** 55:10

**package** 37:10

**pages** 25:17,25 71:5 76:16 82:24 109:8, 24 196:18 200:12 215:7,12 219:20 226:5 227:11 232:23 286:17 287:5

**paging** 287:14,17

**paid** 30:24 94:12 99:22,23 207:4 209:10, 11,12,14,23

**Paige** 146:15 244:3,4,11 245:23 272:1,5, 11 273:24

**panel** 195:16 234:21

**paper** 20:22 30:9 60:15 68:14 70:6 105:6 167:6 251:5

**papers** 60:13 69:14,21

**paragraph** 84:7 85:17 96:20 97:6 99:15 118:16 161:25 163:13,22 183:5 195:14 201:19 204:18 205:12 206:19 211:7,11, 16 213:1 214:12 222:3 224:14 227:15,16, 19 230:9 233:6 249:3 253:25 254:2,15 259:21,22 265:6,10 288:6,11,16,20 289:22,24 291:7 292:11 293:13

**paragraphs** 177:14 292:15,19

**parcel** 108:10 174:17

**parens** 129:17 130:15,16

**parentheticals** 118:23

**Parker** 189:1

**parlance** 223:7

**Parsons** 146:8 277:13,16

**part** 39:2 46:1 53:21,22 59:25 60:2 67:7 68:11 81:23 92:11 98:1 105:19 108:10 125:10 143:18 152:18 161:24 164:9 165:23 174:17 182:11,14 220:15 231:10 244:11 261:9 266:18 270:24 290:17,21, 23 292:3 293:13

**partial** 259:22

**partially** 286:16

**participate** 40:9,11,17,19,23 164:2,8 187:21 206:14

**participated** 43:24

**participates** 163:1

**participating** 163:2 187:25

**participation** 41:2

**particulars** 214:10

**parties** 50:15 94:25 120:16 132:15 144:10 210:19 303:11,12

**parts** 59:25 219:17,18

**party** 12:6 16:18 17:23 75:2 79:24 98:5 102:8 106:11 116:13 131:1,3 217:4 218:1,8 219:4 244:23 303:16

**passed** 247:8

**past** 71:14 122:14 139:1

**paste** 81:14

**patent** 23:16,19

**patience** 275:23

**pattern** 138:25

**pause** 27:2 156:1 214:21

**pay** 105:25 106:7 134:5 137:6,12 220:24 239:12 240:3,12 241:23 242:6 243:6 248:13 290:19 305:4

**paying** 96:18 99:22 163:3 280:5

**payment** 52:19 147:6 206:23 209:8 238:10

**Peerless** 49:22

**pendency** 153:22 154:23

**pending** 9:1 36:11 180:15 192:3 208:15 210:11 282:12

**Penn** 8:12 9:4 36:8 46:20,25 57:24 84:4 86:1 90:18,24 91:10,14,25 93:24 94:16, 19,22 95:4,5 96:17 111:13,19,23 112:6,9 113:1 119:10 121:6 127:23 130:2 132:17, 22 133:5,10,18 134:10 135:22 137:10,12 138:3,7 140:21 141:22 142:8,25 146:8,15 147:16,17 153:12 154:25 155:3,23 156:17,25 157:9,14 158:11,20,24 159:1, 6,19 160:2,9,10 165:12 166:9,11,14 167:2,19 168:18 169:2,9,16,18,24 170:1, 7,16 171:12 172:8,18,20 174:2,15 175:4, 10,18 176:2,3,5,7,17,19 177:2 180:18 181:2,9,16 182:14,21 183:6,20,22 184:25 185:23 186:11,19,23 187:1,8,19,20 188:3,7,20,22 189:6,8,15 191:10 193:18 194:2,6 195:15 197:22 198:8,19 199:10, 18,23 200:2,10,20 201:10,23 202:1,10,23 203:18 205:14 206:10,12,23 209:5 210:8, 25 211:2,3 212:18,21 213:6,11 214:11 215:10,18 216:5,13 217:17 220:6,12,21 221:7 222:12,17 224:15,17,22 225:22 227:17,24 230:10,18,23 231:2,14,18,21 232:13 234:9 235:17,21 237:4,15 239:11 240:2,6,11,16 241:2 242:11 243:5,25 246:15 248:4,11,17 249:10,12,14 250:5, 7,14,16,24 251:9,18 252:3,16,25 253:5,8 254:20 255:2,10,15,18,25 256:5,16,22,24 257:7,9,11,22 259:9 260:1,20,22 261:13, 14,19 262:2,8 264:7,8,14,20 266:24 267:5 268:4,16 269:8,15 271:17 272:2,7, 17 273:6,15 274:5 276:8,9,12,18 277:4 278:3,12,19 279:17,22,25 280:4,8,14,17 281:3,9,15,19,25 283:5,11,16,22 284:2 286:12,22 287:1 288:1,8,10,13,18 289:5, 11,17,25 290:1,8,16,19 291:1,7 292:7,21 293:6 294:17 295:5 296:2,19 298:14 301:4,23 303:23 304:3,23,24 305:5,21 306:8,10,17,24 307:6 312:7,9

**Penn's** 142:17 156:3 200:6 244:4 294:15 311:24

**Pennsylvania** 8:6 75:20 268:18

**penny** 191:18,19

**people** 83:21 97:19 136:20 303:7 309:6

**people's** 108:3 144:2 287:15

**perceive** 178:19

**perceived** 177:22

**percent** 300:11

**percentage** 53:15 99:24

**perfect** 287:19

**perform** 55:23 86:10

**performing** 301:7

**pergola** 294:7

**period** 30:18 34:12 37:12 89:11,18,21, 25 90:19,20 116:13 157:6 174:1 203:24 237:18 248:2 250:1 253:13

**periods** 162:15

**permits** 288:6

**permitted** 73:11 140:9

**person** 46:25 48:12 77:13,16,17 112:18 218:22 308:23 309:3

**personal** 23:9 37:14 44:17 67:22 68:6, 21 70:14,22 82:13 89:13 282:3 310:17,

22,24

**personally** 65:24,25 66:2 116:11 137:2 191:24 250:5,6

**pertains** 60:2

**pertinence** 183:18

**pertinent** 86:11 113:19 219:18 311:12

**phase** 182:12

**Philadelphia** 205:5,9

**Phoenix** 63:11

**phone** 29:21 100:19,21

**photographs** 296:13

**phrase** 104:8 124:3,6 137:3 250:11

**phrasing** 48:24

**pick** 256:22

**picture** 195:8

**piece** 96:2 127:9 167:6 251:5

**pieces** 14:20 86:10 125:21 204:24

**Pittsboro** 9:21

**place** 10:18 56:1 91:23 94:2 157:9 166:14 171:21 186:17 190:22 206:21 212:3 214:20 246:21

**plain** 216:16,25 223:3 232:6 301:11

**plaintiff** 8:11 9:3 245:1,6

**plaintiff's** 13:7 24:8 245:2 272:22,23

**plan** 150:4,5

**play** 63:2 225:24 282:22

**played** 109:25

**pleading** 115:10,13 155:13 226:22 303:5,17 307:16

**pleadings** 87:23 88:7,8,13 93:1,22 95:2, 3 109:6,8,15 114:20,21,25 117:5,6 120:1, 23 121:1 129:1,3 133:21 147:16 226:8 287:6 301:25 303:7 304:10,13,15 307:2 312:8

**Poe** 189:1

**point** 15:7 19:20 31:5 32:1 35:6 36:23 37:19 43:24 46:18 50:24 58:9 59:6 61:18 64:12 66:20 68:3 69:3 78:6 102:12,17 104:19 105:7 108:17 119:6 120:15,17 123:13 135:21 147:15,24 158:1,3,9 159:17 162:19,25 166:1 181:10,14 183:1,

18 188:2 197:5 198:19 201:4 203:3 223:12 234:8 235:16 238:8,13,17 243:4, 10 251:11,15 257:7 261:19 262:2 269:7, 13,19 271:12 274:23 276:17 279:11 281:15 282:16 284:12,16 303:23 305:21 306:8 311:4

**pointed** 181:24 249:5,9

**pointing** 197:2

**points** 22:17 112:21 133:10 173:10 174:14 176:5,13,21 184:19 185:6 230:19 236:13 310:14

**pol** 233:17

**policies** 9:3 32:14 35:9,13,14,23 43:25 44:3 45:6,25 46:6 52:22 54:2 55:1 57:24 81:17 83:1,8 90:16,25 91:21 93:4,19 95:14 96:9 132:11,19 137:10,12 140:21, 23,24 141:5,7,20,23,24 142:1,5 153:17 155:1 162:11 165:16 168:7,9 189:14 206:14 215:17,18 219:12,23 227:7 257:15 259:8 268:13 289:7 290:3 293:1 296:19 305:23 312:2,14

**policy** 9:2 11:15 12:11,13 14:21,22 18:2, 14,18 19:3,5 21:20 22:9 38:1 45:6 49:10 50:7,24 51:7,8,23,25 52:3,16,21 53:18 54:4,13 56:10,21,22 57:8 61:10 66:16 67:22 68:18,24 69:24 70:20 73:5 74:1,3 75:9,16 81:9,15,25 82:4,7,8,18 83:4 89:10,11,15,17,21,25 90:1,5,13,19,20 91:10,15,18 92:5 93:2,17 97:17,21 105:24 106:4 108:7 114:11 115:10 117:7 122:8 124:1,2 131:2,20 132:5,6,7,8 138:6 140:20 141:8,21 153:15 154:24 155:9 158:3 162:10,13,15 165:12,13 190:2,15 193:8 202:18 206:14 209:25 215:11,23 216:4,9,10,14,25 218:14 219:5,11,12,14, 17 222:6,20 223:16 227:12 231:15,24 232:2 233:18 235:10 249:13 253:14 257:2 258:22 260:10 261:13 266:4,20 267:2,7,25 268:5,19,25 269:15,25 280:17,18 281:5,10,13,17 288:10 291:16 293:22 296:25 297:9,13,14 299:21 300:21 301:5,12,24

**policy-limits** 205:15

**policyholder** 74:6

**policyholder's** 279:18

**pondering** 173:15

**portion** 30:12,14 66:10 71:5 99:16 215:6 238:18 254:18 255:17 259:20,25

261:18 282:4 289:24

**portions** 83:12 97:25 123:17 233:17 256:13 260:16 269:2

**position** 34:20 39:23 58:17 100:16 131:21,22 132:2,22,25 133:1,5,7,15,18 163:18 164:9,13 165:19 187:2,9 188:8,10 196:20 197:22,24 198:3,20 199:18,22 200:6,11,17,25 201:2 202:6,10,24 236:20 237:5,15 248:18 250:21 251:9,25 253:9 257:13 258:13,16 290:8 306:7,15 309:10 311:25 312:5,10,22

**positions** 33:14

**possibility** 205:25 235:14

**possibly** 262:11

**post** 121:6,18 127:17 128:6 239:12 280:5,21 283:7

**post-january** 96:7

**post-tender** 243:6

**post-tendered** 248:13

**potential** 162:7 185:19 202:17 203:10

**potentially** 270:25

**Power** 72:21 76:23

**Powerpoint** 62:22

**Powerpoints** 62:25

**practical** 253:20

**practice** 15:20 16:10,16 75:17 138:16, 20 139:5 140:11 177:23 178:6 179:6,9 202:1 213:14 218:15 219:1 222:19 232:16 251:13,24 276:13 280:8 298:22 299:2,3,11 303:5 307:16

**practices** 139:3 222:11

**practicing** 300:24 301:9

**prayer** 263:13

**pre-1983** 308:3

**pre-covid** 27:11

**preamble** 139:1

**precedent** 223:15

**preceding** 39:11 93:5 181:15

**precept** 18:6

**precipitating** 199:10

**precise** 85:24 110:14 211:13 212:24

**precisely** 33:2 48:3 58:9 141:17 184:3 208:23

**precision** 229:6

**precluded** 125:1

**predates** 93:2

**predicated** 225:4

**predominantly** 208:15

**preference** 100:5 195:17

**prejudice** 158:14 191:9 227:18 228:2 229:19 230:4

**preliminaries** 9:10

**preliminary** 25:13

**PREPA** 76:20,23

**prepare** 268:4

**prepared** 17:8 22:6 44:23 45:20 46:11 57:19,22 73:13 80:1,11 85:13 101:21 113:11 141:18 151:4 175:22 185:2,22 189:4 193:17 207:2 209:4 212:17 213:10 220:16 232:24 244:21 245:12 260:20 272:10 273:24 276:2 284:11,21

**preparing** 167:17 177:16 286:12 294:12

**present** 26:11 28:20 31:6,17 32:2 80:20 100:14 133:13 187:3,23 196:11 197:12 200:10 214:14 228:8 236:24 238:15 248:24 275:2,4 281:18

**presentation** 65:4 66:19 154:5 160:23 161:5 181:20 185:25 209:6

**presented** 36:9,11 58:11 60:10 68:6 76:19 85:25 158:20 182:21 186:10 227:22 231:19 241:15 248:2,6,7,8 276:19 307:20

**presents** 36:13 46:19 206:22

**president** 34:21 35:3 62:11

**pretty** 40:2 104:17 235:1 281:8

**prevalent** 310:25

**previous** 92:2 94:6 234:4 238:9

**previously** 80:8 107:9,19 115:23 121:14 125:8,19 129:14 137:19 151:14 153:5 159:25 161:7 163:6 208:25 215:14 224:9 226:16 243:18 271:10 273:21 285:18 288:4 298:9

**primarily** 38:10 63:1 221:18

**primary** 26:20 44:22 140:23 141:8,24 142:5

**primary-level** 141:4

**principle** 224:10

**principles** 41:17

**print** 110:2

**prior** 9:5 11:17 20:14 32:5 95:21 96:10 102:10 118:2 148:21 149:13,16 160:22 161:10 163:10 164:17 191:5 197:5 225:16 226:12 230:19 233:13,15 246:12 248:20 254:14 258:5 260:6 264:9,15 269:4 274:3 292:13,18,25

**private** 112:13 160:17

**privilege** 101:12,18

**procedural** 151:1 196:8

**procedurally** 120:14

**procedure** 59:11 66:1

**proceed** 37:19 38:16 176:18,19 181:17

**proceeded** 196:5

**proceeding** 43:1 107:1 147:14

**proceedings** 8:1 74:20 103:11

**proceeds** 275:6 284:12

**process** 9:6,12 21:14 22:4 38:20,23 39:3,7,10 47:1 55:22 58:24 61:18 85:3 122:13 171:14 182:14,16 217:18,24 270:24 277:19 297:22 298:7,8

**processes** 55:25

**processor** 22:16 85:3,4

**procure** 24:12

**procurement** 75:17

**produced** 69:22 119:15 171:5 226:16 286:22

**product** 44:16 69:11

**production** 142:25 144:22

**productions** 142:15 144:9

**products** 154:19

**professional** 12:17 47:9 50:17 59:6 60:25 64:12 65:21 76:18 77:2 78:21 79:6 167:3,15 194:18 216:1 217:11,16 262:25 301:8 311:15

**professionals** 59:19 60:8,17 61:14 62:19 63:6 64:11,20 65:3 260:19,22 299:17 300:15 301:13 309:15

**profit** 43:13,14,17

**program** 41:2 66:4

**programming** 40:17,20 63:5

**programs** 40:24 59:3

**project** 42:2 62:7 63:10 83:20,21

**projects** 48:10

**promise** 173:8 267:20

**prompt** 157:19,24 158:4 179:24 180:2,4

**promptly** 280:7,15,20

**properly** 279:23 283:11

**property** 23:13 24:21,25 34:5 67:18 69:25 70:5 77:8 132:8,11 185:18 199:1 291:24

**prosecution** 136:6 246:1,9

**prospect** 205:25

**protocol** 81:23

**prove** 224:5

**proven** 258:17

**provide** 20:10 27:14 36:15,22 37:18 38:15 43:1 46:21 47:8 58:15 62:1 84:12 85:10 124:5,14 131:2 133:12 177:7 180:21 186:2,22 200:21 201:10 206:20 214:9 237:6 256:14 258:11 281:13 284:19 290:2,9 298:3 305:4

**provided** 12:9,25 20:3,10 21:1 47:6 55:5 56:12 61:12,20 62:18 63:4 64:9,18 66:3 68:4 89:2 101:20 102:8,21 103:1 104:21,23 108:18 122:19 128:16 134:12 140:21 144:11,21 147:4 148:12 156:17 158:10 184:1 187:12 200:16 202:18 226:25 245:2 253:21 255:13,15 258:7 281:1,13 283:12,15 309:15 312:2,13

**provider** 65:16

**providing** 16:18 17:22 45:25 54:24 85:18 124:6 133:11 177:4 178:10 187:6 216:10 229:12 263:21 300:25 311:10

**provision** 177:12 195:19

**provisions** 122:9 222:7,8 267:2 280:17 293:22

**prudent** 17:11

**publication** 66:10 67:2 69:22 89:23 149:13,17 182:2 233:13,15 264:9,15 269:4 292:14,18,25

**publications** 26:13 49:13 66:13,21,23 67:20 68:3 69:7,13

**published** 67:5 89:24 101:21 204:8

**Puerto** 72:21 74:10,12,13,18 76:23 77:15 78:22 79:4 308:8

**pulled** 187:20 188:4 257:19

**Pulling** 151:21

**pup** 44:12,13

**purport** 101:16 135:16

**purported** 88:17,21

**purpose** 19:10 52:22 90:25 103:20 233:10 262:20

**purposefully** 254:21 255:3 256:6,16 261:15,23 262:8

**purposes** 22:19 55:18 57:7 84:2 87:16 101:18 104:15 111:12 117:6 120:4 123:10 133:9 177:17 225:19 226:19 233:4 244:13 307:18

**pursuant** 288:10

**pursue** 105:25 106:7 137:7

**pursued** 106:19

**pursuit** 137:13

**purview** 17:4

**put** 10:20 29:22 66:13 97:12,15 112:5 165:23 172:20 190:14 218:5 224:3 249:12 310:24

**putting** 46:2 151:23 215:24 225:16 246:18 306:10

**puzzled** 184:8

## Q

**qualifications** 65:20 191:25

**qualified** 73:6 75:4,22 192:9 193:12 249:21

**qualifier** 90:22

**qualify** 61:6

**quantum** 209:9 242:1

**quarter** 194:19

**question** 14:19 15:1,25 17:15 28:7 33:2 48:3 49:16 50:4,18,21 54:14 57:1 91:25 92:22,23 93:10,14 102:20 107:18 125:21 133:9,19 136:9 137:15 139:11,15 144:17 152:10 155:12 157:16 166:24 167:17 169:20 172:10,12 173:20 174:10 181:16 182:18,19 185:4 187:24 190:7 191:10 194:9,14 195:5 197:25 199:9 208:8 219:22 225:20,21 227:18 229:9 232:7 235:2,13 240:14 252:7 262:1 265:12 271:4 277:7,8 288:3 297:2 299:23 302:2, 16

**questioning** 302:19,21

**questions** 39:1 160:24 171:25 218:25 228:16,18 229:21 274:15 284:16,19 285:20 301:14,18,19 302:6,8 305:11 311:20

**quick** 265:12 285:5

**quickly** 235:22

## R

**race** 62:11

**radio** 89:23

**raised** 213:6 235:13

**Randy** 205:3

**range** 173:14 188:2 228:17 239:3

**rate** 28:11 29:14 193:9

**rates** 28:8 29:20,22

**ratification** 224:8

**re-focus** 61:25

**re-plow** 122:12

**reach** 173:16 232:20

**reached** 159:1 172:23 175:6

**reaches** 171:12

**reaching** 301:6

**read** 50:2 112:4 113:16,17 118:16,22 163:12,21 174:2 184:16 194:20 198:6 199:24 210:9 211:8,18 212:9 229:3 240:5,7 245:22 246:3 253:12 254:2 259:22 260:12,16 261:3 262:1 265:10,24

266:18 267:22 288:7,12,17,23 289:24

**reading** 94:4 118:25 137:25 138:2 143:23,25 149:9 163:17 173:17 200:5 216:25 217:13 223:3 232:4,6 237:4 245:19 271:12 285:9 291:19 301:11

**reads** 189:25

**ready** 116:1

**realize** 204:20

**reason** 41:6 45:11 59:24 81:22 83:3 96:16 143:17 161:24 163:23 170:22 171:2 213:4 256:23 260:14

**reasonable** 201:24 202:4 203:14 209:11,12,14,18,23 234:14 237:23 246:7 260:9 263:3

**reasonableness** 244:16

**reasons** 206:3 251:19 303:9

**recall** 23:20,25 24:23 25:2 27:20,23 28:6,16 37:16 49:15 53:13 56:16 63:12 64:13 66:8 76:7 79:8 84:19,22 87:21 91:2,19 92:1 94:17 95:6 100:25 111:8 114:2,6 118:12 129:16,23 130:8,10 169:5,12 174:10 214:18 238:17 240:10 241:20 247:9 273:2,18 286:16,25 287:4, 11,25 288:3 290:24 291:3 295:21 296:7, 17 299:8,22 312:21

**recalling** 294:9,10

**receive** 38:14 47:5 58:14 86:15 101:24 102:2 134:24 142:14 143:13 152:2 172:6, 15 284:13

**received** 30:5 31:13 47:11 94:15 101:6 102:8,11,25 103:8 109:16 111:20,21 116:17 130:18 142:13,16 148:20 156:10 166:11 170:18 172:6,9 193:4 228:10 230:20 250:4 298:16,19 304:20 308:24

**receives** 157:8 169:25 217:15

**receiving** 36:21 42:25 61:16 297:23

**recent** 23:10 57:10 114:17,19 115:4,11

**recently** 113:9 166:25 192:23 242:10

**recess** 78:9 150:16 214:25 254:9 275:16

**recital** 294:15

**recklessly** 249:11,15 261:15,23

**recognize** 11:3 25:14 116:9,22 120:9 234:1

**recognized** 45:17

**recollection** 49:24 59:1 88:4 91:5 128:10 175:9 213:3 241:16 274:25 283:14

**recommend** 183:16 277:1

**recommendation** 37:1,2 47:19,24 184:8,19 185:3 198:21 262:12 269:6 270:2 298:4,18,20

**recommendations** 37:11,14 61:10

**recommended** 245:17 252:11

**recommending** 270:17

**reconcile** 50:11 82:6 184:21 233:21

**reconsider** 239:17

**record** 8:4,24 19:9 58:8 78:8,10,14 93:25 129:16 150:12,15,17,21,23 156:7, 12 175:9 204:19 214:22,24 215:1,5 217:13 218:3 226:16,19 229:25 234:23 254:4,8,10,15 261:19 273:20 275:10,15, 17,21 284:24 285:6 313:5

**records** 84:18

**record's** 221:6

**recovering** 306:9

**Red** 9:21

**redacted** 103:8,11,16,22 132:24 143:2 166:17 169:13 171:24 174:21 175:4 183:14 187:10,14 189:12 199:8,13 207:9 212:10,14 252:6 256:9,12 268:14 269:17 270:8,21 276:24 278:17 279:6 286:14,15, 16

**redactions** 101:7,17 175:1 191:12 207:16

**redirect** 301:21 302:13,18,23

**refer** 35:15 119:6,7 291:4 293:12

**reference** 21:3 22:17 49:15 70:6 88:17 91:7 101:5 121:6 127:19 130:1 142:23 151:7 154:1 155:2 170:25 181:14 189:5 200:12 204:9 277:18 286:11 295:16 296:3,6 308:1

**referenced** 69:13 87:22,23 99:14 120:15 125:22 142:2 143:7 145:19 155:21 196:12 205:24 208:16 213:1 257:3 265:7 279:13 297:8 299:6

**references** 55:16,17 85:18 89:23 93:1, 23 104:10 145:25 170:19 184:7

**referencing** 43:11 125:11 128:9 137:21 143:9 164:22 168:7 177:2,10,13 178:6 179:19 180:13,22 202:5 212:2 214:12 261:25 265:13

**referral** 252:8

**referred** 43:7 138:15 223:7 293:1 297:2 298:9

**referring** 211:10 267:11 300:13

**refers** 295:14 297:3

**reflect** 28:25 31:8 162:24 167:1 171:6 215:13 250:18 253:6 296:2

**reflected** 101:7 116:25 156:20 168:17 250:13

**reflection** 121:25

**reflective** 13:25 85:12 109:25 136:3 144:12 253:3

**reflects** 26:2 106:25 145:12 185:10 297:5

**refresh** 49:24

**refreshed** 50:3

**refusal** 239:12 241:21,22,23 242:3 243:6 248:13 280:6,15 283:6 290:19

**refusing** 289:11

**regard** 19:6,7,8 31:9 38:18 60:22 112:15 133:13 237:12 240:13 241:22 258:16 269:11 270:3

**rehash** 260:16 305:14

**reimburse** 283:7

**reimbursed** 224:24 280:21

**reimbursement** 134:2,23 191:11 239:18 246:15,24 248:7 288:19 289:12

**rejected** 241:12

**rel** 295:6

**relate** 155:6 261:11 291:10 292:4

**related** 69:9 85:19,23 160:24 162:8 190:14 200:16 218:25 283:18 291:23 293:15

**relates** 93:16 245:24,25 246:9,10

**relating** 89:22

**relation** 57:10

**relative** 83:6 84:13 90:4 92:5 94:1 96:2

107:24 108:5 158:9 165:3 166:14 182:16 276:23 294:16

**relevance** 184:10

**relevant** 92:16 95:15 154:4 294:16 295:6,11 296:2,16 299:17

**relied** 109:2 152:3,6,14 286:12

**relief** 291:8 292:8,13 293:6,14

**rely** 21:3 175:25 265:22

**relying** 180:12 204:7

**remain** 224:20 248:14

**remaining** 221:18

**remains** 98:8

**remanded** 210:13

**remark** 192:17

**remember** 24:7 78:25 91:9 134:6 168:22 205:20 297:7

**render** 308:15

**rendered** 54:16 191:13 308:13

**rendering** 98:18 179:7

**renewal** 38:22,24 39:2,7,14 153:22 154:24 155:9

**renewed** 153:10,17 239:18

**renewing** 38:21 153:23

**reopen** 284:18

**repeat** 123:16

**rephrase** 54:23 79:1 297:2

**report** 15:8,10 20:4 22:6 25:17 48:1 72:7 78:17 80:10,15,22 81:1,7 82:11 83:7,8,12 84:25 85:1,20 91:6 95:11 96:21 97:9,11,15,25 101:2,5,9,21 102:20 103:5, 21 104:9 105:17 109:9,24 112:25 117:1 121:5,18 127:16 128:9 142:17 143:9 144:17 150:22 151:7,14,16,18 152:23 155:21 156:20 166:24 167:1,18 170:15 177:16,20 179:5,25 180:13 183:3 185:2,5 195:13 196:12,19 197:19 200:13 215:6,8 219:20 221:2,6,15 225:17 227:6,11 229:24 230:9,24 232:4,8,9 233:6 234:11 235:13 238:19 245:3,5,11,12 246:3,18 248:20 254:16 259:20,22 260:15 262:1 264:7 267:19,22 268:15 271:4 272:18 273:24 274:1,9 277:7 279:13 284:20 285:23 286:9,12

**reporter**  8:10

**reporting**  268:16

**reports**  244:21 268:10 277:8

**represent**  9:3 73:18 91:13 119:20 138:16 161:20 164:12 192:22 197:24 226:19,25 241:8 245:4 271:16 273:23 290:16 292:12

**representation**  160:18 293:20 306:8 308:4

**representative**  14:6

**representatives**  158:23 172:24 173:24 174:1 175:8 176:7 270:25

**represented**  24:2,15 72:1 167:7

**representing**  13:2,8,10 84:10 160:16 168:8 195:1 213:21

**request**  11:11 96:12 134:5 158:12 190:5 198:4 239:18 272:14

**requested**  102:5 290:20

**require**  106:14

**required**  65:13 104:10 224:16,17 299:18

**requiring**  157:16

**requisite**  193:13

**requisites**  204:23

**res**  301:6

**rescinded**  255:12

**research**  57:10,15 58:5 60:16 204:12

**researched**  182:4

**reservation**  122:1,5,14 123:4,17 124:7, 15 127:18,23 159:21 160:1,8,13 163:20 166:10 168:4 171:16 177:5 180:19 181:4, 7,11,15 183:23 184:12 186:23 200:3,22 201:11 202:7 217:21 218:6 235:18 237:7 251:1 252:14,21 253:2 257:5 258:8 294:11,14,24 295:9,17 300:23 304:6 305:11,15,20 306:4 312:17,19,20,21

**reservations**  311:20

**reserve**  124:19 284:17

**reserves**  258:12

**residual**  63:22

**resolution**  61:2,19 76:19 179:24 180:15

**resolve**  140:3 241:3

**resolved**  59:23 60:20

**resource**  41:21

**respect**  22:3 23:6 31:19 39:2 47:4 56:1 58:11 66:23 69:3 74:22 89:13 97:2 100:22 120:11 127:15 129:9 134:11 151:6 180:11 181:19 189:13 209:16 214:4 217:25 218:14 220:2 226:3 231:1 232:1 234:14 236:22 238:4 243:6 248:12 266:7 296:14 305:14 307:23

**respects**  32:25 49:8 56:21,22 70:19 83:22 151:24 220:15

**respond**  47:18,19 189:8 206:15 279:23

**responded**  47:15 110:4 112:12 137:23 155:16 283:23

**responding**  110:22 166:21 175:19 280:5

**response**  30:2 108:19 111:2,10 112:23 153:3 160:24 172:15 176:2,14,16 194:6 198:8 229:21 230:6 242:10 302:6

**responses**  112:22 142:8,12,13

**responsibilities**  33:24 34:15,23,24 38:8

**responsibility**  33:3 309:18

**responsible**  48:18 65:25

**responsive**  11:11 155:13

**rest**  36:3

**restate**  103:22

**restroom**  214:21

**result**  99:17 196:9 220:10

**resulted**  216:12

**resume**  141:14

**retain**  51:21 184:11 188:23 282:2

**retained**  19:13 24:3 27:14,17,21 35:10 44:7 61:24 84:8,17,21 183:25 189:1 198:22 251:8

**retaining**  50:24

**retention**  29:1 30:4 35:14 284:4

**retrospective**  282:15

**reversed**  148:8 233:12 234:1

**review**  10:22 11:6 16:6 32:21 90:24 97:4 115:10 128:3 134:20 140:22,24 145:16

148:16,24 151:3,8 167:4 170:23 171:9 185:24 219:11 244:12 250:12 262:6 267:4 268:10 271:22 273:25 274:2,23 277:14,19 278:10 292:10,14 293:24 296:14 297:18 298:13 311:25

**reviewed**  20:18,25 49:12 88:7 91:11 104:20 105:19 109:19,23 112:8,20 149:23 156:24 159:4 166:25 169:1 186:3 187:7 189:14 200:23 202:11 248:22 252:2,3 256:13 286:11 287:13 294:12 308:12

**reviewing**  104:11 149:3 244:16 287:4 296:7

**reviews**  32:15

**revised**  45:2 66:15,16 82:12

**revision**  68:22

**revisions**  26:15 45:13 46:2 66:18 69:9 71:1,3 297:6

**revisited**  97:23 274:10

**Rican**  76:23

**Rico**  72:21 74:10,12,13,18 77:15 78:22 79:4 308:8

**rife**  267:24 268:23 270:11,15

**rights**  18:18 122:1,5,14 123:4,17 124:7, 15 127:18,23 159:22 160:2,8,13 163:20 166:10 168:4 171:16 177:5 180:19,20 181:5,7,11,15 183:23 184:13 186:23 200:4,22 201:11 202:7 217:21 218:6 235:18 237:7 251:1 252:14,21 253:2 257:6 258:8 294:11,14,25 295:9,17 300:7,24 304:6 305:12,15,20 306:4 312:17,19,21,22

**rise**  139:2

**risk**  39:17 62:14 92:16 93:24 95:14 112:15,16,19

**Road**  9:21

**Roanoke**  34:21

**Robert**  9:17

**role**  35:3 42:7,9 114:10 282:23 308:25

**rolled**  42:3

**rollout**  66:19 69:10

**ROR**  122:15,17,23 124:25 168:6,8 173:6 204:23 257:18,19 263:22 267:17

**ROR's** 253:12,18

**RORS** 122:20 123:10 127:13 200:5 237:17 249:25 281:12

**Ross** 145:21

**rough** 115:7

**round** 32:21,24 48:1 135:6 241:20 262:20 277:22

**rule** 108:25

**ruled** 203:21 204:1 232:11,12 233:24

**rules** 53:25 55:24 214:5 225:18 299:7,16 300:6,14

**ruling** 264:21 293:4

**Rutherfoord** 34:21 35:4,16 36:25 123:12

## S

**salutations** 265:21

**sampling** 109:10

**sanctions** 191:9

**sandwich** 150:8

**sat** 36:20 58:9 65:23 77:23 192:21,22 308:19,20

**savings** 222:22 223:6,11

**say-so** 189:23

**schedule** 82:6,19,22

**scholarship** 60:15

**school** 10:3,4

**scope** 152:12

**screen** 86:17 108:22 110:2 129:21 130:11 142:24

**seat** 58:10 65:24 215:25 217:12 308:19 309:6

**sec** 197:17

**section** 30:14 31:16,20 66:10 70:4 101:1 151:9,16,20 221:11,14 222:4 227:9,10 238:19 261:3 267:19,22 290:4

**sections** 219:14

**seek** 168:19 191:10

**seeking** 51:8,9,10,16 112:10 134:23 229:13 242:11

**segment** 45:3

**segments** 150:24

**seldom** 39:14 106:5

**select** 189:16

**selected** 189:24

**selection** 188:20 189:6 190:14,18 193:18 194:4 195:2 238:5 279:24 282:1,5 283:18,21

**Selling** 34:1

**send** 29:25 272:18 303:24

**sending** 41:19 166:20 273:1

**sends** 170:1

**sense** 51:11,14 71:22 93:16 102:24 109:14 132:8 137:5 152:15 154:11 158:8 198:1 221:11 259:16

**sentence** 97:10 99:15 175:17 196:14 197:1 205:12 234:4 249:4 254:19 257:8,9 267:21 288:7,12,17

**separate** 13:12 21:10 43:16 54:10 82:16 117:17 127:22 187:15 209:17 305:9 309:21

**separately** 194:17 246:8

**September** 107:1 152:25 166:12 168:17,25 169:6,11 176:8

**sequence** 126:4 302:22

**sequentially** 222:5

**series** 160:24 177:5 180:19 232:21 270:16 305:11

**serve** 17:7 29:7

**served** 32:4 110:16 116:18 153:7 242:9 245:6 271:19

**serves** 193:6

**service** 10:10 157:15

**services** 27:14 28:10,12,15 42:16 45:1 54:16 218:11

**serving** 11:14 31:25 32:11

**session** 263:14 275:22

**set** 21:14 35:1 46:16 52:6 93:1,22 97:3 178:24 243:13

**setting** 182:16,22 190:17

**settlement** 138:16,20 139:5 140:11 177:23 178:6 179:9 211:19 212:3,18,22 213:16

**seven-month** 185:1 203:24 209:24

**sharp** 285:16

**Shaw** 8:13 15:23 16:14 17:5 25:10 45:9 51:12 56:3 66:7 72:5 88:19 92:8,18 93:7 94:3,10,21 95:16 99:3 107:14,17 108:1 118:10 119:5 120:14 124:21 126:7,9,11, 13,15,17,21 127:1,4 128:14 133:16 136:25 150:3,8,11,13 152:8 165:5 168:20 169:4,9 178:1,13,20 179:15 185:13 187:4,16 188:13 189:19 193:20 196:17, 24 197:1,5,8,13,15 200:14 208:18 211:10,14 214:22 216:22 217:5 219:8 226:14 232:5 234:16 238:14 241:24 242:23 244:24 247:4 249:1 251:3,16 255:22 256:2 261:5,7 274:14 275:12 279:1 281:11 285:1,3 286:9 289:4,10,16 290:13,24 291:21 293:4,11 294:2,9,23 295:3,21 296:1,7,14,22 297:1,7 298:13 300:13 301:3,14,20 302:13,14,17,22 305:13 311:23 312:12,20,25

**Shaw's** 284:17 301:18 302:6

**Shepard** 116:9,12,22 118:13,19 120:10

**shifting** 223:25

**shop** 150:9

**short** 78:17 157:16

**shortly** 302:20

**should've** 186:6

**shoulda** 173:22

**should've** 235:22

**show** 66:25 126:20 127:5 138:25 229:25

**showing** 164:17

**shown** 183:6 287:15

**shows** 162:13

**sic** 205:13

**side** 24:8 140:2 144:1 145:1 159:19 166:9,14 192:22,23 272:16,22,25 303:11

**side-by-side** 115:9 120:4

**sides** 131:6 144:10

**side's** 272:19

**sign** 29:3 65:13

**significant** 78:14

**similar** 206:13

**similarly** 231:13

**simple** 16:4

**simply** 98:1 103:22 131:11 140:1,3 142:4 198:4 233:12 237:17 238:7 252:17 253:12 301:7

**single** 138:25 147:8 269:7 281:15 302:2 311:15

**singular** 144:18,22 145:4 219:12 234:2

**sir** 8:23 9:5,8,16,19 10:2,10,11,16 11:13, 14,16 12:4,19,23 13:11,15 14:14,16 15:22 16:3,13,15 17:25 19:14 20:2,7,8, 12,13,20 21:2,6,13 22:12 24:6,9,20 25:15,23 26:4,17,24 27:4,13,16 28:19,23 29:2,5,16 30:5,9,16,20 31:3,18,22 32:6 33:5,9,23 34:8,13,19,22 35:7,12 36:17 38:7,17 40:1,4,25 41:9,23 42:6 44:1 45:8 46:4,15,23 47:3 48:6,25 49:20,23 50:13 51:14,24 52:9,17 54:3,8,18,21 55:2,19 56:4,14 57:5,18,21 58:2,7 60:21 61:4 62:20 63:14 66:21 67:4,9,12,20 68:13 69:8,15 70:8 72:14,17 73:2,5,17 74:4,8, 11,14,16,24 75:6,12,21,24 76:14 77:3,14 79:19,22 80:7,13,16,18 81:4,21 82:1,21 83:2,10,14,18 84:11,14 85:9,11,15,22 86:3,13 87:3 88:14 89:5,8 90:6 91:8,16 92:20 94:6,24 95:17 96:15 97:5,8,14 98:7,9 99:18 100:9,17 101:3,8,10,15,19, 23 102:4,6,9,23 103:6,13 104:13 105:1, 13,18,21 107:3,22 108:9,13,17 110:7,24 111:5,15,22 112:14 113:2,12 114:4 115:15 116:15 117:22 118:3,4,24 119:20, 25 120:6,10,11,21 121:16,20,23 122:2,4, 22 124:8 125:5,12,24 126:2 127:7,11,21 128:2,5,10,15,18,23 129:4 130:12,23 132:20 134:9,11,16 135:15,18 136:10 137:4,8,16,22 138:1,8,11,21 140:19 141:24 142:3,6,7,10 144:4,16,19,24 145:15,17 146:6,9,11,13,17,20 147:9,20, 22 148:4,7,11,15,17 149:1,14,25 151:6 152:1,16,20 153:2,8 155:10,19 157:11 159:9 160:4,12,20 161:12,25 162:4,23 164:11,14 165:17 166:9 167:13 170:5,9, 14 171:4 172:14 173:3,18 174:4,10,20 175:12,16,21,24 176:10,23 177:9,25 178:8 179:22 180:8,10 182:25 183:4,10 185:22 188:18,19 189:25 190:11,23 191:1 192:7 193:10,23 194:21 195:4,6,
18,23 198:17,18 200:5,19 201:8,14,22 202:13 203:16 205:7,17 206:17 207:1,17 209:21 210:4 211:12,18,25 213:3,21 214:14 215:20 217:2,9 218:10 219:21 220:8,15 221:4 222:9 223:9 224:21 225:6,9,12 226:2 227:13,20,25 228:5 230:2 231:5,12,25 232:18 233:1,9 234:25 235:16,20 236:2,8,11 238:20 239:9,14,22 242:9,16,22 243:8,23 244:8,18,19 245:4 248:3,9,15 249:17 250:3 254:1 255:24 256:3 258:9,14,19 259:6 260:23 261:9, 17,19 263:6,24 264:2,5,12 265:25 266:8, 23 267:19 268:1 270:5 271:2,9,11,25 272:6,8 273:4 275:8 276:16 277:20 278:2 279:15,21 280:3,13,24 281:2,7,24 282:7, 9,19 283:1,10 284:14 285:8,22,25 286:2, 7,14,24 287:21 288:3 290:5,18,23 291:13 292:5,9,16 293:3,18 295:13,19,24 296:6 297:12,20 298:1,6,12,21,23 299:4,9,12, 24 300:10 301:2 302:4,24 303:3,15 304:14 306:3 307:15 310:8,11 312:6

**sit** 64:16 66:3 79:2 80:17 94:8 95:18 129:25 130:17 149:22 157:4 162:11 210:6 214:8 221:1 225:10 232:24 257:22 269:19 272:9

**site** 302:2

**sitting** 58:10 70:19 130:3 203:20

**situation** 175:24

**situations** 206:5

**skip** 195:12 204:17 205:11 221:5 230:8 253:24 254:17 259:17 260:24

**slander** 310:25

**slogan** 294:18 295:10,17,22

**slogging** 286:19

**small** 14:20 34:1 38:11 62:5 81:3

**smart** 235:1

**snippets** 276:25

**Society** 68:11

**sold** 34:10 35:23

**something's** 262:18

**sooner** 264:1

**sort** 30:1 97:22 115:12 130:13 159:12 173:18 221:14 251:13 277:22

**sorts** 40:12

**sought** 168:22 238:23 262:8

**sound** 155:18

**sounds** 26:20 40:14 95:7 147:3 152:17 155:5 166:25 182:10 219:2 261:2,25

**source** 151:22

**sources** 93:19

**South** 54:6 57:8 73:1

**Spanish** 74:15,20

**speak** 304:10,15

**speaking** 78:18 119:17 240:22

**speaks** 74:21 87:20 89:15 233:2

**special** 34:16 190:10

**specific** 40:23 41:5 44:4,7 68:5 90:13 91:17 102:25 111:9 123:6 125:3 131:18 139:4 177:12 180:6 189:5 212:17 214:4 260:15 264:13 278:13 283:14 297:7

**specifically** 11:5 32:17 40:22 46:19 56:16 59:5 69:22 84:7 90:24 91:3,21 123:9 137:9 153:10 164:5,22 178:5 180:21 184:23 224:2,22 227:11 240:9,11 249:5,9 266:16 291:22

**specificity** 220:5

**speculation** 256:11

**speed** 190:19 194:10

**spend** 15:8 150:25

**spent** 205:15

**spinning** 162:5

**split** 42:11 157:25

**spoke** 285:5

**spring** 66:18 144:11

**Sta** 299:15

**staff** 38:1 45:12 46:9 48:9

**stamp** 287:2

**stamped** 119:14

**stand** 112:23

**standard** 12:21 83:4 157:21 180:2 258:20,21 259:4

**standards** 170:12 177:1 179:18 180:12 181:24,25 201:25 202:3,4 203:15 204:8,9 222:11 235:22 250:9 263:9

**standpoint** 21:17 23:2 30:23 40:15 86:22 115:14 120:23 124:9 133:2 135:21 136:16 138:4 154:4 176:20 178:15 182:1 263:10 264:16

**stands** 52:3,4

**start** 15:18 25:20 41:25 42:2 62:6 87:2 122:24 158:3 171:14 175:16 218:2 222:2,3 271:12

**started** 9:5 31:2 69:9 96:23 183:24 211:16 229:23 230:7 247:2 251:7 302:15,17 310:8

**starting** 36:10 39:22 81:6 108:17 236:14

**starts** 116:5 201:20 230:10 249:4 267:22 302:22

**state** 8:17 11:21,24 15:19 16:2,5,8,11,17 43:5,18 56:19 63:17 64:21 73:1 75:20 106:14 124:24 140:9,15 157:23 179:13 182:13 218:22,24 219:1 222:5 250:23 258:14,23 259:4 308:8 312:24

**state's** 54:12

**stated** 73:9 243:10 249:8

**statement** 15:10 52:23 122:6 183:4 231:2,11 245:14 257:18 260:15 261:22 262:5 263:15 264:6 306:19

**statements** 198:7 213:6 306:22

**states** 49:19 55:6,9 65:15 106:14 157:22 290:11 293:13

**state's** 55:24

**stating** 103:20 233:5

**status** 171:8 175:3 179:24 191:4 208:19

**statute** 138:13 139:5 140:12 177:23 178:7 179:9 300:2

**statutes** 16:7 138:15 299:7,14,16 300:6

**stay** 28:3 84:22 208:24 209:1

**stayed** 27:24 28:4,5 42:4 208:11,21,24

**Stephen** 8:13 127:2 128:12 150:2 197:19 198:13 265:5

**Steve** 107:12 145:13 261:4

**Steve's** 259:19

**stick** 258:22

**stipulate** 196:20

**stipulation** 198:13 200:8,15

**stood** 182:15

**stop** 308:11

**stopped** 196:21 197:3,8

**stores** 265:20

**stricken** 69:19 79:21

**strike** 288:23 312:11,15

**strip** 63:25

**strong** 40:2

**student** 69:15

**study** 299:18

**Studying** 61:8

**stuff** 60:2 98:2 166:20 197:7,18 271:13

**style** 265:19

**styled** 137:15

**subcontractor** 308:9,17

**subcontractors** 62:4

**subhead** 279:8

**subheads** 279:7

**subject** 39:16 57:20 60:3,14,23 70:10 95:9 108:3 124:7,15 163:20 173:9 179:13 180:9 181:4,11 183:22 184:12 186:23 200:3,21 201:10 211:23 217:21 235:17 237:7 247:15 248:1,19 252:13,21 253:2 257:5 258:8 263:22 273:13 276:1 284:12,16 304:5 311:20 312:18,20

**submit** 37:10

**submitted** 147:5 162:6 167:2 198:25 219:2 220:6 244:1 246:14,23

**submitting** 167:18

**subpoena** 11:7

**subrogation** 106:1,10

**subrogee** 106:20

**subsection** 138:13

**subsequent** 39:18 84:24 124:19 128:1 134:3

**subset** 21:23

**substantial** 69:5 152:17 176:1,14 178:16

**substantially** 175:19 207:9 274:7

**substantive** 26:10

**subsume** 197:18

**subsumed** 201:17 261:1

**successful** 282:3,10,13

**successfully** 282:23

**sued** 39:11

**suffered** 286:5

**sufficient** 126:22,24 128:12 195:9 278:19,23

**sufficiently** 202:9,23

**suggest** 58:24 79:18 159:4 233:23

**suggested** 183:7 267:4 298:24

**suggestion** 183:3,19 184:3

**suggests** 156:25 187:8 270:12

**suit** 152:24

**Sumitomo** 44:10,13 64:14

**summaries** 143:12

**summarize** 149:5

**summarized** 295:5

**summarizing** 80:11

**summary** 97:7 131:16 149:20 151:10,24 210:21 268:21 275:25 279:16 284:2 294:15 302:5

**summation** 134:14

**Super** 118:20

**superficial** 260:4

**superior** 167:19

**supervise** 58:19

**supervised** 48:15

**supervision** 33:6

**supervisor** 183:6 309:2

**supervisors** 260:2

**SUPERWINGS** 265:18

**supplement** 67:3 71:18 104:9,16 142:16 273:24

**supplemental** 20:5 101:20,24 144:9 242:10 280:11 281:22 283:9

**supplemented** 306:13

**supplements** 80:15 142:14 144:12 145:1 284:20

**support** 249:9 250:23 271:7 279:11

**suppose** 28:24 30:25 38:5 74:12 80:5

**supposed** 222:6

**surface** 27:12

**surplus** 35:16,17

**swear** 8:10

### T

**table** 32:21,24

**tables** 262:20

**tabling** 48:1 277:22

**taker** 62:14

**takes** 56:10

**taking** 36:21 52:15 131:20 167:16 205:1 216:16 251:19 292:23 301:11

**talk** 15:7 18:10 33:13 36:8 46:8 52:10 67:17 81:3 90:3 137:4 151:9 158:18 215:6 240:24 260:17 276:8 303:16 304:16

**talked** 46:11 52:11 84:8 96:1 117:4 144:14 152:19,24 153:3 155:20 166:9 171:15 181:25 199:25 216:4 220:3,4 235:19 237:22 239:21 247:21 260:19 272:14 281:8 306:14 309:13

**talking** 22:2 33:13 46:3 64:18 66:20 78:15 93:21 174:16 180:25 185:6 190:11 191:13 201:5 231:3 242:1 244:7 250:10 251:5 254:13,14 257:9 263:19 264:14 268:22,25 294:6 297:10 308:1

**talks** 206:25 227:19

**task** 82:9 92:19 135:11

**taught** 18:14 42:20 49:13 54:19,20 55:9

**teach** 41:16 125:5,6 223:10 224:10 263:12

**teaching** 18:12 32:12 55:13 137:3 298:25

**team** 19:25 36:20 46:1,5 48:15 58:13,14, 19,23 59:8 65:24 83:16 102:11 103:1 160:16 170:7 183:20 187:17 246:22 247:25 277:24

**teams** 37:21

**technical** 42:14 146:7

**telephone** 265:21

**tells** 110:12,14

**template** 123:7,8

**ten** 76:4 123:20

**tender** 121:6,19 127:17 128:7 206:1 207:25 227:17 239:12 280:5,21 283:7

**tendered** 51:20 73:6 75:4,14,22 76:8,9 119:10 175:18 183:8 205:18,23 207:4 245:12

**term** 32:22 56:5,7 82:19 89:9 90:4 122:1,3 252:8,9 269:25 303:1,2

**terminology** 24:14

**terms** 16:10 18:20 53:14 54:11 71:14 75:14 78:18 86:9 91:20 95:13 117:7 131:19 142:7 165:24 169:17,24 170:21 171:21 182:15 189:23 201:9 220:4 253:14 257:14,16 267:24 268:13,19,24 269:15 274:23 281:4,9,16 291:17 293:22 301:25 304:23

**territory** 89:17

**test** 49:25 57:23 287:23

**testified** 8:18 12:17 71:19 72:25 76:2 120:9 164:19 208:25 228:12 241:17 254:25 268:9 287:9

**testify** 45:21 46:11 71:23 72:3,6,10 114:6 130:20 207:12

**testimony** 11:18 12:6,10,25 28:11 65:19 73:13 74:13 78:20 79:5,20,23 84:16 102:10 104:12,21,24 124:16 174:24 236:16,19,22 238:6,11 261:24 280:12 281:1 283:9 284:9 285:12 297:17,21 299:1 305:15 306:14

**textbooks** 60:1,3 204:14

**Thanksgiving** 172:17 186:6,13 235:23, 25

**That`s** 309:4

**that's** 53:20,22 97:3 102:12 103:17 106:22 121:21 140:15 145:3 146:24 156:9 161:6 168:5 185:8 196:25 197:4,18 200:18 207:7 208:2 211:12 214:5,7 217:8 219:9 226:13 227:4 246:16 252:23 295:1

**theory** 106:13 255:21

**there's** 185:19 207:10 237:11

**they're** 286:14 289:3

**They've** 66:16

**thing** 58:20 67:7 118:14 129:6 130:10 173:5 178:18 196:15,16 207:24 270:13 275:23 311:7 312:16

**things** 22:25 23:5 43:22 62:3,4 66:1 86:17 110:22 120:5 129:6 146:22 167:11 174:2 194:10 198:9 216:12 223:4 243:24 261:25 273:16 277:24 285:12 294:8 303:10 305:16 306:13

**thinking** 62:9 95:6 111:1

**third-party** 22:21,22 23:2,7 24:11 52:20 77:9,10 120:2 132:12,13 220:14

**this's** 109:9

**Thomas** 34:21 35:4,15 36:24

**thought** 174:6 270:24 311:11

**thoughts** 32:22 310:6

**thousand** 240:19 241:7,15 242:7

**thousands** 286:17 287:5

**throw** 25:9

**tie** 167:7

**ties** 283:20

**Tilden** 8:6,16,21 9:17,20 10:21 16:23 25:11 70:13 78:13 83:19 84:1 93:15 105:22 107:18 118:15 124:12 132:8 134:1 150:20 161:11 187:16 197:21,24 215:4 226:24 250:12 254:13 260:15 270:10 273:23 275:20 285:4 301:17

**till** 301:20

**time** 8:4,23 9:10 10:21 11:4 12:12 15:8 19:20 22:5 24:22 25:12 28:1 30:19 31:1 32:18 34:11,12,24 35:6 37:13 39:6 41:15 42:1,23,24 45:25 46:18,24 47:2,21,23 59:20,22 60:9,18,19 61:1 63:8,15 76:18, 19 78:8,11,15,25 79:10 80:20 84:23 92:16 93:20,21 95:6,15 96:10 97:2,4 102:3,22 104:22 112:1,9 114:18 115:25 116:13 117:13 120:15,17 121:2 123:11, 19 127:24 133:13 135:21 148:22 150:15, 18,25 151:7 153:22 154:24 157:7,9 162:25 163:5 164:24 165:24 166:3,15 167:10 168:24 169:10,23,25 170:1,17

172:7,8 174:9 175:11 180:22 185:7,24 187:2 188:2,15,17 192:4 194:19 198:25 199:6,15 200:10 206:21,24 207:20 208:7, 15,16 209:3,6 214:14,24 215:2 217:16 221:18 229:11 230:1,19 231:7 234:8 236:24 237:7 238:15 254:1,8,11 257:7 258:5 272:12 274:4 275:2,4,15,18,22 281:18 282:16 284:23 301:21 303:23 309:18 310:16

**timekeeping** 83:25

**timeliness** 157:13 158:9,10 181:20 227:16 229:8 269:12

**timely** 227:22 228:3,4,11 265:4

**times** 11:17,19,20,23 12:9 32:7 39:9 44:24 47:8 76:2 81:2 97:23 100:11 103:21 105:7 121:14 200:2 213:5 252:13 258:7 297:24 301:22 307:24

**timing** 110:22 111:9 155:13 158:3 174:13 175:24 182:20 186:9 190:17 227:16 228:12 229:19 263:19 269:12 276:21

**Tips** 70:23

**tired** 259:18 271:13 285:14

**title** 42:8

**today** 8:25 11:8,10,17 13:14 15:9,11 19:24 20:14 21:1 22:20 25:12 27:15 30:11 43:12 45:7 46:17 47:25 56:2 57:17 66:3 80:12,17 83:20 87:6 94:8 95:18 98:6 117:12 118:2 120:8,20 128:20 129:10 130:3,18 133:4 148:25 149:22 155:24 157:4 161:10,16 162:12 163:10 164:17 197:6 203:20 210:7,14 214:9 221:1 225:10 226:10,12,15 232:24 246:13 248:21 257:22 269:20 272:9 274:3 284:24 287:16,22 294:12 297:17 304:18 309:22

**today's** 8:4 188:10

**toing** 172:2

**told** 17:21 98:3 178:5 217:24 302:5

**top** 26:3 183:4 236:25 264:8 286:11 294:6 296:18

**topic** 68:5

**topics** 36:7 78:16 239:11

**tortured** 196:7

**total** 13:20 28:13 245:17 248:4

**totality** 248:22 271:6

**totally** 20:15 250:10 276:5

**touch** 174:14

**touched** 226:5

**trade** 23:16,18 40:6,13,14 43:13 139:3 222:22,23 223:1,5 256:21 260:3,7,11 266:8,16 291:24 294:4 296:3,9

**trademark** 23:16,18 24:24 69:24 291:23 293:17 294:1 295:15 309:20

**trademark-related** 23:12

**trademarks** 265:17

**train** 48:9

**training** 25:23 61:10,13,20 62:18 63:5 64:9,18 66:4 135:13 260:7,9,18,21 263:14 309:5,15

**transcript** 113:10 146:12 274:21

**transcripts** 145:12,16 146:19

**translate** 151:20

**transpire** 190:20

**transpired** 94:9 167:12 229:17

**Traps** 70:23

**Travelers** 92:2,5 93:9 94:5,9 96:14,18 160:23 161:5,14,21 162:3,6,15,19,22,25 163:13,17 164:5,10,16 165:3,11 255:11, 12,16 304:18

**tread** 179:6

**treating** 280:18

**treatis** 182:2

**treatises** 204:8,12 296:17

**trends** 125:6

**trial** 73:8,9,16 75:25 77:20,24 147:24 148:8,9 149:11 178:25 180:14 182:16,22 190:19,20,22,25 191:6 192:23,24,25 196:9 198:15 233:12 234:2,7,8 258:17 259:2 275:6 282:18 284:12

**trials** 192:21

**Tricks** 70:23

**trigger** 52:7 56:6,7,13,19 57:7,13,15,23 89:7 149:6 154:6,9

**triggered** 90:1 298:15

**triggers** 56:25 57:4

**trouble** 232:8 285:7

**true** 16:23 17:13,17 18:3,7,16,20 40:3 48:24 54:7 58:17 81:17 95:20 96:24 98:12 103:16 108:8 113:9 117:9,13,15 119:3 131:6,9 132:10 133:23 137:7 138:10 147:1,2 161:1,5 165:4 166:3 170:12 177:19,23 189:24 191:16 193:15 194:19 198:12 211:23 215:19 216:6 220:22 225:23 226:12,13 231:11 233:19 234:23 235:2 236:10 237:7 245:13 246:18,20 255:21 258:13,18 263:11,23 268:7,8 277:9,14 283:3 292:23 304:9,21 306:23 308:22 309:16,17

**truncate** 223:10 232:22

**truth** 8:17,18

**turn** 63:24 80:7 104:25 151:13 265:3

**Turning** 97:9

**TV** 89:23

**tweak** 68:25

**tweaks** 122:16

**two-month** 175:11

**two-page** 268:21

**two-thirds** 12:14 13:20,24

**type** 15:4 22:25 24:25 33:8 39:1,8 56:21 57:6 58:20 63:5,10 64:9 77:6 99:9 100:18 115:2 117:8 129:2 175:3 178:17 182:2 206:13 226:6 228:18 309:9 311:6

**types** 18:12 56:25 57:4 61:9 93:19 165:16 309:16

**typical** 23:5 160:19 306:11

**typically** 24:14 30:6 69:16 122:6,15 139:22 154:2 272:20

**U**

**ugly** 98:1 218:20

**Uh-huh** 24:4 29:11 35:19 42:13 46:7 53:7 61:15 62:13 63:18 68:20 70:3,21 72:20,23 97:18 109:4 122:18 123:22,25 143:3 180:1 196:6 205:5,22 206:6 230:13 260:13 272:24 282:17

**ultimate** 179:16 183:21 184:5,10,11 220:11 225:21 252:17,18,25 253:3 257:4

309:11

**ultimately** 37:17 47:6 48:19 58:16 131:14 167:2 217:18 252:12

**umbrella** 44:8,21,22 45:6 70:17,19 140:24 141:7,20 142:1 153:11 168:9 227:7 277:11 296:19

**umbrellas** 141:6 168:13

**un** 101:16

**unable** 308:15

**unauthorized** 293:16 298:22 299:2

**uncertified** 22:11

**underlined** 69:19

**underlying** 22:22 24:24 28:4 46:20 52:6 87:13,19,23 92:7 105:11 106:25 107:7,16 110:5 113:25 118:8 119:3,7,9, 12 129:2 132:13 133:21 134:22 146:1 147:7 152:24 161:16,17 182:13,23 185:12,16 189:7 193:15 213:2 214:16 215:16 220:10 226:9 227:23 229:17 250:17 256:18 257:1,16 258:1 277:3 282:4,10,12 287:6 288:9,14 291:9 293:14,21 295:22 296:8 307:18 312:3

**underneath** 278:8

**underscoring** 159:13

**undersigned** 118:18

**understand** 20:13 21:23 22:23 50:18 56:11 65:1,18 80:20 90:7 94:24,25 98:1 133:5 136:14 165:17,20 179:3 191:12 197:2 198:2 201:4 202:20 203:9 208:4 210:16 217:2 221:10 231:21 233:18 235:16 239:4 244:6 246:5,11 250:3 253:17 257:2 269:9 276:20 281:14 287:22 292:21 302:25 306:7

**understandably** 197:20

**understanding** 14:17,24 15:2 16:16 18:5 22:9,10 36:16 46:18,22 50:5,11 52:13,24 56:18 57:3 73:8 84:11 85:15 87:4 89:13,19 90:14 105:14 110:3 122:8 123:23 125:3 130:25 132:19 136:2 149:2 153:1 155:25 159:13,16 166:13 167:11, 21,22 187:5 188:12 212:25 220:10 246:25 259:3 260:4 275:2 285:20 286:21

**understate** 182:11

**understood** 29:18 63:19 83:23 127:15 144:2 305:13

**undertake** 89:1 143:24 176:12 208:22 215:21

**undertaken** 92:4 248:5

**Underwriters** 43:10

**underwriting** 38:18 39:10,17 64:14 153:25 155:7

**underwrote** 38:10

**unfair** 138:15,19 139:3,4 140:11 177:22 178:6 179:9

**Unit** 78:11 150:18 215:2 254:11 275:18

**United** 55:9 157:22

**units** 59:3

**universities** 43:21

**University** 10:6

**unredacted** 102:20 166:24 184:6,16 185:5 252:9 269:2,21,23

**unreimbursed** 203:20

**unrelated** 218:8

**untoward** 262:21 263:10

**update** 66:25 299:7

**updated** 26:12

**USI** 72:16,24 75:19 76:9

**utilize** 55:17

**V**

**Vanderzanden** 72:16

**varies** 106:14

**verbal** 159:5

**verbally** 152:5

**verbiage** 85:21 270:10

**verifies** 91:6

**verify** 135:7,11,19,25 136:2

**version** 114:17,19 115:4 121:15 166:24 184:6,16 252:9

**versions** 105:9 120:1 168:11 226:24 227:2

**versus** 8:7 41:3,4 72:16 86:24 90:8 95:19 143:25 156:8 182:13,22 188:21 198:3 244:14 245:25 251:23 264:3

278:13

**vested** 189:15

**vice** 34:21 35:3

**video** 8:5

**view** 57:2 92:5,13 158:1 170:11 185:23 188:8 230:22 235:24 253:18

**viewed** 295:6

**views** 294:15

**violated** 139:7 140:11 222:18

**violation** 177:22

**violations** 178:19

**violative** 203:14

**Virginia** 35:4

**virus** 123:1,2

**vision** 285:7 288:6

**visit** 62:24

**visited** 16:1

**visualize** 108:21 110:12

**vitae** 25:18

**voluminous** 144:21

**voting** 40:10,15

**W**

**W-I-N-G-S** 294:6

**wait** 229:11

**walk** 25:22 36:18 80:23 152:21

**walking** 151:1 170:21

**wanted** 78:17 125:9 137:20 150:6 156:7 170:6 180:24 198:10 205:9,11 215:5 221:11

**wanting** 32:20

**wasn't** 294:19

**Waste** 49:22 53:10

**watching** 137:2 197:19

**waves** 294:6

**ways** 14:22

**website** 16:2,5,6

**week** 172:19 308:5,6

**well-accepted** 18:6

**Westfield** 61:22 62:3,18 63:16 64:11,23 66:4 124:23,24 309:13

**Westlaw's** 182:5

**we're** 93:10 186:22 228:17 250:10 294:9

**we've** 97:22 282:6

**whatsoever** 204:6

**what's** 183:15,18 217:1 243:9

**whe** 200:19

**wheelhouse** 103:19 136:19

**When's** 309:18 310:16

**whi** 113:9

**White** 205:4

**wholesale** 248:17

**wholesaler** 73:21,25

**whomever** 232:3

**who's** 244:22

**Williams** 205:4

**Wings** 8:8 87:14 88:5 111:25 116:14 118:7,17,20 119:2 120:2 132:14 161:18 162:8 191:19 220:14 265:17 291:23 293:17 294:1,5 295:15

**withdraw** 124:25 198:10

**withdrawal** 125:1

**withdrawn** 290:14 293:6

**withdrew** 198:12,14

**Womble** 8:13 19:12,13,17,25 21:1 27:23 84:9 85:8 96:13 102:12,25 134:4,6, 21 135:4,23 136:4 147:5,6 158:24 159:2, 7,18 160:16 163:14 171:8 172:24 173:12 174:5,8 175:7 187:17 188:23 191:13 194:25 208:4,6 216:11 228:16 246:22 247:7,14,25

**won** 191:3 213:2

**wondered** 273:10

**word** 17:14 32:24 51:1,2 52:18 85:3,4 89:7 108:3 241:21 294:5 303:4

**worded** 124:23

**wording** 59:2 70:19

**words** 12:5,20 13:6 47:11 54:4 55:3 69:18,19 86:14,25 92:24 106:3 111:23 114:18 139:10 147:17,23 149:5 152:11 181:7 189:22 215:24 216:16 223:5,10 230:17 232:7 273:12 279:9

**work** 9:12 19:21 20:17,19,25 21:15 25:12 28:18 29:12 30:23 31:24 37:20 43:6 46:1 53:15,21 54:5 55:18 57:16 59:2,25 70:7 71:4 80:11 81:3 83:15,17,24 84:2 89:12 108:16 115:2 117:8 134:21 147:6 157:24 180:2 217:18 223:19 239:5 243:14 244:11 246:8,9 298:25 299:1,8 308:1

**worked** 14:11 23:7,18 31:4,24 32:10 38:4 45:11 47:14 48:4 58:14 71:16,17 141:16 195:19 258:4 307:24 308:12,24

**workers** 35:2

**workers'** 63:22 64:1

**working** 19:16 24:23 26:25 31:2 35:1 38:24 41:23 52:25 56:18 58:12 61:17 65:3 90:14 110:3 159:13,16 169:17 194:18 244:22,25 308:2

**works** 47:1 54:11 56:19 223:12 224:7

**Worldwide** 224:13

**worries** 128:14

**worse** 192:9

**worth** 239:5

**would've** 80:4 111:2 175:5

**woulda** 173:21

**wouldn't** 93:3 120:5 210:12 229:5

**write** 59:11 60:7 63:20 64:1,2 176:13 310:9,12

**writes** 59:9 60:6 62:3 63:17 64:20

**writing** 32:12 41:21 43:25 61:10 66:1 122:7 152:5 206:13 271:20 299:1

**written** 44:3 60:13 69:14,22 83:13 95:11 142:8 177:8 182:2 188:24 195:10,21 204:7 233:22,23 309:5

**wrong** 215:12

**wrote** 60:14,15 72:7 185:7 205:3

**Wynn** 234:20 240:8

## Y

**year** 10:7 27:12,18,22 39:18 62:8 84:21 87:21 100:11 128:1 144:13 153:18 164:6 186:7 198:23 236:25 297:8

**years** 18:10 33:4,8 37:13 38:5 40:3 45:11 50:2 52:14 63:9,12 67:1,6 69:6 71:15,16 72:9 76:5,16 77:21 78:19 79:18 93:5,9 95:23 96:22,25 192:24 196:5 201:7,12 208:12 228:7 246:24 248:2 255:5 258:5 267:9 282:12,20 296:15 298:25 302:25 303:9 304:6 311:16

**years,'08** 141:21

**yesterday** 102:1,22 104:21 144:23 148:20 167:1 185:10

**Yezzi** 46:8

**York** 37:4 119:8 120:15 157:22,23

**Young** 73:9

**You'd** 252:24 282:6

**you're** 74:5 141:10 151:4 156:15 162:18 223:6 230:17 244:19 273:12

**you've** 13:4 66:13 207:5 289:21 304:18

STATE OF NORTH CAROLINA

COUNTY OF EASTERN DISTRICT

IN THE GENERAL COURT OF JUSTICE
EASTERN DISTRICT OF NORTH
CAROLINA
NORTHERN DIVISION COURT
DIVISION
2:14-CV-00008-FL

PENNSYLVANIA NATIONAL MUTUAL
CASUALTY INSURANCE COMPANY,

Plaintiff,

v.

BEACH MART, INC. and L&L WINGS,
INC.

Defendants.

**NOTICE OF DEPOSITION**

TO:     Brian Tilden
        c/o Stephen Shaw
        Womble Bond Dickinson (US), LLP
        300 North Greene Street, Suite 1900
        Greensboro, NC 27401

PLEASE TAKE NOTICE that the undersigned attorney, pursuant to Rule 30 of the North Carolina Rules of Civil Procedure, will take the testimony of Brian Tilden by deposition upon oral and video examination before a court reporter duly authorized to administer oaths by the State of North Carolina, at the time and on the date set forth below, and thereafter, from day to day as the deposition may be adjourned, at which time and place you are notified to appear and take such part in the examination as you may be advised and as shall be fit and proper. The examination will be recorded by video and stenographic means.

Deponent's Name:        Brian Tilden

Place:                  Womble Bond Dickinson (US), LLP
                        300 North Greene Street, Suite 1900
                        Greensboro, NC 27401

Date:                   June 23, 2021

Time:                   10:00 a.m.

EXHIBIT
118

00368C.00002

THIS THE 16TH DAY OF JUNE, 2021.

HEDRICK GARDNER KINCHELOE & GAROFALO LLP

By: _____ (signature: *h. liv. for*)

David L. Levy
NC State Bar No. 34060
Hedrick Gardner Kincheloe & Garofalo, LLP
6000 Fairview Road, Suite 1000
Charlotte, NC  28210
Phone:  (704) 366-1101
Fax:     (704) 366-6181
dlevy@hedrickgardner.com
*Attorney for Plaintiff/Counter-Defendant*

00368C.00002

# CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served upon all counsel of Record as an attachment to an electronic mail addressed as follows:

> Stephen F. Shaw
> Jonathan T. Sink
> Womble Bond Dickinson (US), LLP
> 300 North Greene Street, Suite 1900
> Greensboro, NC 27401
> STEPHEN.SHAW@WBD-US.COM
> JON.SINK@WBD-US.COM
> Fax: 336-574-4521
> Attorneys for Beach Mart, Inc.

THIS THE 16TH DAY OF JUNE, 2021.

**DAVID L. LEVY**

00368C.00002

# UNITED STATES DISTRICT COURT
### for the
Eastern District of North Carolina

| | |
|---|---|
| Pennsylvania National Mutual Casualty Insurance <br> *Plaintiff* <br> v. <br> Beach Mart, Inc. <br> *Defendant* | ) <br> ) <br> ) Civil Action No.   2:14-cv-00008-FL <br> ) <br> ) <br> ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                 Brian Tilden

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place:   Womble Bond Dickinson (US), LLP <br> 300 North Greene Street, Suite 1900 <br> Greensboro, NC 27401 | Date and Time: <br><br> 06/23/2021 10:00 am |
|---|---|

The deposition will be recorded by this method:    court reporter

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: Please produce all exhibits, document, and any other materials relied upon in forming expert opinions in the case.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   6|22|21

CLERK OF COURT

                                      OR

_____       _____
*Signature of Clerk or Deputy Clerk*                *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Pennsylvania National Mutual Casualty Insurance _____ , who issues or requests this subpoena, are:

David L. Levy, Hedrick Gardner Kincheloe & Garofalo, LLP, 6000 Fairview Rd., Suite 1000, Charlotte, NC 28210, dlevy@hedrickgardner.com, 704-366-1101

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 2:14-cv-00008-FL

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

## (c) Place of Compliance.

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

## (d) Protecting a Person Subject to a Subpoena; Enforcement.

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

## (e) Duties in Responding to a Subpoena.

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

## (g) Contempt.
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

PENNSYLVANIA NATIONAL MUTUAL
CASUALTY INSURANCE COMPANY,

      Plaintiff,

v.

BEACH MART, INC. and L&L WINGS,
INC.,

      Defendants.

**CIVIL ACTION NO.: 2:14-cv-00008-FL**

Expert Report of
R. Bryan Tilden, CPCU, CLU, ARM, ALCM, ChFC, CIC, SCLA
TILDEN AND ASSOCIATES
Pittsboro, North Carolina
February 1, 2021

1

**EXHIBIT**
119



# PREFACE

I, R. Bryan Tilden, offer the following report containing a statement of my opinions and the basis and reasons, the data or other information considered in forming the opinions, my qualifications, and the compensation I am to be paid.

I have been retained by Womble Bond Dickinson LLP to review certain materials and to, in summary, provide my expert opinions relating to an insurance claim and the adjustment of a loss, all as explained in this report.

I have over 46 years of experience in the insurance and risk management industry as an author, agent, broker, consultant, underwriter, drafter of policy forms and endorsements, teacher, historian, claim examiner and consultant for both the insured and insurers. As a broker representing the insured, I have placed accounts in the international insurance market, including coordinated placements with Lloyd's brokers, Lloyd's syndicates, United States, Canadian, British, and European insurance companies. I have worked with Lloyd's brokers, Lloyd's syndicates, United States, Canadian, British, Bermudian, and European companies in the drafting, underwriting, and placement of insurance policies for marine and non-marine, and the adjustment of property and liability losses. I teach the construction, drafting, underwriting, adjusting, and analysis of insurance policies throughout the United States, Canada, the Caribbean, Bermuda, and the European Union. I have testified in the United States and London regarding the above subject matters. I am familiar with the international insurance and domestic marketplace's custom and practices, including the London, European, Caribbean, Canadian, Bermudian, and United States markets. I have extensive experience with the commercial general liability insurance policy at issue.

2

I am not an attorney, and nothing in this report should be construed as a legal opinion in any way. My opinions reflect custom and practice in the insurance industry that come to bear on this matter. At the same time, it is impossible to review the handling of matters without reference to industry rules, regulations, policy terms and conditions, the claimed loss, and the transactions at issue. If any of the terminology or concepts used in this report has any overlap or congruence with legal terms, please be aware that the terms are not being used as legal terms; rather, they are used as terms of art within the insurance industry which are commonly used and understood in the industry.

My curriculum vitae are attached hereto as Exhibit A. I prepared this report after reviewing the documents listed below. My billing rate for consulting expert and expert witness work is $300 an hour.[1] These are my opinions to a reasonable degree of professional certainty. *Because discovery is ongoing, I reserve the right to amend or supplement this report. Supplementation is likely because of the excessive amount of documents which have been withheld in this litigation, which prevented me from completing a full analysis of this matter. Specifically, it is impossible for me to give my full opinions at this point in the litigation because Penn National has refused to provide many of the claims handling documents which are central to the opinions set forth in this report. Once the full claims file and the relevant claims handling documents are produced and available to me, and once I can review deposition testimony relevant to these withheld documents, I expect to supplement this report to complete the analysis required in this matter.*

---

[1] No portion of my compensation is dependent upon the result of this litigation.

3

# DOCUMENTS CONSIDERED

1. Beach Mart's Complaint against L&L in underlying matter (Sept. 9, 2011);

2. L&L's Answer and Counterclaims against Beach Mart in underlying matter (November 22, 2011);

3. Beach Mart's notice of counterclaims to Penn National (June 8, 2012);

4. Penn National's post tender correspondence and correspondence appointing David Brown to defend matter (Jul 18, 2012 - Jan. 15, 2013);

5. Penn National's Complaint for Declaratory Judgment against Beach Mart (Feb. 4, 2014);

6. Beach Mart's demand for reimbursement of fees incurred (Dec. 01, 2014) and subsequent correspondence;

7. Beach Mart's Answer and Counterclaims in coverage declaratory judgment (Oct. 02, 2017);

8. Penn National Business Owners Liability Insurance Policies (Jan. 1, 2008 to Jan. 1, 2012):

   - BP9 0645388 00
   - BP9 0645388 01
   - BP9 0645388 02
   - BP9 0645388 03;

9. Written Discovery Responses of Penn National and Beach Mart;

4

10. Redacted Claims Notes for Penn National's Claim File and Coverage File through 2/2018;

11. Penn National's Redacted Claim File through 2/2018; and

12. Deposition Transcripts of Greg Gross, Gary Gibson, and Steve Oliver.

While I have reviewed these documents, I could not form complete opinions because a number of documents necessary for my opinion have been redacted, or appear on a privilege log but have not been produced by Penn National, or the documents and records necessary for my opinion have been withheld by Penn National. Additionally, a number of questions were asked at depositions, but the Penn National deponent was told not to answer the question by his lawyer or was unable to answer the question because the relevant documents of Penn National's file had been redacted or withheld. Once this information is obtained, I will necessarily be required to amend or supplement this report to reflect this withheld and/or redacted information and material.

## <u>SUMMARY OF OPINIONS</u>

Based on my review of the documents identified above and my years in the insurance industry, it is my opinion that:

1. Penn National failed to adequately investigate the claim before determining whether coverage applied;

2. Penn National failed to conduct an investigation that followed the custom and practice of the insurance industry in considering all the facts to make an informed decision;

3. The manner that Penn National handled the claim failed to give consideration to the policyholder's interests, and failed to look for coverage in the claim;

5

4. Penn National failed to properly or reasonably consider or respond to the insured's concerns over the selection of defense counsel and whether such action by Penn National was in the best interests of the insured;

5. Penn National's delay in initially responding, delay in paying post-tender defense costs, and refusal to accept its coverage obligation promptly in this matter was inappropriate, contrary to industry custom and practice, and Penn National had more than enough information at a very early juncture in this case to make these decisions;

6. Penn National's refusal to accept its obligations promptly in this matter can only be attributed to its misrepresenting facts and insurance policy provisions – had Penn National been fairly treating its policyholder, it would have accepted its insurance obligations promptly, began defending the claim, and would have reimbursed Beach Mart for its post tender defense costs;

7. Penn National misrepresented terms and conditions of the Policy;

8. Penn National did not clearly explain the basis of its opinion that coverage did not apply;

9. Penn National did not clearly explain the basis and justification for its selection defense counsel, forcing Beach Mart to retain personal counsel to assure a successful defense of the underlying litigation;

10. Penn National did not clearly explain the basis of its refusal to reimburse Beach Mart for its post tender defense costs; and

11. Penn National did not properly consider additional information which was provided by Beach Mart.

6

# <u>BACKGROUND</u>

Beach Mart first sued L&L Wings, Inc. ("L&L") in 2011 the "Underlying Litigation." The Underlying Litigation was a case regarding L&L's attempt to terminate a 2005 trademark agreement between it and Beach Mart. I have no opinion regarding the trademark law at issue in the Underlying Litigation.

Some time after Beach Mart filed its lawsuit, in November 2011, L&L counterclaimed for trademark infringement and unfair competition, unfair and deceptive trade practices and breach of contract. These counterclaims came from L&L's allegation that Beach Mart copied and imitated L&L's branding and advertising styles or concepts. L&L claimed that substantial consumer confusion came from that trademark and its use. Dkt. 40-10.

Analyzing those counterclaims which L&L asserted, the counterclaims included alleged infringement of the WINGS trademark, but also alleged copying of L&L's "distinctive" building facades and store layouts (which L&L claimed was protected "trade dress"), misappropriation of L&L's advertising slogans, misappropriation of L&L's promotional greetings, and misappropriation of other materials. *Id.*, at ¶¶ 23-24; Dkt. 40-12, ¶¶ 21-22, 61- 62. L&L asserted that it had been damaged through Beach Mart's unfair competition and unlawful trade practices. Additionally, L&L alleged claim breach of contract and breach of implied duties of fair dealing.

By June 8, 2012, Beach Mart tendered the Underlying Action to Penn National and demanded that Penn National assume its defense obligation and agree to indemnify it, per the Policy between the two of them. But after defense of the counterclaims was tendered to it, Penn National substantially delayed in responding to Beach Mart. Instead of complying with North Carolina law and the industry standards and customs, it delayed in providing a defense, and sent a

7

series of "reservations of rights" letters which neither definitively denied coverage nor agreed to provide a defense. But discovery has shown that Gary Gibson, a claims supervisor at Penn National, had already suggested denying the claim within the first month after the claim was tendered.

More than seven months after Beach Mart tendered its demand for defense, after the completion of the initial discovery period and summary judgment briefing, and after trial in the Underlying Litigation had been scheduled and then subsequently delayed, Penn National finally notified Beach Mart that it would provide a defense, and a law firm appointed by Penn National first contacted Beach Mart to begin efforts to provide a defense to L&L's counterclaims. Beach Mart expressed its concerns over the qualifications and experience of the panel counsel selected by Penn National to defend the counterclaims. Beach Mart further questioned whether, given the nature of the complex intellectual property claims asserted by L&L in the underlying litigation, given the overarching seriousness of such claims in light of Beach Mart's continuation of business and the amount of damages sought by L&L (in excess of $20mm), and given the progress at that juncture by Beach Mart's personal counsel, the panel counsel selected by Penn National would bring sufficient expertise to bear in assuring a favorable defense of the counterclaims.

From January 2013 to February 2014, Penn National's panel counsel worked to assist in the provision of a defense to Beach Mart, as counter-claim defense counsel. But, more than a year after Penn National first began to provide a defense to Beach Mart, Penn National changed its position. Shortly before the Underlying Action's mediated settlement conference, Penn National filed this lawsuit seeking to avoid its coverage obligations. D.E. 1.

8

Beach Mart was never provided an explanation as to why Penn National changed its position, was not given any prior notice of this declaratory judgment lawsuit, and was never told why Penn National chose to file this lawsuit *immediately* before the mediated settlement conference in the Underlying Action. At the time, Penn National had not updated its January 2013 correspondence that a defense would be provided under the policies.

It is my opinion that Penn National's conduct toward its policyholder did not comply with reasonable and commercially-acceptable standards for acting in the best interests of its insured, and that this general business practice of Penn National has continued on throughout this coverage action. Initially, Penn National waited too long to first reach its decision to provide a defense of the claim, and then after 7 months' delay did decide to defend Beach Mart. Beach Mart is entitled to all of its post-tender defense costs incurred during that time period when it was defending itself out of pocket. When a claim is filed against a policyholder and the policyholder gives notice to its insurer, the steps the policyholder takes to prevent a default judgment are steps which protect the insurer. Beach Mart could have defaulted on the counterclaim (exposing Penn National to policy-limits liability), but it spent its own money to defend this claim. It is entitled under the Policy for reimbursement of those funds. Penn National had ample opportunity to appoint counsel, negotiate rates, defend the claim, and otherwise fulfill its obligations under the Policy. By refusing to do that for many months, it must now reimburse the policyholder for those costs. For a period of at least 5 years, Penn National never questioned or challenged the amount of fees for which Beach Mart sought reimbursement, nor did Penn National ever provide any explanation or justification for Penn National's refusal to pay such fees after Beach Mart's reimbursement demand, while at this same time providing an ongoing defense of the Underlying Litigation.

9

Penn National's failure to comply with reasonable and commercially-acceptable standards for acting in the best interests of its policyholder continued after it filed this coverage lawsuit. Beach Mart first made a demand for reimbursement of its post-tender defense costs on or about December 1, 2014. Insurers are generally obligated, and it is customary within the industry, to promptly respond to their policyholders, particularly on an issue as important as this one. But Penn National took more than two years to respond to this demand. During that two years, there was other correspondence between the two parties. In July 2017, Penn National for the first time definitively rejected Beach Mart's request for reimbursement. Instead, Penn National made a counteroffer to settle all outstanding disputes, including this coverage action. This delay by Penn National did not comply with reasonable and commercially-acceptable standards for acting in the best interests of its insured; once an insurer knows that coverage is due under one part of the policy, it is obligated to pay that amount to its policyholder. It cannot use that as leverage to influence settlements under other portions of an insurance policy. Either on purpose or inadvertently, this is a common tactic of insurance adjusters.

After this lawsuit started, Penn National was obligated to attend a mediated settlement conference. Penn National undermined the mediation when it appeared at the settlement conference without authority to settle the entire case, and refused to obtain full settlement authority during the course of the mediation. While industry custom and practice, along with court rules, permit an insurer to attend a mediation with limited amounts of monetary authority, it offends good faith for an insurer to attend a mediation but not have authority to settle the entire case and all outstanding disputes. Unsurprisingly, that mediation ended in an impasse because of Penn National's failure to attempt a fair and equitable settlement.

10

*The Penn National Policy*

Penn National issued Policy Number BP9 0645388 00 ("Policy") effective January 1, 2008. It was subsequently renewed for several years.

The policy included the Businessowners Liability Coverage Form, which is based on a standard commercial general liability insurance policy form, originally copyrighted by the Insurance Services Office, Inc.; which assists the industry in generating commonly used form policies.

The Policy begins by clearly stating it provides both indemnity coverage for, and that Penn National also has a duty to defend its insured in, any claims or lawsuits for "advertising injury."

### A. Coverages

1. Business Liability

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage", "personal injury", or "advertising injury" to which this insurance does not apply. We may at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

   (1) The amount we will pay for damages is limited as described in Section D - Liability And Medical Expenses Limits Of Insurance; and

   (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements or medical expenses.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Coverage Extension - Supplementary Payments.

The Policy goes on to state that "This insurance applies . . . to . . . "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services."

When the Penn National claims handlers read the Policy in comparison to the L&L Counterclaim, they had an obligation under the policy to insert this definition of "Advertising injury" and construe it in favor of finding coverage:

**F. Liability And Medical Expenses Definitions**

1.  "Advertising injury" means injury arising out of one or more of the following offenses:

    a.  Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    b.  Oral or written publication of material that violates a person's right of privacy;

    c.  Misappropriation of advertising ideas or style of doing business; or

    d.  Infringement of copyright, title or slogan.

If the Penn National claims handlers had done so, they would have seen, at a minimum, that the L&L Counterclaims included legal claims for "misappropriation of advertising ideas or style of doing business" with the numerous claims for copying or misappropriating the style of the building, including the trade dress rights claimed by L&L, the layout of the interior of the stores, and the mimicking or copying of advertising slogans, website logos, in-store salutations and telephone greetings. This is indisputably a covered claim, and in my opinion this case would not have been a "close call" for a skilled and experienced claims handler. Industry custom and practice is that claims handlers assigned to complex claims such as this one would already have sufficient skill and experience to understand these issues (rather than simple automobile or general liability matters where the claims issues are simpler).

Having established that the L&L Counterclaim contains at least one covered claim which triggered the duty to defend, the claims handler would then have to review the Policy's exclusions. The Policy further excludes six types of "advertising injury":

13

p. Personal Or Advertising Injury

"Personal injury" or "advertising injury":

(1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured;

(4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement; or

(5) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

(6) With respect to any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess the effects of pollutants; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

14

Case 2:14-cv-00008-FL     Document 117-8     Filed 10/15/21     Page 138 of 201

Based on my review of the materials provided to me, the Penn National claims handlers should have immediately recognized that none of these exclusions applied. First, the facts alleged in the L&L Complaint do not articulate actions that would fall within these exclusions. Second, if there were any close calls, those close calls should be construed in favor of finding coverage for the policyholder.

The Policy also contains an additional exclusion for Advertising Injury:

q. **Advertising Injury**

"Advertising injury" arising out of:

(1) Breach of contract, other than misappropriation of advertising ideas under an implied contract;

(2) The failure of goods, products or services to conform with advertised quality or performance;

(3) The wrong description of the price of goods, products or services; or

(4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

Once again, this exclusion does not apply, and that should have been immediately apparent to the claims handlers. Even though breach of contract allegations accompanying the counterclaims assert claims for breach of contract, that claim only arises from the SUPER WINGS trademark agreement between Beach Mart and L&L. In no respects does that contract relate to the trade dress, slogan, or advertising copying alleged by L&L elsewhere in the counterclaims to constitute unfair competition, infringement, false designation of origin, and unfair and deceptive trade practices.

15

Case 2:14-cv-00008-FL    Document 117-8    Filed 10/15/21    Page 139 of 201

# Opinions

Generally speaking, within the customs and practices of the industry, insurance companies are supposed to liberally construe policy provisions that extend coverage, and narrowly construing provisions that exclude coverage.

Penn National breached its insurance contract, which required the defense of L&L's counterclaim and required Penn National to indemnify Beach Mart from any covered losses arising from that counterclaim.

First, my analysis begins with whether the conditions precedent under the Policy have been met. Here, they have. Penn National has admitted that the premiums were paid, and that the underlying counterclaims brought by L&L were timely tendered to Penn National. Penn National has not argued that it was prejudiced by any late notice, nor has Penn National developed any evidence that would support such a claim of prejudice.

Penn National had a duty to defend the counterclaims brought by L&L, and that duty to defend began immediately. The claims articulated by Penn National fell within the definition of advertising injury contained in its Policy. The Fourth Circuit later ruled in Beach Mart's favor on this issue, but Penn National should have originally come to the same conclusion, had it conducted its claims handling in a fair manner, consistent with custom and practice in the industry.

Penn National's course of conduct in handling this claim demonstrates ample examples of failing to implement reasonable standards for the prompt investigation of claims. Among them are:

- A seven month delay in communicating whether or not it would provide counsel and defend L&L's counterclaim;

16

- A one year and six month (1.5 years) delay in denying its duty to indemnify, and only doing so when it filed its complaint for declaratory judgment;

- Penn National's failure to clearly respond to Beach Mart's concerns and questions regarding the selection of defense counsel and failure to ensure that the selection of defense counsel with adequate experience in handling complex intellectual property claims was communicated to Beach Mart;

- Penn National's refusal to pay defense costs during what has been called the "interim period" without providing an explanation and reasonable basis for the denial, and Penn National's delay of 2.5 years in communicating that decision;

- Penn National's refusal to pay post tender defense costs, even after losing on appeal in the Fourth Circuit, and presumably also a failure to even reconsider Beach Mart's renewed request for reimbursement.

- Penn National's failure to explain or justify in any respect its refusal to pay Beach Mart's post-tender defense costs.

As to Penn National's handling of Beach Mart's claim, my fundamental opinion is that Penn National failed to follow good, acceptable, and customary claim handling practices in responding to the claim submitted by Beach Mart. In considering the various claim handling customs and practices, I conclude that Penn National failed to comply with reasonable and commercially-acceptable standards for acting in the best interests of its insured,, and that it committed multiple acts with frequency when it transgressed several bounds of reasonable conduct. The numerous facts specifically pointed to above support the contention and my opinion and belief that Penn National acted recklessly with intent to injure Beach Mart (or, acted in a manner that put Penn National's interest above and before its policyholder, Beach Mart). Additionally, because the redacted and/or withheld claims documents of Penn National are not yet available to me, which undoubtedly bear on this opinion, I reserve all rights to amend or supplement the forgoing opinion once these materials are produced.

17

In accord with custom and practice within the industry, Penn National's policy language reserved unto Penn National the full and final power to make all coverage decisions under the Policy. Because the Policy vests Penn National with sole power to make coverage decisions, the law in every single American jurisdiction either implies a duty of good faith and fair dealing in making these decisions, or gives other statutory or regulatory guidelines to limit the insurer's discretion in handling and resolving claims (or both implies a duty and gives guidelines). While Penn National (or any other insurer) cannot make coverage decisions based on undeveloped facts or vague assertions, when determining whether it has a duty to defend, it is required to compare the allegations in the counterclaim against Beach Mart *as they were drafted* or based on additional information provided by Beach Mart, and not misconstrue those counterclaim allegations in a manner that avoids coverage. However, Penn National did exactly that: is purposefully misconstrued the allegations in its favor, and in a method to avoid its defense and coverage obligation. That was a misrepresentation of the policy terms and conditions.

Additionally, while the policy language reserves the right to Penn National to select and control the defense counsel provided to defend the counterclaims, there is a necessary obligation on the part of Penn National to select defense counsel with appropriate expertise and experience to favorably handle the type, nature, and magnitude of the claims asserted against the insured. Here, L&L asserted complex intellectual property and unfair competition claims that required several years of intense litigation by highly experience trademark attorneys to favorably resolve. Moreover, L&L's pursuit of these claims sought damages in excess of $20mm and aimed to totally shut down Beach Mart's long-standing business. Beach Mart questioned at the outset whether the defense counsel selected by Penn National from among its existing insurance defense panel counsel met these qualifications. Furthermore, even after Beach Mart questioned whether, given

18

the nature of the complex intellectual property claims asserted by L&L in the underlying litigation, given the overarching seriousness of such claims in light of Beach Mart's continuation of business and the amount of damages sought by L&L (in excess of $20mm), and given the progress as of 2013 by Beach Mart's personal counsel, Penn National failed to adequately respond to or explain whether its selection of panel counsel brought sufficient expertise to bear on Beach Mart's behalf to assure a favorable defense of the counterclaims.

When I review the L&L Counterclaims against Beach Mart – just as Penn National's claims handlers were supposed to do – it is immediately apparent that the counterclaims articulate claims and allege conduct covered by the Policy.  For example, the Counterclaims allege:

- Deception of L&L's customers and unfair competition; (D.E. 40-10, ¶¶ 24-26; ¶¶ 48- 49)

- Misappropriation of L&L's trade dress and design rights; D.E. 40-10, ¶¶ 23-24; ¶¶ 48-49)

- Infringement of L&L's advertising slogan "All You Need To Reach The Beach"; (D.E. 40-10, ¶¶ 23-24; ¶¶ 48-49)

- Misuse of L&L's advertising concepts on websites; (D.E. 40-10) and

- Misuse of "Hello, Wings!" store and telephone greeting. (D.E. 40-10, ¶ 19).

These allegations *clearly* triggered coverage under the advertising injury section of the Policy.  This is not the sort of claim where it is important for a policyholder to explain the assumptions underlying its loss.. Here, the Beach Mart Complaint and L&L Counterclaim, when compared with the Policy, give fair notice of that a duty to defend is triggered. To the extent that Penn National had any question about whether the claim was covered, Beach Mart reasonably and

19

quickly responded to any questions. Penn National's later assumption of the defense of this matter show that the allegations of the L&L Counterclaims triggered the duty to defend. Penn National, contrary to its duties to act in good faith towards its insured, turned a blind eye for months to the large number of allegations clearly stated in the Counterclaims, and essentially failed to do any further investigation in to the case materials or discovery available to it.

The L&L Counterclaims against Beach Mart were plain and unambiguous that it contended WINGS and SUPER WINGS were infringements. But the Counterclaims also make claims of unfair competition and deceptive trade practices arising from copying or imitating L&L's distinctive store environment and façade (trade dress), as well as stealing/passing off/misappropriating L&L's advertising slogans, in-store and telephone greetings, and other materials.

Penn National has an obligation to its policyholders to have educated, informed, and well-trained claims handlers. Penn National's claims handlers knew – or should have known – that trade dress is covered by the Policy. The fact that trade dress infringement is covered by the standard "advertising injury" provisions in a commercial general liability policy is not new or novel; it has been known to those trained in the industry for decades. This was commonly accepted as early as 2001 and had been taught within the industry. Penn National's claims handlers knew, or should have known and should have been trained, that allegations of trade dress infringement trigger its CGL policy. To the contrary, Penn National's adjusters and supervisors appeared to lack any knowledge of trade dress infringement, had only the most superficial understanding of other forms of advertising injury of the kind as described in the Counterclaims, and lacked any meaningful prior experience or training in handling trade dress or advertising injury claims. I can only assume a failure of implementation of reasonable training for not accepting such a claim when

20

the Policy clearly provides coverage for trade dress infringement. Additionally, because the redacted and/or withheld claims documents of Penn National are not yet available to me, which undoubtedly bear on this opinion, I reserve all rights to amend or supplement the forgoing opinion once these materials are produced.

I have reviewed the 2005 contract between Beach Mart and L&L regarding the use of the trademark "WINGS." There was a dispute between the two companies regarding the right to use this trademark. However, that 2005 contract did not contain any provisions or descriptions about general advertising concepts, trade dress, website design, in-store greetings to customers, telephone greetings, the general design of a store façade, or other conceptions of trade dress. Penn National's claims handlers and attorneys were misrepresenting the insurance policy provisions to deny coverage by arguing that all these allegations of trade dress infringement (contained in the counterclaim) were actually included in the 2005 contract. This argument goes beyond the boundaries of fair advocacy and good faith, because it is creating a "fact" that does not actually exist. Penn National may have wished the 2005 contract would have included trade dress, telephone greetings, building design, etc. but it does not address these things. Penn National advanced this argument – and attempts to create this "fact" – in order to advance a coverage position more-favorable to the insurer and defeat coverage for the policyholder. Misrepresenting pertinent facts is not the custom and practice of the insurance industry; the insurer is supposed to take the facts as they are and apply those facts to the provisions of the Policy. The insurer is not supposed to create new facts which are more favorable, in an effort to defeat coverage under the Policy. Additionally, because the redacted and/or withheld claims documents of Penn National are not yet available to me, which undoubtedly bear on this opinion, I reserve all rights to amend or supplement the forgoing opinion once these materials are produced.

21

Penn National's conduct in insisting certain exclusions apply also misrepresents the insurance policy provisions. Penn National has continued to claim that the prior publication and breach of contract exclusion apply to exclude coverage for this claim.

As explained above, the 2005 contract was solely related to the WINGS and SUPER WINGS trademarks. There can be no dispute that the 2005 trademark agreement relates to and governs only the parties rights relative to the use of WINGS and SUPER WINGS. But L&L's counterclaim alleges claims arising from the design of the store façade and store interior layouts, trade dress, misuse of images on the store website, confusion arising from the slogan "All You Need To Reach The Beach," phrases used in store greetings by employees and used on telephone records, etc. D.E. 40-9, Ex. A. This is the conduct that L&L bases its claims for causing customer confusion (among current L&L customers and future customers) which L&L alleges damaged it. See generally, D.E. 40-10 and 40-12. L&L's claims do not "arise from" the 2005 agreement. Because of these facts do not relate to the 2005 contract, the "breach of contract" exclusion in the Penn National Policy does not apply. The only conclusion I can come to is either Penn National's claims handlers purposefully or recklessly denied this claim. It is my opinion that a well-trained and well-meaning claims handler would only apply a "breach of contract" exclusion to exclude coverage for the L&L allegations which were not contained in the contract in two scenarios: (1) Penn National purposefully sought to avoid coverage so its employees insisted on applying an exclusion contrary to the facts, or (2) Penn National's employees conducted a reckless and cursory (instead of thoroughly and accurately) review of the L&L counterclaim and denied it. Either of these would exhibit a lack of compliance on Penn National's part with reasonable and commercially-acceptable standards for acting in the best interests of its insured. If Penn National's claims handlers had thoroughly reviewed the L&L Counterclaim or had reviewed the entire

22

counterclaim accurately, they should have come to a different conclusion: the breach of contract exclusion cannot apply to avoid coverage for claims not included in the contract.

Adjusters, like other insurance professionals, are supposed to receive education related to the principles of insurance. It is customary, and I would expect, claims handlers like Greg Gross, Gary Gibson, and Steve Oliver to be grounded in the principles of insurance and familiar with why coverage should apply in this matter. Based on his investigation, while it may have been appropriate to consider the 2005 contract at first glance, once it was apparent that the 2005 contract was limited to the trademarks WINGS and SUPERWINGS and did not include copying or misappropriating the style of the building, the layout of the interior of the stores, and the mimicking or copying of in-store salutations and telephone greetings, it was inappropriate to rely on the exclusion for contractual liability. When Penn National doggedly adhered to this exclusion, it was a misrepresentation of the insurance policy provisions, and demonstrated how truly biased their claims analysis and investigation was. Additionally, because the redacted and/or withheld claims documents of Penn National are not yet available to me, which undoubtedly bear on this opinion, I reserve all rights to amend or supplement the forgoing opinion once these materials are produced.

Penn National's *claim function* must fulfill its responsibility to the insured and pay covered claims. Adjusters should construe policies in favor of coverage, construe exclusions narrowly to avoid excluding claims, and not seek to put the insurer's interests ahead of the policyholder. Further, when the claim contains a mixture of covered and uncovered claims; once the claims professional adjudicates that one claim is covered, the insurer's duty to defend all claims is triggered. As the old saying goes, *in for a penny, in for a pound*. If one claim is covered by the policy, the insurer must defend all claims *even if they are excluded*. Here, once the claims handlers were presented with L&L's claims for unfair competition, misappropriation of advertising slogans,

23

and infringement of trade dress (namely, the distinctive style and appearance of the store buildings and signage), it was a misrepresentation of the insurance policy provisions to attempt to exclude the claim based on other grounds. But that is precisely what happened when Penn National relied on the contractual liability provision. Penn National failed to take the plain reading of the pleadings and apply them to the four corners of the policy. Additionally, because the redacted and/or withheld claims documents of Penn National are not yet available to me, which undoubtedly bear on this opinion, I reserve all rights to amend or supplement the forgoing opinion once these materials are produced.

## CONCLUSION:

The handling of Beach Mart's claim was rife with actions that misrepresented the terms and conditions of the policy. Penn National failed to promptly respond to is policyholder, failed to explain the rational for its refusal to defend Beach Mart, failed to mediate in good faith, and has consistently failed to deal fairly with its insured. Penn National's lack of good faith and fair dealing has continued on throughout this coverage litigation. These are my opinions to a reasonable degree of professional certainty. Because discovery is ongoing and the numerous withheld or redacted documents, I reserve the right to amend or supplement this report. I believe supplementation is likely. The withheld documents have prevented me from completing a full analysis of this matter.

R. Bryan Tilden
CPCU, CLU, ARM, ALCM, ChFC, CIC

24

*Curriculum Vitae*
*of*
*R. Bryan Tilden*
526 Red Gate Road
Pittsboro, North Carolina 27312-7934
*Office:* 919.542.1042 • *Fax:* 919.542.6255 • *E-mail:* tilden@mindspring.com

**EDUCATION:**

**Senior Claim Law Associate,** 2008
AMERICAN EDUCATIONAL INSTITUTE, INC.
Basking Ridge, New Jersey

**Chartered Financial Consultant,** 1983
THE AMERICAN COLLEGE
Bryn Mawr, Pennsylvania

**Associate in Loss Control Management**, 1983
INSURANCE INSTITUTE OF AMERICA
Malvern, Pennsylvania

**Associate in Risk Management**, 1982
INSURANCE INSTITUTE OF AMERICA
Malvern, Pennsylvania

**Chartered Life Underwriter**, 1982
THE AMERICAN COLLEGE
Bryn Mawr, Pennsylvania

**Chartered Property Casualty Underwriter**, 1980
THE AMERICAN INSTITUTE FOR PROPERTY AND LIABILITY
UNDERWRITERS
Malvern, Pennsylvania

**Certified Insurance Counselor**, 1978
SOCIETY OF CERTIFIED INSURANCE COUNSELORS
Austin, Texas

**HONORS/ACTIVITIES:**

Active, Continuing Education for CPCUs, Society of Chartered Property Casualty Underwriters, 2016 - 2020

Grading Panel Member, The American Institute for Property and Liability Underwriters

Grading Panel Member, Insurance Institute of America

National Faculty Member, Society of Certified Insurance Counselors

Faculty, ACORD Power of Change Workshop, 1995 to present

Faculty, Independent Insurance Agents Virtual University, commentator to ISO, AAIS and ACORD

Ernest F. Young Education Award, 1988

North Carolina Independent Agent of the Year, 1989

Frequent contributor the *The John Liner Letter* articles on Business Income, CGL, Auto, Risk Management

Reviewer, various CPCU and Insurance Institute textbooks

**MEMBERSHIPS:**

International Association of Arson Investigators

Society of Certified Insurance Counselors

Society of Chartered Property Casualty Underwriters

Society of Claims Law Associates

Society of Financial Service Professionals

**LICENSES:**

Property and Liability Agent, North Carolina, New Jersey

Life and Health Agent, North Carolina, New Jersey

Medicare Supplement and Long Term Care Agent, North Carolina

**EXPERIENCE:**

April 1997 to Present
**Training and Consulting**
Tilden & Associates
Pittsboro, North Carolina

September 1995 to March 1997
**Director of Technical Affairs**
Independent Insurance Agents of North Carolina, Inc.
Raleigh, North Carolina

March 1990 to August 1995
**Director of Education**
Independent Insurance Agents of North Carolina, Inc.
Raleigh, North Carolina

September 1983 to March 1990
**Account Executive**
Chapel Hill Insurance Agency, Inc.
Chapel Hill, North Carolina

September 1979 to July 1983
**Vice President**
Thomas Rutherfoord, Inc.
Roanoke, Virginia

December 1978 to September 1979
**Account Executive**
Marsh & McLennan, Inc.
Washington, DC

July 1974 to December 1978
**Account Executive**
Herb Holland Company, Inc.
Chapel Hill, North Carolina

**PUBLICATIONS:**

The CPCU Society. "A Guide to the CGL Aggregate Limits", http://www.cpcusociety.org/learning/campus/how.shtml , 1999

The CPCU Society, "A Guide to the Motor Carrier Act", http://www.cpcusociety.org/learning/campus/how.shtml. 1999

The CPCU Society, "A Guide to Value Reporting Form",

R. Bryan Tilden, *1999 Business Auto Policy, Changes and Issues* (Albany: Professional Insurance Agents, 1999)

----, *2000 Commercial Property Changes* (Malvern: The CPCU Society, 2000)

----, *2000 Homeowners Policy Changes* (Malvern: The CPCU Society, 2000)

----, *2001 Commercial General Liability Policy Changes* (Malvern: The CPCU Society, 2001)

----, *2001 Business Automobile Policy Changes* (Pittsboro, NC: Tilden and Associates, 2001)

----, *2002 Commercial Property Changes* (Malvern: The CPCU Society, 2002)

----, *2004 Commercial General Liability Policy Changes* (Malvern: The CPCU Society, 2004)

----, *2007 Commercial General Liability Policy Changes* (Malvern: The CPCU Society, 2007)

---- *2008 Commercial Property Changes* (Malvern: The CPCU Society, 2008)

----, *2010 Automobile Policy Changes* (Malvern: The CPCU Society, 2011)

----, *2011 Homeowners Policy Changes* (Malvern: The CPCU Society, 2011)

----, *2012 Commercial Property Policy Changes* (Malvern: The CPCU Society, 2013)

----, *2013 Commercial General Liability Policy Changes* (Malvern: The CPCU Society, 2013)

----, *Additional Insured* (Austin: Society of Certified Insurance Counselors, Inc., 1996, 2005, 2013; Malvern: The CPCU Society, 1999, 2001, 2004, 2005, 2013, 2019)

----, *Advanced Business Income* (Malvern: The CPCU Society, 1990 – 2016)

----, *Advanced Inland Marine* (Malvern: The CPCU Society, 2000)

----, *Advanced Pollution Liability* (Malvern: The CPCU Society, 1999 - 2012)

----, *Arson and the Insurance Contract* (Austin: Society of Certified Insurance Counselors, Inc., 1998, 2004, 2012)

----, *Bonus Life and Non-Qualified Deferred Compensation Plans* (Pittsboro, NC: Tilden and Associates, 1998)

----, *Budgeting* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1995)

R. Bryan Tilden and Donald Malecki, *Builders Risk, Wrap-Ups and Course of Construction* (Malvern. The CPCU Society, 2006)

R, Bryan Tilden, *Business Automobile Coverage Part* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1993, 1994, 1997, 1999, 2002, 2004, 2005, 2006, 2010, 2013)

----, *Business Owner's Policy* (Austin: Society of Certified Insurance Counselors, Inc., 1990 – 2002, 2010, 2013)

----, *Claims Handling* (Pittsboro, NC: Tilden and Associates, 1999)

----, *Closing Gaps in Property Insurance* (Malvern: The CPCU Society, 1999, 2007, 2015)

----, *Commercial Account, The* (Malvern: The CPCU Society, 1999, 2001, 2005)

----, *Commercial Crime Program* (Austin: Society of Certified Insurance Counselors, Inc., 1988, 1991, 1992, 1999, 2000, 2006, 2013; Malvern: The CPCU Society, 2000, 2006, 2009, 2013)

----, *Commercial General Liability Coverage Part* (Austin: Society of Certified Insurance Counselors, Inc., 1989, 1992, 1994, 1996, 1997, 1998, 1999, 2001, 2004, 2007, 2013, 2019)

----, *Commercial Property Coverage Part* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1991, 1996, 2001, 2008, 2012)

----, *Commercial Property Causes of Loss Forms* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1991, 1996, 2001, 2008, 2012)

----, *Contract Bonds* (Pittsboro, NC: Tilden and Associates, 1999)

R. Bryan Tilden and Donald Malecki, *Contractual Risk Transfer* (Malvern. The CPCU Society, 2005)

R. Bryan Tilden, *Director's and Officer's Liability* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1997; 2002 Malvern: The CPCU Society, 1998, 2000, 2002)

----, *Disability Income and Long Term Care Insurance* (Pittsboro, NC: Tilden and Associates, 2006)

----, *Employee Leasing – The New CGL.* Counselor C93 #6 December (1993): 1-4

----, *Employment Related Practices* (Pittsboro, NC: Tilden and Associates, 1999, 2011, 2015)

----, *Endorsements to the Commercial Property Coverage Part* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1991, 1996, 2001, 2008, 2012)

----, *Essentials of Legal Liability* (Austin: Society of Certified Insurance Counselors, Inc., 1995)

----, *Essentials of Life Insurance* (Raleigh, NC: Independent Insurance Agents of North Carolina, Inc., 1991)

----, *Estate Planning* (Pittsboro, NC: Tilden and Associates, 1999)

----, *Estate Planning Techniques, Gifts, Trusts and Family Limited Partnerships* (Pittsboro, NC: Tilden and Associates, 2000)

R. Bryan Tilden and Donald Malecki, *Evolution of the CGL,* (Malvern. The CPCU Society, 2007)

R. Bryan Tilden, *Excess Liability and Commercial Umbrella Policies* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1995, 1997, 2013)

----, *Flood Insurance*, (Austin: Society of Certified Insurance Counselors, Inc., 1998)

----, *Garage Policy* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1993, 1994, 1998, 2006)

----, *Hidden Coverages* (Austin: Society of Certified Insurance Counselors, Inc., 1995, 1997, 2000; Malvern: The CPCU Society, 1998, 2004, 2010, 2013)

----, *Homeowner's Policy* (Pittsboro, NC: Tilden and Associates, 1998, 2001, 2011)

----, *Homeowner's Tricks and Traps* (Austin: Society of Certified Insurance Counselors, Inc., 1989, 1993, 1997, 2001, 2013)

----, *How to Determine the Financial Stability of an Insurance Company* <u>Agents Journal</u> Spring (1985) 18 - 19

----, *Human Resources* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1996)

----, *Insurance Fraud* (Pittsboro, NC: Tilden and Associates, 2001)

----, *Insurance Statute and Rules Update, An Agents' Guide* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1991)

----, *Insuring Contractors* (Malvern: The CPCU Society, 1998, 1999, 2004, 2007, 2013)

----, *Insuring Defective Construction* (Malvern: The CPCU Society, 2002, 2004, 2007, 2013; Austin: Society of Certified Insurance Counselors, 2002, 2004, 2007, 2013, 2019)

----, *Insuring the E-Commerce Account* (Malvern: The CPCU Society, 2000 – 2019)

----, *Insuring the In Home Business* (Austin: Society of Certified Insurance Counselors, 1998)

----, *Insurance Valuation Problems* (Malvern: The CPCU Society, 1997 – 2013)

----, "It's a Crime Not to Insure! Use New Crime Forms for the Best Coverage," *Resources* (The National Alliance for Insurance Education & Research), (Spring 2001), pp. 10-13.

----, *Law and the Life Insurance Contract* (Pittsboro, NC: Tilden and Associates, 2002)

----, *Leased Properties Exposures* (Austin: Society of Certified Insurance Counselors, Inc., 1989, 1997, 2005; Malvern: The CPCU Society, 1998, 2001, 2005, 2013)

----, *Liability Issues and Solutions* (Austin: Society of Certified Insurance Counselors, Inc., 1998)

R. Bryan Tilden and Donald Malecki, *Malecki and Tilden on the CGL,* (Malvern. The CPCU Society, 2003, 2004, 2005)

R. Bryan Tilden, *Medicare Supplement and Long Term Care* (Raleigh, NC: Independent Insurance Agents of North Carolina, Inc., 1991, 1992)

----, *Mergers, Acquisitions and Joint Ventures* (Malvern: The CPCU Society, 2001; Austin: Society of Certified Insurance Counselors, Inc., 2002, 2013)

----, *More Personal Lines Questions and Answers* (Pittsboro, NC: Tilden and Associates, 1997)

----, *N.C. Insurance Statutes and Rules Update, An Agents' Guide* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1992)

----, *Personal Auto Policy* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1990, 1993)

----, *Personal Auto Policy* (Pittsboro, NC: Tilden and Associates, 1999)

----, *Personal Lines Questions and Answers* (Malvern: The CPCU Society, 1997, 1998, 2012)

----, *Personal Lines, Troublesome Problem Areas* (Indianapolis: Independent Insurance Agents of Indiana, 1997, 1998)

----, *Pollution Liability Coverages* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1991, 1998, 2012)

----, *Pollution and Environmental Liability Coverages* (Malvern: The CPCU Society, 1999, 2012, 2015)

R. Bryan Tilden and John P. Young, *Pre-Licensing Guide* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1988, 1993)

R. Bryan Tilden, *Professional Liability* (Austin: Society of Certified Insurance Counselors, Inc., 1994, 1996, 1998)

----, *Problems and Solutions in Buy-Sell Agreements* (Pittsboro, NC: Tilden and Associates, 1998).

----, *Products and Completed Operations* (Malvern: The CPCU Society, 1999)

----, *Properly Insuring Churches, Clubs, Civic Groups and Other Not-For-Profit Organizations* (Austin: Society of Certified Insurance Counselors, Inc., 1991, 1998, 2001)

----, *Property & Liability Innovations and Solutions* (Austin: Society of Certified Insurance Counselors, Inc., 1998, 1999, 2001)

----, "Puzzled About Commercial Auto?" *Resources* (The National Alliance for Insurance Education & Research), (Fall/Winter 2001), pp. 8-9.

----, *Rental Car Exposures and Coverages* (Austin: Society of Certified Insurance Counselors, Inc., 1988, 1990, 1992, 1999)

----, *Shared Ownership of Property* (Austin: Society of Certified Insurance Counselors, Inc., 1989, 1990, 2001)

----, *Small Employer Group Benefits* (Raleigh, NC: Independent Insurance Agents of North Carolina, Inc., 1992)

----, *Solving Troublesome Liability Issues* (Austin, Society of Certified Insurance Counselors, Inc., 2016)

----, *Solving Troublesome Property Issues* (Austin, Society of

----, *Split Dollar Plans* (Pittsboro, NC: Tilden and Associates, 1998)

----, *Time Element Coverages* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1992, 1996, 2001, 2008, 2012)

----, *Tips, Tricks and Traps of the CGL* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1992, 1998, 1999, 2012; Malvern: The CPCU Society, 2000, 2012)

----, *Toxic Mold, Where Is The Coverage?* (Malvern: The CPCU Society, 2003, 2004, 2008, 2010, 2013)

----, *Umbrella and Excess Liability* (Malvern, The CPCU Society, 2004, 2013)

----, *Underwriting Workers Compensation* (Pittsboro, NC: Tilden and Associates, 2003)

----, *Utilizing the New Commercial Coverages* (Albany: Professional Insurance Agents, 2003)

----, *Will the Policy Pay for Rebuilding?* Professional Agent February 1998: 24 - 27

----, *Workers' Compensation* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1992, 1997, 2012)

----, *Workers' Compensation: Treating the Exposure* (Malvern: The CPCU Society, 2000)

----, *Workers' Compensation: Underwriting* (Malvern: The CPCU Society, 2000)

**CASES PAST 4 YEARS:**   *Daniel Island Riverside Developers, LLC, et al, v. The Oaks at Rivers Edge Property Owners Association, Inc., et al,* 2010-CP-08-4318, In the Court of Common Pleas, Fifteenth Judicial Circuit, County of Berkeley, South Carolina.

*Michael McDonald, et al, v. Selective Insurance Company of South Carolina, et al,* 1422-CC00687, In the Circuit Court of St. Louis City, State of Missouri.

*Mark Scott and Merrilee Scott v. LifeSecure Insurance Company,* 2:15-cv-00197-CW-DBP, United States District Court, District of Utah, Central Division.

*Mark Williams v. Soderholm Financial Services v. White Bear Lake Insurance Company,* 26-CV-15-260, District Court of Minnesota, County of Grant, Eighth Judicial District.

*Pamela Shore v. State Farm Mutual Insurance Company,* 4:16-CV-00301, United States District Court, Western District of Missouri.

*Seneca Insurance Group, Inc., v. Hamby & Aloisio, Inc.,* 1:16-CV-00174-WSD, United States District Court, Northern District of Georgia, Atlanta Division.

*Gerald and Marsha Chanan v. Willis Towers Watson, Inc.,* 2016 L 004531, Circuit Court of Cook County, Illinois County Department, Law Division.

*Berkley Regional Specialty Insurance Company v. <u>Mel Foster Co. Insurance, Inc., et al,</u>* 2:15-cv-00027-HEA, United States District Court, Eastern District of Missouri, Northern Division.

*Belmont Confections, Inc. v. <u>Century Insurance Consultants, Ltd. et al,</u>* GD-12-008129, In the Court of Common Pleas of Allegheny County, Pennsylvania.

*<u>BNSF Railway Company</u>, v. Morrison Grain & Ag Services, Inc. and Mid-Continent Casualty Company,* CIV-15-1066-F, United States District Court, Western District of Oklahoma.

*528 North Avenue, LLC, v. <u>Ronald Diskin Associates Corp.,</u> et al,* MRS-L-2323-15, Superior Court of New Jersey, Morris County, Law Division.

*<u>Lion Petroleum, Inc.,</u> v. Paco Corporation, et al,* 15SL-CC00888, Div. 18, Circuit Court of St. Louis County, State of Missouri.

*<u>Gemini Insurance Company and Berkley Program Specialists, LLC</u>, v. Pelican General Insurance Agency,* 16-CV-02780, United States District Court, Northern District of Illinois, Eastern Division.

*Walker Risk Analysis Management & Services Company v. <u>FKI Industries and Wells Fargo Insurance Services USA, Inc.</u>,* 12 L 161, In the Circuit Court of the 18th Judicial Circuit, DuPage County, Wheaton, Illinois.

*Puerto Rico Electric Power Authority v. Passco, Inc., NIFE Barerias Industrias LTDS, et al <u>(American International Insurance Company)</u>,* K AC2007-4896(508), Commonwealth of Puerto Rico, First Instance Court, Superior Court of San Juan.

*<u>USI</u> v. Frieman, et al,* 180100954, Court of Common Pleas, Philadelphia County, Pennsylvania.

*<u>USI</u> v. VanderZanden, et al,* 01-17-0006-6562, American Arbitration Association.

*<u>Carlyle Commodity Management LLC, et al,</u> v. Certain Underwriters at Lloyds, et al,* 651151/2017, Supreme Court of the State of New York, County of New York, Commercial Division.

*Conrad Sales Group, LLC d/b/a Bay Hill Seafood v. Joseph Clyde Jenkins, Jr., Jenkins Insurance Agency, Inc. and <u>Nationwide Mutual Insurance Company,</u>* 16 CVS 493, Superior Court of Guilford County, North Carolina.

*<u>Patsy E. Holden, et al,</u> v. Tedford and Associates, LLC, et al,* CJ-2018-188, District Court of Rogers County, Oklahoma.

*Whitney J. Cagle v. <u>Westfield Insurance Company</u>,* 1816-CV22073, Circuit Court of Jackson County, Missouri, at Independence.

Case 2:14-cv-00008-FL     Document 117-8     Filed 10/15/21     Page 156 of 201

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

| | | |
|---|---|---|
| BEACH MART, INC.,<br>    Plaintiff<br><br>v.<br><br>L&L WINGS, INC.,<br>    Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:11-CV-44-F |
| L&L WINGS, INC.,<br>    Counterclaimant<br><br>v.<br><br>BEACH MART, INC.,<br>    Counter-Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| L&L WINGS, INC.,<br>    Plaintiff<br><br>v.<br><br>SHEPARD MORROW, SUPER WINGS,<br>LLC, and BEACH MART, INC.,<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:14-CV-52-F |

## ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS

Now comes L&L Wings, Inc. ("L&L"), by and through its undersigned counsel, for its Answer to the First Amended Complaint of Beach Mart, Inc. ("Beach Mart"), and does say, allege, and aver, with knowledge as to itself and otherwise upon information and belief, as follows:

## THE PARTIES

1.      L&L lacks information or belief sufficient to admit or deny the allegations set forth in Paragraph 1 of the Amended Complaint, and therefore denies them.

DB3/ 201303241.5

**EXHIBIT**

120

2.     L&L admits the allegations set forth in Paragraph 2 of the Amended Complaint.

## JURISDICTION AND VENUE

3.     L&L denies the allegations set forth in Paragraph 3 of the Amended Complaint, except admits that Beach Mart purports to invoke this Court's subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 2201.

4.     L&L denies the allegations set forth in sentences one and two of Paragraph 4 of the Amended Complaint, and avers that there is no Exhibit A annexed to the Amended Complaint. L&L admits the allegations set forth in sentences three and four of the Amended Complaint.

5.     L&L admits the allegations of the first sentence of Paragraph 5 of the Complaint, and denies the allegations set forth in the second sentence of Paragraph 5 of the Amended Complaint.

## FACTUAL BACKGROUND

6.     L&L lacks information or belief sufficient to admit or deny the allegations set forth in Paragraph 6 of the Amended Complaint, and therefore denies them.

7.     L&L admits the allegations set forth in Paragraph 7 of the Amended Complaint, except avers it has been using the name WINGS continuously since 1978, and denies that the Outer Banks of North Carolina are geographically distinctive for any relevant legal purpose.

8.     L&L admits the allegations set forth in Paragraph 8 of the Amended Complaint, except avers that it not only claims to be, but in fact is, the owner of the three federal trademark registrations referenced in Paragraph 8 of the Amended Complaint, denies that the allegations set forth in Paragraph 8 of the Amended Complaint accurately describe the categories of goods and

services of said federal trademark registrations and refers the Court to said federal trademark registrations for an accurate recitation of those categories.

9. L&L denies the allegations set forth in Paragraph 9 of the Amended Complaint, except admits that L&L and Beach Mart entered into an agreement effective January 1, 1995 that terminated by its terms on December 31, 1995, refers the Court to that agreement for a full statement of its contents and avers that there is no Exhibit A annexed to the Amended Complaint.

10. L&L denies the allegations set forth in Paragraph 10 of the Amended Complaint.

11. L&L denies the allegations set forth in Paragraph 11 of the Amended Complaint.

12. L&L denies the allegations set forth in Paragraph 12 of the Amended Complaint.

13. L&L denies the allegations set forth in Paragraph 13 of the Amended Complaint, except admits that L&L and Beach Mart entered into an agreement dated August 29, 2005, refers the Court to that agreement for a full statement of its contents and avers that there is no Exhibit B annexed to the Amended Complaint.

14. L&L denies the allegations set forth in Paragraph 14 of the Amended Complaint.

15. L&L denies the allegations set forth in Paragraph 15 of the Amended Complaint.

16. L&L lacks information or belief sufficient to admit or deny the allegations set forth in Paragraph 16 of the Amended Complaint, and therefore denies them.

17. L&L denies the allegations set forth in Paragraph 17 of the Amended Complaint.

18. L&L denies the allegations set forth in Paragraph 18 of the Amended Complaint.

19. L&L denies the allegations set forth in Paragraph 19 of the Amended Complaint.

20. L&L denies the allegations set forth in Paragraph 20 of the Amended Complaint.

21. L&L denies the allegations set forth in Paragraph 21 of the Amended Complaint.

22. L&L denies the allegations set forth in Paragraph 22 of the Amended Complaint.

Case 2:11-cv-00044-F   Document 304   Filed 02/23/17   Page 3 of 28
Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 159 of 201

23. L&L denies the allegations set forth in Paragraph 23 of the Amended Complaint.

24. L&L denies the allegations set forth in Paragraph 24 of the Amended Complaint, except admits that L&L and Morrow executed an agreement dated April 29, 1993, and avers that there is no Exhibit C annexed to the Amended Complaint.

25. L&L denies the allegations set forth in Paragraph 25 of the Amended Complaint.

26. L&L denies the allegations set forth in Paragraph 26 of the Amended Complaint.

27. L&L denies the allegations set forth in Paragraph 27 of the Amended Complaint, and refers the Court to the agreement between L&L and Morrow dated April 29, 1993 for a full statement of its terms.

28. L&L denies the allegations set forth in Paragraph 28 of the Amended Complaint.

29. L&L denies the allegations set forth in Paragraph 29 of the Amended Complaint.

30. L&L denies the allegations set forth in Paragraph 30 of the Amended Complaint.

31. L&L denies the allegations set forth in Paragraph 31 of the Amended Complaint.

32. L&L denies the allegations set forth in Paragraph 32 of the Amended Complaint.

33. L&L denies the allegations set forth in Paragraph 33 of the Amended Complaint.

34. L&L denies the allegations set forth in Paragraph 34 of the Amended Complaint and avers that there is no Exhibit B annexed to the Amended Complaint.

35. L&L denies the allegations set forth in Paragraph 35 of the Amended Complaint.

36. L&L denies the allegations set forth in Paragraph 36 of the Amended Complaint.

37. L&L denies the allegations set forth in Paragraph 37 of the Amended Complaint.

38. L&L denies the allegations set forth in Paragraph 38 of the Amended Complaint, and avers that the referenced Morrow agreement was void and/or terminated as of the dates referenced in Paragraph 38 of the Amended Complaint.

39.  L&L denies the allegations set forth in Paragraph 39 of the Amended Complaint.

40.  L&L denies the allegations set forth in Paragraph 40 of the Amended Complaint, except admits that the agreement dated August 29, 2005 contains a no-contest provision and refers the Court to the agreement for a full statement of its contents.

41.  L&L denies the allegations set forth in Paragraph 41 of the Amended Complaint.

42.  L&L denies the allegations set forth in Paragraph 42 of the Amended Complaint.

43.  L&L denies the allegations set forth in Paragraph 43 of the Amended Complaint.

44.  L&L denies the allegations set forth in Paragraph 44 of the Amended Complaint.

45.  L&L denies the allegations set forth in Paragraph 45 of the Amended Complaint.

46.  L&L denies the allegations set forth in Paragraph 46 of the Amended Complaint.

47.  L&L denies the allegations set forth in Paragraph 47 of the Amended Complaint.

48.  L&L denies the allegations set forth in Paragraph 48 of the Amended Complaint.

49.  L&L denies the allegations set forth in Paragraph 49 of the Amended Complaint.

## BEACH MART'S FIRST CLAIM FOR RELIEF
### (Fraudulent Inducement to Contract)

50.  L&L hereby repeats and realleges its answers to Paragraphs 1-49 above, as if fully set forth herein.

51.  L&L denies the allegations set forth in Paragraph 51 of the Amended Complaint.

52.  L&L denies the allegations set forth in Paragraph 52 of the Amended Complaint.

53.  L&L denies the allegations set forth in Paragraph 53 of the Amended Complaint.

54.  L&L denies the allegations set forth in Paragraph 54 of the Amended Complaint.

55.  L&L denies the allegations set forth in Paragraph 55 of the Amended Complaint.

56.  L&L denies the allegations set forth in Paragraph 56 of the Amended Complaint.

DB3/ 201303241.5                                    -5-

Case 2:11-cv-00044-F   Document 304   Filed 02/23/17   Page 5 of 28
Case 2:14-cv-00008-FL      Document 117-8      Filed 10/15/21      Page 161 of 201

## BEACH MART'S SECOND CLAIM FOR RELIEF
### (Negligent Misrepresentation)

57. L&L hereby repeats and realleges its answers to Paragraphs 1-56 above, as if fully set forth herein.

58. L&L denies the allegations set forth in Paragraph 58 of the Amended Complaint.

59. L&L denies the allegations set forth in Paragraph 59 of the Amended Complaint.

60. L&L denies the allegations set forth in Paragraph 60 of the Amended Complaint.

61. L&L denies the allegations set forth in Paragraph 61 of the Amended Complaint.

62. L&L denies the allegations set forth in Paragraph 62 of the Amended Complaint.

63. L&L denies the allegations set forth in Paragraph 63 of the Amended Complaint.

64. L&L denies the allegations set forth in Paragraph 64 of the Amended Complaint.

## BEACH MART'S THIRD CLAIM FOR RELIEF
### (Cancellation of Trademark Registrations Pursuant to 15 U.S.C. § 1064)

65. L&L hereby repeats and realleges its answers to Paragraphs 1-64 above, as if fully set forth herein.

66. L&L denies the allegations set forth in Paragraph 66 of the Amended Complaint.

67. L&L denies the allegations set forth in Paragraph 67 of the Amended Complaint.

68. L&L denies the allegations set forth in Paragraph 68 of the Amended Complaint.

69. L&L denies the allegations set forth in Paragraph 69 of the Amended Complaint.

70. L&L denies the allegations set forth in Paragraph 70 of the Amended Complaint.

71. L&L denies the allegations set forth in Paragraph 71 of the Amended Complaint.

72. L&L denies the allegations set forth in Paragraph 72 of the Amended Complaint.

73. L&L denies the allegations set forth in Paragraph 73 of the Amended Complaint.

DB3/ 201303241.5    -6-

Case 2:11-cv-00044-F   Document 304   Filed 02/23/17   Page 6 of 28
Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 162 of 201

## BEACH MART'S FOURTH CLAIM FOR RELIEF
### (False or Fraudulent Registration Pursuant to 15 U.S.C. § 1120)

74. L&L hereby repeats and realleges its answers to Paragraphs 1-73 above, as if fully set forth herein.

75. L&L denies the allegations set forth in Paragraph 75 of the Amended Complaint.

76. L&L denies the allegations set forth in Paragraph 76 of the Amended Complaint.

77. L&L denies the allegations set forth in Paragraph 77 of the Amended Complaint.

78. L&L denies the allegations set forth in Paragraph 78 of the Amended Complaint.

79. L&L denies the allegations set forth in Paragraph 79 of the Amended Complaint.

80. L&L denies the allegations set forth in Paragraph 80 of the Amended Complaint.

## BEACH MART'S FIFTH CLAIM FOR RELIEF
### (Unfair and Deceptive Trade Practices Pursuant to N.C. Gen. Stat. § 75-1.1)

81. L&L hereby repeats and realleges its answers to Paragraphs 1-80 above, as if fully set forth herein.

82. L&L denies the allegations set forth in Paragraph 82 of the Amended Complaint.

83. L&L denies the allegations set forth in Paragraph 83 of the Amended Complaint.

84. L&L denies the allegations set forth in Paragraph 84 of the Amended Complaint.

## BEACH MART'S SIXTH CLAIM FOR RELIEF
### (Declaratory Judgment)

85. L&L hereby repeats and realleges its answers to Paragraphs 1-84 above, as if fully set forth herein.

86. L&L admits the allegations set forth in Paragraph 86 of the Amended Complaint.

87. L&L denies the allegations set forth in Paragraph 87 of the Amended Complaint.

DB3/ 201303241.5

-7-

Case 2:11-cv-00044-F   Document 304   Filed 02/23/17   Page 7 of 28
Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 163 of 201

## BEACH MART'S SEVENTH CLAIM FOR RELIEF
### (In the Alternative)
### (Declaratory Judgment)

88.     L&L hereby repeats and realleges its answers to Paragraphs 1-87 above, as if fully set forth herein.

89.     L&L denies the allegations set forth in Paragraph 89 of the Amended Complaint.

90.     L&L denies the allegations set forth in Paragraph 90 of the Amended Complaint.

91.     L&L denies the allegations set forth in Paragraph 91 of the Amended Complaint.

92.     Except as admitted, L&L denies all allegations set forth in the Amended Complaint.

## AFFIRMATIVE DEFENSES

93.     The Amended Complaint fails to state a claim upon which relief can be granted.

94.     The claims in the Amended Complaint are barred by the applicable statute of limitations.

95.     The claims in the Amended Complaint are barred by the doctrine of laches.

96.     The claims in the Amended Complaint are barred because Beach Mart has failed to allege same with the particularity required under Fed. R. Civ. P. 9.

97.     The claims in the Amended Complaint are barred by Beach Mart's lack of standing.

98.     The claims in the Amended Complaint are barred by Beach Mart's own unclean hands.

99.     The claims in the Amended Complaint are barred by Beach Mart's own misconduct, which is contrary to law and unlawful.

100. The claims in the Amended Complaint are barred by the doctrines of excuse and discharge.

101. The claims in the Amended Complaint are barred by the doctrines of waiver, ratification and estoppel.

102. The claims in the Amended Complaint are barred because they are predicated upon a purported license agreement from Shepard Morrow, which was null and void from inception because Morrow never acquired or owned rights in the WINGS mark and/or never acquired or owned rights in the WINGS mark for retail stores or services.

103. The claims in the Amended Complaint are barred because they are predicated upon a purported license agreement from Shepard Morrow, which terminated by its terms in 1994 and/or terminated by mutual abandonment.

104. To the extent that Beach Mart has been injured or suffered damages, if any, such injury and damages were the result of and caused by Beach Mart's own actions or inaction, and through no actions of L&L.

105. To the extent that Beach Mart has suffered damages, if any, it is barred from recovering such damages, in whole or in part, by its failure to mitigate such damages.

## NON-WAIVER

106. L&L does not waive, and expressly reserves, all such other defenses as may be disclosed by further investigation and discovery.

Case 2:11-cv-00044-F   Document 304   Filed 02/23/17   Page 9 of 28
Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 165 of 201

## COUNTERCLAIMS

Now comes Counterclaimant L&L Wings, Inc. ("L&L"), by and through its undersigned counsel, for its Counterclaims against Counter-Defendant Beach Mart, Inc. ("Beach Mart"), does say, allege and aver, with knowledge as to itself and otherwise upon information and belief, as follows:

## NATURE OF THE ACTION

1.      This is an action for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) declaratory judgment that Beach Mart acquired no rights in the WINGS trademark or otherwise as a result of the assignment of Shepard Morrow's alleged rights in WINGS to Beach Mart; and (4) declaratory judgment as against Beach Mart that L&L is the sole owner of the WINGS name in connection with retail stores, beachwear and beach-related products.

## PARTIES

2.      L&L is a corporation duly organized under the laws of the State of South Carolina, is authorized to do business, *inter alia*, in the State of North Carolina, and maintains its principal place of business at 666 Broadway, New York, New York 10012.

3.      Beach Mart is a corporation organized under the laws of the State of North Carolina, and maintains its principal place of business at 2229 South Croatan Highway, Nags Head, North Carolina 27959.

## JURISDICTION AND VENUE

4.      This Court has original jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, 1332(a) and 1338(a) and (b), and pursuant to the Court's supplemental jurisdiction. This Court also has jurisdiction over these claims pursuant to 28 U.S.C. § 2201

DB3/ 201303241.5                                                   -10-

Case 2:11-cv-00044-F   Document 304   Filed 02/23/17   Page 10 of 28
Case 2:14-cv-00008-FL      Document 117-8      Filed 10/15/21      Page 166 of 201

because there is an actual cases and controversy between the parties regarding their respective rights to the WINGS mark.

5.    Venue is proper in this District under 28 U.S.C. § 1391(c) in that Beach Mart conducts business in North Carolina so as to subject it to personal jurisdiction, and under 28 U.S.C. § 1391(b) in that a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

A.    L&L Wings And The WINGS Mark

6.    L&L was established in 1978, and is well-known as a retailer of beach related apparel, beach toys, souvenirs and other related items.  L&L owns and operates 29 retail stores under the WINGS brand in six states, including North Carolina, South Carolina, Florida, Massachusetts, Texas and California.  Since February 1, 1978, L&L has continuously offered for sale and has sold products, and has provided services, under the trademark WINGS.

7.    L&L has extensively and consistently advertised, marketed and promoted the WINGS trademark since 1978 in interstate commerce.

8.    L&L is the owner of all right, title and interest in and to the WINGS trademark as used in connection with the operation of retail apparel stores, retail clothing stores, retail discount store services in the field of beachwear clothing, and the retail sale of beach related apparel, beach toys, souvenirs and other related items.

9.    L&L has achieved significant consumer recognition as the source of beachwear clothing, beach related apparel, beach toys, souvenirs and related items sold at retail under the WINGS name.

10.     L&L is the owner of the following valid and subsisting federal trademark registrations on the Principal Register of the United States Patent and Trademark Office for the WINGS name: (a) Reg. No. 3458144, issued July 1, 2008, for WINGS used in connection with retail apparel stores in the field of beachwear clothing; (b) Reg. No. 4193881, issued August 12, 2012, for WINGS used in connection with beach towels, men's, women's and children's clothing, beach shoes, socks, head wear, accessories and retail store services featuring beach related equipment; and (c) Reg. No. 4205040, issued September 11, 2012, for WINGS (stylized) used in connection with beach towels, men's, women's and children's clothing, beach shoes, socks, head wear, accessories and retail store services featuring beach related equipment.

B.     The 2005 Agreement With Beach Mart

11.     Prior to 1995, Beach Mart's principal Israel Golasa was employed for approximately six years by L&L in connection with the operation of L&L retail stores in North Carolina. Mr. Golasa was fully familiar with L&L's use of the WINGS trademark during his employment by L&L, as well as the goodwill and reputation represented by the WINGS trademark, all to the benefit of L&L.

12.     Mr. Golasa's employment by L&L terminated as of January 1, 1995. At that time, he was permitted by L&L to continue to operate, through Beach Mart, two retail stores in North Carolina that were formerly operated by L&L, to sell beach-related apparel, beach toys, souvenirs and other related items under the WINGS trademark.  L&L granted such rights to Beach Mart pursuant to a license agreement, effective January 1, 1995, granting permission to Beach Mart to use the WINGS mark (the "1995 License Agreement").

13.     Notwithstanding the expiration of the 1995 License Agreement by its terms on December 31, 1995, Beach Mart continued thereafter to operate the two retail locations formerly

operated by L&L, and continued using the WINGS trademark in connection therewith. Such continued operation was pursuant to an oral understanding between L&L and Beach Mart, pursuant to which Beach Mart would otherwise abide by the terms of the 1995 Agreement and make a payment of an annual fee to L&L in consideration of the extended permission to use the WINGS trademark. This arrangement continued for a number of years until Beach Mart, without explanation or excuse, ceased paying and refused to pay any fees for the right to use the WINGS trademark, yet continued to use the WINGS trademark without authorization.

14.　　Beach Mart and L&L negotiated a resolution of Beach Mart's unexcused and unauthorized use of the WINGS trademark, and with the intention of avoiding further disputes and potential litigation, as well as to establish distinctions and avoid confusion between Beach Mart's stores and L&L's stores, the parties agreed to a new arrangement as memorialized in the 2005 Agreement, dated August 29, 2005. The 2005 Agreement provided, *inter alia*, that:

- Beach Mart would use the WINGS designation, but only as part of the designation "BIG WINGS" or "SUPER WINGS," and in no instance on a standalone basis as WINGS after December 31, 2005.
- Beach Mart's right to use WINGS in the form of "BIG WINGS" or "SUPER WINGS" was expressly conditioned and made "contingent" upon Beach Mart's not using WINGS, separately, at any time after December 31, 2005.
- Beach Mart's use of "BIG WINGS" or "SUPER WINGS" would be permitted only in the North Carolina counties of Camden, Chowan, Currituck, Dare, Passquotank, Perquimans, Tyrrell and Washington.
- Beach Mart acknowledged and agreed that L&L: (1) was the owner of the WINGS trademark; (2) had developed the goodwill, reputation and value associated with and represented by the WINGS trademark; and (3) owned all goodwill "accruing and/or arising from the use of the mark WINGS."
- L&L had the non-exclusive right to terminate the 2005 Agreement under certain conditions, including without limitation Beach Mart's bankruptcy and Beach Mart's challenge of any provision of the 2005 Agreement or its validity.
- Upon expiration or termination of the 2005 Agreement, L&L's consent to Beach Mart's use of the WINGS trademark, whether or not accompanied by "SUPER" or "BIG" would cease, and Beach Mart would be obligated at its own expense to remove all materials, signs, promotions, bags or other items bearing such names within thirty days.

15. The 2005 Agreement did not specify a durational term.

16. In the event Beach Mart failed to promptly fulfill all of its obligations under the 2005 Agreement, L&L expressly reserved the right to pursue all legal remedies, and if Beach Mart continued to use WINGS, SUPER WINGS or BIG WINGS after the expiration or termination of the 2005 Agreement, in addition to all other remedies, L&L would be entitled to injunctive relief, as well as all costs and disbursements, including attorneys' fees, for such unauthorized use.

C.     Beach Mart's Breach Of The 2005 Agreement

17. Subsequent to entering the 2005 Agreement, Beach Mart willfully and intentionally breached its terms, and engaged in conduct that caused L&L to suffer loss and damage, and to be deprived of the consideration it bargained to receive in entering into the 2005 Agreement.

18. Subsequent to December 31, 2005, Beach Mart has used, and continues to use, the WINGS trademark alone, and not accompanied by either the word "BIG" or "SUPER" as a modifying designation. Beach Mart's use of the unqualified WINGS trademark has occurred in a manner identical to L&L's use of the WINGS trademark in terms of shape, size and color. In addition, calls to Beach Mart's stores are answered with the greeting, "Hello, Wings," all in a manner to confuse and mislead consumers concerning an association of Beach Mart's retail stores with those of L&L. Such usage has occurred in no fewer than 12 stores operated by Beach Mart. No fewer than four other stores, operated by Beach Mart affiliates, use the WINGS trademark alone in connection with the sale of merchandise.

19. To the extent that Beach Mart has qualified its use of the WINGS trademark by using the word "super," it has done so in such a manner that has caused "super" to be diminished

Case 2:11-cv-00044-F   Document 304   Filed 02/23/17   Page 14 of 28
Case 2:14-cv-00008-FL     Document 117-8     Filed 10/15/21     Page 170 of 201

and undetectable. By way of illustration, rather than using the form permitted by the 2005 Agreement — "SUPER WINGS" — Beach Mart has used "super" with the WINGS trademark in connection with store signage by making "super" so small that it is not observable by consumers, especially after dark when the WINGS trademark is illuminated, but the word "super" is not. In such instances, Beach Mart's use of the WINGS trademark in connection with its store signage is virtually indistinguishable from L&L's use of the mark. By way of further illustration, Beach Mart has positioned the word "super" in its signage in such a way that consumers cannot observe its use in connection with the WINGS trademark except from particular limited vantage points.

20. Beach Mart has similarly diminished the size of the word "super," to the extent it is used at all, in connection with merchandise labels and advertising so that it is possible only upon careful up-close inspection to see that the word "super" is even being used. Beach Mart's use of "super" in such contexts has also been in close proximity to materials showing only the WINGS trademark, unmodified by "super," and thereby to diminish any distinctiveness between merchandise sold by Beach Mart as compared to merchandise sold by L&L. Beach Mart's use of the word "super" with the WINGS trademark, to the extent Beach Mart has used it at all, has been contrary to the purpose and intent of the 2005 Agreement — viz. to maintain a commercial distinction between L&L's retail operations and those of Beach Mart, and avoid consumer confusion.

21. Beach Mart has engaged in further conduct to eliminate the distinctiveness between its operations and those of L&L. Such conduct includes, *inter alia*, constructing and operating retail stores that use the identical façade as L&L's stores, which use a triangular tower above the entry and a distinctive wave design. Beach Mart has also adopted the advertising

slogan — "All you need for the beach" — which is virtually identical to L&L's slogan — "All you need to reach the beach."

22. Beach Mart's clearly intended purpose in wrongfully attempting to conceal the distinction between Beach Mart and L&L from consumers and customers is to present Beach Mart to consumers and customers as if it is L&L and, by so presenting Beach Mart, to cause consumers and customers who are familiar with L&L to patronize and purchase merchandise from the Beach Mart stores.

23. Beach Mart has further violated the express terms of the 2005 Agreement by using the WINGS trademark outside of the North Carolina territories designated in the 2005 Agreement, namely in Long Beach Island, New Jersey.

24. In undertaking all of the foregoing actions, Beach Mart has sought to and has succeeded in redirecting the goodwill, reputation and value represented by the WINGS trademark to its own benefit contrary to its express acknowledgement that such goodwill, reputation and value are owned by L&L and accrue and arise exclusively for the benefit of L&L.

25. Beach Mart's actions in relation to its unauthorized use of the WINGS trademark and in violation of the 2005 Agreement has caused consumers to be actually confused regarding the source of WINGS-branded merchandise and the relationship of L&L and Beach Mart. Such actual confusion has occurred in interstate commerce involving consumers from, at least, Delaware, Indiana, New Jersey, New York, Ohio, Pennsylvania and Virginia, as well as North Carolina. L&L has suffered injury as a result of Beach Mart's conduct in relation to the WINGS trademark, without limitation, based upon numerous complaints by consumers of poor quality goods sold by Beach Mart in association with the WINGS trademark. L&L has been further injured by Beach Mart's sale of counterfeit merchandise in association with the WINGS

trademark, as well as by the inappropriate and disrespectful treatment of customers by Beach Mart, with such customers believing they were shopping at and purchasing goods from an L&L store.

26. As a result of Beach Mart's conduct as described herein, L&L has been deprived of the benefit of maintaining and capitalizing on the goodwill, reputation and value of the WINGS trademark, which has been misappropriated by Beach Mart. L&L has also lost the opportunity to continue operations in the North Carolina counties designated in the 2005 Agreement in which Beach Mart was permitted to use the WINGS trademark, thereby losing at least the volume of sales achieved by Beach Mart in such territory.

E.     L&L's Proper Termination Of The 2005 Agreement

27. As a result of Beach Mart's continual violation of the 2005 Agreement and unauthorized use of the WINGS trademark, and its refusal notwithstanding the request of L&L to cease such conduct and to take remedial steps to eliminate the harm and injury caused by Beach Mart to L&L, by letter dated August 9, 2011, L&L gave appropriate and reasonable notice, properly delivered, to Beach Mart terminating the 2005 Agreement effective October 21, 2011.

28. Notwithstanding such notice, Beach Mart has improperly and without authority continued to use the WINGS trademark alone, and in association with the word "super," in such ways as to undermine the value of the WINGS trademark, and to misappropriate the goodwill, reputation and value associated therewith, and to otherwise injure L&L, and such conduct has been undertaken by Beach Mart willfully and purposefully.

29. L&L has been injured monetarily, as well as irreparably for which there is no remedy at law.

F.    The Morrow Agreement

30.    In 1992, Shepard Morrow acquired five federal trademark registrations for the name WINGS, all for use in connection with men's and boy's clothing. These trademark registrations were assigned by their original owner, Piedmont Industries, a clothing manufacturer, to Hampton Industries as part of a bankruptcy. As part of that same bankruptcy, Hampton Industries assigned the registrations to Morrow on May 26, 1992.

31.    Morrow never made use in commerce of the WINGS name at any time.

32.    None of Morrow, Piedmont Industries or Hampton Industries has ever used the WINGS name in connection with retail stores, beachwear or beach related products.

33.    In April 1993, L&L and Morrow, both resident in New York, New York at the time, entered into a written agreement (the "Morrow Agreement"). The Morrow Agreement is governed by New York law.  Morrow signed the Agreement in New York, where he lived until 2002.

34.    The Morrow Agreement purportedly granted to L&L a license to use the WINGS name in connection with Morrow's five trademark registrations. Based on Morrow's representation to L&L that he was the owner of those five trademark registrations, L&L entered into the Morrow Agreement.

35.    Morrow failed to disclose to L&L, prior to L&L's execution of the Morrow Agreement, that he had never used the WINGS name in commerce, and had never used the designation in connection with retail stores, beachwear or beach related products. At no time since executing the Morrow Agreement has Morrow used the WINGS name in commerce, including in connection with retail stores, beachwear or beach related products.

Case 2:11-cv-00044-E   Document 304   Filed 02/23/17   Page 18 of 28
Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 174 of 201

36. In the Morrow Agreement, Morrow expressly disclaimed making any representation concerning the WINGS trademark, except to the extent of his purported ownership of certain U.S. trademark registrations and his claimed exclusive right to use the WINGS name in connection with the goods specified in those registrations, none of which related to retail stores, beachwear or beach related goods. At the time of the Morrow Agreement, due to Morrow's failure to use the WINGS name in any manner, the identified trademark registrations were abandoned, and all have been cancelled by the U.S. Patent and Trademark Office as U.S. trademark registrations.

37. As a result of the foregoing, at the time the parties entered into the Morrow Agreement, Morrow had abandoned all rights that may have existed in connection with the WINGS name as used by Morrow's assignors. Morrow thus had no rights to convey and did not convey any rights under the Morrow Agreement to L&L, which was null and void from its inception, and without legal effect.

38. In the alternative, to the extent that the Morrow Agreement was not void and of no effect *ab initio*, Morrow terminated the Morrow Agreement in 1994.

39. Paragraph 8 of the Morrow Agreement, entitled "Termination," provides as follows:

> Licensor may terminate this Agreement at any time in the event that Licensee fails to make a Royalty Payment. In such event, Licensor shall deliver written notice of such non-payment to Licensee and allow Licensee fifteen (15) days after the delivery of such notice in which to remit the Royalty Payment (the "Cure Period"). If the Royalty Payment is not made during the Cure Period, then this Agreement shall terminate fifteen (15) days after the date of such notice.

40. L&L ceased making Royalty Payments under the Morrow Agreement. Thereafter, Morrow exercised his right to terminate that Agreement by sending written notice, through his counsel, of such non-payment to L&L, through its counsel, on June 10, 1994. Morrow's counsel

Case 2:14-cv-00008-FL Document 117-8 Filed 10/15/21 Page 175 of 201

again communicated with L&L on August 2, 1994, more than 15 days after the first notice, stating again that no payment had been made. L&L made no further Royalty Payments to Morrow.

41. From the time of the termination of the Morrow Agreement in 1994, until the time of his purported assignment to Beach Mart as set forth below, Morrow did not use, or license to any third party to use, the WINGS name in commerce, and had no communication with and did not take any other actions directed to L&L regarding any purported rights he might have in the WINGS name.

G. The Purported Assignment Of Rights Under The Morrow Agreement To Beach Mart

42. On Friday, April 18, 2014, counsel for L&L received a letter from Morrow's North Carolina counsel purporting to give notice that Morrow "will assign" all of his rights and duties in the Morrow Agreement to Beach Mart. Also on April 18, 2014, L&L learned for the first time that Morrow had executed an Assignment Agreement with Beach Mart (the "BM Assignment Agreement") dated April 18, 2014.

43. By the BM Assignment Agreement, Morrow purported to assign to Beach Mart, *inter alia*, "(i) all of Morrow's right, title and interest in and to the Trademark (defined therein as "WINGS"), together with the goodwill symbolized by the Trademark; (ii) all of Morrow's rights and interest under the [Morrow Agreement] . . . .; and (iii) all of Morrow's rights and interest in any causes of action, claims or demands . . . arising from" any infringement of the WINGS mark and any breaches of the Morrow Agreement with L&L.

44. The BM Assignment Agreement provided that Morrow would receive a payment from Beach Mart for the assignment in the amount of $65,000, and by that agreement, Morrow purported to assign his alleged rights and interest in the WINGS name, including all alleged

Case 2:11-cv-00044-F   Document 304   Filed 02/23/17   Page 20 of 28
Case 2:14-cv-00008-FL    Document 117-8    Filed 10/15/21    Page 176 of 201

rights and interest under the Morrow Agreement, as well as all claims against L&L arising therefrom, to Beach Mart.

45. On April 21, 2014, counsel for L&L sent a letter via electronic and registered mail to both Morrow's New York and North Carolina counsel informing them of L&L's objection to the BM Assignment Agreement and to the Notice as breaches of paragraphs 7 and 9 of the Morrow Agreement, to the extent the Morrow Agreement was still in effect, and demanding that pursuant to paragraph 7, Morrow assign to L&L his rights under the Morrow Agreement, to the extent he owns any such rights, for the "Royalty" fee as defined therein.

H. The Actual Controversy Between L&L And Beach Mart

46. By entering into the BM Assignment Agreement, Beach Mart has now purportedly taken assignment of Morrow's alleged rights in the WINGS name pursuant to the Morrow Agreement. As Beach Mart is currently asserting claims against L&L regarding the parties' rights in the WINGS name, these actions give rise to an actual controversy between L&L and Beach Mart. Beach Mart's actions in this regard were in direct conflict with respect to the sole and exclusive rights of L&L in and to the WINGS trademark for use in connection with, *inter alia*, retail stores, beachwear and beach related goods, and created an actual controversy between it and L&L with regard to rights in and to the WINGS trademark, including with respect to whether Beach Mart had any right or ability to take assignment under the BM Assignment Agreement.

## FIRST COUNTERCLAIM FOR RELIEF
### Breach of Contract

47. L&L realleges and incorporates the allegations of paragraphs 1 through 46 above, as if set forth fully herein.

48. The 2005 Agreement, entered into between L&L and Beach Mart with an effective date of August 29, 2005, was a valid and binding contract until it was properly terminated by L&L effective October 21, 2011.

49. Beach Mart breached the 2005 Agreement by, *inter alia*, using the WINGS trademark after December 31, 2005 without the words "BIG" or "SUPER" accompanying it, or in using the word "super" together with the WINGS trademark in a manner contrary to the parties' understanding as reflected in the 2005 Agreement, and by misappropriating for itself the goodwill, reputation and value associated with the WINGS trademark.

50. Beach Mart further breached its obligations under the 2005 Agreement by failing to market, promote and sell products, and provide services, of sufficient quality to maintain the goodwill, reputation and value of the WINGS trademark.

51. Beach Mart has continued to be in breach of the 2005 Agreement by failing: (1) to stop using the WINGS trademark and "SUPER WINGS" name following the 2005 Agreement's termination; and (2) to remove "any and all materials, signs promotions, bags, other items, etc. bearing the name WINGS, 'BIG WINGS' or 'SUPER WINGS.'"

52. L&L at all times substantially performed all obligations undertaken and imposed upon it by the 2005 Agreement.

53. All conditions precedent to the 2005 Agreement have occurred or been satisfied.

54. As a proximate cause of Beach Mart's breaches of the 2005 Agreement, L&L has suffered, and continues to suffer, injury and damages in an amount that will be determined at trial, but which in all events is in excess of the jurisdictional amount of $75,000.

55. As a result of Beach Mart's breach of the 2005 Agreement, L&L is entitled to recover compensatory damages, the precise amount of which will be proven at trial, and to an award of costs and expenses, including attorneys' fees, associated with this action.

## SECOND COUNTERCLAIM FOR RELIEF
### Breach of Implied Covenant of Good Faith and Fair Dealing

56. L&L realleges and incorporates the allegations of paragraphs 1 through 55 above, as if set forth fully herein.

57. L&L at all times substantially performed its obligations under the 2005 Agreement.

58. All conditions required for Beach Mart to perform its obligations under the 2005 Agreement, if any, were timely met by L&L.

59. Beach Mart unfairly interfered with L&L's right to receive the benefits of the 2005 Agreement, including but not limited to exclusive control of the WINGS trademark and thereby breached its obligation to perform under the 2005 Agreement in good faith and to deal fairly.

60. Beach Mart, acting in bad faith and dealing unfairly, deprived L&L of its rights by, *inter alia*, using "super" together with the WINGS trademark in a manner intended to and which did in fact deprive L&L of the benefits of the 2005 Agreement, by purposefully diminishing the distinctiveness between Beach Mart and L&L, failing to maintain appropriate quality controls over the use of the WINGS trademark, and intentionally seeking to redirect and misappropriate the goodwill, reputation and value associated with the WINGS trademark from L&L to Beach Mart.

61. Beach Mart further breached its duty to act in good faith and deal fairly by undermining the distinctiveness of Beach Mart and L&L as intended by the 2005 Agreement,

DB3/ 201303241.5                                        -23-

Case 2:11-cv-00044-F   Document 304   Filed 02/23/17   Page 23 of 28
Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 179 of 201

including by adopting identical exterior store designs at its retail locations as compared to those used by L&L, by offering for sale and selling counterfeit and inferior quality goods, and by falsely and without authorization promoting itself as "Wings," and by use of the advertising slogan "All you need for the beach."

62. As a result of Beach Mart's actions, the ability to maintain the distinction between L&L's and Beach Mart's respective retail operations has been and will continue to be eroded, L&L's reputation has been and will continue to be diminished, and Beach Mart has and will continue to purposefully, intentionally and impermissibly abscond with L&L's goodwill, business reputation and the value of the WINGS trademark, all of which are exclusively owned by and the property of L&L.

63. These wrongful actions of Beach Mart constitute a breach of the covenant of good faith and fair dealing that arises out of the 2005 Agreement.

64. As a proximate cause of Beach Mart's breach of duties to perform under the 2005 Agreement in good faith and to deal fairly, L&L has suffered, and continues to suffer, damages in an amount that will be determined at trial, but which in all events is in excess of the jurisdictional amount of $75,000.

### THIRD COUNTERCLAIM FOR RELIEF
**Declaration That Beach Mart Acquired No Rights In The WINGS Trademark Or Otherwise As A Result Of The BM Assignment Agreement**

65. L&L realleges and incorporates the allegations of paragraphs 1 through 64 above, as if set forth fully herein.

66. By entering into the BM Assignment Agreement, and by its current assertion of claims against L&L, Beach Mart has claimed rights in and to the WINGS trademark adverse to and in conflict with those of L&L.

DB3/ 201303241.5

-24-

Case 2:11-cv-00044-E Document 304 Filed 02/23/17 Page 24 of 28
Case 2:14-cv-00008-FL Document 117-8 Filed 10/15/21 Page 180 of 201

67. As a result, an actual controversy exists between L&L and Beach Mart as to rights relating to the WINGS trademark.

68. To clarify and settle the foregoing adverse legal interests between L&L and Beach mart, L&L is entitled to a declaration that Beach Mart acquired no rights to the WINGS name and no causes of action or claims against L&L as a result of the BM Assignment Agreement, and that the BM Assignment Agreement is null and void and of no force or effect.

69. In the alternative, to the extent the Court finds that Beach Mart acquired rights in ant to the WINGS trademark by virtue of the BM Assignment Agreement, and that the BM Assignment Agreement is in force and effect, L&L is entitled to a declaratory judgment that L&L is entitled to have assigned to it by Beach Mart its rights, title and interests in the WINGS trademark pursuant to paragraph 7 of the Morrow Agreement.

### FOURTH COUNTERCLAIM FOR RELIEF
**Declaration That L&L Is The Owner Of The WINGS Names In Connection With Retail Stores, Beachwear And Beach-Related Products**

70. L&L realleges and incorporates the allegations of paragraphs 1 through 69 above, as if set forth fully herein.

71. To clarify and settle the foregoing adverse legal interests between L&L and Beach Mart, L&L is entitled to a declaration as against Beach Mart that L&L is the sole and exclusive owner of all rights in and to the WINGS trademark for use in connection with retail stores, beachwear and beach related products.

WHEREFORE, L&L respectfully seeks judgment as follows:

(a) That L&L be awarded damages in an amount to be determined at trial, but in no event less the jurisdictional amount of $75,000, as a result of Beach Mart's breach of the 2005

Case 2:11-cv-00044-F   Document 304   Filed 02/23/17   Page 25 of 28
Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 181 of 201

Agreement and breach of the implied duty of good faith and fair dealing in connection with the 2005 Agreement;

(b)   Pursuant to 28 U.S.C. § 2201, a declaration that Beach Mart has acquired no rights in the WINGS name or otherwise as a result of the BM Assignment Agreement;

(c)   Pursuant to 28 U.S.C. § 2201, a declaration that L&L is the sole and exclusive owner of the trademark WINGS for use in connection with retail stores, beachwear and beach related products;

(d)   That such other and further relief be awarded to L&L that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, L&L demands trial by jury in this action of all issues so triable.

DB3/ 201303241.5                                    -26-

Case 2:11-cv-00044-F   Document 304   Filed 02/23/17   Page 26 of 28
Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 182 of 201

Dated: February 23, 2017

/s/ *Donalt J. Eglinton*

Donalt J. Eglinton
N.C. State Bar I.D. No.: 010314
E-mail: dje@wardandsmith.com
For the firm of
Ward and Smith, P.A.
Post Office Box 867
New Bern, NC 28563-0867
Telephone: (252) 672-5400
Facsimile: (252) 672-5477

*LR 83.1 Counsel for L&L Wings, Inc.*

-and-

MORGAN, LEWIS & BOCKIUS LLP

/s/ *Richard S. Taffet*

Richard S. Taffet
N.Y. State Bar I.D. No.: 1721182
E-mail: richard.taffet@morganlewis.com
Timothy J. Stephens
N.Y. State Bar I.D. No.: 2655355
E-mail: timothy.stephens@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

*Attorneys for L&L Wings, Inc.*

DB3/ 201303241.5                                          -27-

Case 2:11-cv-00044-F   Document 304   Filed 02/23/17   Page 27 of 28
Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 183 of 201

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2017, I caused the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Beach Mart, Inc. and Super Wings, LLC, c/o their attorneys of record Charles A. Burke, Esq., Stephen F. Shaw, Esq. of the firm of Womble Carlyle Sandridge & Rice, PLLC, and David L. Brown, Esq. and David G. Harris II, Esq., of the firm of Goldberg Segalla LLP; and Shepard Morrow, c/o his attorneys of record John L. Coble, Esq. and Matthew B. Davis, Esq., of the firm of Marshall, Williams, & Gorham, LLP.

/s/ *Timothy J. Stephens*
Timothy J. Stephens
N.Y. State Bar I.D. No.: 2655355
E-mail: timothy.stephens@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

*Attorneys for L&L Wings, Inc.*

Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 184 of 201

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

| | | |
|---|---|---|
| BEACH MART, INC., Plaintiff | ) ) ) | |
| v. | ) ) | |
| L&L WINGS, INC., Defendant | ) ) ) | No. 2:11-CV-44-F |
| L&L WINGS, INC., Counterclaimant | ) ) ) ) | |
| v. | ) ) | |
| BEACH MART, INC., Counter-Defendant | ) ) ) ) | |
| L&L WINGS, INC., Plaintiff | ) ) ) ) | |
| v. | ) ) ) | No. 2:14-CV-52-F |
| SHEPARD MORROW, SUPER WINGS, LLC, and BEACH MART, INC., Defendants | ) ) ) ) ) | |

## SECOND AMENDED COMPLAINT
### (JURY TRIAL DEMANDED)

L&L Wings, Inc. ("L&L"), by and through its undersigned counsel, brings this Second Amended Complaint asserting claims against Shepard Morrow ("Morrow"), Super Wings, LLC ("Super Wings"), and Beach Mart, Inc. ("Beach Mart"), and alleges on knowledge as to itself and otherwise on information and belief, as follows:



EXHIBIT
121

DB3/ 201302998.5

## NATURE OF THE ACTION

1. This is an action arising from the unlawful conduct by Morrow, Super Wings and Beach Mart to claim rights in and ownership of the trademark WINGS for use in connection with retail stores, beachwear and other beach related goods, of which L&L is the sole and exclusive owner.

2. Morrow, Super Wings and Beach Mart have asserted that a 1993 agreement between Morrow and L&L concerning the WINGS trademark (the "Morrow Agreement") is a valid and existing agreement. L&L contends that the Morrow Agreement was null and void from its inception, or else terminated in accordance with its terms. If the Morrow Agreement is valid and existing, Morrow has breached his obligations thereunder, and Super Wings and Beach Mart have tortiously and in concert interfered with the Morrow Agreement.

3. Morrow, Super Wings and Beach Mart have willfully, intentionally and in concert sought to diminish L&L's rights in and to the WINGS trademark by entering into two Trademark Assignment Agreements, whereby Morrow has twice purported to assign, first to Super Wings and then to Beach Mart: (a) rights to the WINGS trademark that he, Super Wings and Beach Mart know or should know Morrow does not own; (b) the Morrow Agreement, which was null and void from its inception, or is now terminated, or if still valid and existing has been breached by Morrow by his failure to assign all right, title and interest to the WINGS trademark under the Morrow Agreement to L&L, and by Morrow's attempted assignments to Super Wings and Beach Mart and Morrow's improper notice to L&L thereunder; and (c) purported causes of action against L&L under the Morrow Agreement that Morrow, Super Wings and Beach Mart know or should know do not exist.

Case 2:11-cv-00044-F   Document 305   Filed 02/23/17   Page 2 of 17
Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 186 of 201

4.      As a result of such conduct by Morrow, Super Wings and Beach Mart, L&L brings this action for: (a) breach of contract against Shepard Morrow for breach of the Morrow Agreement, to the extent same is valid and existing; (b) breach of the covenant of good faith and fair dealing against Morrow, to the extent the Morrow Agreement is valid and existing; (c) tortious interference with contract against Super Wings and Beach Mart, to the extent the Morrow Agreement is valid and existing; (d) civil conspiracy to tortiously interfere with contract against Super Wings and Beach Mart, to the extent the Morrow Agreement is valid and existing.

## PARTIES

5.      L&L is a corporation duly organized under the laws of the State of South Carolina, is authorized to do business, *inter alia*, in the State of North Carolina, and maintains its principal place of business at 666 Broadway, New York, New York 10012.

6.      Morrow is a resident of the state of New Jersey. By declaration filed in a related action on April 18, 2014, Morrow has consented to personal jurisdiction in North Carolina.

7.      Super Wings is a limited liability company organized under the laws of the State of North Carolina, and maintains its principal place of business at 2229 South Croatan Highway, Nags Head, North Carolina 27959.

8.      Beach Mart is a corporation organized under the laws of the State of North Carolina, and maintains its principal place of business at 2229 South Croatan Highway, Nags Head, North Carolina 27959.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over these Claims pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and is between citizens of different states.

Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 187 of 201

10.     Venue is proper in this District under 28 U.S.C. § 1391(c) in that Beach Mart and Super Wings conduct business in North Carolina so as to subject them to personal jurisdiction, and under 28 U.S.C. § 1391(b) in that a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

A.      L&L's Ownership Of The WINGS Trademark

11.     L&L was established in 1978, and is well-known as a retailer of beach related apparel, beach toys, souvenirs and other related items.

12.     L&L owns and operates 29 retail stores under the WINGS brand in six states, including North Carolina, South Carolina, Florida, Massachusetts, Texas and California.

13.     Since February 1, 1978, L&L has continuously offered for sale and has sold products, and has provided services, under the trademark WINGS.

14.     L&L has extensively and consistently advertised, marketed and promoted the WINGS trademark since 1978 in interstate commerce.

15.     L&L is the owner of all right, title and interest in and to the WINGS trademark as used in connection with the operation of retail apparel stores, retail clothing stores, retail discount store services in the field of beachwear clothing, and the retail sale of beach related apparel, beach toys, souvenirs and other related items.

16.     L&L has achieved significant consumer recognition as the source of beachwear clothing, beach related apparel, beach toys, souvenirs and related items sold at retail under the WINGS name.

17.     L&L is the owner of the following valid and subsisting federal trademark registrations on the Principal Register of the United States Patent and Trademark Office for the

WINGS name: (a) Reg. No. 3458144, issued July 1, 2008, for WINGS used in connection with retail apparel stores in the field of beachwear clothing; (b) Reg. No. 4193881, issued August 12, 2012, for WINGS used in connection with beach towels, men's, women's and children's clothing, beach shoes, socks, head wear, accessories and retail store services featuring beach related equipment; and (c) Reg. No. 4205040, issued September 11, 2012, for WINGS (stylized) used in connection with beach towels, men's, women's and children's clothing, beach shoes, socks, head wear, accessories and retail store services featuring beach related equipment.

B.     The Morrow Agreement

18.     In 1992, Morrow acquired five federal trademark registrations for the name WINGS, all for use in connection with men's and boy's clothing. These trademark registrations were assigned by their original owner, Piedmont Industries, a clothing manufacturer, to Hampton Industries as part of a bankruptcy. As part of that same bankruptcy, Hampton Industries assigned the registrations to Morrow on May 26, 1992.

19.     Morrow never made use in commerce of the WINGS name at any time.

20.     None of Morrow, Piedmont Industries or Hampton Industries has ever used the WINGS name in connection with retail stores, beachwear or beach related products.

21.     In April 1993, L&L and Morrow entered into the Morrow Agreement.

22.     The Morrow Agreement purportedly granted to L&L a license to use the WINGS name in connection with Morrow's five trademark registrations.

23.     Based on Morrow's representation to L&L that he was the owner of those five trademark registrations, L&L entered into the Morrow Agreement.

Case 2:11-cv-00044-E   Document 305   Filed 02/23/17   Page 5 of 17
Case 2:14-cv-00008-FL    Document 117-8    Filed 10/15/21    Page 189 of 201

24. Morrow failed to disclose to L&L, prior to L&L's execution of the Morrow Agreement, that he had never used the WINGS name in commerce, and had never used the designation in connection with retail stores, beachwear or beach related products.

25. At no time since executing the Morrow Agreement has Morrow used the WINGS name in commerce, including in connection with retail stores, beachwear or beach related products.

26. In the Morrow Agreement, Morrow expressly disclaimed making any representation concerning the WINGS trademark, except to the extent of his purported ownership of certain U.S. trademark registrations and his claimed exclusive right to use the WINGS name in connection with the goods specified in those registrations, none of which related to retail stores, beachwear or beach related goods.

27. At the time of the Morrow Agreement, due to Morrow's failure to use the WINGS name in any manner, the identified trademark registrations were abandoned, and all have been cancelled by the U.S. Patent and Trademark Office as U.S. trademark registrations.

28. As a result of the foregoing, at the time the parties entered into the Morrow Agreement, Morrow had abandoned all rights that may have existed in connection with the WINGS name as used by Morrow's assignors. Morrow thus had no rights to convey and did not convey any rights under the Morrow Agreement to L&L, which was null and void from its inception, and without legal effect.

29. In the alternative, to the extent that the Morrow Agreement was not void and of no effect *ab initio*, Morrow terminated the Morrow Agreement in 1994.

30. Paragraph 8 of the Morrow Agreement, entitled "Termination," provides as follows:

DB3/ 201302998.5

-6-

Licensor may terminate this Agreement at any time in the event that Licensee fails to make a Royalty Payment. In such event, Licensor shall deliver written notice of such non-payment to Licensee and allow Licensee fifteen (15) days after the delivery of such notice in which to remit the Royalty Payment (the "Cure Period"). If the Royalty Payment is not made during the Cure Period, then this Agreement shall terminate fifteen (15) days after the date of such notice.

31. L&L ceased making Royalty Payments under the Morrow Agreement. Thereafter, Morrow exercised his right to terminate that Agreement by sending written notice, through his counsel, of such non-payment to L&L, through its counsel, on June 10, 1994.

32. Morrow's counsel again communicated with L&L on August 2, 1994, more than 15 days after the first notice, stating again that no payment had been made.

33. L&L made no further Royalty Payments to Morrow.

34. From the time of the termination of the Morrow Agreement in 1994, until the time of the purported assignment of his alleged rights to Super Wings, described hereinafter as the "SW Assignment Agreement," Morrow did not use, or license any third party to use, the WINGS name in commerce, and had no communication with or took any other actions directed to L&L regarding any purported rights he might have in the WINGS name.

C. The Purported Assignment Of Rights Under The Morrow Agreement To Super Wings

35. Beach Mart's principal, Israel Golasa, formed a new entity, Super Wings, on December 30, 2013, and Super Wings entered a purported Trademark Assignment Agreement with Morrow dated December 31, 2013 (the "SW Assignment Agreement").

36. Upon information and belief, Super Wings was formed for the purpose of advancing the efforts of Beach Mart to undermine the rights of L&L in and to the WINGS name and to further Beach Mart's unlawful use of the WINGS name.

37. By the SW Assignment Agreement, Morrow purported to assign to Super Wings, *inter alia*, "(i) all of Morrow's right, title and interest in and to the Trademark (defined therein as

"WINGS"), together with the goodwill symbolized by the Trademark; (ii) all of Morrow's rights and interest under the [Morrow Agreement] . . . .; and (iii) all of Morrow's rights and interest in any causes of action, claims or demands . . . arising from" any infringement of the WINGS mark and any breaches of the Morrow Agreement with L&L.

38.     As a result of the SW Assignment Agreement, and Morrow's and Super Wings' assertion of rights in the WINGS name in connection therewith, L&L expended and continues to expend significant resources and money to address and oppose these assertions of rights.

D.     The Purported Assignment Of Rights Under The Morrow Agreement To Beach Mart

39.     On Friday, April 18, 2014, counsel for L&L received a letter from Morrow's North Carolina counsel purporting to give notice that Morrow "will assign" all of his rights and duties in the Morrow Agreement to Beach Mart (the "Notice").

40.     The Notice did not indicate when Morrow intended to assign his alleged rights and duties in the Morrow Agreement, and further did not explain how he would assign such alleged rights and duties in light of the SW Assignment Agreement.

41.     At 5:30 pm on April 18, 2014, a copy of the Notice was hand-delivered by counsel for Morrow and Super Wings to L&L at its offices located at 666 Broadway, New York, N.Y.

42.     L&L did not become aware of the Notice until Monday, April 21, 2014.

43.     Also on April 18, 2014, as a result of certain filings made by Morrow and Super Wings in a related action, L&L learned for the first time that Morrow and Super Wings had executed a Rescission Agreement, dated April 17, 2014 (but signed by Morrow on April 18, 2014) (the "Rescission Agreement"), rescinding the SW Assignment Agreement, and further that Morrow had executed an Assignment Agreement with Beach Mart (the "BM Assignment

Case 2:11-cv-00044-F   Document 305   Filed 02/23/17   Page 8 of 17
Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 192 of 201

Agreement") dated April 18, 2014, which Israel Golasa had signed on behalf of Beach Mart at 3:05 pm that same day, prior to the delivery of the Notice to either L&L or its counsel.

44. The BM Assignment Agreement was identical to the SW Assignment Agreement in all material respects, except that Morrow received a larger payment for the assignment from Beach Mart ($65,000 versus $60,000), and by that agreement, Morrow purported to assign his alleged rights and interest in the WINGS name, including all alleged rights and interest under the Morrow Agreement, as well as all claims against L&L arising therefrom, to Beach Mart.

45. On April 21, 2014, counsel for L&L sent a letter via electronic and registered mail to both Morrow's New York and North Carolina counsel informing them of L&L's objection to the BM Assignment Agreement and to the Notice as breaches of paragraphs 7 and 9 of the Morrow Agreement, to the extent the Morrow Agreement was still in effect, and demanding that pursuant to paragraph 7, Morrow assign to L&L his rights under the Morrow Agreement, to the extent he owns any such rights, for the "Royalty" fee as defined therein.

E. Breaches By Morrow Of The Morrow Agreement As A Result Of Both The SW Assignment Agreement And The BM Assignment Agreement

46. Paragraph 7 of the Morrow Agreement provides in relevant part that if ten years after the execution date of the Morrow Agreement Morrow is not using the WINGS mark and he has not licensed any party other than L&L to use the WINGS mark, then Morrow shall assign all right, title and interest in and to the WINGS mark to L&L upon full payment of and in consideration of the Royalty, as defined in the Morrow Agreement.

47. From the date ten years after the execution of the Morrow Agreement to the present, Morrow has not used the WINGS mark and has not extended any licenses to any other party.

Case 2:11-cv-00044-F Document 305 Filed 02/23/17 Page 9 of 17

48. Morrow, nonetheless, failed to make the assignment required by paragraph 7 to L&L, which stands ready, willing and able to make full payment of the Royalty upon such assignment if the Morrow Agreement is valid and existing.

49. Paragraph 9 of the Morrow Agreement provides in relevant part that Morrow may assign all or any part of his rights under that Agreement only upon notice to L&L. Paragraph 9 further provides that subject to the foregoing notice requirement, all rights, duties and obligations of Morrow shall bind and inure to any successor or assign.

50. Paragraph 10 of the Morrow Agreement provides in relevant part that any notice or consent required to be given to L&L thereunder, such as the notice required by paragraph 9 regarding assignment of that agreement, is to be made in writing and either personally delivered or sent by registered or certified first class mail to Bennett D. Krasner, Esq. as counsel for L&L, at L&L's offices.

51. Morrow's attempted and purported assignments to Super Wings and Beach Mart were not upon notice to L&L, and any notice provided did not afford L&L any reasonable ability to obtain the benefits of the Morrow Agreement, specifically but without limitation in connection with L&L's rights under paragraph 7 of the Morrow Agreement.

F. Beach Mart's and Super Wings' Intentional, Willful And Concerted Actions To Interfere With the Morrow Agreement and L&L's Rights In And To The WINGS Trademark

52. By their actions, Beach Mart and Super Wings have acted intentionally, willfully and in concert to interfere with the Morrow Agreement, to the extent such agreement remained in effect, and to unlawfully diminish and compromise L&L's sole and exclusive rights in and to the WINGS trademark for use in connection with, *inter alia*, retail stores, beachwear and beach related goods. Super Wings and Beach Mart knowingly entered into agreements to induce Morrow to commit several breaches of the Morrow Agreement by forming Super Wings, and

Case 2:14-cv-00008-FL Document 117-8 Filed 10/15/21 Page 194 of 201

entering into the SW Assignment Agreement and the BM Assignment Agreement with Morrow. These overt acts, in furtherance of their plan, were undertaken to benefit Beach Mart and to advance its unauthorized and unlawful use of the WINGS trademark. Upon information and belief, Super Wings engaged in such conduct at the direction of Beach Mart's principal, Israel Golasa, who is also Super Wings' sole member.

## COUNT I
## BREACH OF CONTRACT
### (As Against Morrow)

53. L&L realleges and incorporates the allegations of paragraphs 1 through 52 above, as if set forth fully herein.

54. Morrow has breached the Morrow Agreement, to the extent same was valid and existing, by failing to assign all right, title and interest to the WINGS trademark under the Morrow Agreement to L&L as required by paragraph 7 of the Morrow Agreement for the specified consideration, and instead purporting to assign such right, title and interest to Super Wings and later to Beach Mart by the SW and BM Assignment Agreements.

55. Morrow has breached the Morrow Agreement, to the extent same was valid and existing, by entering into the SW Assignment Agreement and the BM Assignment Agreement without providing the written notice to L&L as required by paragraph 9 of the Morrow Agreement.

56. Morrow's material breaches of the Morrow Agreement proximately caused injury to L&L by violating L&L's rights in and to the WINGS trademark.

57. As a direct and proximate cause of his breaches of the Morrow Agreement, Morrow has caused and will cause L&L monetary damages in an amount to be proven at trial, but which in all events is in excess of the jurisdictional amount of $75,000.

Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 195 of 201

## COUNT II
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (As Against Morrow)

58. Plaintiff realleges and incorporates the allegations of paragraphs 1 through 57 above, as if set forth fully herein.

59. To the extent the Morrow Agreement remains a valid and binding contract, Morrow has breached the covenant of good faith and fair dealing implied therein by depriving L&L of the benefit arising under the Morrow Agreement. Morrow's lack of any notice of the SW Assignment Agreement, and his unreasonable and inadequate notice of the BM Assignment Agreement, deprived L&L of the opportunity to obtain the benefits afforded it under paragraph 7 of the Morrow Agreement, which required Morrow to assign his rights under the Morrow Agreement to L&L in circumstances that have now been satisfied. To the extent the Morrow Agreement continues to be valid and existing, or to the extent either Super Wings or Beach Mart took any assignment to the rights thereof, L&L stands ready, willing and able to receive the benefits to which it is entitled under paragraph 7 of the Morrow Agreement for the consideration specified in paragraph 7.

60. Morrow's breach of the covenant of good faith and fair dealing proximately caused injury to L&L by depriving L&L of its bargained-for rights under the Morrow Agreement, to the extent it exists, to have all rights, title and interests to the WINGS trademark under that Agreement assigned to L&L upon full payment of the Royalty, as defined therein.

61. As a direct and proximate cause of his breach of the covenant of good faith and fair dealing, Morrow has caused and will cause L&L monetary damages in an amount to be proven at trial, but which in all events is in excess of the jurisdictional amount of $75,000.

**COUNT III**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(As Against Super Wings And Beach Mart)**

62. L&L realleges and incorporates the allegations of paragraphs 1 through 61 above, as if set forth fully herein.

63. Super Wings and Beach Mart had full knowledge of the Morrow Agreement and the terms thereof prior to executing the SW Assignment Agreement and the BM Assignment Agreement, respectively, including such terms relating to Morrow's obligation to give written notice to L&L of any assignment of rights under the Morrow Agreement, and to assign such rights to L&L.

64. Notwithstanding such knowledge, to further the interests of Beach Mart as a competitor to L&L, Super Wings and Beach Mart deliberately and intentionally caused and induced Morrow to execute the SW Assignment Agreement and subsequently the BM Assignment Agreement, and thereby materially breach his obligations to L&L under the Morrow Agreement, to the extent it remains in force and effect.

65. Super Wings' and Beach Mart's deliberate and intentional conduct to procure Morrow's material breaches of the Morrow Agreement was for the purpose of improperly causing injury to L&L for the benefit of Beach Mart.

66. Super Wings and Beach Mart's deliberate and intentional conduct to procure Morrow's material breaches of the Morrow Agreement was without legal justification.

67. Morrow would not have breached the Morrow Agreement but for the unlawful conduct of Super Wings and Beach Mart.

Case 2:11-cv-00044-F   Document 305   Filed 02/23/17   Page 13 of 17

68. Super Wings' and Beach Mart's unlawful conduct has interfered with and undermined L&L's rights under the Morrow Agreement, to the extent it exists, and has caused L&L injury.

69. As a direct and proximate cause of the tortious conduct of Super Wings and Beach Mart, L&L has suffered monetary damages in an amount to be proven at trial, but which in all events is in excess of the jurisdictional amount of $75,000.

## COUNT IV
## CIVIL CONSPIRACY TO TORTIOUSLY INTERFERE WITH CONTRACT
### (As Against Super Wings And Beach Mart)

70. L&L realleges and incorporates the allegations of paragraphs 1 through 69 above, as if set forth fully herein.

71. Super Wings and Beach Mart knowingly acted in concert for the purpose of inducing Morrow to breach the Morrow Agreement in order to unlawfully interfere with L&L's rights in the WINGS name for the benefit of Beach Mart.

72. Super Wings and Beach Mart committed overt acts in furtherance of their plan and agreement to interfere with L&L's rights in the WINGS name, including forming Super Wings for the purpose of damaging L&L for the benefit of Beach Mart, executing and rescinding (through the Rescission Agreement) the SW Assignment Agreement, and executing the BM Assignment Agreement.

73. Super Wings' and Beach Mart's conspiracy to tortiously interfere with L&L's rights with respect to the Morrow Agreement has caused injury to L&L.

74. As a direct and proximate result of Super Wings' and Beach Mart's conspiracy to tortiously interfere with respect to the Morrow Agreement, L&L has suffered monetary damages

Case 2:11-cv-00044-E   Document 305   Filed 02/23/17   Page 14 of 17

Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 198 of 201

in an amount to be proven at trial, but which in all events is in excess of the jurisdictional amount of $75,000.

WHEREFORE, L&L respectfully seeks judgment as follows:

(a)     that damages be awarded against Morrow for breach of contract in an amount to be determined at trial, but in all events in an amount in excess of the jurisdictional amount of $75,000, plus costs and interest, and that Morrow be directed to assign all rights, title and interests in and to the WINGS trademark that he may possess to L&L;

(b)     that damages be awarded against Morrow for breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial, but in all events in an amount in excess of the jurisdictional amount of $75,000, plus costs and interest, and that Morrow be directed to assign all rights, title and interests in and to the WINGS trademark that he may possess to L&L;

(c)     that damages be awarded against Super Wings and Beach Mart for tortious interference with contract, in an amount to be determined at trial, but in all events in an amount in excess of the jurisdictional amount of $75,000, plus costs and interest, and that Beach Mart be directed to assign all rights, title and interests in and to the WINGS trademark that it may possess to L&L;

(d)     that damages be awarded against Super Wings and Beach Mart for conspiracy to tortiously interfere with contract, in an amount to be determined at trial, but in all events in an amount in excess of the jurisdictional amount of $75,000, plus costs and interest, and that Beach Mart be directed to assign all rights, title and interests in and to the WINGS trademark that it may possess to L&L; and

(e)     that such other and further relief be awarded to L&L that the Court deems just and

proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, L&L demands trial by jury

in this action of all issues so triable.

Dated: February 23, 2017

/s/ *Donalt J. Eglinton*
Donalt J. Eglinton
N.C. State Bar I.D. No.:  010314
E-mail: dje@wardandsmith.com
For the firm of
Ward and Smith, P.A.
Post Office Box 867
New Bern, NC  28563-0867
Telephone: (252) 672-5400
Facsimile: (252) 672-5477

*LR 83.1 Counsel for L&L Wings, Inc.*

-and-

MORGAN, LEWIS & BOCKIUS LLP

/s/ *Richard S. Taffet*
Richard S. Taffet
N.Y. State Bar I.D. No.: 1721182
E-mail: richard.taffet@morganlewis.com
Timothy J. Stephens
N.Y. State Bar I.D. No.: 2655355
E-mail: timothy.stephens@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

*Attorneys for L&L Wings, Inc.*

Case 2:14-cv-00008-FL    Document 117-8    Filed 10/15/21    Page 200 of 201

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2017, I caused the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Beach Mart, Inc. and Super Wings, LLC, c/o their attorneys of record Charles A. Burke, Esq., Stephen F. Shaw, Esq. of the firm of Womble Carlyle Sandridge & Rice, PLLC, and David L. Brown, Esq. and David G. Harris II, Esq., of the firm of Goldberg Segalla LLP; and Shepard Morrow, c/o his attorneys of record John L. Coble, Esq. and Matthew B. Davis, Esq., of the firm of Marshall, Williams, & Gorham, LLP.

/s/ *Timothy J. Stephens*
Timothy J. Stephens
N.Y. State Bar I.D. No.: 2655355
E-mail: timothy.stephens@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

*Attorneys for L&L Wings, Inc.*

Case 2:14-cv-00008-FL   Document 117-8   Filed 10/15/21   Page 201 of 201